```
 1                                          Volume 1
                                    Pages 1  -  150
 2                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
 3          BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE
      UNITED STATES OF AMERICA,        )
 4                                     )
                      Plaintiff,       )
 5                                     )
        vs.                            )  NO. CR 11-0625 EMC
 6                                     )
      BASSAM YACOUB SALMAN,            )
 7                                     ) San Francisco, California
                      Defendant.       ) Tuesday,
 8    _____) September 17, 2013
                                       ) 11:45 a.m.
 9
                      EXCERPT OF PROCEEDINGS
10              TESTIMONY OF MAHER FAYEZ KARA
      APPEARANCES:
11
      For Plaintiff:          MELINDA L. HAAG
12                            United States Attorney
                              450 Golden Gate Ave.
13                            San Francisco, California  94102
                       BY:    ADAM A. REEVES
14                            KATHERINE BURKE DOWLING
                              Assistant United States Attorneys
15

16    For Defendant:          SHIFMAN GROUP
                              601 California Street
17                            Suite 1800
                              San Francisco, California  94108
18                     BY:    GAIL R. SHIFMAN, ESQ.
                              and
19                            MOEEL LAW OFFICE
                              214 Duboce Avenue
20                            San Francisco, California  94108
                       BY:    SHAFFY MOEEL, ESQ.
21

22    Also Present:           SPECIAL AGENT JEFFREY CHISHOLM

23

24    Reported by  CONNIE KUHL, CSR 13173, RMR, CRR
                   BELLE BALL, CSR 8785,  CRR, RDR
                   Official Reporters, U.S. District Court
25
```

1    **TUESDAY, SEPTEMBER 17, 2013**                    **11:45 A.M.**

2                         **EXCERPT OF PROCEEDINGS**

3              **MAHER FAYEZ KARA, PLAINTIFF'S WITNESS, SWORN**

4              **DEPUTY CLERK:**  State your full name, and spell your

5    last name.

6              **THE WITNESS:**  My first name is Maher; Fayez; last

7    name is Kara, K-a-r-a.

8              **THE COURT:**  Thank you, Mr. Kara.

9         Miss Dowling, you may proceed.

10                         **DIRECT EXAMINATION**

11   **BY MS. DOWLING:**

12   Q.  Good morning.

13   A.  Good morning.

14             **MS. DOWLING:**  Your Honor, may I approach the witness

15   with a stack of exhibits to avoid the back and forth?

16             **THE COURT:**  Yes.

17             **MS. DOWLING:**  Thank you.

18   **BY MS. DOWLING:**

19   Q.  Mr. Kara, I'm delivering to you a stack of exhibits that

20   we'll go through, and then I'll direct you to the right one

21   when they come up.

22   A.  All right.  Thank you.

23   Q.  Thank you.  I'd like to start by looking at Exhibit 85.

24   If you can find that in the stack that I've just brought to

25   you, Mr. Kara.  If you could take a look at it and let us know

1    if you recognize that.

2    A.  Yes, I do.

3    Q.  What do you recognize that document to be?

4    A.  This is a copy of a plea agreement that I entered into

5    with the United States government.

6    Q.  And if you could please turn to Page 9 of Exhibit 85.

7    A.  Yes.

8    Q.  And is that your signature on that page?

9    A.  Yes, it is.

10   Q.  And what is the date of the plea agreement?

11   A.  July 6, 2011.

12   Q.  And are you familiar with the contents of the plea

13   agreement?

14   A.  Yes, I am.

15   Q.  Mr. Kara, what crimes have you pled guilty to?

16   A.  I've pled guilty to two crimes.  The first is to

17   securities fraud, and specifically with relation to insider

18   trading; and the second crime was conspiracy to commit

19   securities fraud.

20   Q.  And how did you commit the crimes of conspiracy and

21   insider trading?

22   A.  Starting with insider trading, I illegally tipped my

23   brother, Mounir Michael Kara, with the intent that he benefit

24   from information about companies or stocks.

25        And then, with conspiracy to commit securities fraud, it

KARA - DIRECT EXAMINATION/DOWLING

1    was similarly that the information that I was giving my

2    brother I knew would benefit him.

3    Q.   And have you been sentenced for those crimes?

4    A.   No, Ma'am, I have not.

5    Q.   And if you could please turn to Page 6.

6    A.   (The witness complies)

7    Q.   And as part of your plea agreement, Mr. Kara, have you

8    agreed to cooperate with the government?

9    A.   Yes, I have.

10   Q.   And what do you mean by "cooperate"?  What does that mean

11   to you?

12   A.   To me, when I entered into the agreement, it was really to

13   respond truthfully to questions about my conduct as well as

14   any other questions that the government had regarding this

15   matter.

16   Q.   If you could turn now to Page 8, and there's a section on

17   Page 8 under a heading called "government's promises".

18   A.   Yes.

19   Q.   What promises has the government made to you in the plea

20   agreement?

21   A.   Really just what is written here.  And specifically it

22   was, the way I understood it, was about moving to dismiss any

23   other open charges that were related to this case, agreeing

24   not to add any additional charges than the two that I have

25   pled guilty to, and to potentially recommend guidelines

1    that -- or to recommend sentencing guidelines that could be

2    different from what was expected.

3    Q.  And under that government's promises, can you take a look

4    specifically at Paragraph 19 on that page and let me know what

5    your understanding of this particular promise was?

6    A.  Similar to the last point that I made, it -- that the

7    government may use its sole and exclusive judgment to

8    determine whether or not a departure from the sentencing

9    guidelines should be recommended, pending my cooperation.

10   Q.  Okay.  And outside of the promises that you listed there

11   on the page, what promises has the government made to you?

12   A.  Nothing.

13   Q.  And is it your hope that by cooperating with the

14   government, the punishment you receive for the crime you've

15   committed will be less than it otherwise would?

16   A.  Yes, it is my hope.

17   Q.  Has anyone promised you that you will receive a particular

18   sentence for the crimes that you have committed?

19   A.  No.

20   Q.  You can put Exhibit 85 to the side, please.

21   A.  (The witness complies)

22   Q.  Mr. Kara, where were you born?

23   A.  Beirut, Lebanon.

24   Q.  At some point, did you immigrate to the United States?

25   A.  Yes, in 1976, there was a civil war ongoing in Lebanon and

KARA - DIRECT EXAMINATION/DOWLING

1    my parents emigrated to the United States.  We eventually

2    settled in the Bay Area.

3    Q.  And do you live in the Bay Area now?

4    A.  Yes, I do.

5    Q.  And do you have any siblings?

6    A.  I do.  I have older brother, Mounir -- Michael -- Kara.

7    And I have a sister, Mya, and her married name is Pendleton.

8    Q.  How much older is your brother, Michael, than you are?

9    A.  He is about 10 years and a few months older than I am.

10   Q.  And are you married, Mr. Kara?

11   A.  Yes, I am.

12   Q.  What is your wife's name?

13   A.  Sawsan, S-a-w-s-a-n, or commonly known as Susie, Kara.

14   She's taken on our last name.

15   Q.  What was her maiden name?

16   A.  Salman.  S-a-l-m-a-n.

17   Q.  And does she have any siblings?

18   A.  Yes, she does.

19   Q.  What are their names?

20   A.  She has three siblings, and her older sister, her name is

21   Amao, A-m-a-o.  She has an older brother, Ghazy, G-h-a-z-y.

22   And an older brother named Bassam.

23   Q.  And is Susie the sister of the defendant Bassam Salman?

24   A.  Yes.

25   Q.  Your wife's older brother, Bassam Salman, is he similarly

1  aged to your older brother, Michael?

2  A.  I believe so.

3  Q.  When did you first meet Susie?

4  A.  Susie and I met in right around 2002, February of 2002.

5  Q.  How did you meet?

6  A.  We met through a common family introduction.  My parents

7  met a relative of hers, and we were introduced to one another

8  that way.

9  Q.  And when did you first meet Susie's brother, Bassam

10  Salman?

11  A.  I believe I took a trip out to Chicago to meet Susie

12  first, and then also the family, in or around April of 2002.

13  Q.  At some point, did you become engaged to Susie?

14  A.  We did.  Thankfully, we got engaged in June of 2003.

15  Q.  June of 2003?

16  A.  Uh-huh.

17  Q.  And from the time of your engagement going forward, did

18  your family, the Karas and the Salman family, spend time

19  together?

20  A.  Yes, we did.

21  Q.  What are some examples of the time the family spent

22  together?

23  A.  We're all from Middle Eastern cultures, so it's very

24  common that the families have to get to know one another, so

25  initially, my sister took a trip out to Chicago, shortly

1    after -- or along the same time that I took my first visit.

2    Susie's family came out shortly thereafter to meet my family

3    in the San Francisco Bay Area.  And we had several chances to

4    go out and visit them as well in Chicago.

5    Q.  You indicated that the families have to get to know one

6    another.  Why is that?

7    A.  I think when we think of marriages or unions, we think of

8    not only the spouse/spouse relationship, we think of it as a

9    family relationship.

10   Q.  So the families are expected to be close?

11   A.  We hope -- yes, we hope, and we would like to expect that

12   they become close, yes.

13   Q.  Did they become close?

14   A.  I believe we did.  I love Susie's family very much.

15   Q.  And did you observe Bassam Salman and your brother Michael

16   interact during this time period of the family's getting to

17   know one another and becoming close?

18   A.  Yes, they did.

19   Q.  And did they appear to be friends?

20   A.  Yes, I think they became friendly, yes.

21   Q.  Did you observe them spending time together?

22   A.  Sure, yes, I did.

23   Q.  Did Bassam Salman attend your wedding?

24   A.  Yes, he did.

25   Q.  I'd like to show you now what's been marked as Exhibit 1,

KARA - DIRECT EXAMINATION/DOWLING

1    if you could please find that in the pile of exhibits.

2    A.  Yes.

3    Q.  Does this chart fairly and accurately represent the

4    relations among some of your family members and friends of

5    your family members?

6    A.  Sorry.  Just give me a second.

7    Q.  Take your time.

8    A.  Yes, it looks pretty accurate.  I don't know some of the

9    people by their names, but I do recognize some of the

10   relationships.

11   Q.  So of the folks you recognize, the relationships are

12   clear?

13   A.  Yes.

14   Q.  Thank you.

15       Your Honor, I'd like to move Exhibit 1 into evidence.

16           **THE COURT:**  Any objection?

17           **MS. SHIFMAN:**  No objection, your Honor.

18           **THE COURT:**  Exhibit 1 is admitted.

19       (Trial Exhibit 1 received in evidence)

20   **BY MS. DOWLING:**

21   Q.  Do you see yourself in this exhibit?

22   A.  Yes, I do.

23   Q.  And what about your brother, Michael?

24   A.  Yes.

25   Q.  And do you see Bassam Salman on this chart as well?

KARA - DIRECT EXAMINATION/DOWLING

1    A.  Yes, I do.

2    Q.  And can you describe again Mr. Bassam Salman's

3    relationship to your family?  How is he related to you?

4    A.  He is my wife's brother, so my brother-in-law.

5    Q.  And is Susie located on this chart as well?

6    A.  Yes, she is.  It's written under Susie Salman.

7    Q.  If you see below Mr. Salman, there's an individual named

8    Karim Bayyouk.  Prior to 2009, did you know Mr. Karim Bayyouk?

9    A.  No, I did not.

10   Q.  And if you go up from there to the right of Bassam Salman,

11   there's an individual named Joseph Azar.  Can you explain to

12   the jury who Joseph Azar is?

13   A.  He is a friend of my brother's.

14   Q.  And did you know Mr. Azar?

15   A.  I briefly met him maybe once or twice before I got married

16   to Susie.  And then saw him one time after we got married.

17   Q.  So approximately three times you saw him?

18   A.  Three times probably, yes, Ma'am.

19   Q.  What were the circumstances you saw Mr. Azar?

20   A.  It was an introduction by my brother, family gatherings.

21   And also I believe Mr. Azar came to my father's funeral.

22   Q.  And the third occasion you mentioned?

23   A.  The third occasion, although I don't recall -- I don't

24   believe he came to our wedding -- he called -- he invited us,

25   through my brother, invited my wife and I to come over to say

KARA - DIRECT EXAMINATION/DOWLING

1    congratulations after we got married.

2    Q.  So you went to his house?

3    A.  Yes.

4    Q.  What about Nasser Mardini?  He's to the right of Mr. Azar.

5    Do you know who Nasser Mardini is?

6    A.  Yes, I do.

7    Q.  Can you identify for the jury who Nasser Mardini is

8    please?

9    A.  Yes, he is the husband and brother-in-law of May Hito

10   Safwan Hito.  They are two very long time close friends of the

11   family.  My parents and their parents knew each other all the

12   way from the 1960's, and remained very close and dear friends

13   of our family, to now.

14   Q.  You see below Mr. Mardini there are two individuals, an

15   Andre Coudsi and another individual by the name of Mazen

16   Mardini.  Do you know who those individuals are?

17   A.  No, I don't.

18   Q.  Let's move back up to the middle line over to Mr. Zahi

19   Haddad.  Do you know who Mr. Zahi Haddad is?

20   A.  Yes.

21   Q.  Who is that?

22   A.  He is my mother's brother, so he's my uncle.

23   Q.  And Mr. Emile Jilwan?

24   A.  He is also a friend of my brother's.

25   Q.  What about all the way down on the bottom, there's an

KARA - DIRECT EXAMINATION/DOWLING

1    individual with the name Nabil Bahu with a photo.  Do you know

2    who that individual is?

3    A.  Yes, I do.

4    Q.  Who is that?

5    A.  He is the -- Sam Salman's brother-in-law.

6    Q.  Then last question on this chart:  If you see there are

7    three down the left side, Roula, Rana and Rania Atiyeh.  Do

8    you know who those individuals are?

9    A.  I know Miss Roula and Miss Rania.  I've met both of them.

10   I don't really know Rana.

11   Q.  And how do you know those individuals?

12   A.  Roula is married to Mr. Bassam Salman and is my

13   sister-in-law.  And Rania is her sister, and is Nabil's wife

14   and somebody that I have met.

15   Q.  Thank you.  You can set that exhibit to the side.

16       You said that you grew up in the Bay Area; is that

17   correct?

18   A.  Yes.

19   Q.  Where did you go to high school?

20   A.  I went to high school in the Sunset District here at

21   St. Ignatius College Preparatory.

22   Q.  And where were you go to college?

23   A.  I want to college at UC-Berkeley.

24   Q.  And what year were you graduated from UC-Berkeley?

25   A.  I graduated in 1993.

KARA - DIRECT EXAMINATION/DOWLING

1    Q.   And did you start work after graduating from UC-Berkeley?

2    A.   No, I didn't.

3    Q.   What did you do?

4    A.   My brother fell ill during that time as a result of

5    complications related to a surgery that he had had around that

6    April or May of 1993 timeframe.  So I stayed at home and

7    helped my family to take care of my brother.  He was in

8    intensive care for several months.  And along that time, I

9    also took all of the -- all the parts of the CPA exam and got

10   my CPA during that time.

11   Q.   That was productive.

12   A.   Yeah.

13   Q.   So your brother also lives in the Bay Area?

14   A.   Yes.

15   Q.   And after you spent approximately six months, I think you

16   said, helping your brother recuperate, what did you do next?

17   A.   I moved to New York and I accepted a position with a

18   company that I had interned with, and that was Coopers &

19   Lybrand, and I was working in their Manhattan office in the

20   tax consultant group.

21   Q.   So you decided to leave the Bay Area and go to New York?

22   A.   I did.

23   Q.   Why is that?

24   A.   I think -- for several reasons.  The primary reason was

25   really to have a progression in my life.  I had lived at home

KARA - DIRECT EXAMINATION/DOWLING

1   all the way through college and had never gotten a chance to

2   really feel independent.  So I wanted the opportunity to do

3   that.  At the same time, I had dealt with quite a few issues

4   surrounding the stress that my brother had put on our family.

5   And I wanted to try and break free, away, if you will, and

6   live my life independently without a lot of the stress that

7   was coming along with it.

8   Q.  You mentioned the stress involved with your brother.

9   Prior to your move to New York to work with Coopers & Lybrand,

10  did you ever observe your brother, Michael, abuse alcohol or

11  drugs?

12  A.  No.

13  Q.  And after working at the tax consultant group at Coopers &

14  Lybrand in New York, what did you do next?

15  A.  I decided during the middle of 1995 to apply for business

16  school.  And -- I wanted to get my masters in business

17  administration so I applied to several schools and selected to

18  go to the University of Chicago.

19  Q.  And what were -- what year were you graduated from the

20  University of Chicago?

21  A.  It was a two-year program, so I graduated in 1998.

22  Q.  And did you work after graduating from the University of

23  Chicago?

24  A.  I did.

25  Q.  What did you do?

KARA - DIRECT EXAMINATION/DOWLING

1    A.   I took a full-time position in New York with who was known

2    as Solomon Smith Barney back then, and it was a division of

3    Travelers Group.   The company then merged with Citigroup in

4    1999, and it became known as Citi.

5    Q.   Then you started working for Citi as part of that merger?

6    A.   Yes.

7    Q.   How long did you work at Citigroup?

8    A.   Approximately from 1998 through 2007, so about nine years.

9    Q.   So when you first started working for Citigroup, where

10   were you located at that point?

11   A.   I was located in New York, and the first year was what was

12   known as a generalist year -- they allowed to you rotate into

13   three different investment banking groups, four months each.

14   So I got a chance to do rotations, in San Francisco as well as

15   in London.

16       And then, when I got back, I was offered full-time

17   positions in various groups and selected to go to the

18   San Francisco Technology Group.

19   Q.   Approximately what year did you begin in the San Francisco

20   Technology Group?

21   A.   In 1999.

22   Q.   And how long did you remain in the Technology Group in

23   San Francisco?

24   A.   I worked in that group -- they eventually to Palo Alto.

25   But through the Internet bubble, which I believe was in or

KARA - DIRECT EXAMINATION/DOWLING

1    around the middle of 2002.

2    Q.  So what happened in 2002?  Did you switch to another

3    group?

4    A.  I did.  I was asked if I'd join the Healthcare Group

5    within Citigroup at that time and specifically focus on

6    biotechnology and pharmaceutical companies.

7    Q.  And where were you located at that point when you began in

8    the Healthcare Group at Citi?

9    A.  Initially, I was located again in Palo Alto.  Then we

10   moved to San Francisco.  And then finally, was at the end

11   of '03, was asked to move to New York.

12   Q.  Okay.  So by 2003, you were located in New York, the

13   Healthcare Group at Citi; is that correct?

14   A.  Yes.

15   Q.  And do you recall your home number in New York during that

16   time period?

17   A.  I do.  It's 646-414-1525.

18   Q.  And what was your title at that point in 2003 in the

19   Healthcare Group?

20   A.  I was vice-president of healthcare investment banking.

21   Q.  And over time, did that title change?  Did you move to the

22   next level?

23   A.  Yes, I did.

24   Q.  And what is that next level?

25   A.  The next promotion I received was to director of

1    investment banking.

2    Q.   So during the period approximately 1995 to 2004, did you

3    ever observe your brother, Michael Kara, abuse alcohol or

4    drugs?

5    A.   Yes, I did.

6    Q.   Tell me about that.  What did you observe?

7    A.   It was around the time of 1999 or 2000.  And I was living

8    in corporate housing over at 1000 Chestnut here in Russian

9    Hill.  I received a phone call from my doorman indicating to

10   me that someone who didn't look well said he was my brother,

11   Michael Kara, and that he was asking to be let into my

12   apartment.

13   Q.   And what did you do, Mr. Kara?

14   A.   I left my office, which was on California Street at that

15   time, and I drove home.  Drove home.

16   Q.   And what did you do next?

17   A.   I saw my brother in my apartment, and he didn't look very

18   well.  So I took care of my brother.

19   Q.   And what happened after that?

20   A.   After I -- the next morning, when I felt he was okay, he

21   promised that he was going to take care of himself, and I

22   called his wife and called my dad to let them know that he was

23   safe.  And he told me he would take care of himself.

24   Q.   While you were a vice-president in healthcare investment

25   banking and then a director, what were your duties and

1  responsibilities at the Citigroup?

2  A.  I really -- I categorize my duties as an officer, which

3  was part of a vice-president, into two categories.  The first

4  one was execution of transactions for corporate clients.  And

5  by transactions, I mean financings for companies.  Whether

6  they issue stock or issue bonds, we were the underwriters for

7  those offerings.

8      And I was also then, as part of my responsibilities, asked

9  to call on the companies that were assigned to me and start to

10  begin to develop relationships with the CEOs and the CFOs and

11  senior members of the team.

12 Q.  And when you say "call on", what do you mean by that term?

13 A.  I think it's analogous to like a stockbroker.  They're

14 given clients or assigned client names, and you begin to

15 develop relationships with them in the hopes that you can

16 garner mandates or engagements in order to execute

17 transactions for them.  So that Citigroup can garner fees from

18 those transactions.

19 Q.  And what do you mean by a mandate?

20 A.  A mandate is when a corporate client actually assigns

21 Citigroup or assigned a specific team within Citigroup to work

22 on its behalf, either in the form of an underwriting or a

23 merger or acquisition type of situation.

24 Q.  So Mr. Kara, what were some of the companies that you

25 called on during at that time period?

KARA - DIRECT EXAMINATION/DOWLING

1    A.  I, as I had mentioned, pharmaceutical and biotechnology

2    companies.  Some of my pharmaceutical clients were Merck,

3    Schering-Plough; and biotechnology companies in the Bay Area,

4    they were Genentech, Gilead Sciences.  Endo Pharmaceuticals --

5    not here in the Bay Area, but other ones -- as well as Protein

6    Design Labs and Pain Therapeutics.

7    Q.  And how would you generally generate fees with these

8    companies?

9    A.  Again, you would work towards solidifying a relationship

10   with the company.  And when a -- you would, what we call,

11   pitch ideas or market ideas to the company, about raising

12   money, about buying other companies.  And the companies,

13   they're all dynamic and involved, so at certain times their

14   board members and senior decision-makers decide to conduct a

15   transaction, and they engage the help of Citigroup.

16   Q.  And how would you define confidential nonpublic

17   information?

18   A.  It's information that's generally not known to the large

19   investing public, and it's information that, if disseminated

20   to the large public, could have a significant impact on the

21   stock price of a corporation.

22   Q.  And would you come across nonpublic confidential

23   information in the course of your job at Citigroup?

24   A.  Yes, I would.

25   Q.  And did Citigroup provide you training on how to handle

1    confidential nonpublic information that you received from

2    clients?

3    A.  Yes, they did.

4    Q.  Can you describe generally some of the types of training

5    that you received at Citigroup?

6    A.  The training was immediate, and -- if not even before we

7    had an opportunity to take our seats and begin working on

8    behalf of clients.  So as a generalist, they conducted a

9    large, six-week training program, and at least three or four

10   days during one week, we went through compliance issues and

11   expectations of employee conduct and how to treat confidential

12   information.

13        And then every year thereafter, we would have very regular

14   training and reminders about how to conduct yourself and how

15   to hold confidential information closely.

16   Q.  I'd like to show you now what's been marked as Exhibit 21,

17   if you could, please, locate it in the exhibits that I've

18   given you.  And take a moment to look at it and let me know if

19   you recognize that document.

20   A.  Yes, I do.

21   Q.  Mr. Kara, what is Exhibit 21?

22   A.  This is looks like the employee -- what we call --

23   commonly called an employee handbook or code of conduct for

24   Citigroup employees.

25        **MS. DOWLING:**  Your Honor, I'd like to move Exhibit 21

 1   into evidence.

 2              MS. SHIFMAN:  Objection, your Honor, hearsay.

 3              THE COURT:  Objection overruled.

 4              MS. SHIFMAN:  I'm sorry, I withdraw the objection.

 5   Excuse me.

 6              THE COURT:  Okay.  It is admitted.

 7         (Trial Exhibit 21 received in evidence)

 8              MS. SHIFMAN:  Thank you.

 9              MS. DOWLING:  Thank you, your Honor.

10   BY MS. DOWLING:

11   Q.  Mr. Kara, if you could please turn to Page 2 of

12   Exhibit 21.

13   A.  Yes, Ma'am.

14   Q.  At the top, you see that there's a date.

15         Maybe if you could highlight or blow up that portion so

16   the jury can see it.

17         What is the date at the top of this page?

18   A.  It's May 2006.

19   Q.  And were you an employee of Citigroup in May of 2006?

20   A.  Yes, I was.

21   Q.  So were you subject to this code of conduct?

22   A.  Yes, I was.

23   Q.  If you could turn to Page 17, please.

24   A.  Yes.

25   Q.  And maybe, Maryam, if we could blow up the heading,

 1    Insider Trading Area?

 2         Was this part of the policy at Citigroup?

 3    A.   Yes, it was, Ma'am.

 4    Q.   And if you could please read that first paragraph.

 5    A.   Sure.

 6         "Citigroup policy and the laws of many countries prohibit

 7    trading in the securities (including equity securities,

 8    convertible securities, options, bonds, and any stock index

 9    containing the security) of any company while in possession of

10    material, nonpublic information (also known as 'inside

11    information') regarding the company.  This prohibition applies

12    to Citigroup securities as well as to the securities of other

13    companies.  It applies to transactions for any Citigroup

14    account, client account or personal account.  A personal

15    account is any account in which you have a financial or

16    beneficial interest, or the power to affect or ability to

17    influence trading or investment decisions, either directly or

18    indirectly.  Personal accounts typically include accounts of

19    spouses, domestic partners, children and other members of your

20    household, and accounts over which you have investment

21    discretion."

22    Q.   Mr. Kara, in your own words, what did this mean to you?

23    A.   Almost what it says, Ma'am, if I could just paraphrase it.

24    It is that we are prohibited, that Citigroup employees were

25    prohibited from using information that they obtained as part

1    of their work and that was confidential and material, to

2    transmit that information or disseminate it to people outside

3    of Citigroup.

4    Q.  Thank you.

5        And, Maryam, if we could go back to the full page, I want

6    to focus.

7        Mr. Kara, if you could focus your attention now on the

8    first full paragraph under investments and outside activities

9    on the right side of the page.  Do you see that?

10   A.  Yes, I do.

11   Q.  If you could just read that first paragraph, Mr. Kara?

12   A.  Sure.

13       "It is also illegal in many countries to 'tip' or pass on

14   inside information to any other person if you know or

15   reasonably suspect that the person receiving such information

16   from you will misuse such information by trading in securities

17   or passing such information on further, even if you do not

18   receive any monetary benefit from the tippee."

19   Q.  Did you understand this policy to apply to you?

20   A.  Yes.

21   Q.  Can you give the jury some example of what, in your own

22   mind, this policy would prohibit you from doing?

23   A.  It would prohibit me from doing a crime I'm guilty of:

24   Transmitting information to a person outside of Citigroup for

25   their benefit.

KARA - DIRECT EXAMINATION/DOWLING

1    Q.  If you could set that exhibit aside, please.  We'll look

2    now at Exhibit 22.

3        Mr. Kara, just take a moment to look at Exhibit 22 once

4    you've found it.  And when you're ready, let me know if you

5    recognize that document.

6    A.  Yes, I do recognize it.

7    Q.  And what is that document, Mr. Kara?

8    A.  This is a copy of a presentation for a meeting which I

9    actually remember attending about our annual compliance

10   requirements for employees at Citigroup.

11       **MS. DOWLING:**  Your Honor, I'd like to move Exhibit 22

12   into evidence.

13       **MS. SHIFMAN:**  No objection, your Honor.

14       **THE COURT:**  22 is admitted.

15       (Trial Exhibit 22 received in evidence)

16   **BY MS. DOWLING:**

17   Q.  Mr. Kara, if you could please turn to Page 12 of this

18   exhibit.

19   A.  Yes.

20   Q.  And what is this?

21   A.  This was a section of the presentation specifically

22   focused on informing employees about insider trading and our

23   duties as employees with respect to receiving confidential

24   information.

25   Q.  Was this part of the training that you would have received

1   around 2006?

2   A.  Yes, it was.

3   Q.  If you could please flip to the next page, Page 13.

4   A.  (The witness complies)

5   Q.  The heading on this page is:  "What is Material, nonpublic

6   Information."  And it then lists some examples.  Was this part

7   of the training that you received?

8   A.  Yes, it was.

9   Q.  And what are some of the examples of material, nonpublic

10   information that you received?

11   A.  Including some of the ones that are listed here, we would

12   have an opportunity to learn about earnings or upcoming

13   significant announcements for companies ahead of when they

14   were published to the general public.  That's material,

15   nonpublic information.

16       As part of the mandates that I described earlier, we would

17   know if a company was planning to either acquire another

18   company or had gotten approached to be acquired by another

19   company.  That's material nonpublic information.

20       We also got an opportunity to learn if a company was going

21   to issue securities in relation to fund raisings.  That's

22   material, nonpublic information.

23       Those are some of the examples, Ma'am.

24   Q.  Thank you.  And if you could turn to Page 17, please.

25   A.  (The witness complies)

KARA - DIRECT EXAMINATION/DOWLING

```
 1   Q.  The top of this slide says, "What Are Employee Obligations
 2   Regarding Confidential Information?"  And do you see under the
 3   second bullet where it says, "Employees may not personally
 4   profit from confidential information or MNPI"?
 5   A.  Yes, I do.
 6   Q.  What is MNPI?
 7   A.  Material nonpublic information.
 8   Q.  And the next bullet says that, "Employees may not use
 9   confidential information or MNPI to trade securities for their
10   own (or related) accounts or to advise relatives, friends or
11   others with respect to trading."
12       Do you see that?
13   A.  Yes, I do.
14   Q.  What did this policy mean to you, Mr. Kara?
15   A.  It meant that I should safeguard the information that I
16   learned in my job and not transmit it to people that didn't
17   need to know about it.
18   Q.  Did you understand this to prohibit you from disclosing
19   that type of information to people outside of Citigroup?
20   A.  Yes, I did understand that.
21   Q.  You can set that exhibit aside, please.
22       We'll go now to --
23           THE COURT:  We're coming up on our lunch break
24   period.  I don't know if there's a convenient break point.
25           MS. DOWLING:  Whenever you like, Judge.  We can do
```

1   that now.

2           THE COURT:  All right.  We'll take that now and

3   return in one hour at 1:15.

4       And I'm going to remind you, please, do not discuss this

5   case with anyone; do not conduct any research; please keep an

6   open mind until this case is submitted to you for a decision.

7       We'll see you at 1:15.

8           MS. DOWLING:  Thank you, your Honor.

9           DEPUTY CLERK:  All rise for the jury.

10  (The jury exits the courtroom)

11          THE COURT:  Okay.  See you back in an hour.

12  (Recess from 12:19 to 1:18 p.m.)

13  (The following proceedings were held in the presence of

14  the Jury)

15          THE COURT:  Okay.  Welcome back, ladies and

16  gentlemen.  We will continue with the direct examination of

17  Mr. Kara.

18          MS. DOWLING:  Thank you, Your Honor.

19          THE COURT:  Ms. Dowling, you may proceed.

20          MS. DOWLING:  Yes, Your Honor.  Thank you.

21                  DIRECT EXAMINATION, RESUMED

22  BY MS. DOWLING:

23  Q   Hello, Mr. Kara, again.  I would like to direct your

24  attention to Exhibit 24, if you can find that, please.

25  A   Yes, ma'am.

1    **Q**    And, do you recognize that document?

2    **A**    Yes, I do.

3    **Q**    And what is that document?

4    **A**    This is a memorandum that was issued by our Global Control

5    Group, which is our legal group, regarding the treatment of

6    confidential and material non-public information.

7              **MS. DOWLING:**  Your Honor, I would like to move

8    Exhibit 24 into evidence.

9              **MS. SHIFMAN:**  No objection, Your Honor.

10             **THE COURT:**  24 is admitted.

11    (Trial Exhibit 24 received in evidence)

12   **BY MS. DOWLING:**

13   **Q**    If you could look at the first page of that document, and

14   we'll let Maryam pull that up on the screen there.

15       Do you see the box in the middle, marked "Highlights"?

16       (Document displayed)

17   **A**    Yes, I do.

18   **Q**    Could you please read the first bullet point?  We're going

19   to go through the first three bullet points.

20   **A**    Sure (As read):

21   "Confidential information is generally non-public information

22   that belongs to the firm or the firm's clients that you are

23   required to safeguard from improper disclosure or use."

24   **Q**    The second bullet, please.

25   **A**    (As read)

1   "You should not disclose confidential information without

2   authorization to anyone outside the firm, or to anyone within

3   the firm who does not have a valid need to know it."

4   **Q**   And then the third bullet point, please?

5   **A**   (As read)

6   "If confidential information is also material non-public

7   information regarding an issuer or any issue of securities,

8   its improper dissemination or use can result in violations of

9   securities laws, insider trading and other laws, subjecting

10  you to criminal and other penalties."

11  **Q**   And did you understand the Citigroup policies, Mr. Kara?

12  **A**   Yes, I did.

13  **Q**   And if you could turn to Page 7 of this exhibit, and we're

14  going to look at the top of the page under the header of

15  "Examples of Material Information."

16  **A**   Yes.

17  **Q**   And the first bullet says:

18  "Merger and acquisition activity or restructurings."

19      And earlier, you had testified that you worked on merger

20  and acquisition activity, correct?

21  **A**   Yes.

22  **Q**   Is that likely to be material information?

23  **A**   Yes, it is.

24  **Q**   Why is that?

25  **A**   Just to put it in simple terms, if a company is interested

KARA - DIRECT EXAMINATION / DOWLING

1    in buying another company, typically they will purchase that

2    company for a substantial premium over its certain share

3    price.  If that information is disseminated to the general

4    public, it will likely cause a significant appreciation in the

5    stock of the company, of the target company.

6    **Q**   Okay.  And now I'm going direct your attention to the

7    middle portion of the page, under "Prohibition on Trading on

8    or Tipping Material, Non-public Information."

9         (Document displayed)

10         **MS. DOWLING:**  Thanks, Maryam.  And if you could

11   highlight, please, the third bullet.

12         (Document highlighted)

13   **BY MS. DOWLING:**

14   **Q**   And if you could read that, Mr. Kara, please?

15   **A**   (As read)

16   "If you trade on or tip material, non-public information as an

17   employee working in the securities industry, you can expect to

18   be held to a high standard in determining whether you knew or

19   should have known that the source of the information was a

20   corporate insider or some other person acting improperly (i.e.

21   acting in breach of a fiduciary, statutory, or other legal

22   duty)."

23   **Q**   And Mr. Kara, what is your understanding of what "tipping"

24   means?

25   **A**   Tipping is providing material, confidential, non-public

1    information to someone for their benefit.

2    **Q**    Okay.  And you can set that exhibit aside, please, and we

3    are going to turn now to the next exhibit, Exhibit 25.

4         Take a moment and got that exhibit out, and let us know

5    when you have looked at it, please.

6    **A**    Yes.

7    **Q**    And, do you recognize this document, Mr. Kara?

8    **A**    I do.

9    **Q**    And, could you identify what this document is, please?

10   **A**    This, again, is a memorandum to all CIB employees.  That's

11   corporate and investment banking employees.  And again, it's

12   from our legal team.

13        And it's a reminder about our obligations to safeguard and

14   protect material non-public information.

15               **MS. DOWLING:**  Your Honor, I move to admit Exhibit 25.

16               **MS. SHIFMAN:**  No objection, Your Honor.

17               **THE COURT:**  25 is admitted.

18        (Trial Exhibit 25 received in evidence)

19        (Document displayed)

20   **BY MS. DOWLING:**

21   **Q**    Mr. Kara, we're just going to look at one paragraph on

22   this page.  If you could look at the third paragraph.

23        (Document displayed)

24   **Q**    If you could read that, please?

25   **A**    (As read)

1  "You are reminded that you may not misuse confidential or

2  material, non-public information regarding an issuer's

3  securities.  Trading on material, non-public information, or

4  conveying such information to anyone improperly..."

5      Otherwise known as "tipping..."

6  "...violates firm policy and may constitute a violation of

7  federal or other insider trading laws, European regulations on

8  market abuse, or other applicable laws."

9  **Q**  Thank you, Mr. Kara.  And you can set that exhibit to the

10  side, please.

11      Mr. Kara, while employed at Citigroup, did there ever come

12  a time when you tipped, when you shared material non-public

13  information with anyone outside of Citigroup?

14  **A**  Yes, there was.

15  **Q**  And what did you do?

16  **A**  Um, I began sharing material non-public information with

17  my brother, Mounir Michael Kara.

18  **Q**  And why did you do that?

19  **A**  It happened, ma'am, over a series of years.  And, I would

20  call it sort of an evolution of the way that I was

21  transferring information to my brother.

22      When I entered into the healthcare investment banking

23  group in 2002, I didn't have any healthcare experience.  And

24  specifically, I knew nothing about science, and knew nothing

25  about the general healthcare industry.  My brother had a

1    scientific background, and -- an undergraduate degree in

2    chemistry and a toxicology background that I thought would be

3    useful in helping me learn about the drugs and about the

4    company that I was now going to be responsible for.

5        At that time, I was a vice-president.  And as I had

6    mentioned, I was an officer of the corporation.  And a lot of

7    the meetings that I would be asked to begin really involved

8    CEOs and CFOs of large public corporations.  And I didn't want

9    to come across as somebody that didn't have any knowledge.

10       So, I began sharing with my brother information about the

11   companies, information -- and asking him questions about the

12   drugs, how they worked, how the science behind it worked.

13   And, at that time, gave him clear instructions that

14   information that I was sharing with him was confidential, and

15   that I was really just trying to gain an industry knowledge

16   through his help.

17       What I would call Phase Two of that would be that those

18   conversations, unfortunately, became much more relevant in our

19   life because my father was diagnosed with cancer in late 2003,

20   early 2004.  And, in fact, he was diagnosed with two different

21   types of cancers.  Non-Hodgkins lymphoma, and then

22   glioblastoma multiforme, which is a terminal form of brain

23   cancer.

24       My discussions with my brother then began to gravitate

25   much more towards companies that were focused in the oncology

1    and pain-management space.  And I was looking for -- we were

2    looking, my brother and I, for companies that had different

3    treatment options that could potentially benefit my dad.

4        As it turned out, a lot of the companies that I was

5    working with and was a lead coverage officer for had drugs

6    that were going to be treated -- that could help my dad.  And

7    I, in fact, contacted some of those companies to see if we

8    could use compassionate use for some of the medications for my

9    dad, because we were trying to save his life.

10   **Q**   Okay.

11   **A**   And, and last, the third evolution is after all of that,

12   my brother, once -- after my father died, my brother's

13   discussions began to become much more targeted.  And began to

14   be much more focused around asking me about -- specifically

15   about companies and more towards a business end of it.

16       And I confronted him, and asked him point-blank, "Are you

17   trading in these companies?"  And he flat-out denied it, and

18   he swore on his daughter's life that he wasn't trading in it.

19       It then -- but he -- he would go away for a while and not

20   ask me questions, and then he would come back and he would ask

21   me questions again.  I tried to deflect it.  It got to the

22   point where I told my wife no longer to take his calls at

23   home.  Tried to avoid his phone calls, wouldn't reply to his

24   e-mails, because I just didn't want to talk to him.

25       It got to the point where it was so persistent and so

1   nagging that to get him off my back, I finally caved in.  And

2   that was the third what I would call phase of the type of

3   information that I was sharing with my brother, where I

4   knowingly tipped him, to get him off my back, and to benefit

5   him.

6   **Q**   And, you wanted to help your brother, sharing that

7   information?

8   **A**   Yes, that definitely was -- I knew that by tipping him,

9   that I was helping him.

10  **Q**   And in helping him, you were helping yourself.  Right?

11  **A**   I --

12          **MS. SHIFMAN:**  Objection; leading.

13          **THE COURT:**  Overruled.

14          **THE WITNESS:**  I -- I just didn't know -- I repeatedly

15  asked him to please just leave me alone, and that what we were

16  doing, that -- I became very uncomfortable with it.  And, he

17  wouldn't stop.  And, yes.  The way that I thought I was

18  helping myself was just by getting him off my back, and

19  fulfilling whatever needs he had.  You know, and I expected

20  that he was likely trading on it.

21  **BY MS. DOWLING:**

22  **Q**   And some of the information that you and your brother

23  exchanged, did that help you in a business development

24  capacity, with regard to the companies you were calling on?

25  **A**    Initially it did.  His information was incredibly helpful.

 1    And I -- I was kidding myself in thinking that what I was

 2    doing was okay, because I assumed, oh, I'm likely benefiting

 3    Citigroup because now I'm becoming this much more intelligent

 4    officer, and I can have these fruitful scientific discussions

 5    with the officers of these public corporations.

 6        And I was completely naive and gullible to assume, first

 7    and foremost, that that was okay.  But, second, to continue to

 8    do it, after, you know, after the passing of my dad and at the

 9    point where I noticed that my brother's questions were

10    becoming much more targeted.

11  **Q**   And in that Phase Three, as you labeled it, in that time

12    period, you knew that your brother was trading on these

13    companies.  The stocks.

14  **A**   He never disclosed to me that he was trading, but I fully

15    expected that he was trading it, because the types of

16    questions that he asked indicated to me that it was -- it was

17    the behavior of somebody that was trading in security -- the

18    questions were indicative of someone that was trading in

19    securities.  I didn't want to ask him, you know.  When I did

20    ask him, he denied it.

21        But at the point where I decided to give him information

22    with the intent to help him trade I didn't want to ask him

23    again, "Are you trading," because I knew what the answer was

24    going to be, and that was going to be "Yes."

25  **Q**   What were some of the biotech companies and drugs that you

KARA - DIRECT EXAMINATION / DOWLING

1   discussed with your brother, in order to learn more about the

2   biotechnology area?

3   **A**   Initially my main focus was really in the -- and it

4   graduated with my dad or it progressed with my dad's illness.

5   I focused on oncology companies, and focused on

6   pain-management companies, and large pharmaceutical companies.

7        So, around the time of my dad, we looked at a company

8   called American Pharmaceutical Partners, or APPX.  And they

9   had a lead drug called Abraxane, which helped reduce the

10  cytotoxicity or the toxic effects of chemical therapeutic

11  drugs to patients, so that patients could get more drug

12  without having all of the residual harm that comes with

13  traditional chemotherapy.

14       I discussed Genentech with my brother, because my father

15  was on one of their lead drugs called Rituxan for non-Hodgkins

16  lymphoma.  That was part of his therapy.  I also discussed

17  Schering Plough's drug called Temodar, which was very novel

18  and still in discovery, in the discovery stage.  And it was

19  the first-of-its-kind oral treatment for patients with brain

20  cancer, and was enabling patients to have several months of

21  extended survival who are terminally ill.

22       We also discussed Endo Pharmaceuticals, which was a client

23  of mine.  And they had several medications that my family

24  eventually used, including Lidoderm, which was a patch for low

25  back pain.  And they also had end-of-life pain, for my dad

1    when he was terminally ill.

2    **Q**   So some of the companies that you discussed with your

3    brother, they either were or became Citigroup clients?  Is

4    that correct?

5    **A**   Yes.  Many of them -- I would say almost all of the

6    companies that I discussed with my brother at -- didn't

7    necessary -- weren't necessarily companies that we earned fees

8    from, but they were almost all companies that we spoke to.

9    And had an active dialogue with.

10       And, we more than likely received material non-public

11   information from those companies.

12   **Q**   And why were you comfortable sharing non-public material

13   information with your brother?

14       I guess that kind of dovetails with the Phase Two time

15   period you were talking about earlier.

16   **A**   Yeah.  Again, I apologize for being what I would call

17   incredibly naive, relaxed, unguarded.  But I just never could

18   imagine that my brother would take it upon himself to trade in

19   the companies that I was covering and had -- you know, we

20   share the same last name, he knew how important the job was to

21   me, how much I cared about it.

22       And, when I suspected it, and asked him, I warned him

23   initially, and then repeatedly told him that the information

24   was confidential.  And when I asked him, "Are you trading?" he

25   swore to me that he wasn't.

KARA - DIRECT EXAMINATION / DOWLING

1  Q   Mr. Kara, you spoke of your father's illness.  Did he pass

2  away at some point?

3  A   He did.

4  Q   And did your family do anything to commemorate your

5  father's life?

6  A   Yes.  Shortly within what we call a 40-day mourning

7  period, we had a memorial service for my father after his

8  funeral, which was on November 17 of 2004.

9  Q   And do you recall Mr. Bassam Salman attending any of these

10  events?

11  A   I believe Mr. Salman attended my father's memorial

12  service.

13  Q   And did Mr. Salman visit with your father before his

14  passing?

15  A   Yes.  They loved my dad, and my father loved them very

16  much.  And yes, I think he came to -- when my dad was in very

17  critical condition, came out to see if he was okay.

18  Q   Mr. Bassam Salman visited your father when he was ill?

19  A   Yes, yes.

20  Q   And at this point before your father passed away -- in

21  2004, was it?

22  A   Yes.

23  Q   At this point, you had known Susie Salman for a couple of

24  years at that point.  You said you met in 2002, correct?

25  A   Yes.

1    **Q**   So by the 2004 time period when Mr. Salman is visiting

2    your father who's ill, did the families know each other quite

3    well at that point?

4              **MS. SHIFMAN:**  Objection; calls for speculation.

5              **THE COURT:**  Overruled.  You may answer, if you know.

6              **THE WITNESS:**  And I'm sorry, ma'am.  Because of the

7    objection, I lost the question.  Can you repeat the question

8    for me?

9    **BY MS. DOWLING:**

10   **Q**   Yes, I can.  So, in 2002, you and Susie Salman met,

11   correct?

12   **A**   Yes, we did.

13   **Q**   And you and Susie Salman actually met at the -- the

14   initial meeting was at Mr. Salman, Mr. Bassam Salman's house.

15   Correct?

16   **A**   Yes.

17   **Q**   So you met them at the same time.

18   **A**   Yes.

19   **Q**   So by 2004, moving forward in time, your families, the

20   Kara family and the Salman family, they have gotten to know

21   each other very well.  Correct?

22   **A**   Yes.  There were numerous opportunities.  And in fact, as

23   I mentioned, we got engaged in 2003.  And we had to postpone

24   our wedding three times because of my father's illness.

25        And, our original wedding date was August of 2004.  And,

KARA - DIRECT EXAMINATION / DOWLING

1     at that point, my dad was in a wheelchair, and couldn't walk.

2     So we postponed the wedding.  And then, it's customary to wait

3     an extra year, so we didn't get married until July of 2005.

4     Q   And, did Mr. Salman know what you did for a living?

5           MS. SHIFMAN:  Objection; calls -- this witness can't

6     possibly know what's in the mind of somebody else.

7           THE COURT:  Overruled.  You can answer, if you know.

8           THE WITNESS:  I don't have a specific recollection of

9     talking to Mr. Salman about being an investment banker.  I do

10    know my brother announced that to everybody, and it was

11    actually my surprise, at my wedding.

12        But, I had told Mr. Salman that I worked generally in the

13    finance industry.  For Citigroup.  And that, you know, my

14    responsibilities were really to help companies raise money.  I

15    did not get into specific details about what I did.

16    BY MS. DOWLING:

17    Q   So he -- you spoke with Mr. Salman about being in finance

18    in general, Citigroup in particular.  And that you worked on

19    financing?  Is that --

20    A   Yes.

21    Q   That's correct?

22    A   Yes.

23    Q   But you didn't use the term investment banker (Indicating

24    quotation marks), is that correct?

25    A   That's correct.

KARA - DIRECT EXAMINATION / DOWLING

1   **Q**   Why didn't you use that particular term to describe to

2   Mr. Salman what you did for a living?

3   **A**   I -- I didn't like to tell people what I did for a living

4   because I didn't want people to make assumptions about me as a

5   person, and about my income level, or have ideas in their mind

6   about what kind of a person -- you know, even back in 2002,

7   investment bankers had terrible reputations.  So, I tried to

8   not share with anybody what I did for a living.  I didn't want

9   them to make any assumptions about me.

10  **Q**   Okay.  And, Mr. Kara, how did your brother Michael react

11  to your father's death in 2004?

12  **A**   Much like the whole family.  We were all extremely

13  depressed, but I think my brother was suicidal at the time,

14  and took -- took my father's death very, very, very -- it

15  deeply affected him.

16  **Q**   Were they very close?

17  **A**   Yes.  Very, very close.

18  **Q**   Did he help care for your father in his later years quite

19  a bit?

20  **A**   My brother did, yeah.  And my brother -- and my dad really

21  -- what I've come to know, my dad shielded us very much from

22  the -- the issues that involved my brother.  So, it was a

23  mutual caring relationship.

24       And, you know, my brother had my dad working with him, as

25  part of his remediation company.  And, you know, my dad adored

1    Mounir, and Mounir adored my dad.

2    Q    And did Mounir take on some financial responsibilities for

3    your dad during that time period?

4    A    I believe he did.  He was always very generous with his

5    parents, and with family.  And my brother -- I -- I came to

6    share in some of those responsibilities.

7         But yeah, there was a point where I knew my brother had

8    been helping my family for -- for an extended amount of time.

9    And I talked to him, and I told him I wanted to participate in

10   that.  So --

11   Q    And had Mounir in the past -- Michael, in the past, had he

12   helped you financially when you were growing up?

13   A    Yes.  I think, you know, to some extent, he did help

14   finance part of my business school education.

15   Q    You indicated earlier that your brother was suicidal at

16   the time of your father's death.  What do you mean by that?

17   A    It was around the Christmas holidays of 2004.  And it was

18   within a month of my dad's funeral.  I was at my brother's

19   house.  And, he came out of his room, and sat down on the

20   couch next to me.

21        And as I saw him walking in the room, he had a gun in his

22   right hand, and he had a clip in his left hand, but he also

23   had a clip in the gun.  And he sat down next to me, and he

24   just broke down and began to cry.  And put the gun in his

25   mouth.  And said, "I -- I want to be with Dad."

KARA - DIRECT EXAMINATION / DOWLING

1    **Q**    So, did you know that this was all about your father's

2    death?

3    **A**    That's how I -- yeah.  That's how I interpreted it.

4    **Q**    So, what did you do in response?

5    **A**    I grabbed the gun out of my brother's hand; I put it to

6    the side.  I hugged my brother.  And we started crying

7    together.

8    **Q**    Did you ever see Michael do anything along those lines

9    after that point?

10   **A**    No.

11   **Q**    Did you ever observe him to do or say anything else that

12   caused you to be concerned about his well-being after that

13   point?

14   **A**    Um, up to that point?

15   **Q**    After that point.

16   **A**    No, I don't think so.

17   **Q**    Mr. Kara, let's switch topics.  Earlier you had mentioned

18   a company called Protein Design Labs.  What is Protein Design

19   Labs?

20   **A**    It was a biopharmaceutical company that was based here in

21   Fremont, California, and focused on developing drugs to treat

22   autoimmune diseases and anti-inflammatory diseases.

23   **Q**    And was Protein Design Labs a Citibank client?

24   **A**    Yes, it was.

25   **Q**    And did you personally do any work for Protein Design

1    Labs?

2    **A**   Yes, I did.

3    **Q**   What kind of work did you or you and Citigroup do for

4    Protein Design Labs?

5    **A**   We executed several transactions for the companies.

6    Primarily around financings.  And we also advised them on

7    mergers and acquisitions.

8    **Q**   And over what time period did you work with Protein Design

9    Labs?

10   **A**   I think it was one of the first accounts that I was

11   assigned, so I would say in that 2002-2003 time frame, all the

12   way through my departure from Citigroup, so the middle of

13   2007.

14   **Q**   So this would have been one of the early companies that

15   you called on?

16   **A**   Yes.

17   **Q**   To establish a relationship with?

18   **A**   Yes.

19   **Q**   And it worked because you did financings with them in the

20   next years after that.  Correct?

21   **A**   Yes.

22   **Q**   I'd like to turn now to what has been marked as Exhibit

23   238.  And if you could please locate Exhibit 238.

24       If you can take a minute to look at that exhibit, and let

25   me know if you recognize it.

1        (Witness examines document)

2    **A**   Yes, I do.

3    **Q**   And what is this, Mr. Kara?  What is that exhibit?

4    **A**   This is a series of e-mails -- or it's an e-mail from a

5    colleague, a Citigroup colleague named Mariano Gaut who is in

6    our equity markets team, to several members of the Protein

7    Design Lab as well as ESP Pharma working team.

8    **Q**   And what was the purpose of this e-mail, Mr. Kara?

9    **A**   This was the -- the purpose was to circulate a memorandum

10   in which we were examining acting as a financing agent for PDL

11   Biopharma, or PLI at that time, in their contemplated

12   acquisition of a private company called ESP Pharma.

13           **MS. DOWLING:**  Your Honor, I would offer Exhibit 238

14   into evidence.

15           **MS. SHIFMAN:**  Objection, foundation and hearsay,

16   Your Honor.

17           **THE COURT:**  Overruled.  238 is admitted.

18       (Trial Exhibit 238 received in evidence)

19           **MS. DOWLING:**  Thank you, Maryam.

20       (Document displayed)

21           **MS. DOWLING:**  If we could enlarge the top portion of

22   this e-mail, please.

23   **BY MS. DOWLING:**

24   **Q**   Mr. Kara, that sentence here:

25   "Attached is the memo that earlier on today..."

KARA - DIRECT EXAMINATION / DOWLING

1     (Reporter interruption)

2    **BY MS. DOWLING:**

3    "Attached is the memo that earlier on today ECM distributed to

4    Equities senior management to describe the PDLI situation."

5    Can you please tell the jury what "PDLI" is in reference

6    to?

7    **A**   Yes, that's Protein Design Labs, Inc.

8    **Q**   And if we could turn now to Page 2.

9    (Document displayed)

10   **Q**   You reference that there was a memo that was sent along

11   with this e-mail.  Do you recognize this portion of Exhibit

12   238?

13   **A**   Yes, I do.

14   **Q**   And why is that?

15   **A**   There was -- I wrote a significant portion of this memo,

16   ma'am, including the fundamental views of PDLI, as well as the

17   risk factors.

18   **Q**   So you were involved in this transaction?

19   **A**   Yes, I was.

20   **Q**   And at the top of the memo it says "CONFIDENTIAL," in bold

21   letters.  Why is that?

22   **A**   Again, this is in relation to a potential financing of an

23   acquisition, so that type of information would be treated as

24   confidential material, non-public information within the team.

25   **Q**   And can you describe again what's being conveyed by this

1   memo?

2   **A**   Yes.   This is a description of the financing proposal that

3   we have been asked to give to Protein Design Labs and with

4   respect to the acquisition of ESP Pharma.

5   **Q**   And what is the date of this memo, Mr. Kara?

6   **A**   It looks like January 11, 2005.

7   **Q**   If you look at the very last paragraph of the memo, maybe

8   Maryam could blow that up or enlarge it, if you could read

9   that sentence, please.

10   **A**   (As read):

11   "The Citigroup team is in dialogue with PDLI about acting as a

12   financing agent for any contemplated transaction.   We will be

13   meeting with the PDLI management team on January 12, 2005 to

14   discuss the potential financing alternatives."

15   **Q**   And to your knowledge, did that meeting, the January 12,

16   2005 meeting referenced, did that ever happen?

17   **A**   Yes, it did.

18   **Q**   And how do you know that?

19   **A**   I was the person that actually set up that meeting.

20   **Q**   And who, and who --

21   **A**   And I also attended it.

22   **Q**   Oh, you attended it?   And who else was at the meeting?

23   **A**   I had invited a person from equity capital markets, my

24   partner there, Bruce Wu.   I had also invited Mike Simon, the

25   head of our life sciences team.   Mariano Gaut was there,

1    equity capital markets partner.  And also a junior associate

2    on the account.

3    **Q**    And, what was the purpose of that meeting?

4    **A**    The purpose was really for -- from my perspective, it was

5    for us to express our interest to the CEO of PDLI that we

6    would like to act as their financing agent with respect to ESP

7    Pharma.

8         At that point, ESP Pharma was a private biotechnology

9    company that Citigroup was engaged separately to sell.  And,

10   PDLI was very interested in buying the company.  So, we had

11   gotten released from conflicts and were able to act both as

12   the seller of the private company, and as well as a potential

13   financing agent for the buyer of that company.

14   **Q**    And what happened at that meeting with the CEO?

15   **A**    We expressed to him our interest in working with him,

16   regarding that transaction.  And, he conveyed to us in his

17   interest -- his interest in actually being the party that wins

18   the -- the auction process for the sale of ESP Pharma.

19   **Q**    Ands did you take any steps to help win that business at

20   that meeting?

21   **A**    I did.

22   **Q**    What did you do?

23   **A**    I knew that the CEO of the company enjoyed white wine.  So

24   at that time I was not a wine connoisseur, and my brother knew

25   a lot of about wines, so I'd asked him for his help in

1    obtaining a couple of bottles of white wine that I took to the

2    dinner for the CEO.

3    **Q**    And where did you get the wine?

4    **A**    I believe we got it in San Francisco, at one of the local

5    wineshops here along the pier.

6    **Q**    Do you recall what kind of wine you got?

7    **A**    Yes, two bottles of white.  One was a Kistler Chardonnay,

8    and the other one was a Marcassin Chardonnay.

9    **Q**    I take it, those were nice wines?

10   **A**    They were expensive.  So, I hope they were good.

11   **Q**    And was PDLI's potential acquisition of ESP Pharma and

12   Citigroup's provision for any financing of that deal all

13   non-public information at that time?

14   **A**    Yes.

15   **Q**    And was material information?

16   **A**    Yes.

17   **Q**    Why is that?

18   **A**    Because, had anyone -- had investors realized that PDLI

19   was contemplating a $500-million-plus size acquisition along

20   with a related financing, that definitely would have caused a

21   reaction to PDLI's stock price.

22   **Q**    You told us that Michael had helped you pick out the wine

23   for this important meeting you were having with the CEO.  Did

24   you and Michael discuss PDLI?

25   **A**    Yes.  We discussed -- we had discussed PDLI as early as

KARA - DIRECT EXAMINATION / DOWLING

1    back in 2002, and Michael knew that I was developing a close

2    relationship and a friendly relationship with the CEO of the

3    company.  And he knew about the dinner.

4        He asked me what the dinner was about.  And I said, you

5    know, "Please keep me in your prayers, and I hope we can win

6    this transaction because it will mean a significant amount of

7    fees for Citigroup, and hopefully it will help me in my

8    career."

9    Q    And after the meeting, did you follow up with Michael and

10   continue to provide him information about the transaction?

11   A    I did.  I thanked my brother for the bottles of wine, and

12   told him that the meeting went really well, and I hoped that a

13   transaction would be consummated.

14       And then after that, I regularly updated him -- he would

15   call me and ask me, "How are things going?  How's work?"  You

16   know, something to that effect, often.  And I would feel

17   extremely comfortable in sharing updates about my work and

18   about these types of projects for clients that I was working

19   on.

20   Q    And, about the PDLI transaction in particular?

21   A    Yes.  And in this case, about the PDLI transaction.

22   Q    You can set that exhibit to the side, please.  And we're

23   going to look at another Exhibit, No. 241.

24       Tell me when you've had a chance to look at it.

25       (Witness examines document)

KARA - DIRECT EXAMINATION / DOWLING

1    **A**    Yes.

2    **Q**    Do you recognize this document?

3    **A**    I do.

4    **Q**    And, what is it?

5    **A**    It's an e-mail communication among the PDLI/ESP Pharma

6    working group team.  And it's from my colleague Dung Nguyen,

7    who at that time was, I believe, the senior officer engaged to

8    represent ESP Pharma in their sale.

9    **Q**    And this e-mail was sent to you, among others?

10   **A**    Yes.

11           **MS. DOWLING:**  Your Honor, I move Exhibit 241 into

12   evidence, please.

13           **MS. SHIFMAN:**  Objection, foundation and hearsay,

14   Your Honor.

15           **THE COURT:**  All right.  Objection overruled.  241 is

16   admitted.

17       (Trial Exhibit 241 received in evidence)

18       (Document displayed)

19           **MS. DOWLING:**  If we could enlarge the text of the

20   e-mail, please.

21   **BY MS. DOWLING:**

22   **Q**   You mentioned earlier Bruce Wu, and I see that he's

23   located on this e-mail, in ECM.  Who is Bruce Wu, and what is

24   ECM?

25   **A**    Bruce Wu was a Citigroup employee -- he is a Citigroup

1    employee.  He was a good friend of mine.  And he was in charge

2    of the equity capital markets division of the healthcare

3    branch.

4        And what that means is any time that a public security was

5    going to be issued on behalf of a corporate client in the

6    healthcare area, Bruce Wu would be the representative from the

7    equity capital markets side to help underwrite that

8    transaction.

9    **Q**    And what is the date of this e-mail, Mr. Kara?

10   **A**    It looks like January 20, 2005.

11   **Q**    So by that time period, what do you recall what is the

12   status of the PDLI/ESP Pharma transaction?

13   **A**    It was, as -- as ascertained by the e-mail here, it was

14   very close to being complete.  And it looked like PDLI was one

15   of the final bidders for the company.  And there were just

16   some minor valuation issues, and some fee issues.  But it

17   looked like, very close.

18   **Q**    Getting towards the end of the transaction?

19   **A**    Yes, absolutely.

20   **Q**    And did you continue to update your brother Michael on the

21   status of the PDLI transaction?

22   **A**    Yes.

23   **Q**    And what did you tell him?

24   **A**    I had met with the CEO of PDLI, and I believe I was in

25   Geneva.  And, I had called my brother, I think, from -- or my

 1  brother had been trying to contact me, my phone could work in

 2  Europe and I told him that I just ran into the CEO of the

 3  company by chance, and it was looking good for the financing

 4  that they'd want to do a financing shortly after, if they won

 5  the deal.

 6  **Q**  And did the deal, in fact, go through?

 7  **A**  Yes, it did.

 8  **Q**  I want to turn now to another company, Pain Therapeutics.

 9  Are you familiar with a company called Pain Therapeutics?

10  **A**  Yes, I am.

11  **Q**  And what was Pain Therapeutics?

12  **A**  It's a biopharmaceutical company that focuses on

13  developing drugs for pain management.

14  **Q**  And did you personally do any work for Pain Therapeutics?

15  **A**  Yes, I did.

16  **Q**  And what type of work did you for Pain Therapeutics?

17  **A**  I did both financings as well as strategic advisory,

18  including mergers and acquisition.

19  **Q**  And over what time period did you do that work?

20  **A**  Pain Therapeutics I think was my very first client in that

21  middle-of-2002 time frame.  And I worked very closely with

22  them all the way until I resigned from Citigroup, the middle

23  of 2007.

24  **Q**  I would like to show you now what's been marked as Exhibit

25  220, if you could find Exhibit 220.

KARA - DIRECT EXAMINATION / DOWLING

1    **A**    Yes.

2    **Q**    Take a look at the exhibit, and let me know if you

3    recognize it.

4         (Witness examines document)

5    **A**    Yes.

6    **Q**    And what is that document, Mr. Kara?

7    **A**    It's an e-mail communication from me to the head of Live

8    Sciences, Mark Simon, and my -- my colleague, Bruce Wu in

9    equity capital markets.

10        And it's about wanting to stay on top of Pain

11   Therapeutics, because I expected that they were going to have

12   some significant drug data coming up that would lead to the

13   company wanting to issue securities in relation to a

14   financing.

15   **Q**    And you reference "remi."  Who is "remi"?

16   **A**    "Remi" is Remi Barbier, who is the CEO of Pain

17   Therapeutics.

18   **Q**    And what is the "Remoxy data" that's referenced in this

19   e-mail (Indicating quotation marks)?

20   **A**    Remoxy was a late-stage drug that the company was

21   developing.  And it was an abuse-proof, tamper-proof version

22   of Oxycontin, which, if I can ask people to think back to that

23   2004 time frame, there was significant abuse associated with

24   Oxycontin around that time.  And they were coming up with a

25   version that, if successful, had the potential to

 1   revolutionize the pain management industry.

 2           MS. DOWLING:  Your Honor, I would like to move

 3   Exhibit 220 into evidence.

 4           MS. SHIFMAN:  Objection.  Foundation and hearsay,

 5   Your Honor.

 6           THE COURT:  That objection is overruled.  220 is

 7   admitted.

 8       (Trial Exhibit 220 received in evidence)

 9           MS. DOWLING:  We are not going to pull this one up,

10   Maryam.  Thank you.

11   BY MS. DOWLING:

12   Q   If you could set that exhibit aside, please, and we're

13   going to move to Exhibit 223, please.  Just take a minute and

14   look at that exhibit, and let me know if you recognize it.

15       (Witness examines document)

16   A   Yes.

17   Q   And what is this document?

18   A   This is an e-mail communication from me to my brother,

19   Michael, where I'm updating him that I have a dinner scheduled

20   with Remi next week.  And also, let him know that I had heard

21   that Sam's brother Tiger had -- had gotten into an accident

22   and smashed a deer.

23           MS. DOWLING:  Your Honor, I would like to move

24   Exhibit 223 into evidence.

25           MS. SHIFMAN:  Same objection, Your Honor.  Foundation

KARA - DIRECT EXAMINATION / DOWLING

1   and hearsay.

2           **THE COURT:** All right, objection overruled.  223 is

3   admitted.

4       (Trial Exhibit 223 received in evidence)

5       (Document displayed)

6   **BY MS. DOWLING:**

7   **Q**   So, Mr. Kara, you indicated this is an e-mail between you

8   and your brother, Michael.  Just want to focus first on you

9   indicated that -- the last sentence says (As read):

10  "Hey, I have dinner scheduled with remi next week at kokari in

11  San Francisco on the 1st."

12  **A**   Uh-huh.

13  **Q**   And, who is "remi" in reference to?

14  **A**   This is Remi Barbier again, the CEO of Pain Therapeutics.

15  **Q**   If we could look at the second paragraph, if you could

16  read that second paragraph, please.

17  **A**   Sure (As read):

18  "I have a really wild story to tell you -- to share with you

19  about Tiger.  Apparently he totaled his Mercedes.  Smashed a

20  deer.  Better than that, supposedly left the car where it was.

21  When the cops had shown up the deer had gone away but he ended

22  up not being over at Bassam's but supposedly at Tiger Trade

23  because he didn't want anyone to wake up."

24      And then:

25  "Even you and I combined could not have come up with that.

1    Love you, Maher."

2    **Q**   One sentence, "The best part..."

3    **A**   "The best part is that Susie believes it."

4         (Reporter interruption)

5    **BY MS. DOWLING:**

6    **Q**   In this paragraph, who is "Tiger" in reference to,

7    Mr. Kara?

8    **A**   Sam's brother.

9    **Q**   And, sleeping at Bassam's, is that Mr. Bassam Salman

10   (Indicating)?

11   **A**   Yes.

12   **Q**   And, the reference to "Susie," would that be your wife

13   Susie, I take it?

14   **A**   Yes.

15   **Q**   So is this, you are just relaying -- what are you relying

16   to your brother --

17   **A**   I'm relaying to my brother that Tiger had gotten into a

18   car accident with a deer, and that he ended up not being over

19   at Sam's.

20   **Q**   And did you get that information from Tiger or from --

21   **A**   From, I think, Susie.

22   **Q**   From Susie?  Okay.  All right, thank you.  Mr. Kara, did

23   you share any confidential information about Pain Therapeutics

24   with your brother, Michael?

25   **A**   I did.

KARA - DIRECT EXAMINATION / DOWLING

1   **Q**   And what information did you share with your brother,

2   Michael?

3   **A**   I told him about the upcoming follow-on transaction that

4   we were expected to have should the Remoxy data be positive.

5   **Q**   Let's switch now to another company called Bone Care

6   International.

7   **A**   Yes.

8   **Q**   Are you familiar with this company?

9   **A**   Yes, I am.

10  **Q**   And were you the person at Citi that was responsible for

11  working with Bone Care International?

12  **A**   No, I was not.

13  **Q**   And who was, to your knowledge?

14  **A**   It was a colleague of mine named Henry Schwake.

15  **Q**   Were you aware that Bone Care was a Citigroup client?

16  **A**   Yes, I was.

17  **Q**   And, how were you aware that Citigroup had Bone Care as a

18  client?

19  **A**   As part of what we did at Citigroup, we assigned the

20  different officers accounts.  And, I knew that Bone Care

21  International was assigned to Henry Schwake.

22  **Q**   Turn now to, if you could take Exhibit 142 out.  Take a

23  look at that, and let me know when you're ready.

24  **A**   Yes.

25  **Q**   Do you recognize this document?

1    **A**    I do.

2    **Q**    And what is it?

3    **A**    This is a -- what we call an account profile.  And, what

4    we developed, I actually developed this format.  This was a

5    way that Citigroup officers were able to monitor their

6    relationships and the activities associated with the corporate

7    clients that they had.

8              **MS. DOWLING:**  Your Honor, I would like to move

9    Exhibit 142 into evidence, please.

10             **MS. SHIFMAN:**  No objection, Your Honor.

11             **THE COURT:**  All right, 142 is admitted.

12       (Trial Exhibit 142 received in evidence)

13       (Document displayed)

14   **BY MS. DOWLING:**

15   **Q**    If you could turn to Page 19, please, Mr. Kara.

16       (Request complied with by the Witness)

17   **A**    Yes.

18   **Q**    Did you personally receive these account review sheets?

19   **A**    Yes, I did.

20   **Q**    And how do you know that?

21   **A**    I physically used to carry it in my briefcase, often.  And

22   this was -- we actually had an off site in Montauk, New York,

23   where all the officers assembled, as well as the junior

24   people, and we were distributed copies of these for each of

25   the officers so that they could talk about their relationships

KARA - DIRECT EXAMINATION / DOWLING

1    with the individual accounts.

2    **Q**   If you could take a look at this Page 19, what is Page 19

3    of this account review sheets document?

4    **A**   This is specifically referencing Bone Care International.

5    **Q**   And it says "Account Profile."  What information is this

6    intended to provide to you, as a banker at Citigroup?

7    **A**   What's important to us is to know under the "Client

8    Contacts" heading, who are the people that we call on at the

9    client.  We look below that, and we say what transactions have

10   we done for the company in the last six months, where the

11   meeting history has been, who our competitors are in terms of

12   the other investment banks.

13       And things like objectives, what we need to do to get

14   better traction with the account.  And then top bids and

15   opportunities are upcoming transactions that we are seeking to

16   really get for these companies.  And then below is the

17   coverage team, meaning who are the officers that are

18   responsible to call on them.

19   **Q**   You said earlier that you were aware that Bone Care

20   International was a client of Citigroup.  In the April 2005

21   time period, were you specifically aware that Citigroup was

22   engaged on a transaction for Bone Care International?

23   **A**   No, I was not.  I don't recall, sitting here today,

24   knowing that.  But, it's the kind of thing that I could have

25   very easily learned.

1   Q   So, do you recall having any conversations with your

2   brother, Michael Kara, about Bone Care International?

3   A   No.

4   Q   Would you exclude the possibility that you may have had

5   conversations with Michael Kara about Bone Care International?

6   A   I can't -- I can't exclude it.

7   Q   I want to turn now to another company, called Endo

8   Pharmaceuticals.  Are you familiar with a company called Endo

9   Pharmaceuticals?

10  A   Yes, I am.

11  Q   And what is Endo Pharmaceuticals?

12  A   I'm sorry, we're done with --

13  Q   Yes, you can set that aside.

14  A   Endo Pharmaceuticals is a specialty pharmaceutical company

15  that focuses on developing drugs in the pain management

16  sector.

17  Q   And did Citigroup do any work for Endo Pharmaceuticals?

18  A   Yes, we did several transactions for them.

19  Q   And what transactions did you do for them, that you

20  recall?

21  A   They were a private company, so we took them public.  When

22  they were owned by DuPont Pharmaceuticals.  We then conducted

23  several follow-on transactions for the company, issuing

24  several $100 million worth of stock for them.

25      And we were also engaged as a strategic advisor, to look

1    at the possibility of the company either being sold, or look

2    at the possibility that they buy other companies.

3    **Q**   When you said "we," were you personally involved in some

4    of the work that Citigroup did with Endo?

5    **A**   Yes, I was a lead coverage officer on the account.

6    **Q**   I would like to show you now what is marked as Exhibit

7    208, if you could find that in the exhibit pile, please.

8         Take a moment and look at it, and let me know if you

9    recognize it, please.

10   **A**   Yes, I do.

11   **Q**   And what is it, Mr. Kara?

12   **A**   This is, again -- Mike Rockefeller was an analyst that

13   worked for me -- or worked for Citigroup, excuse me.  But he

14   was on -- my junior team member on the Endo Pharmaceuticals

15   account.

16        And it's an e-mail from him with an attachment to the team

17   regarding a commitment committee memorandum that was

18   circulated about an upcoming follow-on transaction for Endo.

19             **MS. DOWLING:**  Your Honor, I would like to move

20   Exhibit 208 into evidence.

21             **MS. SHIFMAN:**  Same objection.  Foundation and

22   hearsay.

23             **THE COURT:**  Was this received by the witness, is his

24   name --

25

1    BY MS. DOWLING:

2    Q    Mr. Kara, was this e-mail on the document --

3             THE COURT:  I see it, okay.  Objection overruled.

4    208 is admitted.

5        (Trial Exhibit 208 received in evidence)

6    BY MS. DOWLING:

7    Q    So, Mr. Kara -- let's let it get up on the screen here,

8    and then we'll talk about it.

9        (Document displayed)

10   Q    First, what is the date of this e-mail?

11   A    May 7, 2004 -- excuse me.  Yes.

12   Q    You stated that the memo was attached to this e-mail.

13   What was the name of that memo?  What are those memos called?

14   A    It's called a "commitment committee memorandum."

15   Q    If we could turn to Page 2 of this document.

16       (Document displayed)

17   Q    Is this part of the commitment committee memorandum that

18   you referenced?

19   A    Yes.  This is the actual memorandum, itself.

20            MS. DOWLING:  Maryam, if we could enlarge the top

21   left portion.

22       (Document displayed)

23   BY MS. DOWLING:

24   Q    So, Mr. Kara, were you on the healthcare team?  Do you see

25   yourself here on the healthcare team?

1   **A**   Yes.

2   **Q**   And, can you please describe the nature of the

3   transaction?

4   **A**   Yes.  The company was interested in issuing between 15 to

5   20 million shares of its common stock in what we call a

6   follow-on stock offering.  And, the total proceeds estimated

7   on the size of the deal really were dependent on the share

8   price, but it was estimated that the company was looking to

9   raise about $500 million.

10   **Q**   Thank you.  And you can set that exhibit to the side,

11   please.

12      I would like to show you now what's been marked as Exhibit

13   259.  If you could take a look at that, and let me know if you

14   recognize it.

15   **A**   Yes, I do.

16   **Q**   And what is this document, Mr. Kara?

17   **A**   This is an automatic e-mail that is sent out from what's

18   known as "autodeal," from the header.  It's an internal system

19   that we use at Citigroup that logs live transactions that we

20   have earned a mandate on.

21      So it's an e-mail from that system to acknowledge the

22   receipt of a transaction regarding Endo Pharmaceuticals.

23   **Q**   And was this email sent to you, among others?

24   **A**   Yes it was.

25   **Q**   And what is the date of this e-mail?

KARA - DIRECT EXAMINATION / DOWLING

1   **A**   It looks like June 10, 2005.

2            **MS. DOWLING:**  Your Honor, I would like to move

3   Exhibit 259 into evidence, please.

4            **MS. SHIFMAN:**  Same objection, foundation and hearsay.

5            **THE COURT:**  All right, objection overruled.  259 is

6   admitted.

7       (Trial Exhibit 259 received in evidence)

8       (Document displayed)

9            **MS. DOWLING:**  If we could enlarge the first portion

10  of this e-mail, please, Maryam.

11      (Document displayed)

12  **BY MS. DOWLING:**

13  **Q**   So, Mr. Kara, you were part of this deal team, right?

14  **A**   Yes.

15  **Q**   And what is the deal that is being discussed in this

16  June 10, 2005 e-mail?

17  **A**   It is that we have been asked by Endo Pharmaceuticals to

18  act as their advisor in a contemplated acquisition by a very

19  large Israeli pharmaceutical company called TEVA

20  Pharmaceuticals.

21  **Q**   If we could move to about halfway down the page, please.

22      (Document displayed)

23  **Q**   Okay.  Do you see in the middle of this enlargement it

24  says "Project Name, Project Everest Tibet"?  What does that

25  mean?

KARA - DIRECT EXAMINATION / DOWLING

**A**    As part of our safeguarding policies as Citigroup, we would assign project names to merger and acquisition assignments to protect the integrity of the information that we were -- that we had obtained.

We oftentimes would take a look at the first initial of each of the companies that are involved.  And we would create project names based on that.  So "Everest" was for Endo Pharmaceuticals, and "Tibet" was for TEVA pharmaceuticals.

**Q**    And you said, "protect the integrity of the information." What do you mean by that, Mr. Kara?

**A**    Again, it's a safeguarding technique that we would use, because our goal was to not have people that didn't need to know about the transaction even within Citigroup know about it.

So we would create project names, to not share what the transaction was about with others, or who the parties involved were.

**Q**    And was TEVA's potential acquisition of Endo Pharmaceuticals confidential information as of June 10, 2005?

**A**    Yes, it was.

**Q**    Was it material information?

**A**    Yes, it was.

**Q**    Why is that?

**A**    Because had a larger public audience learned that at the TEVA Pharmaceuticals was interested in buying Endo, it would

KARA - DIRECT EXAMINATION / DOWLING

1   have likely created a significant stock price jump in Endo

2   Pharmaceuticals' stock.

3   **Q**    Did you discuss TEVA's potential acquisition of Endo

4   Pharmaceuticals with your brother, Michael Kara?

5   **A**    Yes, I did.

6   **Q**    Can you please describe the nature of those conversations

7   with your brother?

8   **A**    It was -- I was sitting at his kitchen table, going

9   through -- or learning about the transaction in California.

10  And had learned -- gotten a call from several deal team

11  members that Endo had entered into dialogue with TEVA

12  pharmaceuticals about potential e-mail being sold to them.

13       So, I took the call from my brother's house.  He overheard

14  it.  Came to me and said something to the effect of, "Hey,

15  what's going on?"

16       And I said, "Great news..."  I would have said something

17  to the effect of "Great news, looks like Endo may be sold,

18  hopefully to TEVA.  We'll see where it goes."

19  **Q**    Did Michael ever tell you that he was buying or selling

20  Endo securities?

21  **A**    No.

22  **Q**    You can set that exhibit to the side, please.

23       (Request complied with by the Witness)

24  **Q**    Mr. Kara, I want to turn back to the -- the time of your

25  wedding.  What was the date of your wedding?

KARA - DIRECT EXAMINATION / DOWLING

1  **A**    July 9, 2005.

2  **Q**    And where were you married?

3  **A**    We were married in Chicago, Illinois.

4  **Q**    I would like to show you now what's been marked as Exhibit

5  89.  If you could take a look at that, and let me know if you

6  recognize it.

7      (Request complied with by the Witness)

8  **A**    Yes, I do.

9  **Q**    What is that?

10 **A**    That is a picture of some of our wedding party in front of

11 the church that my wife Susie and I were going to be married

12 at.

13 **Q**    And is it a fair and accurate depiction of your wedding

14 celebration, on or about July 9, 2005?

15 **A**    It is a very small portion of a large wedding.

16 **Q**    But, accurate of the small portion?

17 **A**    Yes.  Yes.

18 **Q**    Okay.

19      **MS. DOWLING:**  Your Honor, I would like to move

20 Exhibit 89 into evidence.

21      **MS. SHIFMAN:**  No objection, Your Honor.

22      **THE COURT:**  Thank you.  89 is admitted.

23      (Trial Exhibit 89 received in evidence)

24      (Document displayed)

25

KARA - DIRECT EXAMINATION / DOWLING

1  **BY MS. DOWLING:**

2  **Q**   Mr. Kara, where are you located in this photo?

3  **A**   I was the smiling person in the middle of the photograph,

4  with a white tie, and a white flower on my lapel.

5  **Q**   And is your brother Michael in this photo?

6  **A**   Yes, ma'am.

7  **Q**   Where is he located?

8  **A**   He's directly across from me.  And I don't know if the

9  jury can see it.  There's a little bit of a red outline of his

10  tie.  You've got his profile kind of turned towards the

11  audience, but he's the closest male person in front of me.

12  **Q**   Where the arrow is now pointing (Indicating)?

13  **A**   Yes, ma'am.

14  **Q**   Okay.  And if you could look at the back of the photo,

15  there's a yellow circle around an individual.  Do you

16  recognize that individual?

17  **A**   Yes, ma'am.

18  **Q**   Who is that?

19  **A**   That's my brother-in-law, Bassam.

20  **Q**   And, during your wedding celebration, did you observe your

21  brother Michael and Bassam Salman interact?

22  **A**   I did.

23  **Q**   And what did you observe?

24  **A**   And this is around the time of the wedding celebration,

25  ma'am?

KARA - DIRECT EXAMINATION / DOWLING

1   **Q**   Yes, during the wedding celebration.

2   **A**   So we had a -- numerous times to all get together.  I

3   mean, it was celebratory, and it was getting family -- all

4   about getting the families together.  So we had a cruise

5   dinner after our rehearsal dinner that we hosted for very

6   close family and out-of-town guests.  And, we also had a

7   dinner the night before the wedding that we all got together

8   at.

9        And, on the day of the wedding, my brother, acting really

10  on behalf of my dad, or as representative of the elder in the

11  family, would have gone to my brother-in-law's house -- Ghazy

12  Salman, because he's the oldest brother, to go and request

13  their sister's hand, my wife, Susie, in marriage for a final

14  time, and have the families agree to that wedding.

15  **Q**   So this became your brother's duty, because your father

16  had passed away?

17  **A**   Yes.

18  **Q**   So he went to Susie -- your wife's -- older brother's

19  house?

20  **A**   Yes.

21  **Q**   And would Mr. Bassam Salman have been there as well?

22  **A**   I would have expected it.  I don't know if he was actually

23  there.

24  **Q**   And before, before the wedding, you had indicated there

25  were other cultural reasons for your brother Michael Kara and

KARA - DIRECT EXAMINATION / DOWLING

1  your future brother-in-law Bassam Salman to get to know one

2  another and to interact.  Is that right?

3  **A**   Yes.

4  **Q**   And going back to the photo that we have on up on the

5  screen, there is another individual circled in red.  Prior to

6  2009, did you recognize this man?

7  **A**   No.  I did not.

8  **Q**   At that time, the time of your wedding, did you know

9  someone named Karim Bayyouk?

10 **A**   No, I did not.

11 **Q**   Set the wedding photo aside, and I would like to show you

12 now what is been marked as Exhibit 69.  If you could look at

13 Exhibit 69, please, and let me know when you have had a chance

14 to look at it.

15     (Witness examines document)

16     (Off-the-Record discussion between counsel)

17         **THE WITNESS:**  Yes, ma'am.

18 **BY MS. DOWLING:**

19 **Q**   And what is this document, Mr. Kara?

20 **A**   That is an e-mail from my wife, Susie, to me and it was

21 about our guest list for the dinner cruise that I was

22 referencing to you.  She was my fiancee, excuse me, at that

23 time.  She wasn't my wife yet.

24 **Q**   And I assume she did most of the wedding planning?

25 **A**   She did a great job.  Yes, she did.

KARA - DIRECT EXAMINATION / DOWLING

1   Q   Okay.

2          **MS. DOWLING:**  Your Honor, I would like to move

3   Exhibit 69 into evidence.

4          **MS. SHIFMAN:**  Continuing objection, Your Honor.

5          **THE COURT:**  Overruled.  69 is admitted.

6      (Trial Exhibit 69 received in evidence)

7      (Document displayed)

8   **BY MS. DOWLING:**

9   Q   Okay, Mr. Kara, there appear to be several groupings of

10  people shown in this e-mail.  What do those groupings exhibit?

11  A   I think my fiancee at the time, my wife now, grouped us

12  into kind of the closest relatives.  People coming in from

13  California, people coming from Detroit, and then obviously the

14  local family in Chicago.

15  Q   If we can look at the first grouping, if you could tell us

16  who those individuals are, please?

17  A   Um Mounir and Um Susie.  "Um," U-M, is an Arabic word

18  meaning "mother of."  And it's usually of the eldest child in

19  the family.  So, that's referencing my mom and Susie's mom.

20      Mounir, Miriam is his wife, and then their two kids.  And

21  then my sister and her husband and daughter.

22  Q   Okay.  And if we could look at the second grouping of

23  individuals, we're going to scroll down here.

24      (Document displayed)

25  Q   So, we've got California guests.  And we're not going to

1  go through all of these folks, but if you could tell us who --

2  go through the first three rows of individuals, and tell us

3  who those people are.

4  **A**   Sure.  Zahi and Haifa are referenced.  Zahi Haddad and his

5  wife.  Zahi Haddad, as I mentioned earlier, is my uncle, my

6  mom's brother.

7       Sabiha and May.  May is the daughter -- she is the sister

8  of Safwan Hito, that was on that organizational chart earlier.

9  Sabiha is the mother.

10       (Reporter interruption)

11            **THE WITNESS:**  So, Sabiha is May Hito's mom.  And

12  then, Emile Jilwan is my brother's friend.

13  **BY MS. DOWLING:**

14  **Q**   Okay.  And if we could move down now to the Detroit

15  guests.

16       (Document displayed)

17  **Q**   I just want to focus specifically on the last two rows:

18  "Rana/Karim (roula's sister), Nabil/Rania (roula's sister)."

19       Could you tell us who those individuals were, and their

20  relationship to your family?

21  **A**   Yes.  I -- I did -- the people that I knew were Nabil and

22  Rania, who I had met before.  But my sister-in-law Roula has

23  three sisters, and these were two of them that were listed

24  along with, I guess, the names of their husbands.

25  **Q**   Now I want to go down to the last grouping of folks, the

1   Chicago guests.

2   **A**   Uh-huh.

3   **Q**   I don't need to go through all of these, but I want to

4   focus on the first two rows, starting with "Ghazy" and "Sam."

5   **A**   Sure.  This is a reference to Ghazy Salman and Bassam

6   Salman, and their families.  Their spouses.  And their

7   children.

8   **Q**   And, who were those individuals?

9   **A**   So, Ghazy is married to a lovely lady named Khulud, and

10   they have four great kids:  Laura, Jack, Natalie and Yazan.

11       And Bassam's married to a wonderful lady, Roula, with

12   their three kids:  Amal, Amanda and Michael, at that time.

13   And they had a fourth that wasn't there.

14   **Q**   Okay, thank you.  And the individual named Ghazy and the

15   individual named Sam, those are brothers of your wife Susie.

16   Correct?

17   **A**   Yes.

18   **Q**   And does Ghazy have a nickname?

19   **A**   "Tiger."

20   **Q**   Is that the Tiger about whom you were e-mailing in the

21   e-mail that we looked at earlier, with your brother, Michael?

22   **A**   Yes.  Yes, it is.

23   **Q**   And you indicated earlier that your brother had taken on

24   the role of your father during the time of your wedding.

25       Were there other cultural reasons why your brother would

1   have interacted with Bassam Salman and the Salman family?

2   **A**   I have -- I think it's customary in the Middle Eastern

3   culture that when you get married, it's not only a union of

4   the two people in the party, but it is also a union of the

5   families.

6       So part of our traditions, in order to finally get married

7   you need not only the sign-off of the bride and groom, but you

8   need the sign-off of the family to agree to accept the

9   marriage.

10  **Q**   You can move that exhibit to the side.

11          **MS. DOWLING:**   And we're finished with that exhibit,

12  Maryam.   Thank you.

13  **BY MS. DOWLING:**

14  **Q**   Mr. Kara, who was the best man at your wedding?

15  **A**   It was my brother.

16  **Q**   And did he give a speech at your wedding?

17  **A**   Yes, he did.

18  **Q**   And did he talk about your job during that speech?

19  **A**   Yes, he did.

20  **Q**   What did he say?

21  **A**   I was actually very surprised.   But, he put significant

22  emphasis on my career, and said I was an investment banker

23  and, you know, not just a normal guy, that I was an investment

24  banker, whatever that meant to him.   And, took me a little bit

25  by surprise.

KARA - DIRECT EXAMINATION / DOWLING

1    But, he was talking a lot about my career and about the

2    accomplishments that I had.  And I know he meant it in a way

3    that he was very proud of me.  But, it was something that kind

4    of, you know, took me back, took me a little bit by surprise.

5    **Q**   So he was proud of you, your brother?

6    **A**   That is how I interpreted it, yes.

7    **Q**   Okay.  I want to jump forward now to the beginning of 2006

8    time period.

9    **A**   Uh-huh.

10   **Q**   Are you familiar with a company called Andrx Corporation?

11   **A**   Yes, I am.

12   **Q**   And what is Andrx Corporation?

13   **A**   Andrx Corporation was a specialty pharmaceutical company

14   that was based here in the United States.

15   **Q**   And in the January 2006 time period was Citigroup doing

16   any work for Andrx, or relating to Andrx Corporation?

17   **A**   Yes, we were.

18   **Q**   And who did Citigroup represent during that time period?

19   **A**   We were representing a company called Wockhardt

20   Pharmaceuticals.  It was an Indian specialty pharmaceutical

21   company.  And we were representing them in the potential

22   acquisition of Andrx.

23   **Q**   And did you have any role in working with Wockhardt?

24   **A**   Yes, I did.  I had just previously concluded working with

25   them for the prior six months on an unsuccessful attempt to

1   buy another specialty pharmaceutical company, called Alpharma.

2   **Q**   If you could turn now to Exhibit 4, please.  Take a moment

3   to look at it, and let me know if you recognize it.

4   **A**   Yes.

5   **Q**   And what is this document, Mr. Kara?

6   **A**   This is a series of e-mails among Citigroup employees that

7   were on the working group team for Wockhardt Pharmaceuticals.

8   And, were looking at potential acquisition of Andrx.

9   **Q**   And did you receive this e-mail?

10  **A**   Yes, I did.

11  **Q**   And what is the date of this e-mail?

12  **A**   The latest one was on January 11, 2006.

13          **MS. DOWLING:**  Your Honor, I would like to move

14  Exhibit 4 into evidence.

15          **MS. SHIFMAN:**  Continuing objection, Your Honor.

16          **THE COURT:**  All right, objection overruled.  4 is

17  admitted.

18      (Trial Exhibit 4 received in evidence)

19      (Document displayed)

20  **BY MS. DOWLING:**

21  **Q**   Mr. Kara, this e-mail is from an individual named Trygve

22  Mikkelsen.  Who is that?

23  **A**   Trygve Mikkelsen was the head of healthcare mergers and

24  acquisitions at Citigroup.

25  **Q**   And then, looking down, you can see the second e-mail,

KARA - DIRECT EXAMINATION / DOWLING

1    there is an individual named Devinjit Singh.  Who is that?

2    A    Nickamed "DJ Singh," he was my colleague that sat in the

3    Mumbai office, and was the officer that was responsible for

4    Wockhardt physically on the ground in India.

5    Q    I want to focus your attention specifically on this

6    paragraph in Mr. Singh's email, where it says (As read):

7    "Given Wockhardt's imminent bid for Andrx, I'm going ahead and

8    circulating a dial in (below) for 11:00 a.m. New York time

9    today to discuss Wockhardt as well as Ranbaxy."

10        (Reporter interruption)

11   BY MS. DOWLING:

12   Q    (As read):

13   "Given Wockhardt's imminent bid for Andrx, I am going ahead

14   and circulating a dial in (below) for 11 a.m. New York time

15   today to discuss Wockhardt as well as Ranbaxy.  Request all

16   who can make it to dial in.  Thanks, DJ."

17        Mr. Kara, what did you understand "imminent bid for Andrx"

18   to mean?

19   A    That Wockhardt was going to be submitting a proposal to

20   buy Andrx Corporation.

21   Q    And did you consider that information to be confidential?

22   A    Yes.

23   Q    And was this information public?

24   A    No.

25   Q    Was it material information?

1    **A**    Yes.

2    **Q**    Why is that?

3    **A**    Because had it been disseminated to the general public, it

4    likely would have caused Andrx's stock price to go up.

5    **Q**    And you can set that exhibit to the side, please.  When

6    you have a moment, turn to Exhibit 5, please.  Take a look at

7    it, and let me know if you recognize that document.

8    (Request complied with by the Witness)

9    **A**    Yes, I do, ma'am.

10   **Q**    And what is this document?

11   **A**    This is again a series of e-mails among the different

12   working group team members on the transaction of Wockhardt

13   buying Andrx.  And it's an e-mail that I -- I originally

14   received an e-mail indicating that Wockhardt was going to be

15   buying Andrx or would like to buy Andrx.

16   I then forwarded that message to my colleague, Ross

17   MacIntyre, who was head of fixed income, in order to get him

18   to start thinking about a financing proposal for the

19   transaction.

20   **MS. DOWLING:**  Your Honor, I would like to move

21   Exhibit 5 into evidence, please.

22   **MS. SHIFMAN:**  Continuing objection, Your Honor.

23   **THE COURT:**  All right.  Objection overruled.  5 is

24   admitted.

25   (Trial Exhibit 5 received in evidence)

1       (Document displayed)

2              **MS. DOWLING:**  If we could start, Maryam, on the top

3    of the second page where the earlier e-mails are, please.

4       (Document displayed)

5    **BY MS. DOWLING:**

6    **Q**   What is this portion of the e-mail, Mr. Kara?

7    **A**   Yes, ma'am.  It's an e-mail again from DJ Singh, our

8    colleague in India, notifying the working group team that he

9    and a gentleman named Pramit Jhaveri, who was his boss in

10   India, with Wockhardt's chairman, Dr. Khorikawala -- and that

11   they expressed an interest in buying Andrx, and actually

12   agreed to submit an unsolicited offer to the Andrx CEO.

13   **Q**   And I see it says (As read):

14   "Agree to accept an unsolicited offer from W."

15      What is "W"?

16   **A**   "W" is a reference to Wockhardt.

17   **Q**   And if we could look down to the second-to-last paragraph

18   that you see on the screen.

19   **A**   Yes.

20   **Q**   If you could read that paragraph, please.

21   **A**   (As read)

22   "W is paranoid about confidentiality - B of A/Andrx have

23   indicated they would break off discussions in the event of a

24   leak."

25   **Q**   And what did you understand that to mean, Mr. Kara?

```
 1   A    Quite simply, what it said.  Bank of America is the

 2   reference to "B of A."  They were Andrx's advisor.  That they

 3   wanted to keep this, the knowledge of -- of Wockhardt's

 4   interest in Andrx very confidential, and that they would

 5   potentially break off the deal in the event of a leak.

 6   Q    And did you consider this information to be confidential?

 7   A    Yes.

 8   Q    Non-public?

 9   A    Yes.

10   Q    And material information?

11   A    Yes.

12   Q    If you can turn back to the first page, please.

13        (Request complied with by the Witness)

14   Q    You indicated that this first e-mail had been forwarded to

15   Ross MacIntyre.  And, the first paragraph says (As read):

16   "re confidentiality:  we should start using project name and

17   code names on all e-mails and memos immediately."

18        What did you understand that to mean?

19   A    As I've mentioned today, ma'am, typically when we are

20   mandated on a merger or acquisition, we, as a -- as a proper

21   safeguard policy, would assign a project name with code names

22   for the target and the acquirer in order to protect the

23   confidentiality of that information.  And to make sure that

24   only people who needed to know even within Citigroup actually

25   knew about the deal.
```

1   **Q**   And did you continue to work on Wockhardt's potential

2   acquisition of Andrx after January 11th?

3   **A**   I did.

4   **Q**   And what happened?

5   **A**   Oh, excuse me.  After -- after January 11, I did just for

6   a short time, and then I was actually asked to no longer work

7   on the account.

8   **Q**   So you worked on it some period past January 11th, and

9   then you no longer worked on the transaction?

10  **A**   I was -- I helped -- what ended up happening was I was --

11  Citigroup had gone and hired a new person that was going to be

12  focused on the specialty pharmaceutical sector.

13  **Q**   Uh-huh.

14  **A**   His name was Dung Nguyen.  And Trygve Mikkelsen, the head

15  of M&A, asked that Dung supersede me in terms of having

16  primary responsibility on the account.

17      As the transaction went forward, and because of my prior

18  knowledge of Wockhardt and its financing history and the

19  complications associated with an Indian buyer buying a U.S.

20  company, I remained active in terms of knowledge of the

21  account over the time.  Of -- of what was happening on the

22  transaction.

23  **Q**   So you were still involved, just a little bit more

24  peripherally?

25  **A**   That's correct.

KARA - DIRECT EXAMINATION / DOWLING

1    **Q**   If you would set that exhibit aside, we're going to turn

2    to what's been marked as Exhibit 290, please.  And take a look

3    at that document, and let me know when you've had a chance to

4    look at it, and if you recognize it.

5    **A**   Yes.

6    **Q**   And what is this document, Mr. Kara?

7    **A**   This is a series of communications between the internal

8    working group list for the Wockhardt/Andrx transaction.  And

9    it's actually -- the main part of it was an e-mail from Trygve

10   Mikkelsen, the head of M&A, indicating that I no longer need

11   to be cc'ed on this particular transaction because I'm not

12   going to be working on it.

13        **MS. DOWLING:**  Your Honor, I would offer Exhibit 290

14   into evidence, please.

15        **MS. SHIFMAN:**  Continuing objection.

16        **THE COURT:**  All right, thank you.  Okay, overruled.

17   290 is admitted.

18        (Trial Exhibit 290 received in evidence)

19        (Document displayed)

20   BY MS. DOWLING:

21   **Q**   Mr. Kara, if you look in the middle of the page here, this

22   second e-mail is from an individual named Indranil Ghosh.  Who

23   is that?

24   **A**   He was an investment banking colleague that was working

25   for us as an analyst in the India investment banking group.

KARA - DIRECT EXAMINATION / DOWLING

1    **Q**    And, what are the dates of these e-mails?

2    **A**    It seems to be right around January 12th of 2006.

3    **Q**    Okay.  And, Mr. Ghosh says (As read):

4    "Please find attached the Sprout Engagement letter."

5        What is Sprout?

6    **A**    That was one of the code names that we used for the

7    Wockhardt/Andrx situation.

8    **Q**    Okay.  And what is an engagement letter?

9    **A**    An engagement letter is an agreement where -- between

10   Citigroup and a corporate client, where the corporate client

11   agrees to hire Citigroup as an advisor on a transaction.

12   **Q**    You indicated that you had been removed from this deal,

13   but stayed involved peripherally.  This is an e-mail that you

14   testified about, from Trygve Mikkelsen that says (As read):

15   "No need to cc Maher on this as he will not be involved."

16       How did you feel about being removed from the core of the

17   working group on this transaction?

18   **A**    Yeah, I was very upset about being taken off this

19   transaction.

20   **Q**    Why is that?

21   **A**    Several reasons.  I was the U.S. person that actually

22   facilitated the first transaction that we were engaged on, and

23   did not win.  And I had developed a very close relationship

24   with the chairman of Wockhardt.

25       I was a second-year director at that January, 2006 time

1  frame.  And that could have been a promotion year for me.  The

2  next level would have been promotion to managing director.

3  And, the way the investment banks work, oftentimes the way you

4  get promoted is by bringing in a large amount of fees that get

5  attributed to Citigroup.

6      And, this transaction, if it had gone through, had a

7  significant amount of fees that could have been associated

8  with it.  Both in terms of the financing, as well as a

9  separate fee for the advisory of the transaction.  And, having

10 lost the opportunity to get credit for that, I was very upset

11 about it.

12 **Q**   So you were looking to be promoted to managing director?

13 **A**   Yeah.  I mean, it would have been early as a -- as a D2,

14 but something that I'd actually thought, based on my prior

15 performance, that I could have been promoted that year.

16 **Q**   Is that -- I'm sorry, go ahead.

17 **A**   No --

18 **Q**   Is that the top of the investment banking food chain, if

19 you will?

20 **A**   Yes.  At Citigroup, it was.

21 **Q**   And did you discuss being removed from this transaction

22 with your brother Michael?

23 **A**   I did.

24 **Q**   And what did you tell him?

25 **A**   I told him something to the effect that I was really

1    pissed that I was taken off of this account.  Specifically,

2    that it was an account that I had busted my butt on.

3        And I had even been at home in December of 2005,

4    previously, when we found out that we didn't win the last deal

5    for Wockhardt, with a different pharmaceutical company.  And

6    so my brother was aware that we had lost a deal for Wockhardt

7    as early as 2005.  December of 2005.

8    **Q**   And why did you have these discussions with Michael in

9    early 2006 about this transaction?

10   **A**   You know, as I described the nature of my relationship

11   with him, he sort of -- you know, he became very interested in

12   my career, became very interested in how I was doing.  And, he

13   was somebody that I viewed as my friend, and somebody that I

14   could count on to sort of vent about my career.

15       It just -- I got so comfortable -- naively comfortable and

16   completely unguarded about my relationship with him, that it

17   felt like there's no possible way he would do something.  You

18   know, that that -- passing that information to him was like

19   talking to a sound -- you know, to a soundboard.

20   **Q**   In this January, 2006 time period, when you were removed

21   from the deal, after that time, did you continue to monitor

22   what was going on with the Andrx negotiations?

23   **A**   Yes.

24   **Q**   And how did you do that?

25   **A**   My colleague Dung Nguyen didn't have the benefit of

1    working on the previous transaction.  So, there was some

2    complicated structuring questions around the financing of this

3    transaction because the company was based in India, and there

4    were all sorts of rules around how much debt they could

5    assume, et cetera.  So my colleague Dung would come and ask me

6    questions about how to structure the deal.

7  **Q**   I would like to show you what's marked as Exhibit 296,

8    please.  If you could pull that from the exhibit pile.  If you

9    can move forward to 296.

10 **A**   Yes.

11 **Q**   Do you recognize this document?

12 **A**   I do.

13 **Q**   And what is this document?

14 **A**   This is a series of e-mails between my friend and

15   colleague Dung Nguyen and I.

16 **Q**   And what is the subject matter of these e-mails?

17 **A**   It was about getting together for dinner, and then -- that

18   night.  And he was referencing that -- I thought, when he was

19   talking -- in one of the e-mails he references talking about

20   the Andrx situation.  I thought he meant "closed" as in that

21   the deal was done.  He was talking about "close," about the

22   Andrx transaction.

23      And I mentioned to him, "Hey, you know, great job, can I

24   get a lucite and an invite to the closing dinner."

25 **Q**   So this dialogue was about the Andrx --

```
 1    A    The Andrx transaction.  Yes, I'm sorry.

 2               MS. DOWLING:  Your Honor, I would like to move

 3    Exhibit 296 into evidence.

 4               MS. SHIFMAN:  Same objection.

 5               THE COURT:  All right, overruled.  Admitted.

 6         (Trial Exhibit 296 received in evidence)

 7         (Document displayed)

 8               MS. DOWLING:  If we could enlarge the middle portion

 9    of this e-mail.

10         (Document displayed)

11    BY MS. DOWLING:

12    Q    Mr. Kara, the section where it says "u rock, can I get a

13    lucite and an invite to the closing din..."

14    A    Yes.

15    Q    That's where you indicated that you thought that the deal

16    had closed at that time?

17    A    Yes.

18    Q    But it had not yet closed.

19    A    Yes.  I guess I later learned that "close" or "closed" --

20    what I thought was "closed" meant "close."

21    Q    And what is a lucite?

22    A    A lucite is a little plastic trophy that investment

23    bankers make when a deal gets closed.  And we use it as a kind

24    of an affirmation of the deal we just finished.

25    Q    And, did that deal ever take place?
```

KARA - DIRECT EXAMINATION / DOWLING

1   **A**   Yes, it did.  But it was with a different buyer.

2   **Q**   Okay.  Thank you.  You can set that exhibit to the side,

3   please.

4       (Request complied with by the Witness)

5   **Q**   I want to turn now to another company, called United

6   Surgical Partners International.  Are you familiar with a

7   company called United Surgical Partners International?

8   **A**   Yes, I am.

9   **Q**   Is it also known as USPI?

10  **A**   Yes.

11  **Q**   And what is it?

12  **A**   It is a company that's in the healthcare services space.

13  And was a client of Citigroup's.

14  **Q**   And in the summer of 2006 time period, was Citigroup

15  performing any work for USPI?

16  **A**   Yes, they were.

17  **Q**   What was it doing?

18  **A**   Citigroup was representing their largest shareholder, a

19  private equity firm, that was looking to potentially buy the

20  entire company of United Surgical Partners.

21  **Q**   And were you working on this transaction for --

22  **A**   No, I was not.

23  **Q**   And how did you come to learn that Citigroup was advising

24  a company on a purchase of USPI?

25  **A**   I learned it from my colleague, Daniel Decelles.

1  **Q**   And what was the company that was looking to purchase

2  USPI?

3  **A**   It was -- I apologize, the name I'm blanking on, but it

4  was a private equity -- their lead shareholder was a private

5  equity firm that was looking to buy the company.

6  **Q**   And, about approximately when did you -- do you recall

7  learning about this transaction?

8  **A**   I recall learning about it during the summer, kind of end

9  of August, early September of 2006.

10 **Q**   And did you have discussions with your brother about USPI?

11 **A**   I did.

12 **Q**   And what did you tell him?

13 **A**   Initially, the discussions started over a CNBC show at his

14 house and we were watching something about leveraged buyouts.

15 And my brother became interested in understanding who

16 conducted leveraged buyouts.

17     And I explained to him that a company like USPI which had

18 a significant shareholder, the shareholder could come and do

19 an LBO.  And the conversation really revolved around that

20 shareholder, because at that time I had learned from my

21 colleague, Dan Decelles, that he had been invited to join a

22 car club that was being run by a gentleman named Dan Quealy,

23 that was a partner of the private equity fund.  And, that's

24 how the conversation actually started.

25     Later, my brother, around the late August/early September

KARA - DIRECT EXAMINATION / DOWLING

1   time frame -- it was on a visit at home -- had approached me

2   again.  And he brought up the topic of United Surgical

3   Partners, and said that he had been looking at it, and that

4   the company looked cheap.

5       You know, I think I was really taken back by his comment.

6   And at that point in time, it was very clear to me that my

7   brother was looking at United Surgical Partners not for any

8   other reason but as a potential investment.

9   Q   And, what happened after Michael told you that USPI looks

10  cheap?

11  A   Um, I agreed with him.  In fact, I had had a healthcare

12  services report or a healthcare research report that included

13  healthcare services in my bag, and I had seen that it was

14  their top LBO pick.

15      So I gave my brother that research report, and I said that

16  I learned that USPI was likely going to be acquired by a

17  private equity firm.

18  Q   And was that confidential information?

19  A   Yes, it was.

20  Q   Was that material information?

21  A   Yes, it was.

22  Q   So, were you encouraging him?

23  A   Um, I certainly was.

24  Q   Any other confidential information you recall giving to

25  your brother, Michael, at that time about USPI?

1    **A**    Um, no, just that that -- the way that I learned about it

2    was that my colleague Dan Decelles was representing the

3    private equity firm that was looking to acquire the company.

4    **Q**    And, why did you give your brother a research report?

5    What was the purpose of that?

6    **A**    Um, the reason -- excuse me.  The reason that I gave him

7    the research report was it was on my position, and I thought

8    to myself that in the event that, you know, that it was a way

9    for me to kind of absolve myself of any guilt of confirming

10    that a transaction was ongoing at Citigroup and a way that my

11    brother could potentially get -- a negative situation such as

12    the one I find myself in right now ever arose, that he could

13    have information that could back up that he had done his own

14    research on it.

15    **Q**    He would have something to point to?

16    **A**    Yes.

17    **Q**    As opposed to pointing to you as the source.

18    **A**    Yes.

19    **Q**    So over what period of time did you provide Michael

20    information about USPI and a possible USPI acquisition?

21    **A**    From that September time frame my brother, you know,

22    persistently and repeatedly called me.  And again, I did

23    everything I could to sort of deflect it.

24        And, when he would get me on the phone, I figured the only

25    way to sort of get him off my back was just to say -- not to

KARA - DIRECT EXAMINATION / DOWLING

1  take his call, and to tell him that my colleague, Dan

2  Decelles, who was working on it was still busy.  And by that,

3  I was effectively telling him, "sit tight."

4  **Q**  So "Dan is still busy" was code for "sit tight"?

5  **A**  Yeah.

6  **Q**  "Deal's still going on"?

7  **A**  Yes, and I --

8  **Q**  Just taking longer than originally planned?

9  **A**  Yes.  And I did that, really, from September all the way

10  through the end of the year, through December.

11  **Q**  And, what did you think your brother was going to do with

12  that information?

13  **A**  I expected he was going to likely trade on it.

14  **Q**  And why did you disclose the confidential information

15  about a possible USPI acquisition to your brother?

16  **A**  Um, you know, I -- I had gone through a gamut of things in

17  my mind about the persistence and the nagging.  And, I -- I

18  could see that my brother was going to be relentless, and I

19  was afraid of being detected.  So I disclosed USPI to him as

20  opposed to other companies that I was working on, to avoid

21  detection.  And I did it so I could help him.

22  **Q**  And did you help yourself in that process, too?

23  **A**  Standing here, sitting here today, I obviously didn't help

24  myself.  But I thought I could get him off my back.  Yes.

25  **Q**  The goal at that time --

1    **A**    The goal at that time was to give me relief from him, and

2    I felt that was the way to do it, was to give it to him.  It

3    would benefit him, and benefit me directly.

4    **Q**    So you -- you would disclose confidential information to

5    your brother, Michael, about other companies, prior.  How did

6    the USPI situation differ from those earlier -- confidential

7    information that you provided?

8    **A**    For me, again, naively, in looking back at it, I'm just so

9    embarrassed with myself and my own conduct.  And, should have

10   known better.  But, I didn't expect him to be trading on the

11   information.

12       In the case of USPI, I -- I fully expected that he was

13   going to trade on that information.  And it was when I gave

14   him -- when I finally gave him the information, it was my

15   intent to benefit him.  Before, I had no knowledge he was

16   trading, I had no intention of him having any gains or -- even

17   at that time, I didn't know what he was -- how he was going to

18   benefit from it.

19       But, just -- USPI, I knowingly, willfully acted to benefit

20   my brother.

21   **Q**    The two of you had been watching a television show.  Was

22   it about USPI?

23   **A**    It was about leveraged buyouts.  And we were talking about

24   people in my group, and private equity investors, and how much

25   money they made.  And the subject of Dan Quealy, who was the

1    partner in that private equity firm, came up.  And so the name

2    USPI came out.

3        And he turned around and did his -- you know, looked it

4    up, and came back to me and said it was cheap.  You don't say

5    that unless you're doing real work around a company.

6    **Q**    But you proactively brought up the name USPI?

7    **A**    Yes, I did.

8    **Q**    I want to turn now to another company --

9             **THE COURT:**  Let's take a break at this point.

10            **MS. DOWLING:**  Yes.

11            **THE COURT:**  Take another matter.  We're going to need

12   a 20-minute break this time, so get back at 3:15.

13            **MS. DOWLING:**  Thank you, Your Honor.

14            **THE COURT:**  Thank you.

15            **THE CLERK:**  All rise for the jury.

16       (Jury excused)

17       (Recess from 2:54 to 3:19 p.m.)

18       (The following proceedings were held in the presence of

19   the Jury)

20            **THE CLERK:**  All rise for the jury.

21       Please be seated.

22            **THE COURT:**  Okay, we are going to resume with the

23   continued direction of Mr. Kara.

24            **MS. DOWLING:**  Yes, Your Honor.  Thank you.

25                    **DIRECT EXAMINATION, RESUMED**

KARA - DIRECT EXAMINATION / DOWLING

1    BY MS. DOWLING:

2    Q    When we left off before the break, we were just going to

3    begin talking about PDL Biopharma.  Are you familiar with PDL

4    Biopharma?

5    A    Yes, I am.

6    Q    And was that company previously called Protein Design

7    Labs?

8    A    Yes, it was.

9    Q    And at some point, it changed its name?

10   A    Yes.

11   Q    When?

12   A    Shortly after the acquisition of ESP Pharma, the company

13   decided to change its name to PDL Biopharma.

14   Q    And did you do any projects for PDL Biopharma in the

15   2006-2007 time period?

16   A    Yes.

17   Q    And you worked on these projects?

18   A    Yes.

19   Q    What did you did for PDL Biopharma?

20   A    I think, you know, it was one of my core accounts, and we

21   had regular and frequent dialogue with the company about

22   financings -- potential financings, as well as any strategic

23   type of advice.

24        And in that time frame that you are referencing, we at

25   Citigroup became aware that PDL Biopharma could be an

KARA - DIRECT EXAMINATION / DOWLING

1    attractive target to a slew of different companies, or even

2    activist investors.  And we were looking to try to get engaged

3    either by PDL biopharma as a strategic advisor, or potentially

4    by a buyer of the company.

5    **Q**   So Citigroup was looking at getting involved in both sides

6    of a possible transaction, either representing PDL or

7    representing a possible buyer?

8    **A**   Yes.

9    **Q**   If you could turn, please, to Exhibit 344.  Take a look at

10   that document, and let me know when you've had a chance to go

11   through it.

12   **A**   Yes.

13   **Q**   And, do you recognize this document?

14   **A**   I do.

15   **Q**   What is it?

16   **A**   It's an e-mail communication between the head of

17   healthcare M&A by the name of Tryvge Mikkelsen and then the

18   head of the life sciences team, Steven Fisch.

19   **Q**   And what is this in reference to, Mr. Kara?

20   **A**   I was planning to meet with the CEO of the company, PDL

21   Biopharma, Mark McDade, in Fremont.  And one of the topics

22   that I wanted to open up to him was acting as an adviser if

23   they were approached as a target company.

24       So I was asking the team -- at the same time, our team was

25   looking to hear from Schering Plough Corporation about the

```
 1    possibility that they may be interested in acquiring PDL
 2    Biopharma.  So I was asking my team if I should go ahead with
 3    meeting Mr. McDade, or if -- I didn't want to create a
 4    conflict internally between asking to be his advisor and at
 5    the same time the other team asking to be an adviser for
 6    Schering Plough.
 7            MS. DOWLING:  Your Honor, I would like to move
 8    Exhibit 344 into evidence.
 9            MS. SHIFMAN:  Same objection.
10           THE COURT:  Let me make sure -- 344 is the e-mail
11    from Mikkelsen?
12            MS. DOWLING:  Correct.
13            THE COURT:  And it's dated the 4th, right?
14            MS. DOWLING:  December 4th, 2006.
15            THE COURT:  All right.  To Mr. Kara.  All right.
16    Objection overruled, and 344 is admitted.
17        (Trial Exhibit 344 received in evidence)
18            MS. DOWLING:  Thank you, Your Honor.
19        (Document displayed)
20    BY MS. DOWLING:
21    Q   So Mr. Kara, the first e-mail, December 4th, 2006 e-mail
22    from Trygve Mikkelsen to you and Mr. Fisch, says:
23    "Waiting to hear from SPG.  Let's decide by lunchtime today."
24        What is "SPG" in reference to?
25    A   To the pharmaceutical company, Schering Plough
```

KARA - DIRECT EXAMINATION / DOWLING

1  Corporation.

2  **Q**   And, is that the other possible company that Citigroup was

3  looking at representing in a potential transaction?

4  **A**   Yes.  Schering Plough would have been the company

5  representing the buyer of PDL Biopharma.

6  **Q**   Okay.  And if we could scroll down, please.

7       And Mr. Kara, this middle sentence:

8  "should I cancel my meeting with mcdade..."

9       Again, who was McDade?

10  **A**   Mark McDade was the CEO of PDL Biopharma.

11       (Reporter interruption)

12       **THE WITNESS:**  Was the chief executive officer of PDL

13  Biopharma.

14  **BY MS. DOWLING:**

15  **Q**   You can set that exhibit to the side, please, and I would

16  like you to take from the pile Exhibit 347.

17       Tell me when you've had a chance to look at that.

18       (Witness examines document)

19  **A**   Yes.

20  **Q**   And what is this document, Mr. Kara?

21  **A**   This is an e-mail communication between me and a gentleman

22  named Leon Kalvaria, who is the global head of healthcare

23  investment banking as well as consumer investment banking at

24  Citigroup.

25       **MS. DOWLING:**  I would like to move Exhibit 347 into

1    evidence, Your Honor.

2             **MS. SHIFMAN:**  Continuing objection.

3             **THE COURT:**  All right.  Objection overruled, 347 is

4    admitted.

5         (Trial Exhibit 347 received in evidence)

6         (Document displayed)

7    **BY MS. DOWLING:**

8    **Q**   Mr. Kara, can you please explain this e-mail?

9    **A**   Yes, I can.  I was informing the head of the group that I

10   was having a meeting in two days from that date, with the CEO

11   of PDL Biopharma.  And that I had held off on asking him to

12   represent them as a strategic advisor because of directions

13   given to me by Steven Fisch and Trygve Mikkelsen, in that we

14   could be representing Schering Plough as an adviser for the

15   buyer instead of the seller.

16   **Q**   So at this point, you are asking to be able to continue

17   conversations with a company that you covered?

18   **A**   That's right.  And I'm also telling him now that it's

19   clear that it's us working for Schering Plough, I think it is

20   important to initiate -- for me to keep the meeting with Mark

21   McDade, and initiate conversations on other topics than just

22   that one assignment of Schering Plough potentially buying

23   them.

24   **Q**   And did you, in fact, keep that meeting with Mr. McDade?

25   **A**   I did.

KARA - DIRECT EXAMINATION / DOWLING

1  **Q**   And you can put that exhibit to the side, too, please.

2       (Request complied with by the Witness)

3  **Q**   Mr. Kara, in the early 2007 time period, did you -- do you

4  recall having any discussions with your brother Michael about

5  a possible acquisition of PDL Biopharma?

6  **A**   Yes.

7  **Q**   And what was the nature of those discussions?

8  **A**   You know, I was over at my brother's house around this

9  February time period.  And I think it was specifically around

10 a usual visit, where I made it a point to try and stay at home

11 and then visit my family.

12      And my brother saw that I was receiving faxes at his

13 house, and also getting packages for presentation materials

14 related to a meeting with Mark McDade.  And he asked me, "Hey,

15 you know, what..." something to the effect of "You look busy."

16      And I said, "Yeah.  Hopefully -- you know, we're in the

17 midst of a transaction with PDLI.  The company, you know, may

18 be -- may be interested in selling.  Let's see where it goes."

19 **Q**   And was that confidential information that you imparted to

20 your brother?

21 **A**   Yes.

22 **Q**   Was it non-public information?

23 **A**   Yes, it was.

24 **Q**   And would that have been material information?

25 **A**   Yes, it was.

1  **Q**   I want to move forward now to the March, 2007 time period.

2  A company called Biosite.  Are you familiar with a company

3  called Biosite?

4  **A**   Yes.

5  **Q**   And what is it?

6  **A**   Biosite is a medical diagnostics company based in the

7  United States.

8  **Q**   And in 2007, was Citigroup performing any work related to

9  Biosite?

10 **A**   Yes.

11 **Q**   What was Citigroup doing for Biosite?

12 **A**   At the time, I didn't know who the buyer was, but I

13 learned that Citigroup was representing a company that was

14 interested in potentially purchasing Biosite.

15 **Q**   Do you recall who the potential purchaser was?

16 **A**   I later learned that it was Beckman Coulter.

17 **Q**   And were you personally doing any work on that

18 Biosite/Beckman Coulter deal?

19 **A**   No, I was not.

20 **Q**   And how did you come to learn that Citigroup was

21 representing Beckman Coulter in a possible acquisition of

22 Biosite?

23 **A**   Well, I learned that we were representing a buyer, not

24 necessarily Beckman Coulter, at an officer luncheon.  And that

25 was, I believe, on a Monday.  And, I was just walking into the

1   room to gather around the table, and I recall our two group

2   heads at that time, Rick Landgarten and Mike Giaquinto

3   sitting.

4       And one of them mentioned that they were looking forward

5   to some potentially large fees associated with the acquisition

6   of Biosite, and that the announcement of the acquisition could

7   come as early as next -- next Monday.

8   **Q**   Show you what's marked as Exhibit 363, if you could locate

9   it in the exhibits.  And take a look at it, and tell me when

10  you've had a chance to look through it.

11  **A**   Yes.

12  **Q**   And do you recognize that document?

13  **A**   I do.

14  **Q**   And what is that document?

15  **A**   It's an e-mail communication from the chief operating

16  officer of our group, her name is Susan Francis.  And, it was

17  sent to healthcare officers, of which I was a member.

18  Reminding us about the healthcare luncheon that I was just

19  researching on Monday, March 19th.

20          **MS. DOWLING:**  Your Honor, I offer Exhibit 363 into

21  evidence.

22          **MS. SHIFMAN:**  Continuing objection.

23          **THE COURT:**  All right, objection overruled.  363 is

24  admitted.

25      (Trial Exhibit 363 received in evidence)

1      (Document displayed)

2    **BY MS. DOWLING:**

3    **Q**   Mr. Kara, this -- thank you.  And again, what is the date

4    of this e-mail?

5    **A**   It's Monday, March 19th, 2007.

6    **Q**   And I see in the To line, it says "HealthCare Officers -

7    Global."  Are you a HealthCare Officer - Global?

8    **A**   Yes, I was.

9    **Q**   And you said that this was in reference to the luncheon

10   where you overheard a conversation about fees that were going

11   to be generated from a deal with Biosite.  Is that correct?

12   **A**   That's correct.

13   **Q**   And if we look down at the attendees, if we could expand

14   that, if you don't mind enlarging the confirmed attendees

15   portion, please.

16      (Document displayed)

17   **Q**   You were one of the confirmed attendees at this luncheon?

18   **A**   Yes, I was there.

19   **Q**   Mr. Kara, after learning of the impending acquisition of

20   Biosite, did you discuss Biosite with your brother, Michael

21   Kara?

22   **A**   I did.

23   **Q**   And when did that discussion take place?

24   **A**   It took place that Thursday.  March 22nd.

25   **Q**   And where were you at the time?

**A**    I was in a taxicab in New York.

**Q**    And what happened, how did that -- that conversation come about?

**A**    Um, I had received an e-mail from one of the assistants in the office.  And, contacting me to let me know that my brother Michael had called.  I was on the way to go see a colleague of mine -- Dan Decelles, in fact -- who had just recently resigned from Citigroup, and meet him in Soho, which is part of New York, or a little -- a little area in New York.

I picked up the phone, I called my brother back.  And, he didn't sound well.  He told me that he had been sick, and the reason he hadn't called me in a few days was that he was really ill.  He said that my mom wasn't feeling well.  And, just sounded very down.  He then said that he needed a favor.

And, I said, "Okay.  What kind of favor?"

And he said, "I need some information."

And I said something to the effect of "If this is about money, I can give you money."

And he said "No, it's not about money.  I need information.  I owe somebody."  And then he said, "Please, I need this.  Please, I need this."

I paused in the taxi.  I think a bunch of things just started going through my head.  And, my -- my immediate reaction was I went through numerous transactions that I was working on, and I was panicking and wondering what my brother

1   had gotten himself into.

2       And out of my mouth, I said, "I -- I think a company

3   called Biosite -- I learned a company called Biosite may be

4   acquired as early as next week."

5   **Q**   And, why did you choose to give Michael information about

6   Biosite when he asked you for information, as opposed to

7   another company that you were working on?

8   **A**   As I had mentioned, I think it was just such a sudden and

9   unexpected situation that when I realized he needed this

10  information, and he wouldn't agree that it was an issue about

11  money, that I -- I went through my head, and I said I can't --

12  I didn't want to tell him about the biotechnology transactions

13  that I was working on.

14      And I ended up telling him about Biosite because I wanted

15  to reduce the likelihood that by giving him insider

16  information, which if we ever got caught -- which we did --

17  that it could ever be attributed back to me.

18  **Q**   And after you gave him the information that there was an

19  impending acquisition of Biosite, what happened next?

20  **A**   I was in the taxi.  And it just happened so fast, it

21  was -- I told him I needed to call him back.  I paid the taxi.

22  I called my brother back.  I was pacing up and down the

23  street.  And, I just remember it as clear as yesterday.

24      And I told him, "Please, what I just did was wrong.  It

25  was illegal.  Do not act on this.  And do not give this

1  information to anyone.  And if you do, I believe that the

2  Securities and Exchange Commission" -- "the SEC," I said --

3  "is tracing -- will trace this phone call."  And that, "We

4  will get into a lot of trouble."

5  **Q**  And what did your brother say in response?

6  **A**  He said "Don't worry."

7  **Q**  And what did you think your brother was going to do with

8  the information you had given him about Biosite?

9  **A**  He was going to trade on it.

10 **Q**  I would like to show you now what's been marked as Exhibit

11 372.

12    (Witness examines document)

13 **A**  Yes.

14 **Q**  Do you recognize that document?

15 **A**  I do, ma'am.  Sorry.

16 **Q**  And what is it?

17 **A**  This is a copy of my Cingular wireless telephone records

18 for my phone number while I was in New York.  My cellphone

19 number.

20      **MS. DOWLING:**  Your Honor, offer Exhibit 372 into

21 evidence.

22      **MS. SHIFMAN:**  No objection, Your Honor.

23      **THE COURT:**  All right, 372 is admitted.

24    (Trial Exhibit 372 received in evidence)

25      **MS. DOWLING:**  If we could look at the first page,

```
 1    please.

 2         (Document displayed)

 3    BY MS. DOWLING:

 4    Q    Do you see the number listed here, Mr. Kara?

 5    A    Yes, I do.

 6    Q    Was that your cell phone number?

 7    A    Yes, it was.

 8    Q    If you could turn now to Page 34 in that exhibit.

 9         (Request complied with by the Witness)

10    A    Yes, ma'am.

11    Q    Do you see in the lower portion of this -- if you could

12    enlarge calls 161 through 170.

13         (Document displayed)

14    Q    Mr. Kara, are you able to identify the phone calls you

15    just testified to between you and your brother, Michael, where

16    you disclosed the Biosite information?

17    A    Yes, I am, ma'am.

18    Q    And where are those?

19    A    In that far left column, they are Nos., Line No. 167 and

20    168.  Those are the two phone calls that I just referenced.

21    Q    And what times were these phone calls made?

22    A    It looks like the first phone call was at 3:43 p.m.

23    New York time.  East Coast.

24    Q    And who to what number was that call made?

25    A    That was to my brother's cell phone, which was
```

1    707-567-2202.

2    **Q**   And the second call?

3    **A**   It was at 3:49.  And it was also to 707-567-2202.

4    **Q**   And how is it that you are able to remember this so

5    clearly, Mr. Kara?

6    **A**   This is -- this has been a nightmare that I have relived

7    every day of my life for the last six years.  I wish I could

8    take it all back.  But I remember that conversation like it

9    was yesterday.

10    **Q**   Why did you choose to provide your brother with

11    confidential information about Biosite?

12    **A**   Terrible judgment, and it was an issue of panic.  I didn't

13    know what my brother was involved in, when I offered him money

14    and he said it wasn't about money and he didn't need money.  I

15    didn't know what he had done.  And, he said he needed

16    information.  And, that's what I gave him.

17    **Q**   If you could set that exhibit to the side, please.

18    (Request complied with by the Witness)

19    **Q**   Turn now to Exhibit 371.

20    (Request complied with by the Witness)

21    **Q**   Take a look at it, and let me know if you recognize this

22    document.

23    **A**   Yes, ma'am.

24    **Q**   What is this document?

25    **A**   The original e-mail, ma'am, came from Henry Schwake to my

1  colleague in Citigroup.  To healthcare managing directors as

2  well as healthcare directors, of which I was, at that time.

3       And it was Henry announcing to the group that we

4  represented Beckman Coulter in their acquisition of Biosite.

5  **Q**   What is the date of that e-mail and announcement?

6  **A**   It was Sunday, March 25th, 2007.

7  **Q**   And how does that time period relate to when you told your

8  brother about the Biosite acquisition?

9  **A**   That was three days after I had told him, the acquisition.

10  I learned of it -- or told him on March 22nd.

11  **Q**   And was this a sizeable deal?

12  **A**   Yes, it was.

13  **Q**   And before you had received this e-mail (Indicating),

14  about the transaction, were you aware of the size of the

15  transaction?

16  **A**   No, I was not.

17  **Q**   But you were aware that Citigroup would be obtaining fees

18  from the transaction?

19  **A**   Yes, I was aware that there were going to be significant

20  fees associated with it.

21  **Q**   Thank you.  You can set that exhibit to the side, please.

22       (Request complied with by the Witness)

23  **Q**   I want to turn your attention now to another company,

24  called Alexion.  Are you familiar with Alexion

25  Pharmaceuticals?

KARA - DIRECT EXAMINATION / DOWLING

1    **A**    Yes, I am.

2    **Q**    And what is Alexion?

3    **A**    Alexion was a biopharmaceutical company, based in the

4    United States.

5    **Q**    And in 2007, was Citigroup performing work relating to

6    Alexion?

7    **A**    Yes, we were.

8    **Q**    And were you personally involved in the work Citigroup was

9    doing with Alexion?

10   **A**    Yes, I was.

11   **Q**    And what work was Citigroup doing for Alexion?

12   **A**    We were representing a Danish pharmaceutical company, a

13   very large one, called Novo Nordisk.  And we were acting as

14   their advisor in looking at either a contemplated acquisition

15   of the company, or a very large equity investment into Alexion

16   Pharmaceuticals.

17   **Q**    If you could locate Exhibit 375, please.  Let me know when

18   you have had a chance to look at it.

19        (Request complied with by the Witness)

20   **A**    Yes, ma'am.

21   **Q**    Do you recognize this document?

22   **A**    I do.

23   **Q**    Does this document relate to the transaction you were just

24   telling us about?

25   **A**    Yes.

KARA - DIRECT EXAMINATION / DOWLING

1  **Q**   What is this document?

2  **A**   This is what's known as a -- in the acronym, NBM.  That

3  stands for a new business memorandum.  And it's about a

4  project called Project Alex, which refers to Alexion.

5       And, it was letting the control group and letting the deal

6  team know that a transaction had been registered where

7  Citigroup had been mandated as an adviser for Novo Nordisk, to

8  act on their behalf with respect to a counterpart known as

9  Alexion Pharmaceuticals.

10           **MS. DOWLING:**  Your Honor, I would like to move

11  Exhibit 375 into evidence, please.

12           **MS. SHIFMAN:**  Same objection.

13           **THE COURT:**  Overruled.  No. 375 is admitted.

14       (Trial Exhibit 375 received in evidence)

15       (Document displayed)

16  **BY MS. DOWLING:**

17  **Q**   Mr. Kara, what is the date of this e-mail?

18  **A**   This one is February 21st, 2007.

19  **Q**   And could you show us in the middle of the page here where

20  it says -- it says "Project Code Name"?

21       "Project Alex," was that the code name for this

22  transaction?

23  **A**   Yes, it was.

24  **Q**   And would information about this transaction have been

25  confidential information?

1   **A**   Yes.

2   **Q**   And material information?

3   **A**   Yes, it was.

4   **Q**   Non-public information?

5   **A**   Yes, it was.

6   **Q**   Do you recall having any conversations about this

7   transaction with your brother?

8   **A**   No, I don't.

9   **Q**   As you sit here today, could you rule out the possibility

10  that you had conversations about Alexion with your brother?

11  **A**   No, I can't.

12  **Q**   You can set that exhibit aside, please.

13      (Request complied with by the Witness)

14  **Q**   Mr. Kara, at some point did you come to learn that the

15  Securities and Exchange Commission or SEC was investigating

16  possible insider trading in Biosite and other securities?

17  **A**   Yes, I did.

18  **Q**   And, how did you learn about the SEC investigation?

19  **A**   I learned about it from my brother, initially.  He called

20  me on April 30th of 2007.  And the reason that I can remember

21  that date, it's my wife's birthday.  And we had just come back

22  home from dinner.  And, my brother called.  He sounded pretty

23  shaken up.

24      And, he told me that he had received a call from the SEC,

25  and that they had asked him about Biosite, Andrx and USPI.

KARA - DIRECT EXAMINATION / DOWLING

1   That he had told them that he did not get stock information

2   about those companies from me.  That they had asked him

3   whether or not we shared confidential material non-public

4   information.  He said no.

5       And then he also started to name other people that the SEC

6   asked about.  As soon as he started telling me the names of

7   other people, I stopped him.  I told him I didn't want to hear

8   about it, any more.  And I said something like, "What the F

9   were you" -- expletive -- "were you thinking?"

10  **Q**   And after the call with your brother, did the SEC contact

11  you as well?

12  **A**   Yes, they did.

13  **Q**   And when, approximately, was that?

14  **A**   The SEC called me the next day.

15  **Q**   And what happened?

16  **A**   I answered the phone.  And, they began asking me questions

17  about Biosite, USPI, Andrx and other companies.  And, they

18  also asked me about my relationship with these other people.

19  And I made numerous false statements to the SEC.

20  **Q**   What are some examples of the false statements that you

21  made to the SEC?

22  **A**   They asked me whether or not I told my brother about a

23  company called Biosite.  I said no.  That was false.

24      They asked if I had shared material non-public information

25  with my brother about Citigroup clients.  I said no.  That was

KARA - DIRECT EXAMINATION / DOWLING

```
 1    false.
 2        I said -- they asked me if I had told my brother about a
 3    company called USPI.  I said no.  That was false.
 4        They asked me if I had shared information about Andrx
 5    Corporation with my brother.  I said no.  And that was false.
 6        They also asked me if I had learned about a transaction
 7    related to Biosite.  And I said "Not until after the deal was
 8    announced."  That was false.
 9        And I made numerous other false statements that I can go
10    through with you and with the jury and with Judge Chen.
11    Q   Mr. Kara, why did you lie to the SEC when they called you?
12    A   Um, I was terrified.  My wife was nine months pregnant
13    with our first child.  And, Grace was born on May 7th, so six
14    days after that phone call.  I was scared of the consequences
15    on my family.
16        I didn't know what my brother had done with respect to the
17    other people.  Nor the involvement of others.  I didn't even
18    know about the majority of the trading that they were asking
19    me about.  And, I was worried about my career and worried
20    about going to jail.
21    Q   And, after this call with the SEC, did you tell Mr. Bassam
22    Salman that the SEC had contacted you?
23    A   Yes, I did.
24    Q   What did you tell him?
25    A   Um, I told -- it was around, you know, about a month
```

1   after, or -- that I had been contacted.  So, a few weeks

2   after.  And I confided in Mister -- with Bassam that I had

3   received a call from the SEC, and that they had asked me about

4   my involvement with insider trading, and they had asked me a

5   bunch of questions about people that I didn't know about their

6   involvement.  And, that I was really worried about my career.

7   Q    And what was Mr. Bassam Salman's reaction?

8   A    He was concerned.  He put his hands in his pocket and

9   said, "Oh, my gosh, oh, my gosh," and began pacing back and

10  forth.

11  Q    Mr. Kara, were you aware that your brother Michael was

12  providing the material non-public information that you

13  provided him, to other people?

14  A    No.

15  Q    And were you aware that your brother was giving that

16  information to Mr. Bassam Salman (Indicating)?

17  A    No.

18  Q    Mr. Kara, was there a period of time during which you

19  denied your wrongdoing to the government?

20  A    Absolutely.

21  Q    Starting with that SEC call?

22  A    I was denying it to myself, as well.  Not just the

23  government.  Yes.

24  Q    But it didn't end with that second call, right?

25  A    No.

1    **Q**   It continued for a time period.  Right?

2    **A**   It continued for a couple of years.  Until after the

3    indictment.

4           **MS. DOWLING:**  Thank you, Mr. Kara.  No further

5    questions at this time.

6           **THE COURT:**  All right.  Cross-examination?

7           **MS. SHIFMAN:**  Thank you, Your Honor.  I just need a

8    minute to set up.

9           **THE COURT:**  Certainly.

10      (Off-the-Record discussion between counsel)

11           **MS. DOWLING:**  One more question, Your Honor, sorry.

12           **THE COURT:**  All right.

13   **BY MS. DOWLING:**

14   **Q**   Mr. Kara, what was the date of that indictment that you

15   referenced?

16   **A**   I believe, ma'am, I was indicted -- I hate to say this --

17   I think on my wife's birthday in -- on or around April 30th of

18   2009.

19   **Q**   So, approximately two years after that phone call with the

20   SEC.

21   **A**   Yes, ma'am.

22           **MS. DOWLING:**  Thank you.

23           **THE COURT:**  Okay.

24

25

1                        <u>**CROSS EXAMINATION**</u>

2    **BY MS. SHIFMAN:**

3    **Q**   Good afternoon, Mr. Kara.

4    **A**   Hi.

5    **Q**   You will notice to your left there is a binder, with a

6    little yellow on the side, in the binder sleeve.

7    **A**   Yes.

8    **Q**   I have no lovely Maryam at my table who can put things

9    magically on the screen, so we're doing it the old-fashioned

10   way with binders and paper.  So, I may refer you to various

11   documents in there.  And I would -- when I do, I would just

12   ask that you go to the exhibit tab.

13   **A**   Yes, ma'am.

14   **Q**   Okay.  I want to sort of step back, and go back a little

15   bit to the beginning, and talk to you about your educational

16   background.

17        You -- you attended UC Berkeley.  Correct?

18   **A**   Yes.

19   **Q**   And, you graduated in '93 with a degree in business from

20   their Haas School.

21   **A**   That's correct.

22   **Q**   And while you were at Berkeley, you interned at a

23   number -- several big-name companies.

24   **A**   Yes, I did.

25   **Q**   Chevron was one?

KARA - CROSS EXAMINATION / SHIFMAN

1   **A**   Yes.

2   **Q**   Pac Bell was another?

3   **A**   Yes.

4   **Q**   Coopers and Lybrand?

5   **A**   Yes.

6   **Q**   And you received job offers from all three of those

7   companies.

8   **A**   Yes.

9   **Q**   And after you got your bachelor's degree, you went to get

10   your master's.  Is that what you said?

11   **A**   Yes, ma'am.

12   **Q**   And you did that at the University of Chicago, and you

13   went there in -- you graduated, excuse me, in 1998.

14   **A**   That's correct.

15   **Q**   And you studied there for two years.

16   **A**   Yes.

17   **Q**   From '96 to '98.

18   **A**   Yes.

19   **Q**   And, the University of Chicago is a -- is known as one of

20   the best business schools in America.  Is that fair to say?

21   **A**   Yes.

22   **Q**   All right.  It's ranked by *Bloomberg Business Week* as

23   number one, and there's always jostling for that first

24   position?

25   **A**   Yes.

KARA - CROSS EXAMINATION / SHIFMAN

1    **Q**   And it's known for being a school that has a lot of

2    empirical research and studies in the capital markets?

3    **A**   That's correct.

4    **Q**   And the capital markets are a part of our financial system

5    that deal with the shares and equity-backed security bonds and

6    long-term investments.  Is that fair to say?

7    **A**   I -- I don't know equity-backed securities bonds, but it

8    is a school with a strong emphasis in corporate finance, yes,

9    ma'am.

10   **Q**   Correct.  And, a research emphasis on that.

11   **A**   Yes.

12   **Q**   And, it's a very difficult school to get into.  It's

13   competitive.

14   **A**   Are you -- are you asking me?  I'm sorry.

15   **Q**   I am asking you.

16   **A**   Yes.  It was competitive.

17   **Q**   And once you're in the school, it's also very competitive

18   amongst your other students.  All the other students.

19   **A**   Yes.

20   **Q**   It's a prestigious school.

21   **A**   Again, if you are asking me, I felt it was, yes.

22   **Q**   When I'm talking, usually I'll be asking questions,

23   because I'll ask questions, you'll do the answers.  Okay?

24   **A**   Yes.

25   **Q**   Okay.  So as part of your curriculum at the University of

KARA - CROSS EXAMINATION / SHIFMAN

1    Chicago, you took classes to learn about the capital market

2    system and capital markets.

3    **A**    Yes, I did.

4    **Q**    And you learned how stocks work.

5    **A**    Yes.

6    **Q**    Options.

7    **A**    Yes.

8    **Q**    Puts.

9    **A**    Yes.

10   **Q**    And while attending school at the University of Chicago,

11   you also earned and took part in some impressive internships.

12   **A**    Yes.

13   **Q**    For example, you interned in the leveraged finance group

14   at Chase Bank.

15   **A**    Yes.

16   **Q**    While you were there getting your MBA at the University of

17   Chicago, you chose a concentration for your studies.  Is that

18   correct?

19   **A**    That's right.

20   **Q**    And, in my little research, they seemed to have 14

21   different areas of concentration.  Like, economics, accounting

22   or finance, those would be degrees or areas of concentration.

23   Correct?

24   **A**    Yes, ma'am.

25   **Q**    What was your area of concentration?

KARA - CROSS EXAMINATION / SHIFMAN

1   **A**   Finance and corporate strategy.

2   **Q**   And in taking your courses in finance and corporate

3   strategy, business ethics came up on the -- in the various

4   lectures from your professors.  Is that correct?

5   **A**   Yes.

6   **Q**   And, business ethics is sometimes the subject of

7   University of Chicago publications.

8   **A**   Um, I -- I don't recall any specific ones, but I'm sure

9   they have been.

10   **Q**   And, as part of your education while at the University of

11   Chicago, you learned about insider trading.

12   **A**   I likely did.  Yes.

13   **Q**   And, do you remember, do you recall anything that they

14   told you about insider trading while you were studying?

15   **A**   I don't recall anything specific, ma'am, but it would have

16   been definitely supplemented by the training that I got at

17   Citigroup.

18   **Q**   Okay.  Would it be fair to say that while you were in

19   school, they would have told you and lectured upon the

20   distinction between trading on information that was okay to do

21   and trading on information that was criminal?

22   **A**   Probably, yes.

23   **Q**   And, you learned about the consequences of insider trading

24   back as far as somewhere in '96 to '98.

25   **A**   Yes.

KARA - CROSS EXAMINATION / SHIFMAN

1 **Q** And after graduating with your MBA, you went to work at

2 Solomon Smith Barney.

3 **A** Yes.

4 **Q** And I think you said that it later became part of

5 Citigroup?

6 **A** Yes, ma'am.

7 **Q** And eventually you landed in the tech group within

8 Citigroup?

9 **A** That's correct.

10 **Q** And you did very well while you were working in the tech

11 group.

12 **A** I did.

13 **Q** You became the highest-ranking associate in your office.

14 **A** I did.

15 **Q** And as the most successful associate, even at that level,

16 they trained you right out of the box on what your job was.

17 **A** Yes, ma'am.

18 **Q** And, you learned what rules that you needed to follow.

19 **A** That's correct.

20 **Q** You learned the duty of confidentiality you had to your

21 clients.

22 **A** That's right.

23 **Q** To your employer.

24 **A** Yes.

25 **Q** You learned why the duty of confidentiality was important.

KARA - CROSS EXAMINATION / SHIFMAN

1    **A**   That's correct.

2    **Q**   And you learned what could happen if those duties were

3    breached.

4    **A**   Yes.

5    **Q**   You learned about the harm that could come to clients.

6    **A**   Yes.

7    **Q**   You learned about the harm that could come to the

8    employer.

9    **A**   Yes.

10   **Q**   And, you learned about the harm that could potentially

11   result in the capital markets, if the rules were breached.

12   **A**   Yes.

13   **Q**   Your employer made sure that you understood the

14   significance of your duty of confidentiality.

15   **A**   Yes, they did.

16   **Q**   That the significance was, in part, to protect those

17   business interests so that it didn't impact the capital

18   markets.

19   **A**   That's correct.

20   **Q**   You attended training courses while at Citi after the

21   initial training when you came in the door, you said that was

22   six weeks?

23   **A**   Yes, ma'am, I believe the summer training was somewhere

24   between six and eight weeks, before we actually got our formal

25   first assignments.

KARA - CROSS EXAMINATION / SHIFMAN

1    **Q**    So that was a very intensive training in your duties of

2    confidentiality and the rules of play.

3    **A**    Just so I can be clear, the six weeks were not just

4    focused on that, but there was definitely a segment, a

5    significant segment of that where there were probably a couple

6    of days spent on how to treat confidential information.

7    **Q**    After you graduated the intensive study, you had at least

8    annual updates for how to handle confidential information.

9    **A**    Yes, ma'am.

10   **Q**    You learned while on the job, as well, about the law of

11   insider trading.

12   **A**    That's right.

13   **Q**    You received training, both in your day-to-day activities

14   and in the intensive training classes.

15   **A**    Yes, ma'am.

16   **Q**    I would like to shift a little bit and ask you some other

17   questions about your impressive background.  Up until the time

18   period in question that resulted into your testifying here.

19        And, up until this point, you've never had any problems

20   with the law.

21   **A**    No, ma'am.

22   **Q**    You have never been arrested?

23   **A**    No, ma'am.

24   **Q**    Never been convicted of a crime?

25   **A**    No, ma'am.

KARA - CROSS EXAMINATION / SHIFMAN

1   **Q**   And, similarly, you never had any disciplinary problems

2   while you went to school.

3   **A**   No.

4   **Q**   Never in university, at Berkeley?

5   **A**   No.

6   **Q**   Not at the University of Chicago in your MBA program?

7   **A**   No.

8   **Q**   Never accused of plagiarism?

9   **A**   No.

10  **Q**   Never accused of cheating.

11  **A**   No.

12  **Q**   Or acting unethically in any of your courses or classes?

13  **A**   No.

14  **Q**   You never had a reputation for doing anything like that.

15  **A**   I don't know what other people said about me, but I wasn't

16  aware if that was my reputation or not.  I thought I had a

17  clean reputation.

18  **Q**   Because everything you had done had been clean.

19  **A**   I thought so.

20  **Q**   By the books.

21  **A**   I thought so.

22  **Q**   Before you breached your duties to your employer,

23  Citigroup, you never breached your duties to any other

24  employer.

25  **A**   No, ma'am.

KARA - CROSS EXAMINATION / SHIFMAN

1  **Q**   You had always been a good worker?

2  **A**   I tried.

3  **Q**   You never had any disciplinary problems while at your

4  previous jobs?

5  **A**   Not that I was aware of.  Not --

6  **Q**   If you had done anything wrong, do you think you would

7  know?

8  **A**   Yeah, I think I would have known.

9  **Q**   Okay.

10 **A**   Okay.

11 **Q**   You always had good performance reviews?

12 **A**   Generally, yes, ma'am.

13 **Q**   And, after achieving your master's at -- you worked for

14 how many companies before you ended up at Smith

15 Barney/Citigroup?

16 **A**   In which time period are you asking about, ma'am?

17 **Q**   After you got your MBA.

18 **A**   Yeah, I only had worked as an intern at Chase Securities

19 in New York before I received my full-time offer from Solomon

20 Smith Barney.

21 **Q**   But from the time you left Berkeley through your

22 employment at Citigroup, if you weren't in full-time school,

23 you'd always been working.  Correct?

24 **A**   Well, yes.  As I mentioned before, I started at Coopers

25 and Lybrand, in their tax consulting group.  That was my only

KARA - CROSS EXAMINATION / SHIFMAN

1    employer after college and through my MBA.

2    Q    You never left any employment because you were fired from

3    a previous company.

4    A    No, ma'am.

5    Q    And before what did in this case, you always had good

6    references from your previous employers.

7    A    Yes.

8    Q    Your employers trusted you?

9    A    Yes, they did.  I hope so.

10   Q    Citigroup trusted you?

11   A    Yes, they did.

12   Q    Your colleagues trusted you?

13   A    Yes, they did.

14   Q    Your clients trusted you.

15   A    Yes.

16   Q    So, you've never had any problems getting a job.  Up to

17   this point.

18   A    Up to this point.

19   Q    A better job, if you wanted it.

20   A    Yes, ma'am.

21   Q    It's fair to say before what you did in this case, your

22   career was on an upward trajectory.

23   A    Yes.

24   Q    You were a rising star.

25   A    I had my ups and downs, but yeah, when I left Citigroup,

KARA - CROSS EXAMINATION / SHIFMAN

1   ma'am, I was going to a very good opportunity.

2   Q    Because you were on an upward trajectory (Indicating), a

3   rising star.

4   A    Thank you for saying that.  I'll take the compliment.

5   Q    Your reputation in your family was that you were a rising

6   star.

7   A    Yeah.

8   Q    And you felt they were proud of you for everything you had

9   done.

10  A    Yep.

11  Q    When you met Susie in 2002, she was a medical student at

12  the University of Chicago?

13  A    Uh, yes.

14  Q    That's also a very prestigious medical school.

15  A    She's an extremely brilliant woman.

16  Q    And, she finished school and is now a pediatrician.

17  A    Yes.

18  Q    She's hard-working?

19  A    Extremely.

20  Q    Beautiful?

21  A    Yes.

22  Q    Loving?

23  A    Uh-huh.

24  Q    You got engaged in June of 2003.

25  A    Yes.

KARA - CROSS EXAMINATION / SHIFMAN

1    **Q**   And you married in July of 2005.

2    **A**   That's right.

3    **Q**   You introduced your families to each other before you

4    married, because that was important to you.

5    **A**   Yes.

6    **Q**   You wanted them to get a chance to get to know each other.

7    **A**   That's -- yes.

8    **Q**   Build a connection, if that was possible, with each other.

9    **A**   Yes.

10   **Q**   That your families are connected is important, not just

11   sort of for this cultural reason, but because it's important

12   to you.

13   **A**   Yes.

14   **Q**   And it's important to your wife, Susie.

15   **A**   Absolutely.

16   **Q**   So, you had a chance to meet with Susie's family?

17   **A**   Yes, I did.

18   **Q**   And, you had a chance to meet with Sam (Indicating)?

19   **A**   Yes.

20   **Q**   And Susie's family got to know you.

21   **A**   Yes.

22   **Q**   That was the purpose.  You were the main purpose, since

23   you were interested in Susie, potentially marrying Susie.

24   **A**   Yes.

25   **Q**   It was a serious relationship.

1   **A**   Right away.

2   **Q**   And, you wanted them to know what kind of man you are.

3   **A**   Um, yes, I wanted them to understand who they could be

4   considering allowing their sister to get married to.

5   **Q**   You wanted them to know that you were hard-working?

6   **A**   Yes.

7   **Q**   That you were held in high regard?

8   **A**   Uh, yeah, I think so.

9   **Q**   That you were trustworthy.

10  **A**   Yes.

11  **Q**   It's fair to say that you wanted Susie's family to accept

12  you.

13  **A**   Absolutely.

14  **Q**   And to accept your family.

15  **A**   Yes.

16  **Q**   You introduced your own brother, Mounir, Michael Kara, to

17  Susie's family.

18  **A**   Yes, I did.

19  **Q**   Do you call your brother "Michael," or "Mounir"?

20  **A**   Um, I haven't spoken to him in four years, but I don't

21  know what I would say -- whatever you're comfortable with, I'm

22  happy to call him.

23  **Q**   When you spoke to him on a regular basis.

24  **A**   Yeah, I call him "Mounir."

25  **Q**   "Mounir."  So I'm going to call him "Mounir" too, if

1    that's all right with you.

2    **A**    Okay.

3    **Q**    Okay.  You introduced Mounir to Susie's brothers.  To

4    Ghazy, the elder brother.  Right?

5    **A**    Yes.

6    **Q**    And to Sam as well.

7    **A**    Yes.

8    **Q**    And, in your presence, Sam Salman and your brother Mounir

9    had a chance to meet.

10   **A**    Yes.

11   **Q**    The first time they met was in May of 2002, when Sam

12   accompanied Susie and a few other family members out here to

13   California.

14   **A**    That -- that sounds about right.

15   **Q**    And they lived in the Chicago area, so they flew out here

16   to the Bay area.

17   **A**    Yes, ma'am.

18   **Q**    And it was a quick visit.  Two, two days, maybe two and a

19   half days?

20   **A**    I think that's right.

21   **Q**    But the families, though you wanted them to really spend

22   some time and get to know each other, they lived in different

23   cities.

24   **A**    Absolutely.

25   **Q**    And Michael lived here in California (Indicating), Sam

KARA - CROSS EXAMINATION / SHIFMAN

1    lived in Chicago.  Is that correct?

2    **A**    That's correct.

3    **Q**    And they saw each other only occasionally.

4    **A**    As far as I knew, yes.

5    **Q**    And in fact, before your engagement, only that once in May

6    of 2002.

7    **A**    Um, I can't confirm it, ma'am.  That could be very well

8    true.

9    **Q**    And usually, when --

10   **A**    I'm just trying to think of the different times that -- in

11   between the engagement.  I recall my mom and my dad coming out

12   to Chicago as well on a separate, separate trip.

13   **Q**    Okay.  But right now, I'm just talking about Mounir.

14   **A**    Yes, ma'am.  Okay.

15   **Q**    Okay?  Usually when Mounir would be in the presence of

16   Sam, you would also be present, in those early days.

17   **A**    Yeah, initially, yes.  And then Susie and I would try to

18   go have some private time to talk.

19   **Q**    And, when you had your engagement party, that -- I think

20   that was in June of 2003.

21   **A**    Yes.

22   **Q**    That was in Chicago?

23   **A**    Yes.

24   **Q**    Or in the Chicago area.

25   **A**    Yes.

1   **Q**   Sam was there (Indicating)?

2   **A**   Yes.

3   **Q**   But your brother Mounir wasn't.

4   **A**   No, he was not.

5   **Q**   Because he had fallen -- he had been -- you came to

6   understand he had been pushed off a ladder, and he had broken

7   some bones in his back.

8   **A**   Yeah, I knew he had an injured back, yes.  Yes.  And

9   that's -- and that's what I understood from him and his wife

10  as to why they didn't come.

11  **Q**   Because he had been pushed off a ladder.

12  **A**   Yes, ma'am.

13  **Q**   And, something about an Asian gang member pushed him off

14  ladder?

15  **A**   I think that was something that I learned later, but at

16  the time of the actual accident and around then, I think his

17  wife called me and told me that he -- he had hurt his back

18  through a fall.  I think I later learned about what you are

19  describing.

20  **Q**   And, that pushing off a ladder by an Asian gang member,

21  you came to learn that, in fact, isn't what happened.

22  **A**   That's correct.

23  **Q**   That he took a fall, and claimed that's what happened.

24  **A**   That's correct.

25  **Q**   That he maybe wasn't in -- of sound mind when he made that

1    claim.

2    A    I --

3            MS. DOWLING:  Objection, Your Honor.

4            THE COURT:  Overruled.  He can answer the question,

5    if he understands it.

6            THE WITNESS:  I -- I don't know, ma'am, what a sound

7    mind is.  And again --

8    BY MS. SHIFMAN:

9    Q    That is fair.  That's so fair.  Okay.

10   A    And I also, again, had learned it not from my brother, but

11   from another family member.  So I was hearing things

12   thirdhand.

13   Q    Yes.  So you came to learn that he was having a delusion

14   when he made that claim.

15   A    That's not how it was stated to me, but yeah.  That he

16   thought he was pushed off a ladder by an Asian gang.

17   Q    And, let's go back to that engagement party.  Sam got to

18   see your family -- Mounir in particular is what I'm referring

19   to right now -- maybe one time during the year.  Isn't that

20   correct?

21   A    It could be right, yes, ma'am.

22   Q    Once in 2002?

23   A    Um, that's the only visit that I -- I personally recall

24   Susie's family coming to, yes.  And I don't recall my brother

25   going to Chicago.  I'm not sure.

KARA - CROSS EXAMINATION / SHIFMAN

1    **Q**   Maybe once in 2003?

2    **A**   I'm not -- I don't know.  I don't remember it.

3    **Q**   Okay.  And maybe once in 2004.

4    **A**   Um, I think more than once in 2004.  Because I recall the

5    family coming out when my dad was ill, to check on my dad.

6    And then, later at both the funeral services, which, I don't

7    believe Sam was able to attend the funeral, but I do believe

8    later was able to attend the memorial service.

9    **Q**   And when parts of Susie -- members of Susie's family came

10   to visit your -- your ill father, that was Ghazy and Susie.

11   And Rose, Ghazy's mother.  Was it not?

12   **A**   Definitely I remember Tiger being there, yes.  And Susie

13   and her mom.  I'm not -- I am not sure if Sam came or not.

14   And forgive me, ma'am, because I was living in New York, and

15   was flying to see my dad on weekends and taking red-eyes back

16   on Sunday night to get back to work on Monday.

17   **Q**   Sure.  Your brother Michael wasn't always there when you

18   were with Susie's family.

19   **A**   I'm sorry?

20   **Q**   I'll repeat it.

21   **A**   Yes.

22   **Q**   Your brother Michael wasn't always there when you were

23   with Susie's family.

24   **A**   No.  That's correct.

25   **Q**   And Sam wasn't always there when family members from the

KARA - CROSS EXAMINATION / SHIFMAN

1    two sides were together.

2    **A**   That's true.

3    **Q**   It's not easy when families live in different parts of the

4    country, different sides of the country, to get together.

5    **A**   That's correct.

6    **Q**   Takes time and money for the travel for the visits?

7    **A**   Yes.

8    **Q**   Your families did their best to try to get to know each

9    other.

10   **A**   That's correct.

11   **Q**   Is it fair to say that if you had been living in the same

12   community, that the families would have -- visits would have

13   been more regular?

14   **A**   I -- I would hope so.

15   **Q**   And they would have gotten to know each other much more

16   deeply and intently.

17   **A**   Yes.

18   **Q**   Your wife, Susie, when she learned of what happened here,

19   she was shocked.

20   **A**   Yes.

21   **Q**   She was shocked that you would breach your duties in the

22   way that you did.

23   **A**   Yes.

24   **Q**   Because you had never done anything like that before.

25   **A**   That's correct.

KARA - CROSS EXAMINATION / SHIFMAN

1   **Q**   Because that's not who you held yourself out to be.

2   **A**   That's not who I was.   That's correct.

3   **Q**   You got to know her family during your courtship.

4   **A**   Yes.

5   **Q**   You got along with them?

6   **A**   Loved them very much.

7   **Q**   You felt like they liked or loved you?

8   **A**   They are the most welcoming people that I have ever met.

9   **Q**   They -- it seemed to you that they believed you were a

10  good match for Susie.

11  **A**   Yes.

12  **Q**   That you were a catch, as they say.

13  **A**   She's a catch, too.   I was -- I was more lucky, to get

14  her.

15  **Q**   You were well-educated?

16  **A**   Yes.

17  **Q**   Could provide for her and any children you might have.

18  **A**   Yes.

19  **Q**   You loved her.

20  **A**   Very much.

21  **Q**   So, Susie's family loved you, in turn.

22  **A**   Yes.

23  **Q**   They entrusted her to you.

24  **A**   Yes.

25  **Q**   Her brother, on the day of your wedding, literally walked

KARA - CROSS EXAMINATION / SHIFMAN

1    her up to give her to you.

2    **A**    Yes.

3    **Q**    Her oldest brother acted as sort of the father of the

4    family because their father had died?

5    **A**    Yes.

6    **Q**    And Sam walked Susie up the steps in the church to marry

7    you.

8    **A**    Yes.

9    **Q**    He was happy for Susie.

10   **A**    Yes.

11   **Q**    He was happy --

12   **A**    I hope so.

13   **Q**    He was happy for you.

14   **A**    I hope so.  Yes.

15   **Q**    You believe they approved of you.

16   **A**    Yes.

17   **Q**    You -- they trusted that you would be a good addition to

18   their family.

19   **A**    Yes.

20   **Q**    You had worked hard to get to where you were.

21   **A**    Yes.

22   **Q**    You were reliable?

23   **A**    Yes.

24   **Q**    Susie relied on you.

25   **A**    She did.

KARA - CROSS EXAMINATION / SHIFMAN

1    **Q**   You took care of her.

2    **A**   Yes.

3    **Q**   You'd take care of their children.  You promised.

4    **A**   Yes.

5    **Q**   Your family relied on you.

6    **A**   Yes.

7    **Q**   They trusted you.

8    **A**   Yes.

9    **Q**   You disappointed them, by doing this.

10   **A**   Absolutely.

11   **Q**   Everybody.

12   **A**   Myself, most.

13   **Q**   When you revealed that information to your brother, you

14   breached Citigroup's trust.

15   **A**   I did.

16   **Q**   You breached your clients' trust.

17   **A**   I sure did.

18   **Q**   You breached your colleagues' trust.

19   **A**   Yep.

20   **Q**   And you breached your family's trust.

21   **A**   Yes.

22   **Q**   I want to ask you about your brother, Mounir.  I know this

23   is not easy.  I know there's a long history.

24       In 1999, he was diagnosed with Bipolar I disorder.  Is

25   that correct?

KARA - CROSS EXAMINATION / SHIFMAN

1   **A**   Um, I believe that's the right time, ma'am, yeah.

2   **Q**   But he wasn't well long before that diagnosis.

3   **A**   That's correct.

4   **Q**   You have early memories of him being unwell.

5   **A**   Yes.

6   **Q**   He's ten, ten and a half years older than you?

7   **A**   That's correct.

8   **Q**   Your memories of him being unwell began when maybe you

9   were like a preteen, 13 years old?

10  **A**   Yeah, yes.  I think any time from that -- ten-year-old,

11  eleven, twelve and beyond.  Even -- even eight or nine.  Yeah.

12  **Q**   Okay.  So, Mounir was a late teenager, 20 years old, and

13  you recall him having serious difficulties.

14  **A**   Yes.

15  **Q**   His illness manifested itself in many different ways.

16  **A**   Yes.

17  **Q**   Sometimes, he would act paranoid?

18  **A**   Um, it's tough to generalize about that, ma'am.  There

19  were times where he began to act paranoid.  I didn't see that

20  initially, in him.  Again, I was young.

21      I felt the description of what you are describing,

22  paranoid, sort of evolved when I was more in the late college

23  time frame.

24  **Q**   All right.

25  **A**   So I was in my twenties, he was in his thirties.

KARA - CROSS EXAMINATION / SHIFMAN

1  **Q**  So it progressed over time.

2  **A**  Yes.

3  **Q**  Got more severe.

4  **A**  Yes.

5  **Q**  More active.  More present.

6  **A**  I think more present, yeah.

7  **Q**  Okay.  More present.  You -- sometimes he had delusions?

8  **A**  Um, you know, from what I had heard from other family

9  members, yes.

10  **Q**  And, those delusions also progressed and got worse over

11  time.

12  **A**  I think, as -- from what I understood from his wife,

13  because that's who I'd hear about the delusions from, they

14  progressed as a result of many of the medications he was on.

15       **MS. DOWLING:**  Your Honor, I object, on hearsay.

16       **THE COURT:**  Sustained.  I'm going to strike that

17  comment from the Record.

18  **BY MS. SHIFMAN:**

19  **Q**  He's been suicidal?

20  **A**  Yes.

21  **Q**  Have you seen him in a delusion -- when he's been in the

22  midst of a delusion?

23  **A**  No.

24  **Q**  Has he talked to you about some delusional beliefs?

25       **MS. DOWLING:**  Objection, Your Honor, hearsay.

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  Um, I'm thinking of the different

3     incidents, ma'am, in my mind.  The bugging incident, he never

4     discussed it with me.

5          Right now, I can't recall specifically any events.  If you

6     have an event in mind, I would be happy to recall it.

7     **BY MS. SHIFMAN:**

8     **Q**    We will get into some of the specifics in a bit.

9     **A**    Okay.

10    **Q**    It's fair to say he's been emotionally unstable?

11    **A**    Yes.

12    **Q**    He's acted impulsively?

13    **A**    Yes.

14    **Q**    He's had a tendency to exaggerate?

15    **A**    Yes.

16    **Q**    To sometimes even lie?

17    **A**    Yes.

18    **Q**    You have described him to others as a pathological liar.

19    **A**    I think we reached a point in our relationship where it

20    was hard to believe anything that he was saying to me.

21    **Q**    You even told the government that he was a liar, a thief,

22    and a drug addict.

23    **A**    Um, you know, I think those are some -- I don't know how

24    people interpret the things that I say or how they are

25    written.  I think those are pretty broad characterizations.

KARA - CROSS EXAMINATION / SHIFMAN

1   But my brother certainly has had a lot of issues, yes.

2   **Q**   And you wanted the government to know that in your mind,

3   at the time you passed the information on to them, that he was

4   a liar, a thief, and a drug addict?

5             **MS. DOWLING:**   Objection, asked and answered.

6             **THE COURT:**   Overruled.   You can answer.

7             **THE WITNESS:**   Um, if that's how it came across, I

8   wanted them to know that much of what the government had

9   originally thought about this case, I didn't know.

10       So, when I called him a liar, I was probably referring to

11   the times where he just flat-out denied that he was trading,

12   and he turned out to be trading.   A thief, because I felt that

13   much of the information that was used when I learned of the

14   trading activities was taken from me, without my knowledge and

15   without my consent.

16       And to call him a drug addict, I don't know if -- I know

17   he had an addiction.   But to label him as a drug addict, he

18   wasn't -- I think there was a time in his life where he may

19   have been a drug addict, ma'am.

20   **BY MS. SHIFMAN:**

21   **Q**   You're not unsure about that now.

22   **A**   Um, no.

23   **Q**   He was a drug addict.

24   **A**   Um, again, it's, for me, from information that I -- I had

25   heard from other people, yes.

1   **Q**   And, because he went into drug rehab programs?

2   **A**   I --

3        **MS. DOWLING:**   Objection.   Object to this line of

4   testimony as narrative, no time frames or context.

5        **THE COURT:**   I think it's a fair question.

6        In terms of vagueness, why don't you set forth some time

7   frame here?

8   **BY MS. SHIFMAN:**

9   **Q**   You came to learn that he -- it's going to be a two-part

10  question.

11       You came to learn that he went into drug rehabilitation

12  programs.

13  **A**   Yes, I did come to learn it.

14  **Q**   And he went into those drug rehab programs as late as

15  1999.

16  **A**   Um, that sounds about right.   Yes.   Again, ma'am, this is

17  information that I had heard from family members.

18       The 1999 incident was the incident that I described to the

19  Court earlier today, in my apartment at 1000 Chestnut.   And,

20  my brother told me he was going to get help.   I -- I never

21  followed through with him to understand of that, but I thought

22  that he did seek help, and that's when the diagnosis that you

23  described came out.

24  **Q**   And when he was in your apartment on Chestnut Street in

25  1999, he seemed high on drugs to you.

KARA - CROSS EXAMINATION / SHIFMAN

1   **A**   I couldn't -- he was definitely intoxicated on alcohol.

2   And he was grinding his teeth.  And, he was not right.  So, I

3   don't know.  But I don't know what was in his body.  I do know

4   that alcohol was in his body.  I could smell it.

5   **Q**   He's someone who has had a history of lies?

6           **MS. DOWLING:**  Objection, object for vagueness, no

7   time frame here.

8           **THE COURT:**  Why don't you set a time frame, or be

9   more specific.

10          **MS. SHIFMAN:**  Well, Your Honor, I need to -- he's

11  described him as a pathological liar.  This is a followup

12  question to that.

13          **MS. DOWLING:**  Objection.  Misstates testimony.

14          **THE COURT:**  You can allow some -- allow for some time

15  frame.

16  **BY MS. SHIFMAN:**

17  **Q**   Is it fair to say that as recently as the underlying facts

18  in this case, that he was lying without any control, to you?

19          **MS. DOWLING:**  Objection.  Vagueness.

20          **THE COURT:**  Overruled.

21          **THE WITNESS:**  I don't know -- I don't think he was

22  lying without control, ma'am.  He was, um --

23  **BY MS. SHIFMAN:**

24  **Q**   Deliberately lying?

25  **A**   He was intentionally lying, yeah.

1   **Q**   Intentionally lying.  Let's talk about one of those

2   intentional lies.  You directly asked him in February or March

3   of 2005, "Are you trading in any of the companies that I

4   talked to you about?"

5       Do you remember that?

6   **A**   I do.

7   **Q**   He told you "No."  Do you recall that?

8   **A**   Yes.

9   **Q**   That was a lie.

10  **A**   Yes.

11  **Q**   You suspected -- excuse me, withdrawn.

12      He swore on the graves of several of your family members

13  that he wasn't trading.  He told you that.

14  **A**   He swore on his daughter's life.  I do remember that.  I

15  don't know about the graves of family members, but --

16  **Q**   He swore on the life of his daughter Janine, that he

17  wasn't trading?

18  **A**   Yes.

19  **Q**   That was a lie.

20  **A**   Yes.

21      **MS. SHIFMAN:**  Your Honor, so, I'm about to get into

22  another area.  I note that it is 4:29.

23      **THE COURT:**  It is time, then, to go ahead and take

24  our recess for the day.  And we will continue tomorrow morning

25  at 8:30, ladies and gentlemen.  So, we will adjourn for day.

PROCEEDINGS

1        And let me remind you, please do not discuss this case

2   with anyone else, do not attempt to do any research, or form

3   any opinions.

4        We will see you back here tomorrow morning with the

5   continuation of cross-examination of Mr. Kara, at 8:30.

6        Thank you.

7            THE CLERK:  All rise for the jury.

8        (Jury excused)

9        (The following proceedings were held outside of the

10  presence of the Jury)

11           THE COURT:  See you tomorrow morning.

12           MS. SHIFMAN:  Okay, thanks.

13           MS. DOWLING:  May he be excused?

14           THE COURT:  Yes, you may step down.  You don't have

15  to stay here all night.

16           THE WITNESS:  Thank you.

17           MS. SHIFMAN:  If it's all right with the Court, I'm

18  just going to leave that exhibit binder up at the witness

19  stand.

20           THE COURT:  Sure.  Yeah, yeah.

21        (Proceedings adjourned)

22

23

24

25

1

**INDEX**

2

3

**PLAINTIFFS' WITNESSES**                    **PAGE   VOL.**

4

KARA, MAHER FAYEZ

5   (SWORN)                                          2      1
    Direct Examination by Ms. Dowling         2      1

6   Cross Examination by Ms. Shifman         119      1

7                            **EXHIBITS**

8

**TRIAL EXHIBITS**                        **ADMITTED   VOL.**

9

| 1 | 9 | 1 |
|---|---|---|

10  | 21 | 21 | 1 |
    | 22 | 24 | 1 |

11  | 24 | 28 | 1 |
    | 25 | 31 | 1 |

12  | 238 | 46 | 1 |
    | 241 | 52 | 1 |

13  | 220 | 56 | 1 |
    | 223 | 57 | 1 |

14  | 142 | 60 | 1 |
    | 208 | 64 | 1 |

15  | 259 | 66 | 1 |
    | 89 | 69 | 1 |

16  | 69 | 73 | 1 |
    | 4 | 78 | 1 |

17  | 5 | 80 | 1 |
    | 290 | 84 | 1 |

18  | 296 | 89 | 1 |
    | 344 | 99 | 1 |

19  | 347 | 101 | 1 |
    | 363 | 104 | 1 |

20  | 372 | 108 | 1 |
    | 375 | 113 | 1 |

21

22

23

24

25

Belle Ball and Connie Kuhl
Official Reporters - U.S. District Court
(415)373-2529

## **CERTIFICATE OF REPORTERS**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball _Belle Ball_

Wednesday, September 18, 2013

Belle Ball, CSR 8785, CRR, RDR


I, CONNIE KUHL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/  Connie Kuhl_____

Wednesday, September 18, 2013

Connie Kuhl, CSR #13173, RMR, CRR