1                                           **Volume 2**
                                     **Pages 103 – 366**
2                   **UNITED STATES DISTRICT COURT**
                 **NORTHERN DISTRICT OF CALIFORNIA**
3           **BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE**
**UNITED STATES OF AMERICA,          )**
4                                    **)**
                 **Plaintiff,          )**
5                                    **)**
   **vs.                               )  NO. CR 11-0625 EMC**
6                                    **)**
**BASSAM YACOUB SALMAN,               )**
7                                    **) San Francisco, California**
                 **Defendant.          ) Monday**
8                                    **) September 23, 2013**
**_____)  9:06 a.m.**
9

                        **EXCERPT OF PROCEEDINGS**
10            **TESTIMONY OF MICHAEL FAYEZ KARA**
**APPEARANCES:**
11

**For Plaintiff:          MELINDA L. HAAG**
12                        **United States Attorney**
                        **450 Golden Gate Ave.**
13                        **San Francisco, California  94102**
                 **BY:  ADAM A. REEVES**
14                        **KATHERINE BURKE DOWLING**
                        **Assistant United States Attorneys**
15

**For Defendant:          SHIFMAN GROUP**
16                        **601 California Street**
                        **Suite 1800**
17                        **San Francisco, California  94108**
                 **BY:  GAIL R. SHIFMAN, ESQ.**
18                        **and**
                        **MOEEL LAW OFFICE**
19                        **214 Duboce Avenue**
                        **San Francisco, California  94108**
20                 **BY:  SHAFFY MOEEL, ESQ.**

21 **For Michael F. Kara:    RAMSEY & EHRLICH LLP**
                        **803 Hearst Avenue**
22                        **Berkeley, California  94701**
                 **BY:  KATHARINE KATES, ESQ.**
23                        **MILES EHRLICH, ESQ.**

24 **Also Present:          SPECIAL AGENT JEFFREY CHISHOLM**

25 **Reported by  BELLE BALL, CSR 8785, CRR, RDR**
                 **Official Reporter, U.S. District Court**

```
1    MONDAY, SEPTEMBER 23, 2013                          9:06 A.M.

2                       EXCERPT OF PROCEEDINGS

3        (The following proceedings were held in the presence of

4    the Jury)

5              MR. REEVES:  Thank Your Honor.  At this time, the

6    United States recalls Mr. Michael Kara, please.

7              THE COURT:  All right.  Good morning, Mr. Kara.

8              THE WITNESS:  Good morning, sir.

9              THE COURT:  A reminder that you are still under oath.

10       All right.  You may proceed, Mr. Reeves.

11             MR. REEVES:  Thank you, Your Honor.

12        MICHAEL FAYEZ KARA, PLAINTIFF'S WITNESS, RECALLED

13                  CONTINUED DIRECT EXAMINATION

14   BY MR. REEVES:

15   Q   Good morning, Mr. Kara.

16   A   Good morning, sir.

17   Q   How are you today?

18   A   Good.

19   Q   I would like to go back to a topic that we covered very

20   briefly in your earlier testimony.

21             MR. REEVES:  If I could please show the witness what

22   has now been received in evidence as Government Exhibit 440.

23       If I may approach, please?

24             THE COURT:  Yes.

25       (Witness examines document)
```

```
 1            MR. REEVES:  Could we please display Exhibit 440?

 2       (Document displayed)

 3            MR. REEVES:  And if we could please highlight the

 4   date, the handwritten date in the upper middle portion of the

 5   -- of the record, right there.  That's great.  Thank you.

 6       (Document highlighted)

 7            MR. REEVES:  Also highlight the name in the upper

 8   right-hand corner, please.

 9       (Document highlighted)

10            MR. REEVES:  And if we could highlight under

11   "Presenting problems," the -- right there, that's perfect,

12   thank you.

13       (Document highlighted)

14            MR. REEVES:  Okay, good.  All right.

15   BY MR. REEVES:

16   Q    Mr. Kara, approximately a month ago, did you authorize the

17   production of certain of your medical records from Kaiser

18   Permanente to your lawyers?

19   A    Yes.

20   Q    Do you recognize Exhibit 440?  Is that one of your

21   records?

22   A    Yes.

23   Q    Was it okay with you to get a copy of your medical

24   records?

25   A    Yes.
```

1   **Q**   All right.  And based on that release by you, do you

2   understand whether Kaiser did produce those records to your

3   lawyers?

4   **A**   Yes.

5   **Q**   All right.  Thank you very much.  Now, this (Indicating)

6   is a medical record, according to the document, from on or

7   around May 19, 2003.  Is that correct?

8   **A**   Yes.

9   **Q**   And this is a medical record in your name, is it not?

10  **A**   Yes.

11  **Q**   Is that at or about the time that you strained your back

12  moving items at your business, around the time of the

13  engagement party?

14  **A**   Yes.

15  **Q**   Okay.  Do you recall that testimony that you gave last

16  Friday?

17  **A**   Yes.

18  **Q**   All right.  And, do you see the "Presenting problems,

19  lower back/leg pain"?  Do you see that?

20  **A**   Yes, sir.

21  **Q**   Do you have a reason to believe that this is the medical

22  record associated with your care for the back strain that

23  prevented you from going to the engagement party in or around

24  June, 2003?

25  **A**   Yes.

KARA - DIRECT / REEVES

1   **Q**   That's what this record is.

2   **A**   Yes.

3   **Q**   All right.  And, is there -- again, is there anything

4   about your symptoms during this time that was associated with

5   a fall from a ladder in any way?

6   **A**   No.

7   **Q**   Okay, good.  Thank you very much.  I'm done with that.

8        Another little topic I want to cover before we go forward

9   is the family members of the Salman family.

10       You testified that you, in the course of the engagement

11   between Maher and Susie, that you came to know the Salman

12   family.  Is that correct?

13   **A**   Yes.

14   **Q**   And, you testified about Mr. Bassam Salman, and getting to

15   know him.  Do you recall that testimony?

16   **A**   Yes.

17   **Q**   Now, does Mr. Bassam Salman have any other siblings in his

18   family, any brothers or sisters?

19   **A**   Yes.

20   **Q**   And, who is his brother, for example?

21   **A**   Ghazy Salman.

22   **Q**   Is he sometimes known as Tiger?

23   **A**   Yes.

24   **Q**   All right.  Now, is Ghazy Salman older or younger than

25   Bassam Salman?

1    **A**    Older.

2    **Q**    So Ghazy Salman is Bassam Salman's older brother.

3    **A**    Correct.

4    **Q**    And does Bassam Salman have any sisters?

5    **A**    Yes.

6    **Q**    And who is his sister?

7    **A**    Susie Salman, and he has another sister.

8    **Q**    Is Susie Salman older or younger than Bassam Salman?

9           **MS. SHIFMAN:**  Asked and answered in testimony

10   already.

11          **THE COURT:**  Overruled.

12          **THE WITNESS:**  Younger.

13   **BY MR. REEVES:**

14   **Q**    Susie is younger than Bassam Salman.  Okay?  Is that

15   correct?

16   **A**    Yes.  Yes.

17   **Q**    And -- withdrawn.

18        Is your age about the same as Bassam Salman?

19   **A**    A little bit younger.

20   **Q**    A little bit younger.  But is it that closeness in age, is

21   that -- was that in any way a factor in the two of you getting

22   to know each other better?

23   **A**    Yes.

24   **Q**    All right.  Do you think you would recognize Ghazy Salman

25   if you saw him again today?

KARA - DIRECT / REEVES

1   **A**   Yes.

2   **Q**   Do you recognize him in the audience?

3   **A**   Yes.

4   **Q**   Can you please point to him?

5   **A**   That gentleman (Indicating).

6          **MR. REEVES:**   Indicating the gentleman in the front

7   row, Your Honor.

8          **THE COURT:**   All right.

9   **BY MR. REEVES:**

10  **Q**   Do you think you would recognize Bassam Salman if you saw

11  him again today?

12  **A**   Yes.

13  **Q**   Do you recognize him in the courtroom?

14  **A**   Yes.

15  **Q**   Show us where he is, please.

16  **A**   That gentleman (Indicating).

17         **MR. REEVES:**   Indicating the Defendant at the defense

18  table, Your Honor.

19         **THE COURT:**   All right.

20         **MR. REEVES:**   Thank you.

21  **BY MR. REEVES:**

22  **Q**   We got up to in around April, 2005.  Are you ready to go

23  forward?

24  **A**   Yes.

25  **Q**   All right, good.  On or around April 3rd to in or around

1  April 13th, 2005, did you have any type of abdominal surgery?

2  **A**   Yes.

3  **Q**   All right.  I would like to show you what has been

4  received in evidence as Government Exhibit 442, please.

5            **MR. REEVES:**  If I may approach?

6            **THE COURT:**  Yes.

7       (Witness examines document)

8            **MR. REEVES:**  Now, if I could please have Exhibit 442

9  displayed.

10      (Document displayed)

11           **MR. REEVES:**  And if we could please enlarge the top

12 half of the document.  And if we could please highlight the

13 admitted date and discharge date.

14      (Document highlighted)

15           **MR. REEVES:**  And also the admitting diagnosis,

16 please.

17      (Document highlighted)

18           **MR. REEVES:**  All right.

19 **BY MR. REEVES:**

20 **Q**   Mr. Kara, is Exhibit 442 another one of your medical

21 records?

22 **A**   Yes.

23 **Q**   Do you recognize it?

24 **A**   Yes.

25 **Q**   Is this another one of the records that you authorized

 1   Kaiser to give to your lawyers?

 2   **A**   Yes.

 3   **Q**   Is that part of your cooperation in this investigation?

 4   **A**   Yes.

 5   **Q**   All right.  Now, does this pertain to the surgery, the

 6   abdominal surgery that we just spoke about?

 7   **A**   Yes.

 8   **Q**   This particular medical record?

 9   **A**   Yes.

10   **Q**   And, what was the nature of that surgery?  Please tell us

11   what happened.

12   **A**   It was of a small bowel obstruction.  Basically the small

13   intestine was kinked.

14   **Q**   Was that painful?

15   **A**   Very.

16   **Q**   And were you admitted into the hospital on or around

17   April 3rd, 2005?

18   **A**   Yes.

19   **Q**   And, how long were you in the hospital for?

20   **A**   For about ten, eleven days.

21   **Q**   Okay.  And after you were discharged from the hospital --

22   withdrawn.

23       While you were at the hospital, did you have the surgery?

24   **A**   Yes.

25   **Q**   All right.  After your discharge from the hospital, what

 1  kind of recovery or convalescence did you go through?

 2  **A**   About maybe four to five weeks at the house.

 3  **Q**   Okay.  Again, was that painful?

 4  **A**   Yes.

 5  **Q**   Were you incapacitated?

 6  **A**   Completely.

 7  **Q**   Physically incapacitated.

 8  **A**   Correct.

 9  **Q**   All right.  Okay, good.  I'm done with that.

10      Now I would like to go back to Exhibit 112, and while I'm

11  at it, hand you Exhibit 113, in the manner that we were doing

12  last Friday.

13          **MR. REEVES:**  If I could please approach?

14          **THE COURT:**  Yes.

15          **MR. REEVES:**  If we could please display Exhibit 112,

16  Page 7, please.

17      (Document displayed)

18          **MR. REEVES:**  Great.  Thank you.

19      (Document highlighted)

20  **BY MR. REEVES:**

21  **Q**   So according to Exhibit 112, Page 7, on or about April 29,

22  2005, you acquired calls in American --

23          **MS. MOEL:**  Objection, leading.

24  **BY MR. REEVES:**

25  **Q**   -- Pharma --

```
 1          THE COURT:  I'll allow this as foundation.  I assume
 2   you are not going to lead through this whole questioning here.
 3   You're just directing his attention.
 4          MR. REEVES:  That is exactly what I'm doing.  I'm
 5   going to ask him why.  Is that okay?
 6          THE COURT:  Yep.
 7          MR. REEVES:  Okay, thank you.
 8   BY MR. REEVES:
 9   Q    According to the records received in evidence as Exhibit
10   112, at Page 7, there was an investment by you on or about
11   April 29, in an option, a call option relating to American
12   Pharma.
13        Do you see that trading record?
14   A    Yes.
15   Q    Is there -- what's the name for American Pharma, the other
16   name?
17   A    APPX.
18   Q    APPX.  Do you recall making this investment in or around
19   this time period?
20   A    Yes.
21   Q    Was this during the period of time that you were still
22   convalescing from your surgery?
23   A    Yes.
24   Q    All right.  Why did you decide to invest in APPX at this
25   time?
```

1   **A**   I always tried to maintain a reserve of APPX calls.

2   **Q**   Why?

3   **A**   Because of the possibility that it would be acquired.

4   **Q**   All right.  And, is this the same company that you talked

5   about earlier, that made Abraxane?

6   **A**   Yes.

7   **Q**   Did you continue to be interested in APPX?

8   **A**   Correct.

9   **Q**   Now, during this time period, did you discuss your

10   decision to invest in APPX with your brother, Maher Kara?

11   **A**   Yes.

12   **Q**   And what do you recall discussing with him during that

13   time?

14   **A**   Whether this one-drug company will be acquired one day.

15   **Q**   And what, if anything, did he tell you about that?

16   **A**   "Yes."

17   **Q**   So, was that an important piece of information for your

18   investing decision?

19   **A**   Yes.

20   **Q**   Okay.  To your knowledge, was that confidential

21   information in this time period?

22   **A**   Yes.

23   **Q**   Okay.  Now, during this time, did you also have an

24   opportunity to discuss your investing decision in APPX with

25   Mr. Bassam Salman?

1    **A**    Yes.

2    **Q**    Do you recall the substance of that discussion?

3    **A**    Um, not -- not in April, but earlier on, I had discussed

4    APPX with Mr. Salman.

5    **Q**    Do you remember approximately how much earlier?

6    **A**    The discussion of APPX must have happened in the beginning

7    of '05.

8    **Q**    Okay.  And what was that discussion again, please?

9    **A**    That it's a one-drug company, and all one-drug companies

10   will be acquired at one time or another.  Please maintain your

11   call position on that company.

12   **Q**    And in or around the time of this investment, do you

13   recall one way or the other whether you discussed with

14   Mr. Salman your decision to make another investment in APPX,

15   even if you didn't go into the background reasons for why?

16   **A**    Every -- every time I made a position, I took a position,

17   I called Bassam and I informed him that I was taking up a

18   position in APPX.  Or taking up a position in Novartis.

19        I was completely transparent with Bassam.  So if I took up

20   a position for the day, I would call him up and I would tell

21   him what I bought.  So that our trading records would

22   mirror-image each other.

23   **Q**    All right, good.  Thank you very much.  I would like to

24   now look at Exhibit 113, please.  Specifically Page 2.

25        (Document displayed)

KARA - DIRECT / REEVES                    116

```
 1              MR. REEVES:  And specifically the --

 2         (Document highlighted)

 3              MR. REEVES:  Okay.  Thank you.

 4    BY MR. REEVES:

 5    Q    And, look at your trading in a company known as Bone Care.

 6    Do you see that highlighted on the screen?

 7         (Witness examines document)

 8    A    Forgive me, Page 2?

 9    Q    Page 2 at the top of the page.  And also on your monitor,

10    the relevant trade should be highlighted.

11         Do you see it, Mr. Kara?

12         (Witness examines document)

13    A    I do not have Page 2.

14              THE COURT:  Exhibit 113?

15              MR. REEVES:  May I approach?

16              THE COURT:  Yep.

17    BY MR. REEVES:

18    Q    Okay.  I would like to direct your attention, if I could,

19    to Exhibit 113, Page 14.

20              MR. REEVES:  If I may approach, please?

21              THE COURT:  Okay.  I don't have a Page -- what?  This

22    is Exhibit 113?

23              MR. REEVES:  Exhibit 113 --

24              THE COURT:  I only have three pages.  Maybe mine's

25    not --
```

 1           **MR. REEVES:**  Yes.

 2           **MS. SHIFMAN:**  I don't have it either, Your Honor.  I

 3   only have three.

 4           **MR. REEVES:**  I think the version that we have here

 5   marked just has a few more pages, Your Honor.  Could we take a

 6   minute to sort this out, please?

 7           **THE COURT:**  Yeah, okay.

 8       (Off-the-Record discussion between counsel)

 9           **MR. REEVES:**  Your Honor, there are just a couple of

10   trades that relate to Exhibit 113, which is the account for

11   Mr. Jilwan.  But there seems to be extra pages attached to the

12   actual exhibit that don't correlate to the computer

13   (Indicating).

14       Could I propose that we take a brief break, five minutes,

15   to get this correctly correlated so that we can proceed?

16           **THE COURT:**  All right.  Is there a way that you can

17   come back to this later?  Or is this in a sequence that would

18   be disruptive to --

19           **MR. REEVES:**  This is in a sequence.  I'm trying to

20   best I can to go chronologically.

21           **THE COURT:**  All right, we will take a five-minute

22   break.

23           **MR. REEVES:**  Thank you, Your Honor.

24           **THE CLERK:**  All rise for the jury.

25       (Jury excused)

```
 1        (The following proceedings were held outside of the
 2   presence of the Jury)
 3        MR. REEVES:  Your Honor, thank you for that.  I think
 4   what we would like to do is simply make a quick copy of the
 5   correct excerpts from the transcript, mark it and then
 6   distribute it and then proceed.  Okay?
 7        THE COURT:  From the transcript?  Or from the larger
 8   exhibit?
 9        MR. REEVES:  I meant the brokerage record.  Exhibit
10   113 is the compilation, and there are only three pages.  And I
11   just need to make certain that the marked exhibit is the same
12   that you have, that I have, and that Counsel has.
13        THE COURT:  Yep.
14        MR. REEVES:  All right.  So if the witness could step
15   out, we are just going to run downstairs and make a photocopy
16   and make a correction.  Okay?
17        THE COURT:  Okay.
18        MR. REEVES:  Thank you.
19        (Recess taken from 9:26 to 9:32 a.m.)
20        (The following proceedings were held outside of the
21   presence of the Jury)
22        THE COURT:  Are you okay?
23        MR. REEVES:  We are okay.  Thank you so much,
24   Your Honor.
25        (The following proceedings were held in the presence of
```

```
 1    the Jury)

 2           THE CLERK:  All rise for the jury.

 3        Please be seated.

 4           THE COURT:  Okay.  Thank you for your patience,

 5    ladies and gentlemen.  We are going to resume.

 6           MR. REEVES:  Yes.  On behalf of the government, I

 7    want to apologize to the Jury and to the Court and to Counsel

 8    for the interruption.

 9        And Mr. Kara, I want to thank you for pointing out the

10    error.

11    BY MR. REEVES:

12    Q   I would like to show you, please, what has been marked as

13    Government Exhibit 113.  It's a three-page document bearing

14    the label 113-0001, -0002, and -0003.

15           MR. REEVES:  If I may approach?

16           THE COURT:  Yes.

17        (Witness examines document)

18    BY MR. REEVES:

19    Q   Mr. Kara, is Exhibit 113 a compilation of three pages from

20    the Emile Jilwan brokerage records, to the best of your

21    knowledge?

22    A   Yes.

23           MR. REEVES:  All right.  If I could please have

24    Exhibit 113, Page 2 displayed.

25        (Document displayed)
```

1          **MR. REEVES:**  Are we all on the same page now?

2    **BY MR. REEVES:**

3    **Q**   Mr. Kara, do you see the -- the trading relating to Bone

4    Care on or about May 2nd, 2005?

5          (Witness examines document)

6    **Q**   Do you see that?

7    **A**   Yes.  Yes, sir.

8    **Q**   Okay.  There's a settlement date of May 5?

9    **A**   Yes.

10   **Q**   And a trading date on or around May 2nd, 2005, is that

11   right?

12   **A**   Yes.

13   **Q**   Do you remember making a decision to invest in Bone Care

14   in or around May 2nd, 2005?

15   **A**   Yes, sir.

16   **Q**   And, just tell us generally about your decision to invest

17   in Bone Care at this time.  What do you recall happening?

18   **A**   On or -- on or about April 27th, I -- I did receive a

19   phone call from Maher, informing me of Bone Care.  That Bone

20   Care will -- will occur within a very short period of time.

21   That there will be a takeover of this company.

22         And then, the -- we purchased in Fidelity's account, which

23   is shared, you know, by myself and Emile.

24   **Q**   Uh-huh.

25   **A**   Bone Care does not have any options.  It's purely a stock

 1    fade.  So the ones that you see before you are just basically

 2    stocks in Bone Care.

 3    Q    Was this during the period of your convalescence from your

 4    surgery?

 5    A    Yes.

 6    Q    Do you remember being in pain during this period of time?

 7    A    Yes.

 8    Q    So how were you able to carry out these trades?

 9    A    By sitting in front of the computer.  This activity

10    doesn't take much.  It takes maybe five minutes.

11    Q    To trade in stock?

12    A    To -- yes.

13    Q    As versus trading in options?  Is that more

14    time-consuming?

15    A    Very much so.

16    Q    All right.  Okay.  Was this -- withdrawn.

17         You said that your brother, Maher, called you and spoke to

18    you about Bone Care.  Is that correct?

19    A    Yes.

20    Q    Was the information that he gave you confidential,

21    non-public information?

22    A    Yes.

23    Q    Was it valuable to you?

24    A    Yes.

25    Q    How was the possibility that Bone Care would be taken over

1    be valuable?

2    **A**   Because -- because it's non-public information.  And, we

3    -- you know their share price is about to rise, so you buy the

4    company low and you sell it high.

5    **Q**   Do you have a recollection for -- about why you carried

6    out this trade in Mr. Jilwan's account?

7    **A**   I don't think I had enough money in my own account.

8    **Q**   All right.  In this time period, do you recall discussing

9    your decision to invest in Bone Care with Bassam Salman?

10   **A**   Yes.

11   **Q**   What do you recall in substance discussing with Mr. Salman

12   about Bone Care in this time period?

13   **A**   I -- I called Bassam, and I believe I told him that "I

14   have a good one for you.  And it's going to happen in very few

15   days."  And I spelled Bone Care for him, "B-O-N C-A-R-E."

16   **Q**   All right.  Good.  Thank you.  I would like to move

17   forward a few more weeks.

18       **MR. REEVES:**  If we could go back to Exhibit 112 and

19   display Exhibit 112, Page 18, please.

20       (Document displayed)

21       **MR. REEVES:**  And if we could display the top half of

22   the page, and highlight the trading activity on or around

23   June 21, 2005.

24       (Document highlighted)

25

KARA - DIRECT / REEVES

1    **BY MR. REEVES:**

2    **Q**   Okay.  Mr. Kara, on or around June 21st, 2005, did you

3    make a decision to invest in Endo Pharmaceuticals?

4    **A**   Yes.

5    **Q**   And why did you decide to invest in Endo at that time?

6    **A**   Endo was coming up with a pain patch.  And, which will

7    cause the -- the gross revenues at Endo to rise.  And so, I

8    bought stock into Endo.

9    **Q**   Did you discuss this investing decision with your brother,

10   Maher?

11   **A**   Yes.

12   **Q**   And what do you recall him saying about Endo at this time?

13   **A**   That it was a good buy.

14   **Q**   And, did you discuss your decision to invest in Endo with

15   Bassam Salman?

16   **A**   Yes.

17   **Q**   Do you recall the substance of that discussion with

18   Mr. Salman?

19   **A**   As I mentioned, that Endo was coming up with some new

20   drugs, and that Endo would be a good buy, to buy some calls

21   and/or stock into Endo.

22   **Q**   And what type of securities did you acquire in Endo at or

23   around this time?

24   **A**   I bought stock.

25   **Q**   All right.  Thank you very much.

1          Let me direct your attention to the next month, to in or

2    around early July, 2005.  At or about that time, did you

3    attend a wedding of your brother Maher to Susie Salman?

4    **A**    UH, yes.

5    **Q**    From early July, 2005?

6    **A**    Yes.

7    **Q**    Do you remember the wedding?

8    **A**    Yes.

9    **Q**    Would you please describe the wedding weekend to the jury?

10   **A**    The wedding occurred over a period of maybe three-four

11   days.  And, it was a very happy occasion.  And, we -- we

12   stayed in Chicago for about four days.

13   **Q**    And, I would like to show you what has been received as

14   Government Exhibit 89 into evidence, if I could, please.

15             **MR. REEVES:**  If I may approach?

16             **THE COURT:**  Yes.

17             **MR. REEVES:**  And if I could have Exhibit 89

18   displayed, please.

19        (Document displayed)

20        (Witness examines document)

21   **BY MR. REEVES:**

22   **Q**    Do you recognize yourself, Mr. Kara, in this photograph?

23   **A**    Yes.

24   **Q**    Where are you in the photograph?

25   **A**    Directly across from Maher.

1    **Q**    In the center of the photograph (Indicating)?

2    **A**    Yes.

3    **Q**    To the left of Maher in the photograph?

4    **A**    Correct.

5    **Q**    All right.  With your hands together?

6    **A**    Yes.

7    **Q**    All right, good.  Now, do you recognize the person in the

8    back, encircled in yellow (Indicating)?  Do you recognize that

9    person?

10   **A**    Yes.

11   **Q**    Who is that person?

12   **A**    Mr. Salman.

13   **Q**    Okay.  In the course of the wedding weekend, did you have

14   an opportunity to spend time with Bassam Salman?

15   **A**    Yes.

16   **Q**    How much time did you and he spend together in Chicago

17   during that wedding weekend?

18   **A**    The entire weekend.

19   **Q**    You were together a lot, is it fair to say?

20   **A**    Yes.

21   **Q**    All right, good.  So, prior to 2007, did you recognize the

22   person circled in red (Indicating), in the photograph?

23   **A**    No.

24   **Q**    You didn't know who that was prior to 2007.  Is that

25   right?

1    **A**   No.  No.

2    **Q**   All right.  Now, during the course of the wedding,

3    Mr. Kara, did you make a toast to the bride and groom?

4    **A**   Yes.

5    **Q**   Or primarily to your brother?

6    **A**   Yes.

7    **Q**   Do you recall that toast?

8    **A**   Yes.

9    **Q**   I would like to show you what has been marked as Exhibit

10   139 for identification, please.

11       Do you recognize Exhibit 139?

12       (Witness examines item)

13   **A**   Yes.

14   **Q**   What is that?

15   **A**   It is a video of the wedding.

16   **Q**   Okay.  In preparation for your appearance here today,

17   prior to your testimony and the beginning of your testimony,

18   did you have an opportunity to watch the video on the CD

19   marked as Government Exhibit 139?

20   **A**   Yes.

21   **Q**   And what's on that CD?

22   **A**   It's the toast for the wedding.

23   **Q**   That you gave?

24   **A**   Yes.

25   **Q**   Is that a true and accurate copy of your toast to Maher

1  and Susie during the wedding, to the best of your knowledge?

2  **A**    Yes.  And it's initialed by me and dated by me.

3  **Q**    So, in your preparations, did you watch it carefully?

4  **A**    Yes.

5  **Q**    And at the conclusion of watching it, did you actually

6  affix your initials to the CD that we are going to introduce

7  into evidence?

8  **A**    Yes.

9  **Q**    To the best of your knowledge, is that true and accurate,

10  and consistent to your recollection, as to your toast that

11  day?

12  **A**    Yes.

13         **MR. REEVES:**  At this time, I offer Exhibit 139 into

14  evidence.

15         **MS. SHIFMAN:**  No objection, Your Honor.

16         **THE COURT:**  All right, 139 is admitted.

17     (Trial Exhibit 139 received in evidence)

18         **MR. REEVES:**  And I'm going to ask at this point that

19  it please be displayed, and played for the jury.

20         **THE COURT:**  Okay.  Permitted.

21     (Video played, not reported)

22  **BY MR. REEVES:**

23  **Q**    Mr. Kara, was that a happy occasion?

24  **A**    Very much so.

25  **Q**    Let's focus a little bit on the wedding weekend, and the

KARA - DIRECT / REEVES

```
 1   time that you spent with Bassam Salman.

 2        So over the course of the three days in Chicago, relating

 3   to the wedding events, how much of your time did you spend

 4   with Bassam Salman?

 5   A   Seventy-five percent of my time.

 6   Q   And what sorts of things did you do when you weren't

 7   attending the actual wedding, or the wedding ceremony?

 8   A   Took me around.  He showed me Chicago.  Basically, he was

 9   with me the whole time.

10   Q   Did you enjoy that opportunity to spend that time with

11   Mr. Salman?

12   A   Very much so.

13   Q   All right.  In the course of that weekend, did you have an

14   opportunity to visit Mr. Salman's place of business?

15   A   Yes.

16   Q   Do you recall that --

17             THE COURT:  Excuse me.  Can you pull the microphone a

18   little --

19        (Request complied with by the Witness)

20             THE WITNESS:  Forgive me.  Forgive me have.

21   BY MR. REEVES:

22   Q   Keep it close to your lips, if you would, please.

23        Do you recall visiting his place of business?

24   A   Yes.  Forgive me.

25   Q   And, did you get a tour, in a sense?
```

KARA - DIRECT / REEVES

1    **A**    Yes.

2    **Q**    Please describe what you remember happening.

3    **A**    Bassam took me to his place of business.  It's a large

4    wholesaler for grocery items and what have you.  And we toured

5    the place.

6         And own our way out, I noticed he -- he was showing me

7    out.  And I noticed a small office.  I think he either

8    probably motioned it, motioned it to me or I watched it

9    myself, a small office towards the entrance of the building.

10        The office was heavily littered with papers.  The papers

11   were primarily business records and what have you.  But,

12   commingled with the business records there were some papers

13   that had some stock information on them.  Basically, it lifted

14   my attention, the presence of the stocks.  And the information

15   on the stocks.

16        So, I took notice of that.  I asked him if we could talk.

17   He was a little bit busy with some stuff.  He said, sure.  I

18   walked outside, and he followed me within five minutes.

19   **Q**    Let's pause there.  We will continue what happened at that

20   point in a minute.  But, the -- the business that you're

21   looking at, was this a warehouse of some type?

22   **A**    Yes.  It's a large warehouse.

23   **Q**    And what is contained within the warehouse?

24   **A**    Gr- -- merchandise.

25   **Q**    Relating to food distribution?

1   **A**    Yes.

2   **Q**    And within the large warehouse, there was an office?

3   **A**    Yes.

4   **Q**    All right.  And you observed certain information relating

5   to the stock market?  Is that your testimony?

6   **A**    Yes.

7   **Q**    Okay.  Did that concern you in any way?

8   **A**    Yes.

9   **Q**    In what way did it concern you?

10  **A**    That it was -- it was right in the open.  And, the office

11  had a large glass enclosure on it.  And also, I didn't see a

12  door at that time.

13  **Q**    Could you see into the office?

14  **A**    Very much so.

15  **Q**    And see the papers that were in it, for example?

16  **A**    Very much so.

17  **Q**    Were there other people around in the warehouse?

18  **A**    Yes.

19  **Q**    All right.  So, is that the reason you asked to speak with

20  Mr. Salman outside?

21  **A**    Yes.

22  **Q**    All right.  Go on.  What happened next, after you go

23  outside?

24  **A**    Bassam came.  And I said, "Could we go somewhere?"  And he

25  said, "Sure."  We got into the car.  And he turned on the car,

 1    and then we started talking in the car.

 2    **Q**   What was said?

 3    **A**   I basically informed him that the reason why I wanted to

 4    talk to him was because of the situation that was inside the

 5    office.  And the presence of these papers that I saw.

 6         And, I think he detected the tone of voice.  I was

 7    speaking a little bit in a louder tone, you know.  And, he got

 8    concerned.

 9         And I basically told him, point-blank, you know, "You need

10    to be very careful with these pieces of paper.  And what do

11    you think is the source of all of this information?"  And I

12    answered it for him, and I told him, "Maher.  Maher is the

13    source of all of this information."

14         And he was -- he was stunned.  He was perplexed, looking

15    at me.  And he responded to me by saying, "Then we have to

16    protect him."

17    **Q**   What did that mean to you, "We have to protect him"?

18    **A**   We have to be careful.  We have to do whatever we have to

19    do to be careful.

20    **Q**   And, what about the conversation was perplexing?  Did it

21    relate to the documents that you were drawing attention to,

22    for example?

23    **A**   I think -- I think he was just -- the whole -- the whole

24    thing was just perplexing for him, that I noticed that there

25    were a few papers, you know, in the -- on the floor, on the

```
 1   credenza, on his desk, that dealt with stocks that we were

 2   trading in.

 3   Q   At that time, did you think that it was important to keep

 4   the stock trading information that you and he shared more

 5   confidential?

 6   A   Very much so.

 7   Q   To put it away, for example?

 8   A   Very much so.

 9   Q   Was that the thrust of what you are communicating to --

10   A   Absolutely.

11   Q   Okay.  What, if anything, did he say he would do?

12   A   He would shred all of the papers.

13   Q   He would what?

14   A   Shred them.

15   Q   Okay.  Were there any other ways to protect Maher?

16   A   That wasn't discussed.

17   Q   Okay.  But, he would clean up the papers.

18   A   Exactly.

19   Q   All right.  Okay.  During the course of the wedding

20   weekend, did you have an opportunity to discuss a company

21   known as Celgene?

22   A   (Nods head)

23   Q   Do you recall that discussion?

24   A   Yes.

25   Q   Did you discuss it with Mr. Salman?
```

1    **A**    Yes.

2    **Q**    I would like to show you what has been marked as

3    Government Exhibit 113 again, Page 3, please.

4         (Document displayed)

5    **BY MR. REEVES:**

6    **Q**    Do you still have that up there?

7    **A**    Yes.

8         **MR. REEVES:**  All right, and if we could please

9    highlight the portion of Exhibit 113, Page 3, that reflects

10   trading on or about July 8th, 2005, in Celgene.

11        (Document highlighted)

12        **MR. REEVES:**  That's great.  Okay, good.  Thank you

13   very much.

14   **BY MR. REEVES:**

15   **Q**    All right.  Why were you interested in Celgene in or

16   around early 2005, Mr. Kara?

17   **A**    Celgene was a very promising company.  It was -- it

18   manufactured a drug for leukemia.  And, the drug has many

19   applications.  And, the company was so promising that it was

20   going to be the next Genentech.

21   **Q**    Did you discuss Celgene at all with Maher Kara?

22   **A**    Not at that time.  But later on, yes.

23   **Q**    So was your interest in Celgene the product of your own

24   research, in any sense?

25   **A**    Yes.

1  **Q**   As versus something that you would talk through at the

2  time you were looking at it, with your brother Maher.

3  **A**   Correct.

4  **Q**   All right.  In this time period, in around -- on around

5  July 8, 2005, did you discuss Celgene with Mr. Bassam Salman?

6  **A**   Yes.

7  **Q**   Do you recall the substance of that discussion?

8  **A**   Yes.

9  **Q**   And what do you recall telling Mr. Salman about Celgene?

10 **A**   He had asked me for a good tip.  And I told him that I'm

11 buying Celgene.  And, that it showed a lot of promise, and

12 that it would go up -- the share price would go up in the next

13 week or two.  And that he should take a position in Celgene

14 right away.

15 **Q**   Did he seem interested in what you told him?

16 **A**   Absolutely.

17 **Q**   How do you know that?

18 **A**   He told me to cover a little bit, you know, for -- for him

19 at the party, and that he would go make a transaction and come

20 back.

21 **Q**   Was he gone from the party for a little while?

22 **A**   Yes.

23 **Q**   How long was he gone for, for example?

24 **A**   A couple of hours.

25 **Q**   A couple of hours?

1   **A**   Yes.

2   **Q**   Did you cover for Bassam Salman during the party?

3   **A**   I don't know what that meant, but that -- that's what was

4   said.

5   **Q**   Did you try to cover for him?

6   **A**   I guess so.

7   **Q**   Okay, good.  Now, in your discussion with Bassam Salman

8   about Celgene, at any point did you tell him that the source

9   of your information was your own research, as versus coming

10  from Maher?

11  **A**   No.

12  **Q**   No.  So, based on what you said to him, would he have

13  known one way or the other whether the information was coming

14  from Maher?

15  **A**   No.

16  **Q**   Okay.  At or around this time period, did you sometimes

17  let Bassam Salman see your list --

18          **MS. SHIFMAN:**  Objection, leading.

19          **THE COURT:**  Well, I haven't heard the question yet,

20  so finish the question.

21  **BY MR. REEVES:**

22  **Q**   -- your list of investments?

23          **THE COURT:**  Okay.  Overruled.

24          **THE WITNESS:**  I gave him the list.

25

1    **BY MR. REEVES:**

2    **Q**   Do you sometimes call that your hit list?

3    **A**   Yes.

4    **Q**   Why do you call your list of investments your hit list?

5    **A**   It was a list combined of about 30 companies.  And, I

6    called it the hit list because every company that was on that

7    list was a hit company.

8    **Q**   According to you.

9    **A**   Yes.

10   **Q**   All right, good.  Did you consider that a gift in any

11   sense?

12   **A**   I think so.

13   **Q**   Why did you consider that a gift?

14   **A**   Because if the companies on that list were managed

15   appropriately, and purchased at the appropriate time, you

16   could make some money.

17   **Q**   And, was that a gift in that sense from you to your new

18   brother-in-law, Bassam Salman?

19   **A**   Yes.

20   **Q**   Why did you want to make a gift of your hit list to Bassam

21   Salman, in or around the wedding weekend?

22   **A**   It was sort of like a -- a wedding gift.

23   **Q**   That was your intention.

24   **A**   I think so.

25   **Q**   All right.  I would like to move forward, if I could,

```
 1   please, to on around October 6, 2005.  At or around that time,

 2   did you invest in Genentech?

 3       I withdraw the question.  You are absolutely right.  Let's

 4   take a look at the trading records first and then I'll put

 5   another question to you.

 6           MR. REEVES:  If we could please display Exhibit 112,

 7   Page 9, please.

 8       (Document displayed)

 9   BY MR. REEVES:

10   Q   Do you have Exhibit 112, Page 9 before you, Mr. Kara?

11   A   Yes.

12           MR. REEVES:  If we could please highlight the portion

13   of the exhibit in middle just under the black dot in the

14   middle, the trade on or about October 6, 2005.

15       (Document highlighted)

16           MR. REEVES:  Okay, good.

17   BY MR. REEVES:

18   Q   On or about October 6, 2005, Mr. Kara, did you make a

19   decision to invest in Genentech?

20   A   Yes.

21   Q   Why did you decide to invest in Genentech?

22   A   That was at the time when Avastin was being approved.  And

23   that is a billion-dollar drug.  So I wanted to take a position

24   in DNA.

25   Q   Did you discuss your decision to invest in Genentech with
```

KARA - DIRECT / REEVES

```
 1   your brother, Maher?

 2   A    Yes.

 3   Q    Do you recall in substance what, if anything, he said

 4   about this decision?

 5   A    He thought that was a good idea.

 6   Q    Why did he think it was a good idea?

 7   A    Because he thought that Genentech with Avastin would show

 8   promise.

 9   Q    Would show promise?

10   A    Yes.

11   Q    Be profitable?

12   A    Yes.

13   Q    All right.  In or around this time period, did you discuss

14   your trading and your investment decision relating to

15   Genentech with Bassam Salman?

16   A    Yes.

17   Q    Do you recall the substance of that discussion?

18   A    My same explanation.  That Avastin was going to be a

19   billion-dollar drug, and that the income from that drug will

20   help the gross revenues of Genentech.

21   Q    And based on that information, what, what type of

22   securities did you buy?

23   A    I purchased the January -- forgive me.  At Genentech, I

24   purchased, yeah, the January 1, 2006 calls.

25   Q    Calls at what strike price?
```

1    **A**    85.

2    **Q**    Would you have discussed the particulars of your investing

3    decision with Bassam Salman?

4    **A**    Absolutely.

5              **MR. REEVES:**  Let's go forward to Exhibit 112,

6    Page 10, next page, please.

7        (Document displayed)

8    **BY MR. REEVES:**

9    **Q**    And if I can direct your attention to the portion of the

10   page in the middle, three trades up from the black dot in the

11   middle, a convenient measuring here, on or around October 11,

12   relating to Cephalon.

13             **MR. REEVES:**  If we could please highlight that.

14       (Document highlighted)

15             **MR. REEVES:**  If we could just highlight the portion

16   that pertains to Cephalon, just above the black dot, please.

17   Two more above that.  Sorry.

18       (Document highlighted)

19             **MR. REEVES:**  All right, good.

20   **BY MR. REEVES:**

21   **Q**    So on or around October 11, 2005, Mr. Kara, did you make a

22   decision to invest in Cephalon?

23   **A**    Yes.

24   **Q**    And what is Cephalon?

25   **A**    Cephalon is a pain company that manufactures, in this --

1    in this occasion here, manufactures a lollipop that is soaked

2    with fentanyl, which is a painkiller.  So, I --

3    **Q**   Why did you decide to invest in Cephalon in or around this

4    time period?

5    **A**   Because, I was buying short-term calls in Cephalon because

6    of this particular lollipop that was coming up.  And it was

7    going to increase the revenues of Cephalon.

8    **Q**   Did you discuss this strategy with your brother, Maher

9    Kara?

10   **A**   Yes.

11   **Q**   And what, if anything, did he say to you?

12   **A**   Again, this will generate at least 250 to $500 million to

13   Cephalon.  And Cephalon will most likely be acquired.

14   **Q**   All right.  And in or around this time period, did you

15   also discuss your decision to invest in Cephalon with your

16   brother-in-law, Bassam Salman?

17   **A**   Yes.

18   **Q**   And, do you recall the substance of that discussion?

19   **A**   Yes.

20   **Q**   What did you and Mr. Salman discuss regarding Cephalon in

21   this time period?

22   **A**   I told him that Cephalon is a one-or two-drug company, to

23   go ahead and buy some calls in Cephalon.

24   **Q**   All right.  And did you discuss the specifics of your --

25   of the securities that you recommended that he buy?

KARA - DIRECT / REEVES

1   **A**   They mirror-imaged whatever I was buying.  I told him what

2   I was buying.

3   **Q**   You told him what you were buying, so that he could do the

4   mirror-image trading?

5   **A**   Correct.

6   **Q**   Of your trading.

7   **A**   Yes.

8   **Q**   All right.  Okay, good.  Drop the microphone just a little

9   bit, to your mouth.

10   (Request complied with by the Witness)

11   **Q**   I'm done with that exhibit.  We will put that away for the

12   moment.

13       I would like to move forward to on or around January 11,

14   2006.  So this is about three months later on, in the year

15   2006, in January.  Is that time period clear to you?

16   **A**   Yes.

17   **Q**   At or around that time, did you have some type of ongoing

18   dispute with your neighbor?

19   **A**   Yes.

20   **Q**   Would you describe the nature of your dispute with your

21   neighbor.

22   **A**   The nature of the dispute was very simple.  One day, I

23   came home, and I noticed that there was a 12- or 13-foot tree

24   from my yard, had disappeared.  And, subsequent to that, a few

25   days later, I walked out to the yard and saw the neighbor

```
 1   laughing.  Looking at me and laughing.  I guess it had
 2   obscured his view of the water.
 3        And, in my mind, the only logical thing was that the
 4   neighbor had cut the tree down.
 5   Q    Did that create some sort of conflict of sorts between you
 6   and the neighbor?
 7   A    Yes.
 8   Q    Now, did that lead in any way to a certain kind of set of
 9   psychiatric symptoms associated with the neighbor in this time
10   period?
11   A    Yes.
12   Q    What happened?
13   A    Anything that was negative was the neighbor's fault.  No
14   matter what.
15   Q    In your -- in your mind.
16   A    In my mind.
17   Q    All right.  Now, at this time were you living --
18   withdrawn.
19        At this time, what city were you living in?
20   A    Vallejo.
21   Q    Vallejo.  And in or around this time period, moving
22   forward to in or about February 15, 2006, did you have some
23   sort of injury associated with your back?
24   A    Yes.
25   Q    I would like to show you what has been received in
```

```
 1   evidence as Government Exhibit 441, please.

 2       And if we could please have that displayed.

 3           MR. REEVES:  If I may approach?

 4           THE COURT:  Yes.

 5       (Document displayed)

 6       (Witness examines document)

 7           MR. REEVES:  And if we could please enlarge the top

 8   half of the document.

 9       (Document enlarged)

10           MR. REEVES:  And if we could -- I'm sorry, let me

11   back up.  I'm so sorry.

12       I want to enlarge the bottom half and highlight the date,

13   if I could, please.  If we could highlight the date in the

14   upper right-hand corner?

15       (Document highlighted)

16   BY MR. REEVES:

17   Q   Okay.  Mr. Kara, is Exhibit 441 another one of the medical

18   records that you authorized Kaiser to give to your attorneys?

19   A   Yes.

20   Q   All right.  Does it pertain to the injury that you

21   suffered associated with your back on or around February 15,

22   2006?

23   A   Yes.

24           MR. REEVES:  At this time if we could please enlarge

25   the top half of the document.  And if we could highlight
```

 1   Mr. Kara's name and the city that he lives in.

 2        (Document highlighted)

 3        **MR. REEVES:**  And, if we could please highlight the --

 4   the "Patient's Comments" section there.

 5        (Document highlighted)

 6        **MR. REEVES:**  Okay, fine.

 7   **BY MR. REEVES:**

 8   **Q**   So, in or around this time period, did you suffer an

 9   injury to your back?

10   **A**   Yes.

11   **Q**   And in your own words, tell us what you thought happened

12   at that time.

13   **A**   I was on -- I was trying to take down some Christmas

14   lights that are attached to the front of the house.  And, I --

15   I thought that the neighbor had walked up -- I was on the

16   fifth ring of the ladder, and I thought that the neighbor had

17   walked up and pulled the ladder from underneath me.  Because I

18   fell off from the ladder onto a concrete embankment, and broke

19   my back.

20   **Q**   Did you think the neighbor was trying to hurt you?

21   **A**   At the time, yes.

22   **Q**   Today, as you look back on that, is that what you still

23   think?

24   **A**   No.

25   **Q**   What do you think happened?

KARA - DIRECT / REEVES

1    **A**    I slipped.

2    **Q**    You slipped.  Did it have anything to do with the

3    neighbor?

4    **A**    No.

5    **Q**    So, do you think that this was a fantasy of some sort in

6    your mind, that would -- that involved the neighbor?

7    **A**    Of course.

8    **Q**    Did it grow out in any sense of the animosity that you and

9    he were going through at that time?

10   **A**    Sure.

11   **Q**    Okay.  And, let's -- I'm going to read the portion of the

12   patient's comments, about the incident.  Do you see that?

13   **A**    Yes.

14   **Q**    Listen to what I say, and tell me if I read it correctly

15   (As read):

16           "States he was on the fifth rung of ladder when an

17           Asian male wearing dark glasses casually walked up

18           and pulled ladder over causing patient to fall onto

19           his back."

20       Is that what you told Kaiser at or about the time of this

21   injury?

22   **A**    I think so.

23   **Q**    In this same period -- thank you, I'm done with that for

24   the moment.

25       In this same period, was there an incident in your

KARA - DIRECT / REEVES

```
 1   backyard in which you were trying to locate wires or anything
 2   of that nature?
 3   A   Yeah.
 4   Q   Do you recall that incident?
 5   A   Yes.
 6   Q   What happened, Mr. Kara?
 7   A   I thought at the same time that there is a camera from the
 8   back window, taking a look at me, inside the bedroom, when I
 9   was trading my -- my options in the daytime.  So I wanted to
10   find the wire for the camera.  So, I walked outside, and I dug
11   a trench beside the window.  With my hands.
12   Q   Did you find any wires?
13   A   No.
14   Q   Okay.  As you look back on this incident, where you are
15   digging with your hands in the backyard, what do you think
16   about it today?
17   A   It -- it was stupid.
18   Q   Okay.  All right.  Why was it stupid, Mr. Kara?
19   A   Because it -- the wires never existed.  And there was no
20   camera.
21   Q   Do you think the incident with the wires and the digging
22   and the ladder was a product of the anxiety associated with
23   your conflict with the neighbor?
24   A   Not only that, but I had been very depressed and I was
25   taking Zoloft.  And I increased the dosage of Zoloft to three
```

KARA - DIRECT / REEVES

```
 1   times the recommended dose.  And so that makes you manic.
 2   And, I think that had affected me tremendously.
 3   Q   Did you work on that problem in the -- in your medications
 4   with Dr. Woolery, thereafter?
 5   A   Immediately.
 6   Q   Were you able to get the mixture of your medicines
 7   corrected?
 8   A   Yes.
 9   Q   Now, in or around this time period, in or around February
10   of 2006, shortly after the time of the events you have been
11   describing, did you make a decision to move from your home in
12   Vallejo?
13   A   Yes.
14   Q   And where did you move to, temporarily?
15   A   My mom's home.
16   Q   And in what city is that located?
17   A   Also in Glen Cove, Vallejo.
18   Q   Okay.  Did that create a greater separation between you
19   and this neighbor?
20   A   Yes.
21   Q   Did that help in any way with your symptoms?
22   A   Immensely.
23   Q   And thereafter in 2006 did you make a decision to move
24   from Vallejo altogether?
25   A   Yes.
```

1    **Q**    And where did you move to?

2    **A**    Walnut Creek.

3    **Q**    And, once you made the decision to move away from the

4    neighbor, in the manner you have described, did the problems

5    that you had been experiencing in early 2006, did they get

6    better or did they get worse?

7    **A**    They got very much better.

8    **Q**    How did they get better?

9    **A**    There was absolutely no problems any more.

10   **Q**    I would like to go back, if I could please, to Exhibit

11   112, Page 13, please.

12        (Document displayed)

13        **MR. REEVES:**  And if we could please highlight the

14   second-to-the-last trade, involving Neurocrine, at the bottom.

15        (Document highlighted)

16        **MR. REEVES:**  Thank you very much.

17   **BY MR. REEVES:**

18   **Q**    Mr. Kara, moving forward on or around May 15, 2006, did

19   you make a decision to invest in Neurocrine?

20   **A**    Yes.

21   **Q**    Why did you decide to invest with Neurocrine?

22   **A**    Neurocrine was coming up with a sleeping pill that will

23   not require a triplicate form by the physician.  And so the

24   FDA was about to approve that.  And so, I invested in it.

25        **MR. REEVES:**  I got ahead of myself, I'm sorry.  So, I

KARA - DIRECT / REEVES                    149

 1   got -- if we can go back to Exhibit 112, Page 12.  Sorry,

 2   again, for the interruption.

 3       (Document displayed)

 4           MR. REEVES:  And if we could highlight the trades

 5   that occurred on or around February, February 24, 2006, that

 6   are just in the lower half of the -- of Page 12 of Exhibit

 7   112, please.

 8       So, first, if we can enlarge the lower half.  And then if

 9   we could highlight in the middle, down a little bit, a little

10   bit more, a little bit more, right down in there, highlight

11   those, please.

12       (Document highlighted)

13           MR. REEVES:  Okay, good.

14   BY MR. REEVES:

15   Q   Sorry about that, Mr. Kara.  I wanted to talk to you about

16   Andrx.

17       In or around February, on or about February 24, 2006, did

18   you make a decision to invest in Andrx?

19   A   Yes.

20   Q   All right.  Is that what's now reflected on Exhibit 112?

21   A   Yes.

22   Q   Okay.  And, why did you decide to invest in Andrx in or

23   around February 24, 2006?

24   A   Andrx was a pain company.  And, I had received some

25   information from Maher that this company will be acquired in a

```
 1   matter of a week or so.  So, we started loading up on Andrx

 2   calls.

 3   Q    Was the information that you obtained from Maher Kara

 4   relating to Andrx confidential information?

 5   A    Yes.

 6   Q    Was it non-public?

 7   A    Yes.

 8   Q    Was it inside information?

 9   A    Yes.

10   Q    And, was it valuable to you?

11   A    Yes.

12   Q    Why was it valuable to you?

13   A    Because we were going make some money.

14   Q    How would you make money, given what Maher had told you?

15   A    We would buy the calls low, and we would sell them high

16   after the acquisition.

17   Q    After the acquisition had occurred?

18   A    Correct.

19   Q    And, in that way you hoped to profit.

20   A    Correct.

21   Q    All right.  Now, did you, in this time period, also

22   discuss your decision to invest in Andrx with your

23   brother-in-law, Bassam Salman?

24   A    Yes.

25   Q    Do you recall the substance of that discussion?
```

KARA - DIRECT / REEVES

1    **A**    Yes.

2    **Q**    And, what, in substance, do you recall discussing with

3    Mr. Salman?

4    **A**    I told Bassam that, "I have a good company for you, that's

5    a definite takeover."  And, "Start loading up on calls."

6    **Q**    Now, at the time that you told him it's a takeover, that

7    it's a definite takeover, was there public knowledge?

8    **A**    No.

9    **Q**    And, what happened next?  What, if anything, did

10   Mr. Salman do, or say to you?

11   **A**    He was buying calls.

12   **Q**    And according to the trading records, what securities did

13   you decide to invest in, in Andrx, during this time period?

14   **A**    It was March and April, 2006, the $20 calls.

15   **Q**    Okay.  And, is that -- what type of time period is that?

16   **A**    Uh --

17   **Q**    If you are in investing in late February and the

18   expiration is in --

19   **A**    Thirty -- thirty and sixty days.

20   **Q**    Thirty and sixty days?

21   **A**    Yes.

22   **Q**    Does that reflect the short time period that you expected

23   the transaction to occur in?

24   **A**    Yes, sir.

25   **Q**    And what was the strike price for options that you are

1    buying for the April calls?

2    **A**    $20.

3    **Q**    Did you discuss the details of your -- of the securities

4    that you were investing in with Mr. Salman?

5    **A**    Yes.

6    **Q**    What expectation, if any, did you have based on your

7    discussion with him with regard to his in investing?

8    **A**    I discussed with him this -- the strike prices.  And

9    discussed with him the terms, you know, the duration.  And,

10   even discussed with him how much I was paying, the premiums.

11   **Q**    So, are those the details associated with the options that

12   you were investing in?

13   **A**    Yes.

14   **Q**    Okay.  All right, good.

15        Now I'm ready to go to Neurocrine.  If we could go forward

16   to, now, May, 2006, as reflected in Page -- Exhibit 112, Page

17   13.

18        (Document displayed)

19   **Q**    On or about May 15, 2006, did you make a decision to

20   invest in Neurocrine?

21   **A**    Yes.

22   **Q**    And what were your reasons, if you would be kind enough to

23   say them again, that led you to invest in Neurocrine in May,

24   2006?

25   **A**    It was a company that had a sleeping pill that would not

 1   require triplicate from the physician.  Meaning that you can

 2   get a refill without having to see the doctor every 30 days.

 3   Which is significant.  It would not be treated as a narcotic.

 4   **Q**   Would that make it a valuable product, did you think?

 5   **A**   Very much so.

 6   **Q**   Okay.  And did you discuss your decision to invest in

 7   Neurocrine with Maher during this time period?

 8   **A**   Yes.

 9   **Q**   And what, if anything, do you remember him saying about

10   that?

11   **A**   I asked him, I asked him, "If this gets approved by the

12   FDA, what did that mean to Neurocrine?"

13         And he said, "That could mean $500 million of value to

14   Neurocrine."  So, the stock price would rise dramatically.

15   **Q**   Did you discuss your decision to invest in Neurocrine with

16   Bassam Salman?

17   **A**   Yes.

18   **Q**   Do you recall the substance of that discussion?

19   **A**   I mentioned the same thing that I mention now to Bassam.

20   **Q**   And what securities did you decide to buy in May, 2006, in

21   Neurocrine?

22   **A**   I bought the -- I bought the May 20, 2006, $55 calls.

23   **Q**   Okay.  All right, good.

24         Let's move forward, if we could, please, to on or around

25   July 21, 2006.

 1           **MR. REEVES:**  And again, if we could pull up the next

 2    page of Exhibit 112, Exhibit 112, Page 14, please.

 3       (Document displayed)

 4           **MR. REEVES:**  And if we could highlight the third

 5    trade down, please.  Thank you very much.

 6       (Document highlighted)

 7    **BY MR. REEVES:**

 8    **Q**   Mr. Kara, in or around July 21st, 2006, did you make a

 9    decision to invest in a company known as HCA?

10    **A**   Yes.

11    **Q**   What is HCA?

12    **A**   Hospital Corporation of America.

13    **Q**   Okay.  And why did you decide to invest in HCA in this

14    time period?

15    **A**   I saw HCA in the *Wall Street Journal*.  And so, I thought

16    it was -- that there was going to be an acquisition of this

17    particular company.  It was ready for that.

18    **Q**   All right.  In this time period, in the summer of 2006, do

19    you recall discussing HCA and other hospital-related companies

20    with your brother, Maher?

21    **A**   Yes.

22    **Q**   What do you recall discussing in that time period with

23    Maher Kara about that subject?

24    **A**   I had the stocks that I had on that hit list divided up

25    into different groups.  You know, anti-cancer, cardiovascular,

 1  hospitals, et cetera.  In that hospital group, there was

 2  LifePoint, WellPoint, HCA, USPI, that sort of thing.  So I had

 3  all these discussions with Maher about the appropriateness of

 4  these companies.  And HCA was one of them.  Although HCA did

 5  not come from Maher.

 6  Q   Okay.  But you talked about him in -- withdrawn

 7      You talked about HCA in the sense that you just described,

 8  talking about a collection of hospital stocks.

 9  A   Correct.

10  Q   All right.  And in this time period, in or around July 21,

11  2006, did you speak with Bassam Salman about your investing

12  decision in HCA?

13  A   Yes.

14  Q   And do you recall the substance of that discussion?

15  A   I mentioned HCA as a great target for takeover.  And that

16  I was going to invest in it.  And I left it at that.

17  Q   All right.  And what securities did you decide to buy in

18  HCA in or around this time period?

19  A   I bought the August 19, '06, 47.50 calls.

20  Q   Did you discuss the types of securities that you were

21  going to invest in with Bassam Salman?

22  A   I was very transparent with Bassam.  Whatever I bought, I

23  always told him.

24  Q   All right.  Let's move forward to a little bit later, next

25  month, in or about August, in or around August 8, 2006.  At or

KARA - DIRECT / REEVES

```
 1   about that time, did you make a decision to invest in USPI?

 2   A   Yes.

 3           MR. REEVES:  I would like to display, please, Exhibit

 4   112, Page 15, please.  And if we could highlight the first

 5   trade in the record, please.

 6       (Document highlighted)

 7   BY MR. REEVES:

 8   Q   Now, does "USPI" stand for "United Surgical Partners

 9   International"?

10   A   Correct.

11   Q   Why did you decide to invest in USPI in or around

12   August 8, 2006?

13   A   Maher called and said that there's -- there's a company

14   that has these clinics that are surgical clinics.  And Welsh

15   Carson would probably be the acquirer, and to go ahead and

16   take a close look at it.  And, "You may want to take a

17   position in it."

18   Q   And what company had the surgical clinics that you are

19   talking about?

20   A   USPI.

21   Q   So did Maher alert you that USPI had these surgical

22   clinics?

23   A   Yes.

24   Q   And that it might be acquired by Welsh Carson?

25   A   Correct.
```

1   **Q**   Now, was that confidential information, Mr. Kara?

2   **A**   Yes.

3   **Q**   Was it non-public information?

4   **A**   At the time.

5   **Q**   Okay.  It was unknown to the other investors in the

6   market, to your knowledge?

7   **A**   Yes.

8   **Q**   All right.  Did you consider it to be valuable information

9   to you?

10  **A**   Yes.

11  **Q**   Why was it valuable to you?

12  **A**   Because you can buy USPI at a reduced price and sell it

13  later at a high price.

14  **Q**   All right.  Now, did you discuss your decision to invest

15  in USPI with your brother-in-law, Bassam Salman?

16  **A**   Yes, I did.

17  **Q**   Do you recall the substance of your discussion with

18  Mr. Salman about USPI?

19  **A**   Yes.

20  **Q**   What do you -- did you and Mr. Salman discuss regarding

21  USPI?

22  **A**   I told him that, "I have this company which is a hospital

23  -- it's a hospital stock.  There's an issue with it, though.

24  We're not sure when the transaction will occur, but I will --

25  I will check with Maher, and I will get back to you as soon as

1    possible.  So go ahead and take a position in it, but we'll

2    get back to you as soon as we have more information from

3    Maher."

4    **Q**   And when you were discussing with Mr. Salman that you were

5    not sure when the takeover or the acquisition would occur,

6    what did you mean?

7    **A**   We were not sure when the closure date would be.  We knew

8    -- we knew that it will happen, but we were not sure when, at

9    the time.

10   **Q**   And so what did you tell Mr. Salman you would do in order

11   to be more sure?

12   **A**   We will check with Maher.

13   **Q**   That you would check with Maher?

14   **A**   Yeah.

15   **Q**   And get back to Mr. Salman?

16   **A**   Yes.

17   **Q**   Okay.

18           **MS. SHIFMAN:**  Your Honor, perhaps, if we are done

19   with this area, perhaps this is a good time for the morning

20   break?

21           **MR. REEVES:**  We're not done.

22           **THE COURT:**  Well, as soon as you finish the USPI one.

23           **MR. REEVES:**  Sounds good, Your Honor.

24   **BY MR. REEVES:**

25   **Q**   What securities did you decide to invest in USPI in this

PROCEEDINGS

```
 1   time period?

 2   A   It appears that it was mostly the November 18, 2006, $25

 3   strike price.

 4   Q   All right.  Good.  And did you discuss the details of that

 5   investment with Bassam Salman in this time period?

 6   A   Yes.

 7   Q   All right.

 8        MR. REEVES:  Your Honor, I would like to finish with

 9   USPI, if I could, and then take a break.  It might take me a

10   few minutes.

11     What is the Court's preference?

12        THE COURT:  How long will it take you?

13        MR. REEVES:  I think about five minutes.

14        THE COURT:  We are kind of past our time.  Why don't

15   we go ahead and take the break now.

16        MR. REEVES:  That's fine, too.

17        THE COURT:  We will take a 15-minute break.

18        THE CLERK:  All rise for the jury.

19     (Jury excused)

20     (The following proceedings were held outside of the

21   presence of the Jury)

22        THE COURT:  Okay.

23        MR. REEVES:  Would you like the witness to step out?

24        THE COURT:  Yes.

25     (Witness excused from the courtroom)
```

PROCEEDINGS

```
 1          THE COURT:  Thank you.

 2      (Recess taken from 10:38 to 10:50 a.m.)

 3      (The following proceedings were held outside of the

 4   presence of the Jury)

 5          THE COURT:  Let me go on the Record for just one

 6   brief thing.

 7      Mr. Millick, who is Juror No. 7, has indicated to Betty

 8   that his employer is sort of giving him a little bit of a hard

 9   time, you know, "Why are you still in jury service," and is

10   asking that I or somebody from this court call and explain to

11   the controller of this company, Enartis-Vinquiry Company -- I

12   don't know what it is -- that he is on a jury, his service is

13   needed.

14      Any objection to that?

15          MR. REEVES:  No, Your Honor.  I think that's what you

16   should do.

17          MS. SHIFMAN:  No problem.

18          MR. REEVES:  Please.

19          MS. SHIFMAN:  I think he was the gentleman who worked

20   for the wine company.

21          THE COURT:  Is that what it is?

22          MS. SHIFMAN:  Yes.

23      (Reporter interruption)

24          THE COURT:  E-N-A-R-T-I-S, hyphen, V-I-N-Q-U-I-R-Y.

25      I will do that the next break.  Don't want to lose any
```

```
 1   jurors at this point.
 2            MR. REEVES:  No, Your Honor.
 3            THE COURT:  Okay.  Well, Betty's not here, so I guess
 4   we can't start.  What, do you think you will be -- if we take
 5   a break shortly after the noon hour, do you think you will be
 6   close to done with direct?  Or --
 7            MR. REEVES:  Yes.
 8            THE COURT:  Okay.
 9            MS. SHIFMAN:  So will we just take a break then at
10   your conclusion?
11            THE COURT:  Yeah.  I -- I assume we're going to
12   another -- is it an hour or --
13            MR. REEVES:  I think maybe a little less than that,
14   so an hour, minus.
15            THE COURT:  It may make sense then to take an early
16   break, give you a chance to regroup, and start in on cross
17   after lunch.
18            MS. SHIFMAN:  Thank you, Your Honor.
19            MR. REEVES:  Fine.
20            THE COURT:  Okay.
21            MR. REEVES:  Thank you.
22            THE COURT:  And you have, let's see, two more
23   witnesses?
24            MR. REEVES:  Yes.  The way it's shaping up, yes.  The
25   SEC, and then the FBI.
```

```
 1          THE COURT:  All right, so I do have to address the
 2  matters we talked about, at the next -- before we come back --
 3  well, we'll have some time, because I assume you are going to
 4  take most of the afternoon with this witness, or a good part
 5  of it?
 6          MS. SHIFMAN:  (Shrugs shoulders)  Hard to know,
 7  exactly.  This took much longer than I thought on direct.
 8          THE COURT:  Okay.  All right.
 9      (Off-the-Record discussion between the Court and Clerk)
10          THE COURT:  Okay.  We are ready to resume?
11          MR. REEVES:  Yes, Your Honor.
12          THE COURT:  Okay.
13      (The following proceedings were held in the presence of
14  the Jury)
15          THE CLERK:  All rise for the jury.
16      Please be seated.
17          THE COURT:  Okay.  We will resume with the continued
18  direct examination of Mr. Kara.
19          MR. REEVES:  Thank you, Your Honor.
20  BY MR. REEVES:
21  Q   Mr. Kara, we were talking about your decision to invest in
22  USPI in or around early August, 2006.
23      Do you recall that testimony?
24  A   Yes.
25  Q   I would like to show you what has been marked for
```

KARA - DIRECT / REEVES

```
 1    identification as Government Exhibit 329.

 2              MR. REEVES:  If I may approach, Your Honor?

 3              THE COURT:  Yes.

 4         (Witness examines document)

 5    BY MR. REEVES:

 6    Q    Take a moment.  Do you recognize those documents,

 7    Mr. Kara?

 8    A    Yes.

 9    Q    What are they?

10    A    Telephone numbers.

11    Q    Okay.  And, in the middle of the document, it looks like

12    there's a user name:  Miriam M. Kara, do you see that?

13    A    Yes.

14    Q    With a phone number 707-567-2202.  Do you recognize that

15    number?

16    A    That's my phone number.

17    Q    Is that the cell number you were using in 2006?

18    A    Still my cell phone.

19    Q    Okay.

20              MR. REEVES:  At this time I offer Exhibit 329 in

21    evidence, please.

22              MS. SHIFMAN:  No objection, Your Honor.

23              THE COURT:  All right, 329 is admitted.

24         (Trial Exhibit 329 received in evidence)

25         (Document displayed)
```

1            **MR. REEVES:**  If we could enlarge the middle of the

2    document.  And if you could highlight, please, the user name

3    and Miriam M. Kara on the left-hand side of the --

4        (Document highlighted)

5            **MR. REEVES:**  That is great.  Thank you very much.

6    **BY MR. REEVES:**

7    **Q**    Okay.  Mr. Kara, are these a set of the phone records for

8    the cell phone that you were using in or around August, 2006?

9    **A**    Yes.

10   **Q**    All right.  Is that an account that is held in your wife's

11   name for some reason?

12   **A**    Yes.

13   **Q**    Okay.  Good.  If we could please go to the next page.

14           **MR. REEVES:**  And if we could please highlight the

15   line 36.  And enlarge that line, please.

16       (Document displayed)

17       (Document highlighted)

18           **MR. REEVES:**  Great.  Okay.

19   **BY MR. REEVES:**

20   **Q**    On Line 36, do you see an entry on or around August 7, at

21   7:59 p.m?  Do you see that, Mr. Kara?

22   **A**    Yes.

23   **Q**    Do you recognize the phone number that is highlighted in

24   that line?

25   **A**    Yes.

KARA - DIRECT / REEVES

1    **Q**    That number is 312-550-0687?

2    **A**    Yes.

3    **Q**    In the location, Chicago, Illinois?  Do you see that?

4    **A**    Yes.

5    **Q**    Do you have an understanding as to whose phone number that

6    is?

7    **A**    Mr. Salman.

8    **Q**    Bassam Salman's?

9    **A**    Yes.

10   **Q**    Do you think this is a record of your communication with

11   him about USPI, to the best of your knowledge?

12           **MS. SHIFMAN:**  Objection, leading.

13           **THE COURT:**  Sustained.

14   **BY MR. REEVES:**

15   **Q**   Was this at or about the time that you called Mr. Salman

16   about USPI?

17        (Witness examines document)

18           **MS. SHIFMAN:**  Your Honor, I'm going to object.  The

19   witness is looking at some other document.

20        (Witness examines document) before that

21           **THE COURT:**  All right.  You can answer the question

22   if you recall, and then if you need to refresh your memory we

23   have to indicate that for the Record.

24        So, based on what you know, you can answer the question.

25           **THE WITNESS:**  I can't remember.

**BY MR. REEVES:**

1

2    **Q**   Do you remember talking with Bassam Salman in or around

3    early August, 2006, about USPI?

4    **A**   Yes.

5    **Q**   At or about the time that you made your investment in

6    USPI?

7    **A**   Yes.

8    **Q**   But you are not sure if this is necessarily that phone

9    call.  Is that your testimony?

10   **A**   Correct.

11   **Q**   All right.  Good.

12        Now, in this time period -- thank you, I'm done with that.

13        (Off-the-Record discussion between counsel)

14   **BY MR. REEVES:**

15   **Q**   In or around this time period, Mr. Kara, did you discuss

16   your decision to invest in USPI with other people besides

17   Bassam Salman?

18   **A**   Yes.

19   **Q**   Did you speak with USPI about Mr. Joseph -- with

20   Mr. Joseph Azar?

21        **MS. SHIFMAN:**  Objection, leading.

22        **THE COURT:**  Overruled.

23        **THE WITNESS:**  Yes.

24   **BY MR. REEVES:**

25   **Q**   Okay.  Let's talk about Mr. Azar in this period.  In

 1   or around the time that you decided to oh invest in USPI, do

 2   you recall the substance of your discussions with Mr. Azar

 3   about USPI?

 4   **A**   I think so.

 5   **Q**   Okay.  Tell us what you remember.

 6   **A**   I -- again, I mentioned to Mr. Azar the same thing that --

 7   that I had mentioned before.  That there is a company that

 8   will most likely be acquired.  The only issue would be we

 9   don't have the target date of the acquisition.  And, it was

10   left at that.

11   **Q**   What, if anything, did he say?

12   **A**   He -- he thanked me.  And, and it was left at that.

13   **Q**   All right.  And, in this time period, do you recall

14   speaking with Nasser Mardini about USPI?

15   **A**   Yes.

16   **Q**   Okay.  Do you recall the substance of your discussion with

17   Mr. Mardini?

18   **A**   Uh, not really.

19   **Q**   Okay.  Do you foreclose the possibility that you spoke

20   with him about USPI?

21   **A**   I did speak to him about USPI.

22   **Q**   So, you are sure you spoke with him about USPI.

23   **A**   Yes.

24   **Q**   But you don't recall the details any further?

25   **A**   No.

1   **Q**   All right, fine.

2       Now, how did USPI unfold?  Did -- how long did you

3   continue to invest in USPI?

4   **A**   Significant number of months.

5   **Q**   Through the fall of 2006?

6   **A**   Yes.

7   **Q**   Did that have an effect on your investment strategy?

8   **A**   Big time.

9   **Q**   Describe what type of an effect it had.

10  **A**   We were buying short-term calls, only to have to liquidate

11  them, to fall back.  And, for the calls to expire.  And,

12  become worthless.  And then only to find out that first it was

13  going to be November, so we would buy in December calls.  And

14  then, finding out that it's not going to be December, it's

15  going to be something else.  So, we lost quite a bit of money.

16  **Q**   Because the -- the corporate transaction, the takeover was

17  taking longer than you expected?

18  **A**   Yes.

19  **Q**   Okay.  So as you are waiting for the transaction to

20  happen, do you speak with your brother, Maher, about that?

21  **A**   Yes.

22  **Q**   Do you recall the substance of those -- any followup

23  conversations you had with Maher about what was happening with

24  USPI?

25  **A**   Yes.

1    **Q**    What, if anything, do you remember Maher telling you?

2    **A**    To be patient, and once he figures it out he will let us

3    know.

4    **Q**    Did you discuss the -- who it was that was working on the

5    USPI transaction?

6    **A**    It was a colleague of his.

7    **Q**    Do you remember that person's name?

8    **A**    I think Trygve, a gentleman by the last name of Trygve.

9    **Q**    A colleague at Citigroup was still working on the deal?

10    **A**    Yes.

11    **Q**    And approximately how many times did you continue to speak

12    with Maher about following up about what was happening with

13    USPI?

14    **A**    Maybe five or six times.

15    **Q**    And is that through the course of the fall?

16    **A**    Yes.

17    **Q**    And, did the discussions that you had with Maher about the

18    delays associated with a takeover of USPI trigger discussions

19    then with Bassam Salman about his investing?

20    **A**    Yeah.

21    **Q**    Did you have to follow up with Bassam Salman?

22    **A**    Of course.

23    **Q**    What do you recall discussing with Bassam Salman about

24    that?

25    **A**    I was embarrassed, you know, because at first I thought

 1  that we had the -- the target date.  So I have to be very

 2  apologetic from him, you know, because I was concerned that,

 3  you know, he may lose his investment.

 4  **Q**   What, if anything, did he say?

 5  **A**   He was very accommodating, and he said not to worry too

 6  much.  And that when it happens, it will happen.

 7  **Q**   Did you discuss adjusting your investing strategy under

 8  those circumstances?

 9  **A**   I did.

10      (Reporter interruption)

11          **THE WITNESS:**  I did.

12  **BY MR. REEVES:**

13  **Q**   You did.  What did you discuss with Bassam Salman about

14  adjusting your investment strategy in USPI?

15  **A**   I -- I told him to buy short-term calls, and to -- so that

16  he can adapt to this situation.  And be at a moment's notice,

17  ready, just in case the target date happens to -- to come by,

18  so that he will always have in reserve some of those

19  short-term calls so he can switch around.  And that's -- that

20  was relayed to him up front.

21  **Q**   All right.  And, in the same manner, did the delay

22  associated with the acquisition of USPI require you to have

23  followup calls with Mr. Azar?

24  **A**   Mr. Azar does not buy options.  Mr. Azar buys strictly

25  stocks.  So, he was not a problem.

1   **Q**   Okay.  And what about Mr. Mardini?  Did you have to have

2   followup conversations with him?

3   **A**   Maybe once.  I don't -- I don't impact or affect any

4   strategy talks with Mr. Mardini.  I was completely hands-off

5   because he was a stockbroker.  He knows what he was doing.

6   **Q**   Okay.  That was because he knows what he was doing as a

7   stockbroker.

8   **A**   Yes.

9   **Q**   All right.  Now, I would like to show what has been marked

10  as Government Exhibit 138, please.

11          **MR. REEVES:**  If I may approach?

12          **THE COURT:**  Yeah.

13      (Witness examines document)

14  **BY MR. REEVES:**

15  **Q**   Do you recognize Exhibit 138?

16  **A**   Yes.

17  **Q**   What do you recognize it to be?

18  **A**   A research report put out by Citigroup.

19  **Q**   In or around September, 2006?

20  **A**   Yes.

21  **Q**   And in or around the time period when you were investing

22  in USPI, did you get a copy of this research report?

23  **A**   Yes.

24  **Q**   Do you recall that?

25  **A**   Yes.

 1   **Q**    From whom did you get the research report?

 2   **A**    Maher.

 3   **Q**    Have you had an opportunity to look carefully at this

 4   document?

 5        (Witness examines document)

 6   **Q**    Well, have you looked at the document, and do certain

 7   portions of it pertain to USPI?

 8        (Witness examines document)

 9   **A**    Yes.

10   **Q**    Okay.

11             **MR. REEVES:**  At this time I offer Exhibit 138 in

12   evidence.

13             **MS. SHIFMAN:**  Continuing objection, foundation and

14   hearsay.

15             **THE COURT:**  All right.  138 is admitted.  Objection

16   overruled.

17        (Trial Exhibit 138 received in evidence)

18        (Document displayed)

19             **MR. REEVES:**  If we could just enlarge the top half of

20   the document, please, and highlight the date.

21        (Document highlighted)

22   **BY MR. REEVES:**

23   **Q**    Do you recall any of the details associated with your

24   receipt of this research report in or around the fall of 2006,

25   Mr. Kara?

 1   **A**   It was because I had a healthcare division, you know, in

 2   my stock portfolio --

 3   **Q**   Uh-huh.

 4   **A**   It was thought that this would be an asset to me.

 5   **Q**   Thought by whom?  By Maher?

 6   **A**   Maher, yeah.

 7   **Q**   All right.  And does this research report discuss USPI?

 8   Yes, USPI.

 9   **A**   Yes.

10   **Q**   If I could direct your attention to Page 6, please.

11       (Document displayed)

12       **MR. REEVES:**  And if we could highlight the column

13   headings at the top, if we could enlarge that in a small box

14   and then enlarge the portion toward the bottom, one blue line

15   up, that talks about -- okay, yeah.

16       That was pretty unclear.  I'm sorry.  If you could enlarge

17   the upper right-hand corner just so that we can see that, in a

18   large sense.

19       (Document enlarged)

20       **MR. REEVES:**  Good.  And if you could do the same

21   thing, please, for the second-to-the-bottom blue line.  No,

22   just one at a time.

23       (Document enlarged)

24   **BY MR. REEVES:**

25   **Q**   So help us understand, please, what Page 6 of Exhibit 138

 1  is, Mr. Kara.  What is going on on this page, please?

 2  **A**   It is a compilation of the different companies and the

 3  analyst sector calls and top picks, what the analysts in the

 4  area of healthcare are recommending, insofar as buy or sell.

 5  **Q**   All right.  Good.

 6          **MR. REEVES:**  Let's now, if we could, enlarge the

 7  second to last of the blue lines, please.  And if we could

 8  highlight the USPI reference there.

 9      (Document highlighted)

10  **BY MR. REEVES:**

11  **Q**   Okay.  Was USPI according to this analyst report a buy or

12  a sell, recommendation of the analysts?

13  **A**   It was a buy.

14  **Q**   Okay.  Is that consistent with the advice that you were

15  getting about USPI from Maher?

16  **A**   Yes.

17  **Q**   All right.  At this time, I'm done with Exhibit 138.

18      Okay.  I would like to move forward to in or around early

19  March, 2007.  And I'd like to begin by:  In or around early

20  March, did you have any kind of skin rash or a problem

21  associated with having a rash, that made you feel ill?

22  **A**   Yes.

23  **Q**   I would like to show you what has been received in

24  evidence as Government Exhibit 144 -- excuse me, 444, please.

25

KARA - DIRECT / REEVES

```
 1              MR. REEVES:  If I can approach, please?
 2              THE COURT:  Yes.
 3              MR. REEVES:  And if we could display Exhibit 444,
 4      please.
 5         (Document displayed)
 6              MR. REEVES:  If we could enlarge the top half of the
 7      document, please.
 8      BY MR. REEVES:
 9      Q    So this is a medical record dated on or about -- in the
10      upper right-hand corner, March 14, 2007.  Do you see that?
11              MR. REEVES:  If we could please highlight that?
12         (Document highlighted)
13      BY MR. REEVES:
14      Q    Was that at or about the time that you had the -- the
15      symptoms associated with having a rash?
16      A    Yes.
17      Q    All right.  Good.  And this is happening in mid-March,
18      2007?
19      A    Yes.
20      Q    How did that make you feel?
21      A    Very sick.
22      Q    Very sick.  And was it painful?
23      A    Yes.
24      Q    And you sought medical care for it.
25      A    Yes.
```

1    **Q**   All right?

2         **MR. REEVES:**   If we could go to the bottom of the

3    document, and if we could.   And if we could highlight the last

4    paragraph, please.   Enlarge that, yes, that's great and then

5    highlight the first line.   Keep going one more, that's great,

6    right there.

7         (Document highlighted)

8    **BY MR. REEVES:**

9    **Q**   So, did you present to Kaiser Permanente on or around

10   March 14, 2007 the following symptoms:   "Bad generalized

11   itching for one week," and -- as part of your problem?

12   **A**   Yes.

13   **Q**   Were you worried about having a rash?

14   **A**   Yes.

15   **Q**   Okay.   Good.   All right.   Thank you.   I'm done with that.

16        Now, how did this, these rash symptoms make you feel,

17   Mr. Kara?

18   **A**   The medication was making me very tired, but the rash

19   symptoms was all over my body.

20   **Q**   Okay.   And, how do you think you got the rash?

21   **A**   Maybe something at work?

22   **Q**   Something from some of the chemicals that you work with in

23   your business?

24   **A**   Yes.

25   **Q**   And was that difficult for you, in this period?

1    **A**    Yes.

2    **Q**    These symptoms.

3    **A**    Yes.

4    **Q**    All right.  Let move forward about a week to in or around,

5    on or around March 22, 2007.  On or about March 22, were you

6    still recovering from these rash symptoms that you have

7    described?

8    **A**    It -- it was almost gone.

9    **Q**    But were you still -- how were you feeling at that point?

10   **A**    It was okay.  I was good.

11   **Q**    Okay, good.  All right.  Let's -- on or around March 22nd,

12   did you make a decision to invest in Biosite?

13   **A**    Yes.

14   **Q**    I would like to show you what has been received in

15   evidence as Government Exhibit 112, Page 16, please.

16       (Document displayed)

17           **MR. REEVES:**  And if we could enlarge the top half of

18   the document.

19       All right, good.

20   **BY MR. REEVES:**

21   **Q**    So according to your trading records, you made an

22   investment on or about March  22nd in 2007 in Biosite.  Do you

23   recall that investment?

24   **A**    Yes.  Yes, sir.

25   **Q**    Why did you make your investment in Biosite?

1    **A**    I –– I called Maher.  And, found out that this particular

2    company was going to be acquired by Monday.  And the call was

3    on Thursday.  So, within maybe a few days, that this

4    particular company was going to be acquired.

5    **Q**    And do you recall your conversation with your brother,

6    Maher, about Biosite?

7    **A**    Yes.

8    **Q**    What do you recall about that conversation?

9    **A**    This –– this particular company makes kits for doctors.

10   For measuring, you know, heart attacks and the aftermath of

11   heart attacks and what have you.  And, Maher said that there's

12   a pending acquisition over the weekend.  And, that was the

13   primary, you know, thing that went on between me and Maher.

14   **Q**    When you called your brother, Maher Kara, did you ask him

15   for information?

16   **A**    Yes.

17   **Q**    Why were you asking him for information?

18   **A**    I –– I needed a –– I needed a company.

19   **Q**    Why did you need a company?

20   **A**    For multiple reasons.  The primary reason was there was

21   hardly any money left in the account.  Maybe there was 25- to

22   $30,000 left, total, in everything that we had.

23        And, secondly, some of the people that I was giving the

24   tips to had complained that they needed a tip.  And so stupid

25   me listened to one of them.  And ––

1    **Q**    Who did you listen to?

2    **A**    Joseph Azar.

3    **Q**    Was Mr. Azar complaining in this period?

4    **A**    Yes.

5    **Q**    In what sense was he complaining?

6    **A**    That he was making bad investment choices.  And, he needed

7    a tip.

8    **Q**    So when you spoke to your -- your brother, did you speak

9    about your need for information?

10   **A**    Yes.

11   **Q**    Okay.  And what did you tell your brother?

12   **A**    I told him that we needed a company.

13   **Q**    All right.  Go on.  In the conversation you had with your

14   brother, did he offer to give you money in any sense?

15   **A**    Yes.

16   **Q**    Do you remember that happening?

17   **A**    Yes.

18   **Q**    Did you take him up on his offer for money?

19   **A**    No.

20   **Q**    Why not?

21   **A**    I was embarrassed.

22   **Q**    So, what?  You wanted information, not money.

23   **A**    Correct.

24   **Q**    Okay.  And through the course of the phone call, what do

25   you learn about Biosite?  What is your understanding about

```
 1   what might happen to Biosite?

 2   A   Biosite will be acquired, over -- over the weekend.

 3   Q   And the phone call was on what day of the week?

 4   A   Thursday.

 5   Q   Now, when you learned that Biosite would be acquired over

 6   the weekend, was that confidential information?

 7   A   Yes.

 8   Q   Was it non-public information?

 9   A   Yes.

10   Q   Was it valuable to you, Mr. Kara?

11   A   Yes.

12   Q   Why was it valuable?

13   A   Because you are buying a company at a normal price and you

14   have one day of trading, Friday.  And then, the price -- the

15   acquisition would happen over the weekend.  And on Monday, the

16   price will almost double.  And then, but the calls will go up

17   dramatically.

18   Q   After you spoke with Maher Kara about Biosite in the

19   manner you have described, did you tell anyone else about

20   Biosite?

21   A   Yes.

22   Q   Who did you tell about Biosite?

23   A   I first phoned Mr. Salman.  And then I phoned --

24   Q   Is that the first person you spoke with?

25   A   Yes.
```

KARA - DIRECT / REEVES

1 **Q** What do you remember speaking with Bassam Salman about

2 Biosite?

3 **A** I told Bassam that, "I have a good company for you. And

4 this acquisition will happen over the weekend, by Monday. By

5 Monday morning. And you don't have much time."

6 **Q** Was there urgency associated with the trading?

7 **A** Yes.

8 **Q** What was the nature of that urgency?

9 **A** The transaction may happen over the weekend. And there's

10 only one day of trading. Because when I called him, the

11 market had closed for Thursday. So, the phone call happened

12 after 1:00 Eastern time, you know. So, the market had closed

13 for Thursday.

14    The only trading time he had was Friday. So he had one

15 day of trading.

16        **THE COURT:** Mr. Maher, could you move the microphone

17 closer to your --

18        **THE WITNESS:** Forgive me.

19    So he only had one day of trading left. And so, that was

20 the urgency. It's just one day of trading. That's it.

21 **BY MR. REEVES:**

22 **Q** Just the Friday, the remaining trading day before the

23 weekend?

24 **A** Correct.

25 **Q** All right. I would like to show you what has been marked

 1   as Government Exhibit 374, please.

 2            **MR. REEVES:**  If I may approach?

 3            **THE COURT:**  Yeah.

 4   **BY MR. REEVES:**

 5   **Q**   Do you recognize this exhibit?

 6   **A**   Yes.

 7   **Q**   It's another set of your telephone records?

 8   **A**   Yes.

 9   **Q**   For the same account that we looked at before?

10   **A**   Yes.

11   **Q**   Is this for the time period in -- that includes March,

12   2007?

13   **A**   Yes.

14            **MR. REEVES:**  At this time I offer Exhibit 374 in

15   evidence.

16            **MS. SHIFMAN:**  No objection, Your Honor.

17            **THE COURT:**  374 is admitted.

18      (Trial Exhibit 374 received in evidence)

19      (Document displayed)

20            **MR. REEVES:**  All right.  If we could enlarge the

21   middle portion of the document.  Keep going down a little bit.

22   Great.  Thank you.

23      And if we could highlight the -- one second, are you on

24   Page 2 of Exhibit 374?  We're on the wrong page.

25      (Document displayed)

1          **MR. REEVES:**  There we go.  Everything is highlighted.

2   Thank you.

3   **BY MR. REEVES:**

4   **Q**   All right.  We are on the second page of Exhibit 374,

5   Mr. Kara.  Do you see the item numbers on the left, it looks

6   like there is an Item 54, is a call between you and a

7   No. 917-355-5272?

8          Do you recognize that?

9   **A**   Yes.

10  **Q**   Do you know whose phone number that is?

11  **A**   It's Maher.

12  **Q**   Maher's cell number.  And then, below that, it looks like

13  there is an effort to call, just below that, 925-519-8166?

14         Do you recognize that?

15  **A**   Yes.  That's Joseph Azar.

16  **Q**   All right.  Do you know if you were able to reach him at

17  that time or not?

18  **A**   No.

19  **Q**   You were not able to reach him?

20  **A**   No.

21  **Q**   And then, down below that, Item 58 is a call to a number,

22  Area Code 312-550-0687, in Chicago, Illinois.  Do you see

23  that?

24  **A**   Yes.

25  **Q**   Do you know whose phone number that is?

KARA - DIRECT / REEVES

1    A    Yes.

2    Q    Whose number is that?

3    A    That's Bassam's.

4    Q    Is this the phone call that you had with Bassam Salman

5    about Biosite?

6    A    Yes.

7    Q    All right.  Thereafter, are you able to reach Mr. Azar?

8    A    Yes.

9    Q    Okay.  All right.  Thank you.  I'm done with this.

10        What happens with your investment in Biosite?

11   A    Um, it -- it grows.

12   Q    Let me direct your attention to a few days later.  Is

13   there an announcement relating to Biosite?

14   A    Yes.

15   Q    And what was announced?

16   A    An acquisition.  It was acquired.

17   Q    Are you familiar with a company by the name of Beckman

18   Coulter?

19   A    Yes.

20   Q    Was the announcement that Beckman Coulter had agreed to

21   acquire Biosite?

22   A    Yes.

23   Q    What effect did that have on your investment?

24   A    The investment grew, tremendously.

25   Q    So approximately how much did you make on your investing

1    in Biosite?

2  **A**    Maybe 1, $1.2 million.

3  **Q**    Okay.  1.2?

4  **A**    I think so.

5  **Q**    For a couple days' work?

6  **A**    Yeah.

7  **Q**    Keep the microphone -- you might drop it down a little

8    bit.

9  **A**    Yes.

10    (Request complied with by the Witness)

11  **Q**    All right, good.  Very good.

12    Were you happy with that outcome?

13  **A**    Yes.

14  **Q**    You know, how would you describe that kind of profit for

15    you, Mr. Kara?

16  **A**    Very high.

17  **Q**    Very high?  All right.  Let me direct your attention a

18    little further in time to some time in next week, on or around

19    March 26, 2007.  Did you make a decision to invest in a

20    company known as Alexion?

21  **A**    Yes.

22  **Q**    All right.

23        **MR. REEVES:**  Could I please display Exhibit 112, Page

24    17, please.

25    (Document displayed)

```
 1              MR. REEVES:  And if we could enlarge the highlighted

 2   portion?

 3        (Document displayed)

 4   BY MR. REEVES:

 5   Q    Why did you decide to invest in Alexion on or around

 6   March 26, 2007?

 7   A    Alexion had a drug that was to be approved by the FDA.

 8   And, it was imminent.  And the -- the FDA was supposed to

 9   approve it any day.  And so, I was buying calls into Alexion.

10   Q    Did you discuss Alexion with your brother, Maher?

11   A    I discussed it with Maher, yes.

12   Q    And what did you and -- and Maher Kara discuss about

13   Alexion?

14   A    I mentioned to Maher that the FDA had a pending approval

15   application for an NDA, a new drug application, for a specific

16   application from Alexion.  And if this approval process went

17   through, Alexion stood to make $400,000 per patient.  And,

18   what -- whether he thought that this approval may go through

19   or not.

20   Q    Okay.  Did you discuss investing in Alexion with Bassam

21   Salman?

22   A    Yes.

23   Q    And do you recall that discussion?

24   A    I told him that it is most likely that this particular

25   drug will go through.  And that Alexion will tend to profit
```

 1   significantly.

 2   **Q**   All right.  All right, good.  Back to Biosite very

 3   quickly.  At around the time of your investing in Biosite, do

 4   you recall talking with Nasser Mardini about Biosite?

 5   **A**   Yes.

 6   **Q**   What do you recall discussing with Mr. Mardini about

 7   Biosite in -- in or around March 22, March 23rd, 2007?

 8   **A**   I told Nasser that there's this company that's going to be

 9   acquired over the weekend.  And, to go ahead and investigate

10   it.  And, buy -- buy calls in it.

11   **Q**   All right.  And did you place trades to benefit any of the

12   other people that you identified as related to you and your

13   family?

14   **A**   My very old friend, Safwan Hito, was outside the country.

15   And, he was the only person that had given me his account

16   number, beside Emile.  And, so, I executed trades on his

17   behalf.  Yes.

18   **Q**   Were you logged in as Safwan Hito with his permission, and

19   placed trades in his account?

20   **A**   Correct.

21   **Q**   All right.  Good.  Thank you.  I'm done with that.

22       I would like to move forward to in and around April, 2007.

23   At or around the time of Orthodox Easter.  Is that time period

24   clear to you?

25   **A**   Yes.

KARA - DIRECT / REEVES

```
 1   Q    At or around that time, did you travel to Chicago,
 2   Illinois?
 3   A    Yes.
 4   Q    For what reason?
 5   A    Maher was in Chicago, and he wanted to take Jonathan to
 6   New York.
 7   Q    And who is Jonathan, again?
 8   A    My son.
 9   Q    So, who traveled then from California to Chicago?
10   A    Me and -- me and Jonathan.
11   Q    And when you got to Chicago, did you have an opportunity
12   to see the Salman family?
13   A    Yes.
14   Q    Did you see Bassam Salman?
15   A    Yes.
16   Q    Okay.  Describe your visit with Bassam Salman in this time
17   period.
18   A    It was during Easter.  I don't think I stayed too long.
19   Maybe three days or so.  Three or four -- a maximum, three
20   days, I think.
21   Q    Okay.  Did you have an opportunity to speak with him
22   alone?
23   A    Yes.
24   Q    Do you remember that conversation?
25   A    Yes.
```

1   **Q**   Where did that happen?

2   **A**   We met like always and, you know, we were inseparable for

3   that entire period.  And, so, we were always driving around.

4   And he never left me, really.

5   **Q**   Do you remember having a conversation with him outside a

6   coffee shop?

7   **A**   Yes.

8   **Q**   Was it in the car at that time?

9   **A**   Yes.

10  **Q**   Was it just you and Mr. Salman?

11  **A**   Yes.

12  **Q**   What do you remember happening in the car during this

13  visit for Orthodox Easter?

14  **A**   He -- he was very kind and he offered me money.

15  **Q**   Describe what was said.  What's the substance of the

16  conversation you and Mr. Salman have in the car?

17  **A**   Um, Bassam, Bassam had mentioned that they had made a

18  significant sum of money on the last few transactions.

19  Starting with Bone Care, Andrx, and USPI and Biosite.

20  Specifically, Biosite.

21  **Q**   (Nods head)

22  **A**   And that, he wanted to find the mechanism to basically pay

23  me back.  I -- I told him from the get-go, that wasn't

24  necessary.  And, he insisted.  So, he had a stack of money

25  with him, and separated by rubber bands.  And, so, he

```
 1   insisted, and he kept on pushing the money my way.

 2       And so, I took basically a bundle of money from him, and I

 3   told him, "Thank you so much, it's a gift," after he insisted.

 4   And that was the end of that.

 5       He offered to buy me a coat because it was freezing

 6   outside, and we were near a factory.  And from there he took

 7   me to the airport, and we left.

 8   Q   So when he's offering the money the first time,

 9   approximately how much money was he offering you, Mr. Salman

10   -- excuse me, Mr. Kara?

11   A   About 30- or $40,000.

12   Q   And did you take some portion of that money?

13   A   Yes.

14   Q   At his insistence?

15   A   Yes.

16   Q   How much money did you take?

17   A   I never counted it, but it was in a bundle of rubber

18   bands.  I put it in a drawer.  And I estimated it to be about

19   $10,000.

20   Q   So you took some, but not all of the money that he had

21   offered you.

22   A   Yes.

23   Q   All right.  And did you say that you were near Burlington

24   Coat Factory?

25   A   Yes.
```

1    **Q**    Is that where you can get a jacket?

2    **A**    A coat.

3    **Q**    And Mr. Salman offered to help you because it was cold?

4    **A**    It was cold.

5    **Q**    All right.  I would like to direct your attention to the

6    end of April, 2007, at around April 30, 2007.

7         At or about that time, were you contacted by the United

8    States Securities and Exchange Commission?

9    **A**    Yes.

10   **Q**    And, did you make certain statements to them at that

11   point?

12   **A**    Yes.

13   **Q**    Okay.  Were you truthful in your statements to the SEC?

14   **A**    They were inaccurate.

15   **Q**    What you said was inaccurate?

16   **A**    Yes.

17   **Q**    Was it false?

18   **A**    Yes.

19   **Q**    Misleading?

20   **A**    Yes.

21   **Q**    What did you tell to the SEC to mislead them?  What

22   happened?

23   **A**    Basically I told them in a -- in a manner that the

24   information regarding Biosite, which they had concentrated on,

25   was seen by me on a website before the transaction had

KARA - DIRECT / REEVES

```
 1   occurred.
 2   Q    Was that true?
 3   A    No.
 4   Q    Okay.  Why were you trying to mislead the SEC?
 5   A    For two main reasons.  The primary reason was to distance
 6   Maher away from the -- from the SEC.  And secondary reason, of
 7   course, was me.  To protect me.
 8   Q    All right.  I would like to show you what has been marked
 9   as Government Exhibit 96.
10           MR. REEVES:  If I may approach?
11           THE COURT:  Yes.
12       (Witness examines document)
13   BY MR. REEVES:
14   Q    Do you recognize Exhibit 96?
15   A    Yes.
16   Q    What is that?
17   A    This is the printout from the web, of the particular
18   website that I was referring to.
19   Q    That you referred to a moment ago in your testimony?
20   A    Yes.
21   Q    Did you print these documents out from the web?
22   A    Yes.
23   Q    Did you do this at or around the time of the call from the
24   SEC?
25   A    Yes.
```

KARA - DIRECT / REEVES                                           193

1    **Q**    As a result of being contacted by the SEC.

2    **A**    Correct.

3    **Q**    Okay.

4           **MR. REEVES:**  At this time I offer Exhibit 96 into

5    evidence.

6           **MS. SHIFMAN:**  No objection.

7           **THE COURT:**  96 is admitted.

8        (Trial Exhibit 96 received in evidence)

9        (Document displayed)

10          **MR. REEVES:**  And if we could enlarge the top half,

11   please.

12       (Document enlarged)

13   **BY MR. REEVES:**

14   **Q**    So what are these documents, Mr. Kara?

15   **A**    They're from a Yahoo! page.  And, they talk about, I

16   think, Biosite Diagnostics.  And, it's a printout of --

17   basically from a message board.

18   **Q**    What was your purpose in going to the Internet, going to a

19   Yahoo! message board about Biosite, and in printing out these

20   documents?

21   **A**    To show that there was activity surrounding the stock

22   prior to the transaction occurring.

23   **Q**    To show who that?

24   **A**    Whomever was going to ask.

25   **Q**    Like the SEC?

KARA - DIRECT / REEVES

1   A   Whomever.

2   Q   Would that include the SEC?

3   A   Correct.

4   Q   All right.  And, did the chat, such as it was on the

5   Yahoo! message board, relating to Biosite, have anything

6   whatsoever to do with your decision to invest in Biosite?

7   A   Forgive me?

8   Q   Did the chat or the substance of the chats reflected in

9   the documents that you printed out, did that in fact have

10   anything to do with your decision to buy Biosite options back

11   on or around March 22, 2007?

12   A   No.

13   Q   So, why were you, once the SEC contacted you, going about

14   getting these documents in the manner that you did?

15   A   Trying to cover -- trying to cover our tracks, basically.

16   Q   Is this a cover story?

17   A   Sure.

18   Q   Yes?

19   A   Yes.

20   Q   All right.  Did that cover story extend to the TV show Mad

21   Money, and Jim Cramer?

22   A   Yes.

23   Q   I would like to show you what has been marked Government

24   Exhibit 28, please.

25           **MR. REEVES:**  If I may approach?

1          **THE COURT:**  Yes.

2     (Witness examines document)

3  **BY MR. REEVES:**

4  **Q**   Do you recognize Exhibit 28?

5     (Witness examines document)

6  **A**   Uh, yes.

7  **Q**   What do you recognize this to be?

8  **A**   It's a story by Jim Cramer about Biosite.

9  **Q**   Okay.  In this time period, were you crafting a cover

10  story associated with your investing in Biosite, built around

11  Mad Money and Jim Cramer?

12  **A**   Yes.

13  **Q**   Is this document part of that story?

14  **A**   Yes.

15          **MR. REEVES:**  At this time I offer Exhibit 28 in

16  evidence.

17          **MS. SHIFMAN:**  No objection.

18          **THE COURT:**  All right.  28 is admitted.

19     (Trial Exhibit 28 received in evidence)

20     (Document displayed)

21          **MR. REEVES:**  If we could enlarge the top part of it,

22  please.

23     (Document enlarged)

24  **BY MR. REEVES:**

25  **Q**   Now, did Jim Cramer or Mad Money have anything to do, in

KARA - DIRECT / REEVES

```
 1   fact, with your decision to invest in Biosite?

 2   A    No.

 3   Q    And, by acquiring documents like this (Indicating) in the

 4   Yahoo! chats that we just looked at, were you trying to create

 5   a misleading picture about your investing?

 6   A    Yes.

 7   Q    All right, good.  Thank you.  I'm done with this.

 8        After you received your call from the SEC, did you have an

 9   opportunity to speak with Maher about what had happened?

10   A    Yes.

11   Q    Do you recall that conversation?

12   A    Yes.

13   Q    And what did you and Maher talk about?

14   A    I -- I told him what had happened.

15   Q    What was said between the two of you?

16   A    Uh, that I was investing, and that this is what had

17   occurred.  I told him the truth.

18   Q    And what was his reaction?

19   A    Very badly.

20   Q    Was he upset?

21   A    Very much.

22   Q    All right.  And, in this time period, did you also speak

23   with Bassam Salman about the fact that the SEC was

24   investigating your trading in Biosite?

25   A    Yes.
```

1   **Q**   Do you recall the substance of that discussion?

2   **A**   Um, yes.

3   **Q**   Did you speak with him on more than one occasion?

4   **A**   Yes.

5   **Q**   Okay.  What's the first occasion that you and Mr. Salman

6   had to talk about the SEC investigation?

7   **A**   I basically told him that they phoned me, and what the

8   context of the talks were.  And, he mentioned something to the

9   fact that he's probably going to be next.  And that was the

10  end of it.

11  **Q**   Were there further conversations that you had with Bassam

12  Salman that you recall happening in person, about the same

13  subject?

14  **A**   Yes.

15  **Q**   All right.  Before we get into those, after you were

16  contacted by the SEC in or around late April, 2007 and moving

17  into May, 2007, did you speak with any of the others

18  associated with the trading in Biosite about the SEC's

19  investigation?

20  **A**   Um, all of a sudden, they started coming to my home.

21  **Q**   Who came to your home?

22  **A**   Joseph Azar, and Nick Mardini, and Safwan Hito.

23  **Q**   And did you speak with them each about the -- the

24  investigation?

25  **A**   Yes.

1  **Q**   Let's talk about Mr. Mardini.  Do you recall the substance

2  of your discussion with Mr. Mardini about what to do about the

3  SEC investigation?

4  **A**   Kind of.

5  **Q**   What's -- what -- what -- what is your recollection in

6  substance about what you and Mr. Mardini discussed about the

7  SEC investigation?

8  **A**   Mr. Mardini mentioned that, you know, all of the money

9  would have to be returned.  And, to -- something to the fact

10 that, you know, this will take a significant period of time.

11 And, to hang in there.  That's it.

12 **Q**   All right.  Let's move forward to later in April or May,

13 2007.  At or around that time, did there come a time when you

14 had an in-person conversation with Bassam Salman about the

15 SEC's investigation?

16 **A**   Yes.

17 **Q**   And, where -- where did that conversation take place?

18 **A**   In my home.

19 **Q**   In Walnut Creek?

20 **A**   Yes.

21 **Q**   All right.  And, was anyone else present beside you and

22 Bassam Salman?

23 **A**   My wife brought him into my bedroom.

24 **Q**   And how were you feeling at that point in time?

25 **A**   Medium.

```
 1   Q    Were you recovering from something at that point, too?

 2   A    Yes.

 3   Q    All right.  Is that why you were in your bedroom?

 4   A    Yes.

 5   Q    All right.  Did your wife leave Bassam Salman and you

 6   alone to talk?

 7   A    Yes.

 8   Q    All right.  Do you recall the substance of your discussion

 9   with Mr. Salman at that point?

10   A    Yes.

11   Q    What did you and Mr. Salman talk about?

12   A    Mr. Salman came to see me.  And, with his daughter.  And,

13   he -- he basically had an urge to tell me this.

14        He mentioned that all of -- all of the time that -- for

15   the last three years, ever since that we were discussing

16   stocks and options and all of this stuff, he was not trading,

17   himself.  He was passing this information on to someone else.

18   In Detroit.  And -- and he was doing it to protect us all.

19   And, he was hoping that I would understand.

20   Q    What was your reaction to that news?

21   A    I was very angry.

22   Q    Why were you angry?

23   A    Because the information is not contained anymore.  It's

24   outside his control.  And my control.

25   Q    Okay.  What about passing the information to someone else
```

 1    in Detroit meant that the information was not contained?  What

 2    do you mean by that?

 3    **A**    We don't know who -- who has the information.  Who was it

 4    given to.  How many people are now trading in that

 5    information, and how big is the problem?

 6    **Q**    And, what -- did you and Mr. Salman discuss this, this

 7    concern you had?

 8    **A**    Yeah.

 9    **Q**    What was his response?

10    **A**    He assured me that it was just one person.

11    **Q**    Just one person in Detroit?

12    **A**    Yeah.

13    **Q**    Do you recall him saying anything else about that person?

14    **A**    Kind of, yeah.

15    **Q**    All right.  What do you remember him saying?

16    **A**    He mentioned that that person is -- has a problem right

17    now, and the problem is when the SEC had called him, he -- he

18    had denied knowing anything to do with Maher.

19    **Q**    Why was that a problem?

20    **A**    Because, you know, the guy knows Maher.  But he had denied

21    having to do -- anything to do with Maher.  But he said that's

22    his problem.  And my problem.

23    **Q**    Sorry, Mr. Salman said that that's whose problem?

24    **A**    The other gentleman, in Detroit.

25    **Q**    Okay.  So the problem about denying Maher was, according

PROCEEDINGS                                    201

```
 1   to Mr. Salman, the problem of the person in Detroit.

 2   A    Yes.

 3   Q    All right.  Do you recall anything else about this

 4   conversation between you and Bassam Salman at your home?

 5   A    That he will go ahead and figure it out, and for me not to

 6   worry.

 7   Q    Was that the way you left it?

 8   A    Yes.

 9        (Off-the-Record discussion between counsel)

10           MR. REEVES:  Thank you, Your Honor.  I have no

11   further questions.

12           THE COURT:  I think this is a good break time.  So we

13   will take our one-hour lunch break today.  And if we could get

14   back here, if we can try to get back here at 12:45, I would

15   appreciate it.  And we'll start in on cross-examination.

16        Just a reminder, please do not form any opinions, do not

17   discuss this case with anyone, including yourselves.  And do

18   not attempt to do any research.

19        And, we will see you at a quarter to.

20           THE CLERK:  All rise for the jury.

21        (Jury excused)

22        (Recess taken from 11:50 a.m. to 12:38 p.m.)

23        (The following proceedings were held outside of the

24   presence of the Jury)

25           THE COURT:  Okay.  Can we go on the Record?
```

PROCEEDINGS

```
 1      All right.  I've looked at the subpoena and the response.

 2  And, I conclude that it is appropriate for me to exclude this

 3  evidence, the subpoena and the response, which are Exhibits

 4  119 and 120, on grounds of 403.

 5      I understand the relevance of this, but when you look at

 6  the chain of evidence, my concern is that we are going to get

 7  into a sideshow here which is likely to confuse the jury.

 8  Because all this goes to the Defendant's state of mind, which

 9  goes to whether or not -- you know, the events that happened

10  and his awareness of the information that the government

11  alleges that he does know.

12      And so there is a great deal of evidence, both -- that is

13  going to be -- that has been presented, and this one more

14  piece of evidence about his, quote, openness with the

15  authorities, and actually his attorney's response, is

16  probative but not central to the case.  At the same time, I

17  can see where there is going to be a number of, sort of,

18  disputes within disputes.

19      So, for instance, was it an accurate statement that the

20  only brokerage account, in response to No, 2 is a Schwab

21  account, the request being (As read):

22          "To produce documents sufficient to identify all

23          brokerage accounts held by you, jointly or

24          separately, and all brokerage accounts controlled by

25          you, or in which you have the authority to trade."
```

```
 1        There's arguably an interpretation issue here, and I
 2   presume that's in part what his attorney was doing, is
 3   construing this as narrowly as possible, as saying legally
 4   controlled or facially controlled, not actual control for
 5   de jure versus de facto.
 6        Third category:
 7             "Documents identifying all bank accounts held by
 8             you."
 9        Well, again, what does "held" mean?  And, I understand
10   each side would have an argument here.  This is compounded by
11   the fact this was an attorney's response, not directly made by
12   Mr. Salman.
13        And so, I just see issues within issues within issues that
14   are likely to cause more confusion than anything else.  And
15   that I find that that potential confusion and trials within
16   trials is substantially -- substantially outweighs the
17   probative value.  There is some probative value, but I don't
18   think that it is so probative that it overcomes the 403
19   problem.  So, I'm going to exclude 119 and 120.
20             MS. SHIFMAN:  Thank Your Honor.
21             MR. REEVES:  Could I confer for one second?
22             THE COURT:  Yeah.
23        (Off-the-Record discussion between counsel)
24             MR. REEVES:  Your Honor, thank you for that time, and
25   clarity of your ruling.  I have nothing further to add.  Thank
```

```
 1   you.

 2          THE COURT:  All right, thank you.  I don't think we

 3   will get to the 106 (sic) summary documents today.  Or will

 4   we?

 5          MS. SHIFMAN:  The government has indicated that they

 6   are not going to do these compilation exhibits.

 7          THE COURT:  Oh.

 8          MR. REEVES:  106, I don't know what 106 is.

 9          MS. SHIFMAN:  What we discussed at the --

10          MR. REEVES:  Oh, Rule 1006.

11          THE COURT:  Rule 1006, yes.

12          MR. REEVES:  Thank Your Honor.  Sometimes, having a

13   little opportunity to think it through, we've decided not to

14   introduce compilations.  That's why there were no submissions

15   on that.

16      I told Counsel about that yesterday afternoon.  And, no, I

17   don't think that's a subject that we need to get the Court's

18   ruling on.

19          THE COURT:  All right.  So, the objections that I

20   received, was it this morning, or -- I can't remember now, the

21   day seems so long, from Ms. Shifman, Day Five.

22      Various exhibits for Agent Chisholm.  I don't need to rule

23   on those?

24          MS. SHIFMAN:  They're not the compilation exhibits

25   that had been discussed at the close on Friday.
```

PROCEEDINGS

```
 1            THE COURT:  Oh, the compilation exhibits.

 2            MS. SHIFMAN:  Yes.

 3            THE COURT:  The ones that we talked about last on

 4   Friday.

 5            MS. SHIFMAN:  Right.

 6            MR. REEVES:  My last bite at the matrix apple,

 7   Your Honor.

 8            THE COURT:  Yes.

 9            MR. REEVES:  I think we have decided to forego

10   further feasting on that.

11            THE COURT:  All right.

12            MS. SHIFMAN:  The Court would note, I reserve my

13   objections on some of these exhibits because the list came in

14   late yesterday afternoon.  Early evening.  I was not in the

15   office.  And I don't think Chisholm is going to testify anyway

16   today, quite frankly.  So, I needed to look at the exhibits.

17   I didn't have them readily available at my house.  Some of

18   them, the objections reserved.  420 is one where it is a 1006

19   summary.  But I think, really, we can talk about that at a

20   later time.

21            MR. REEVES:  That's the Biosite phone tree, is it

22   not?  That's the demonstrative showing -- Exhibit 420 in my

23   mind is like Exhibit 78.  The -- the -- that has been the

24   subject of a lot of litigation so far.  It is a demonstrative

25   -- demonstrative summary that I would like to use with the
```

 1  Agent.  But I will not seek to introduce it in evidence.

 2          **THE COURT:**  All right.  Well, maybe at the end of the

 3  day we can make sure what I need to rule on, and whatnot.  But

 4  I -- I have looked at Rule 1006 and some of the authorities,

 5  so I feel equipped to make a judgment if I have to at this

 6  point.

 7          **MR. REEVES:**  Thank you for that, Your Honor.

 8          **THE COURT:**  So, we are --

 9          **MR. REEVES:**  One last little detail?

10          **THE COURT:**  Yeah.

11          **MR. REEVES:**  Before we call Martha Dewing from the

12  SEC, I would like to have an opportunity to speak with her

13  about the Court's ruling relating to Exhibit 88, to make

14  certain that it comes in cleanly, and there are no problems.

15  It is in a format now that she might not be familiar with.

16  So, a couple of minutes there might solve more problems later.

17          **THE COURT:**  I'd rather, yes, not make a mistake.

18          **MR. REEVES:**  I agree.

19          **THE COURT:**  So we can take a short break so you

20  can --

21          **MR. REEVES:**  Between the witnesses?

22          **THE COURT:**  Yeah.

23          **MR. REEVES:**  Thank you, Your Honor.

24          **THE COURT:**  Okay.  You can bring the jury out.

25      (The following proceedings were held in the presence of

1    the Jury)

2           THE CLERK:  All rise for the jury.

3       (The following proceedings were held in the presence of

4    the Jury)

5           THE CLERK:  Please be seated.

6           THE COURT:  Okay.  Welcome back, ladies and gentlemen

7    of the jury.  We are going to now have Mr. Kara resume the

8    stand.

9       Thank you, Mr. Kara.

10      And it is now Ms. Shifman's opportunity to begin

11   cross-examination.  And you may begin.

12      And, if you would keep the microphone close to you, I

13   would appreciate it.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Thank you.

16                    <u>CROSS EXAMINATION</u>

17   BY MS. SHIFMAN:

18   **Q**   Good afternoon, Mr. Kara.

19   **A**   Good afternoon, ma'am.

20   **Q**   I would like to start with talking about you and your

21   brother, Maher.  All right?

22      You were -- you are, excuse me -- a little more than ten

23   years older than your brother?

24   **A**   More like eleven.

25   **Q**   Eleven years older.

```
 1              THE COURT:  Do you want to lower that mic?

 2              MS. SHIFMAN:  Sure.

 3              THE COURT:  So the court reporter can hear you.

 4    Thank you.

 5    BY MS. SHIFMAN:

 6    Q    He was a kid, a child, as you were growing up.

 7    A    Yes.

 8    Q    You took care of him, correct?

 9    A    Yes.

10    Q    You saw him doing well in school?

11    A    Yes.

12    Q    You knew he always got good grades.

13    A    Yes.

14    Q    You watched him go off the Berkeley School of Business?

15    A    Yes.

16    Q    Then off to the University of Chicago for his MBA?

17    A    Correct.

18    Q    And, please keep your voice up.  You secretly helped pay

19    for his schooling at the University of Chicago.

20    A    Yes.

21    Q    You never told him.

22    A    No.

23    Q    He got good, even fantastic jobs, once he graduated.

24    A    Yes.

25    Q    He always advanced in his career?
```

```
 1   A   Yes.

 2   Q   That made you proud?

 3   A   Yes.

 4   Q   And happy, correct?

 5   A   Yes.

 6   Q   And made everyone in the family happy.

 7   A   Yes.

 8   Q   As well as proud.

 9   A   Yes.

10   Q   He never got into trouble, Maher.  Correct?

11   A   No.

12   Q   Not in school, no trouble?

13   A   No.

14   Q   No trouble with the law?

15   A   No.

16   Q   He never cheated?

17   A   No.

18   Q   He always followed the rules?

19   A   Yes.

20   Q   He didn't do any drugs?

21   A   No.

22   Q   And, we saw the wedding video, just earlier on your direct

23   testimony, where you spoke proudly of him.

24   A   Yes.

25   Q   That you went to him for your counsel.  Correct?
```

1    **A**    Yes.

2    **Q**    And for advice.

3    **A**    Yes.

4    **Q**    That you trusted him.

5    **A**    Yes.

6    **Q**    You also testified on direct examination that you suffer

7    from Bipolar I disorder.

8    **A**    Yes.

9    **Q**    And, that you were diagnosed with this in 1999.

10   **A**    Yes.

11   **Q**    Prior to your diagnosis in '99, you had been suffering

12   from that disorder probably for a long time.  Right?

13   **A**    Most likely.

14   **Q**    Over the course of many years, you've had thoughts of

15   suicide many times.

16   **A**    I don't think so.

17   **Q**    Well, in 1994, when you slammed your car into an

18   embankment, that was maybe a time where you had considered

19   taking your life.

20   **A**    Negative.

21          **MS. SHIFMAN:**  May I approach, Your Honor?

22          **THE COURT:**  Yes.

23       (Off-the-Record discussion between counsel)

24          **MS. SHIFMAN:**  If I may approach.

25          **THE COURT:**  Okay.

1        **MS. SHIFMAN:**  And I actually see that something is

2    missing from that binder and I'm just going to grab it before

3    we start.

4        Approaching again, Your Honor.

5        **THE COURT:**  Okay.

6        **MS. SHIFMAN:**  I just want to put this at the -- the

7    back part of this binder, sir.

8    **BY MS. SHIFMAN:**

9    **Q**   So Mr. Kara, I've put in front of you a binder that has

10   some exhibit tabs.  Rather than give you individual folders,

11   I'm going to ask you to open the binder to a particular tab.

12   All right?

13   **A**   Yes.

14   **Q**   Okay.  So we were talking about whether or not in 1994,

15   when you slammed your car into an embankment, whether or not

16   you might have been considering suicide at that time.

17   **A**   Yes.

18   **Q**   Can you please open to Exhibit 668, sir.

19       (Request complied with by the Witness)

20       (Witness examines document)

21   **Q**   And, on Page 1 there.  You, throughout the course of this

22   case, have been interviewed a number of times by a number of

23   people about events in your life.  Is that correct?

24   **A**   I'm sorry?

25   **Q**   Throughout the course of this investigation and case, you

1    have been interviewed by a number of different professionals

2    about your life.  Is that correct?

3    **A**    No.

4    **Q**    You were interviewed by your lawyers about your life, were

5    you not?

6    **A**    Yes.

7    **Q**    You were interviewed by the government counsel about your

8    life.

9    **A**    Yes.

10   **Q**    You were interviewed by Dr. Shields about your life.

11   **A**    Yes.

12   **Q**    You weren't interviewed by me, correct?

13   **A**    Yes.

14   **Q**    Because you refused to meet with me.

15   **A**    I don't think you've -- I don't think you called me.

16   **Q**    Mr. Kara, you were notified by your counsel that I wished

17   to interview you.  Isn't that correct?

18   **A**    I don't remember.

19   **Q**    Let's go back, and I would ask you to read the first --

20   I'm sorry, the second block in the right-hand column under

21   where it says "Additional notes."

22        So the second block of text there, do you see that, sir?

23   The text begins with "Miriam."  Do you see --

24   **A**    Yeah.

25   **Q**    Okay.  Are you in that spot, sir?  I need an answer.

 1   **A**   "Miriam signs" --

 2   **Q**   No, no, don't read it a loud.  I would ask that you read

 3   the second part of that, regarding the Bay Bridge.

 4   **A**   "Michael was on the Bay Bridge" --

 5         **THE COURT:**  Hold on.  You're asking him to read to

 6   himself.

 7         **MS. SHIFMAN:**  That's correct.

 8         **THE COURT:**  You don't have to read out loud, just

 9   look at it.

10         **THE WITNESS:**  Yes.

11      (Witness examines document)

12   **BY MS. SHIFMAN:**

13   **Q**   Please let me know when you are done reading that.

14   **A**   Yes.

15   **Q**   At the time you talked to Dr. Shields, you told him that

16   you intended to fly off the Bay Bridge in that accident.  Do

17   you recall that, sir?

18   **A**   No.

19   **Q**   No memory.

20   **A**   No memory.

21         **MS. SHIFMAN:**  One moment.

22         **THE COURT:**  Okay.

23      (Off-the-Record discussion between counsel)

24   **BY MS. SHIFMAN:**

25   **Q**   Since your diagnosis in '99 and even before, you have

1   exhibited various signs of mania.  Right?

2   **A**   Yes.

3   **Q**   For instance, running out in your yard naked at various

4   times.  Do you recall that?

5   **A**   Yes.

6   **Q**   Do you recall telling that to Dr. Shields?

7   **A**   Yes.

8   **Q**   You have checked yourself into Kaiser as a result of

9   problems with mania, and delusions.

10          **MR. REEVES:**  I object as to time frame and

11  foundation, Your Honor.

12          **THE COURT:**  All right.

13          **MS. SHIFMAN:**  I'll back up.

14          **THE COURT:**  Please lay that.

15          **MS. SHIFMAN:**  Sure.

16  **BY MS. SHIFMAN:**

17  **Q**   In 1999, you had a series of serious episodes that

18  happened in your life.  Right?  You were having delusions?

19  **A**   In 1999?

20  **Q**   Yes.

21  **A**   I don't know about delusions, but I was having some

22  difficulties.

23  **Q**   Okay.  You were contemplating suicide at this time, you

24  were very depressed?

25  **A**   I was very depressed.

```
 1   Q    You were are abusing cocaine at that time?

 2   A    I think no.  I think I was finished with cocaine in 1999.

 3   Q    You were abusing alcohol?

 4   A    Yes.

 5   Q    And you were involuntarily entered, admitted, into Kaiser

 6   Hospital in '99?

 7   A    Yeah.  Yes.

 8   Q    Because, you were viewed as a harm to yourself.

 9   A    Yes.

10   Q    And you remained there for eight days or so, before they

11   released you.

12   A    That seems like an awfully long time.

13   Q    Do you remember how long you were there, sir?

14   A    A couple of days.

15   Q    A couple of days.  That's what you recall?

16   A    Yeah.

17   Q    It hasn't always been easy for you to deal with this

18   Bipolar I, has it?

19   A    No.

20   Q    Or the depression.

21   A    No.

22   Q    Or the paranoid delusions.

23   A    No.

24   Q    Or the periods of mania.

25   A    No.
```

KARA - CROSS / SHIPMAN

216

1  **Q**    You have had to deal with the symptoms, themselves,

2  correct?

3  **A**    Yes.

4  **Q**    You've had to seek treatment for the various symptoms.

5  **A**    Yes.

6  **Q**    You have had to try to maintain those treatments.

7  **A**    Yes.

8  **Q**    You've had to see a psychiatrist?

9  **A**    Yes.

10 **Q**    You have been taking, at least since 1999, antipsychotic

11 medication?

12 **A**    Yes.

13 **Q**    Medications for depression?

14 **A**    Yes.

15 **Q**    Medications for anxiety?

16 **A**    Yes.

17 **Q**    And, if I could, if you could turn the page, you are still

18 on 668 there, to the second page.

19      (Request complied with by the Witness)

20 **Q**    And, you said you -- you believe that you were at the

21 hospital, your memory is you were there in '99 for two days.

22 Is that correct?

23 **A**    I said, "A couple of days."

24 **Q**    All right.  Let me just find it.  I apologize that it's

25 not right at my fingertips.

 1       Again in the third column, sir.  In the middle of the

 2   page.

 3   **A**   I see it.  I was there for a week.

 4   **Q**   You were there for a week.  So your memory wasn't accurate

 5   about how long you were there.

 6   **A**   No.

 7   **Q**   After you were released, after the doctors decided that

 8   you could be released, you entered what's called an intensive

 9   outpatient program.  Right?

10   **A**   Yes.

11   **Q**   And that was through Kaiser?

12   **A**   Yes.

13   **Q**   And, an intensive outpatient program means that you are at

14   the hospital pretty much five days a week, full-time, just

15   about.

16   **A**   Yes.

17   **Q**   And, you did that for a number of weeks.  Correct?

18   **A**   Yes.

19   **Q**   And then, when you completed that intensive outpatient

20   program, you then continued to receive intensive treatment by

21   going to group sessions.  Right?

22   **A**   Yes.

23   **Q**   You went to a dual diagnosis group?

24   **A**   Yes.

25   **Q**   Because you had more than one diagnosis beyond Bipolar I

1    disorder.  Correct?

2    **A**    Yes.

3    **Q**    You had alcohol dependence at the time, that had been

4    diagnosed?  Right?

5    **A**    No, I think the second diagnosis was post-traumatic stress

6    syndrome.

7    **Q**    As well as alcohol dependence, and impulse disorder.  Do

8    you recall that, sir?

9    **A**    Maybe.

10   **Q**    You went to bipolar group sessions?

11   **A**    Yes.

12   **Q**    You also went to what they call transition group sessions.

13   Right?

14   **A**    Yes.

15   **Q**    You also had your own individual therapy sessions.

16   **A**    Yes.

17   **Q**    And, that's when you met Deborah Molinsky, who was your

18   therapist, right?

19   **A**    Yes.

20   **Q**    You had to take your medications?

21   **A**    Yes.

22   **Q**    I wanted to talk a little bit about those medications that

23   you take, sir.

24        You don't need to read anything right now.  Okay?  Thank

25   you.

1        You have already testified on direct, you said that, you

2    know, basically your medications have remained the same since

3    2004.  Right?

4    **A**    Um, basically the same, but, you know, there's been some

5    adjustments in the dosage and the addition or the -- the

6    removal of a couple of meds.

7    **Q**    So, when you testified on direct that your medications

8    have remained the same, that wasn't true.

9    **A**    That's not what I said.  I said "basically the same."

10   "Basically the same" means plus or minus a med or two.

11   **Q**    Do you remember being here in this courtroom in July of

12   this year, testifying?

13   **A**    Yes.

14   **Q**    Judge Chen was here at that time, correct?

15   **A**    Yes.

16   **Q**    The prosecuting attorneys were present here in court

17   (Indicating)?

18   **A**    Yes.

19   **Q**    I was present?

20   **A**    Yes.

21   **Q**    You were asked a number of questions.  Right?

22   **A**    Yes.

23   **Q**    Prior to being asked some questions, Ms. Lee (Indicating),

24   the judge's courtroom deputy, she gave you the oath to tell

25   the truth.  Correct?

220

```
 1    A    Yes.

 2    Q    The same oath that you took here today.

 3    A    Yes.

 4    Q    And do you remember testifying at that time that you

 5    claimed that your medication regimen hasn't changed since late

 6    2004?

 7    A    I'll repeat.  My medication regimen was basically the same

 8    since 2004.

 9    Q    Sir, I would ask you to go to Tab 664 in the binder.  And

10    go to 664-19.  Page 19, I'm sorry.

11         (Request complied with by the Witness)

12    Q    And if you could review -- tell me when you are on Page

13    19, sir.

14    A    Yes.

15    Q    And if you could look on Lines 23 through -- I'm sorry.

16    Let's start at Lines 20 through 24.  If you could read that to

17    yourself.

18    A    I'm sorry, which lines?

19    Q    Lines 20 through 24.  Do you see that on the left side of

20    the page, the line numbers?

21    A    Yes.  Thank you.

22    Q    Okay.

23         (Witness examines document)

24    A    Okay.

25    Q    You testified that your medications hadn't changed since
```

```
 1   2004, correct?

 2   A    Yes.

 3   Q    Was that a lie then or is it a lie now, what you are

 4   testifying about?

 5   A    Neither.

 6   Q    Neither is a lie.  Okay.  Today you said that there's been

 7   some tweaking to your medications.

 8   A    Minor.

 9   Q    Minor.  Uh-huh.  And, you remember testifying in July that

10   you couldn't remember what medications you were taking in

11   2004?

12   A    No, I remembered what I was taking in 2004.

13   Q    Let me direct you to Page -- oh, how about that?  I don't

14   have the page number.  How about that?  I'll find it.

15        You remember testifying in July when you said you didn't

16   know what medications you were taking in 2004?  Do you

17   remember that?

18   A    Maybe at that time I didn't remember.  But today, I

19   remember it clearly.

20   Q    Okay.  And, in July of this year, you testified that you

21   couldn't remember what medications you were taking in 2005?

22   A    Which year are we talking about today?  2004, 2005, or

23   what?

24   Q    Right now the question is, you testified in July of this

25   year, in this courtroom, under oath, that you couldn't
```

1  remember what medications you were taking in 2005.

2  **A**   What is the question?

3  **Q**   It's correct, sir, that you have testified in this court,

4  under oath, that you couldn't remember the medications you

5  were taking in 2005.  Isn't that correct?

6  **A**   I still don't understand the question.

7  **Q**   Let me repeat it again.  You recall being here in July of

8  this year, testifying, yes?

9  **A**   Yes.

10 **Q**   You remember the Judge was here?

11 **A**   Yes.

12 **Q**   Mr. Reeves, and actually a different U.S. Attorney was

13 here, Mr. Leach?  Do you remember that?

14 **A**   Yes.

15 **Q**   I was present, correct?

16 **A**   (Inaudible)

17 **Q**   Mr. Reeves asked you some questions, do you remember that?

18 **A**   Yes.

19 **Q**   Do you remember that I asked you some questions?

20 **A**   Yes.

21 **Q**   Okay.  And I asked you, sir:

22         "In 2005, do you remember the medication and the

23         dosage amounts that you were taking?"

24      And your answer was "No."  Do you recall that?

25 **A**   Yes.

1    **Q**   Because in July, you couldn't remember what medications

2    you were on in 2005.

3    **A**   So what do you want today?

4    **Q**   In 2006, you testified -- I'm sorry.  Withdrawn.

5        In July of this year, you testified that you couldn't

6    remember your medications that you were taking in 2006.  Isn't

7    that correct?

8        I see you looking over for some help, maybe to government

9    counsel --

10   **A**   No, no.  I'm trying to figure out, what exactly is your

11   question, ma'am?

12   **Q**   Sir, I'm asking you, under oath, in July -- I'll give you

13   the exact date if you would like.  July 19th, 2013 here in

14   this courtroom, you testified under oath that you couldn't

15   remember what medications you took in 2006.

16       Isn't that correct, sir?

17   **A**   You just asked me about 2005.

18   **Q**   (Nods head)

19   **A**   Now you change your mind to 2006?

20   **Q**   I did.

21   **A**   Why?

22           **THE COURT:**  You -- it's not your place to ask the

23   questions.

24           **THE WITNESS:**  Well, I don't understand the question,

25   Judge.

```
 1          THE COURT:  Okay.  So the question is, do you recall
 2   testifying that you couldn't remember what medications you
 3   were on in 2006.
 4          THE WITNESS:  No, I don't remember that question.
 5   BY MS. SHIFMAN:
 6   Q   All right.  Again, Exhibit 664, that tab, if you would
 7   look at Page 35, sir.
 8       (Request complied with by the Witness)
 9   Q   Lines -- let me know when you are on Page 35.  Line 16
10   through 18.  Please read that to yourself.
11       (Witness examines document)
12   A   Yes.
13   Q   And it says there, sir (As read):
14          "In 2006, can you remember your medication treatments
15           and dosages that you were taking?"
16       And your answer was "No."
17   A   Yes.
18   Q   And you testified previously at the same hearing on
19   July 19, 2013, that you couldn't remember what medications you
20   were taking in 2007?
21          MR. REEVES:  Objection.  The question calls for
22   "medication and dosages."  I object, Your Honor.
23          THE COURT:  All right.  Rephrase the question,
24   please.
25          MS. SHIFMAN:  Sure.
```

1    **BY MS. SHIFMAN:**

2    **Q**   You testified that in 2007, you couldn't remember your

3    medication dosages, and your treatments.  Correct?

4    **A**   Yes.

5    **Q**   Were you lying then, or are you lying today about your

6    medications?

7    **A**   Lying about what?

8    **Q**   Your -- your memory hasn't gotten better with time, has

9    it, Mr. Kara?

10   **A**   Who told you that?

11           **THE COURT:**  You --

12   **BY MS. SHIFMAN:**

13   **Q**   I'm asking you, sir.

14   **A**   And I'm responding.

15           **THE COURT:**  Well, you have to respond with an answer,

16   and not a question.  So ask the question again, and you answer

17   the question.

18           **THE WITNESS:**  My memory is fine.

19   **BY MS. SHIFMAN:**

20   **Q**   Has it gotten better over time, sir?

21   **A**   It's stable.

22   **Q**   It's stable.  Let's talk about the medication that you had

23   to take today, for instance.

24        Did you take your Seroquel today?

25   **A**   I have been off of Seroquel for about 14 months.

1    **Q**    Did you take your Abilify today?

2    **A**    I take it at nighttime.

3    **Q**    All right.  And what's the milligram dosage that you take?

4    **A**    Ask the pharmacist.

5    **Q**    And have you taken your Zoloft today?

6    **A**    Yes, I did.

7    **Q**    How many pills have you taken today, and what dosages?

8    **A**    Two and a half.

9    **Q**    Two and a half pills?

10   **A**    Yes.

11   **Q**    And what's the milligram dosage?

12   **A**    Ask the pharmacist.

13   **Q**    Have you taken your Remeron today?

14   **A**    Stopped taking Remeron about two years ago.

15   **Q**    How about your Tegretol?

16   **A**    Four tablets a day.

17   **Q**    And how many have you taken so far today?

18   **A**    One.

19   **Q**    How many milligrams?

20   **A**    Ask the pharmacist.

21   **Q**    Have you taken your Topamax?

22   **A**    Yes.

23   **Q**    How many times today?

24   **A**    Twice.

25   **Q**    And the dosage, sir?

1   **A**   Ask the pharmacist, please.

2   **Q**   What other medications did you take today?

3   **A**   That's it.

4   **Q**   You have taken all these medications that I've asked you

5   about, at different times since 1999.

6   **A**   Yes.

7   **Q**   It's fair to say that the medications that you take and

8   have taken have some side effects.

9   **A**   Yes.

10  **Q**   Sometimes they keep you awake at night, right?

11  **A**   No.  They have different effects on me.  But, definitely

12  not awake at night.

13  **Q**   Definitely not.  You have never had a side effect where

14  medications kept you awake at night?

15  **A**   It's the disease that keeps me awake at night, not the

16  medications.

17  **Q**   Conversely, sometimes some of these medications make you

18  drowsy, do they not?

19  **A**   Yes.

20  **Q**   Sometimes they make you feel more anxious?

21  **A**   The medications?

22  **Q**   Yes.

23  **A**   No.

24  **Q**   Sometimes they -- to make yourself feel better, you will

25  take more or less of various medications.  Right?

```
 1   A   Negative.
 2           MR. REEVES:  Objection as to foundation, Your Honor,
 3   as to the time period, please.
 4           MS. SHIFMAN:  I'm going to get into that, Your Honor.
 5           THE COURT:  All right, so she's asking -- well, at
 6   least give some general time period.
 7        Since 1999?  Is that what you're asking?
 8   BY MS. SHIFMAN:
 9   Q   Since 1999.
10   A   No.  I have -- I have a small set of medications that I
11   take on a regular basis.  And I don't play around with
12   medication.
13   Q   Your testimony today that is you have never
14   self-medicated?
15   A   In the past, there has been small incidents where I did
16   self-medicate.  But, it's -- it's been only on very few
17   occasions that that has happened.
18   Q   And when you have self-medicated, that's by increasing or
19   decreasing a dosage?  Correct?
20   A   Yes.
21   Q   A dosage that supposedly only your pharmacist would know
22   about?
23   A   Yes.
24   Q   And you have done that increasing or decreasing of the
25   dosage without your doctor's supervision or prescription?
```

1    A    Correct.

2    Q    You are not a doctor, right?

3    A    No.

4    Q    You are not a psychiatrist?

5    A    No.

6    Q    You have done it anyway, even though you are not supposed

7    to.

8    A    Yes.

9    Q    And, it's fair to say that over the course, since 1999,

10   you have been on some pretty powerful drugs.

11   A    All drugs are powerful.

12   Q    Okay.  Including some of the antipsychotics that you were

13   taking.

14   A    All anti-psychotics are powerful.

15   Q    So, you know that.  Is that right?

16   A    Yes.

17   Q    And you know that these drugs influence or impact the way

18   that you feel.

19   A    Of course I do.

20   Q    And, sometimes they have a tremendous effect on you.

21   A    They do.

22   Q    Sometimes they help, right?

23   A    Yes.

24   Q    Sometimes they don't.  Right?

25   A    Yes.

1    **Q**    And even when the drugs help you with some of the side

2    effects of your disease, the medications can still have a

3    tremendous effect on you, even though it's helping.  Correct?

4    **A**    They have some undesirable side effects, yes.

5    **Q**    And when you change up a cocktail mixture, that can cause

6    other problems for you.  Right?

7         We're going to get into those.  But that's correct, right?

8    **A**    Yes.

9    **Q**    So, I would like to talk to you about some of those times

10   when you weren't taking your medications as prescribed.  Okay?

11   **A**    Yes.

12   **Q**    You have been under the care of Dr. Woolery at Kaiser

13   since about 2001.  Right?

14   **A**    If you say so.

15   **Q**    He's a psychiatrist there?

16   **A**    Yes.

17   **Q**    Okay.  The same psychiatrist whose care you are under to

18   this day.

19   **A**    Yes.

20   **Q**    You trust him?

21   **A**    Yes.

22   **Q**    You testified on direct that he changed your life.

23   **A**    Yes.

24   **Q**    You respect his medical opinion?

25   **A**    Yes.

1   Q   He has, in your opinion, always made himself available to

2   you if there was anything you wanted to talk about.

3   A   Yes.

4   Q   Or if there was an emergency, he was there.

5   A   Yes.

6   Q   You consider him an expert with regard to your care.

7   A   Yes.

8   Q   And in the course of his treatment and care of you, he has

9   prescribed a number of medications over time.  Right?

10  A   Yes.

11  Q   He does that after consulting with you?

12  A   Yes.

13  Q   Sometimes he consults with his colleagues, other medical

14  professionals, right?

15  A   I don't know.

16  Q   He will review any of your pertinent medical records,

17  right?

18  A   I don't know.

19  Q   Well, you have discussed some of your medical issues with

20  Dr. Woolery, haven't you?

21  A   No.

22  Q   You have never discussed any medical issues?

23  A   He has access to my medical records.

24  Q   Right.  Over there at Kaiser.  Correct?

25  A   Correct.

1    **Q**   So, he knows if your blood is elevated with various

2    problems, correct?

3              **MR. REEVES:**  I object, foundation, Your Honor.  I

4    think he doesn't know.

5              **THE COURT:**  All right.  Lay a foundation.

6    **BY MS. SHIFMAN:**

7    **Q**   You and Dr. Woolery have talked about some of your medical

8    problems over the years, have you not?

9    **A**   Not really.

10   **Q**   You never told him about your gastric bypass surgery and

11   the serious complications that came from that?

12   **A**   I don't think so.

13   **Q**   Are you sure about that?

14   **A**   Yeah -- well, I don't think we discussed our -- our

15   medical problems with Dr. Woolery.

16   **Q**   Let's talk about some of the medications that Dr. Woolery

17   did or didn't give you.  Okay?

18        One of the medicines that you took on your own was Prozac.

19   Do you recall that?

20   **A**   Yes.

21   **Q**   You took that on your own in 2001, without a prescription

22   from -- initially from Dr. Woolery.

23   **A**   Yes.

24   **Q**   And you took that because someone gave you some Prozac and

25   you thought it would be best.

1    **A**    No.  I took that because I was depressed.

2    **Q**    You took that because you were depressed.  Okay.  You did

3    that without his prescription, Dr. Woolery's prescription.

4    **A**    Yes.

5    **Q**    And it was medication that you happened to have gotten

6    from a relative.

7    **A**    Yes.

8    **Q**    You've taken, even accidentally, double doses as well of

9    your medication.  That's occurred over time, right?

10   **A**    That happens.

11   **Q**    Like when you took a double dose of the Seroquel in May of

12   2005.  Do you recall that?

13   **A**    That's a common occurrence.

14   **Q**    A common occurrence to sometimes mistakenly take more of a

15   dosage than prescribed.

16   **A**    No.  I said that's a common occurrence with Seroquel.

17   That happens.

18   **Q**    That you take -- you voluntarily take double dosage?

19   **A**    No.  Not me, but in the literature, it happens.  If you

20   have read about it.

21   **Q**    That sometimes people take --

22   **A**    Yes.

23   **Q**    -- more than they are supposed to.

24   **A**    They forget they took the dose of Seroquel, so they take

25   another dose.

1   **Q**   Okay.  And you did that.

2   **A**   Yes.

3   **Q**   Are you a doctor?  I forget.

4   **A**   You have asked me that question before.

5   **Q**   And your answer, sir?

6   **A**   My answer was no.

7   **Q**   No.  Okay.  And in May of 2005, you took a double dose of

8   Seroquel, and you were hospitalized for 48 hours as a result.

9        Isn't that correct?

10  **A**   I don't know how long I was hospitalized for, but I did

11  take my double dose of Seroquel, because I forgot that I had

12  taken Seroquel, so I took another does of Seroquel.

13  **Q**   And as a result, from just taking another dose, you had to

14  be hospitalized.

15  **A**   Yes.

16  **Q**   And that was in May of '05.  Right, sir?

17  **A**   Yes.

18  **Q**   Let's go to another time, when you took different dosages

19  of --

20  **A**   I don't -- I don't think that was the date.  Excuse me.

21  **Q**   Okay.

22  **A**   I think the date is wrong.

23  **Q**   Please go to 668.  I think you're already open there,

24  there, right?  Page 3.

25        (Witness examines document)

1    **Q**   Page 3, sir.  Are you on 3?

2          (Request complied with by the Witness)

3    **Q**   And if you would look at the bottom of the page, the

4    middle column.

5          You told Dr. Shields that in May of 2005, you took a

6    double dose of Seroquel, and you were hospitalized for 48

7    hours.  That's what you told him, right?

8    **A**   This date is wrong.

9    **Q**   That's what you told Dr. Shields, is it not, sir?

10   **A**   He may have transcribed it wrong.  Or I may have said

11   that.  And it's wrong.

12   **Q**   Okay.

13   **A**   The date is wrong.

14   **Q**   Let's move to another time when you took a different

15   amount of a drug that had been prescribed for you.

16         If you will, sir --

17   **A**   What's that?  Excuse me.

18   **Q**   I want to focus your time around the time when your father

19   passed away in November of 2004.

20   **A**   Okay.

21   **Q**   All right?  It followed -- your father's death followed a

22   very long, difficult battle with cancer.  Right?

23   **A**   Yes.

24   **Q**   You were very close to your dad?

25   **A**   Yes.

KARA - CROSS / SHIFMAN                                                    236

1   **Q**   You loved him dearly?

2   **A**   Yes.

3   **Q**   And it was very hard to watch him suffer as he did, I'm

4   sure.  Correct?

5   **A**   Yes.

6   **Q**   Once he passed away, in the time frame after that, you

7   doubled or tripled your dose of Zoloft.  Isn't that correct?

8   **A**   That's correct.

9   **Q**   You were feeling very, very depressed?

10  **A**   Yes.

11  **Q**   And, when you changed your dosage of Zoloft, that had a

12  lot of tremendous side effects for you.  Did it not?

13  **A**   Apparently.

14  **Q**   It made you very manic, right?

15  **A**   Yes.

16  **Q**   You started digging in the yard with your bare hands?

17  **A**   Yeah.

18          **MR. REEVES:**  Objection as to time frame and

19  foundation.  Your Honor.

20          **THE COURT:**  Well, the time frame was shortly after

21  the November death of his father, I guess, to sort of --

22          **MS. SHIFMAN:**  Correct.

23  **BY MS. SHIFMAN:**

24  **Q**   This continued into 2005, did it not, the digging?

25  **A**   The digging was for a two-hour period.  Period.

1    **Q**    One time for two hours?

2    **A**    One time, for two hours.

3    **Q**    That's it.  Do you remember when you were here in July,

4    before the Judge (Indicating), when you testified under oath?

5    **A**    Yes.

6    **Q**    And you said that you went out into the yard, and you were

7    digging day after day, until your hands were bloody?

8    **A**    Ma'am, I -- I know what I did.  I dug in the yard for the

9    wire, and I dug for two hours.  And that was it.  Until my

10   wife got Dr. Woolery on the phone.  I did it on one occasion.

11   **Q**    When your wife got Dr. Woolery on the phone after you had

12   done this a number of times, she literally had to tie you down

13   while she called Dr. Woolery.  Do you recall that?

14   **A**    Nobody tied me down.

15   **Q**    She had to call for an ambulance and help?

16   **A**    No.

17   **Q**    She -- you went to the hospital?

18   **A**    No.

19   **Q**    You didn't go to the emergency room.

20   **A**    Absolutely not.

21   **Q**    And, at the emergency room, they didn't figure out that

22   you had doubled or tripled --

23   **A**    What emergency room?  There was no emergency room, ma'am.

24   She helped me.  She cleaned up my hands.

25   **Q**    I would ask you to -- whoops, wrong page -- go to Exhibit

1    664, sir.  Page 39.

2         (Request complied with by the Witness)

3    **Q**   I'm sorry, the top of Page 40, the next page.  Yes.

4         And, do you see where it says "The witness?"  That

5    paragraph?  Do you see that, sir?  On Page 40?

6    **A**   Yes.

7    **Q**   So, if you could read that paragraph, Lines 2 through 11,

8    to yourself.

9         (Witness examines document)

10   **A**   I can see where you draw that conclusion now.

11   **Q**   Right.  So you testified to Judge Chen --

12   **A**   Yes, yes.

13   **Q**   -- that you doubled -- you started taking more Zoloft --

14   **A**   Yes.

15   **Q**   -- than was prescribed, right?

16   **A**   I did.

17   **Q**   And you told Judge Chen that the Zoloft made you manic.

18   **A**   It did.

19   **Q**   And you said that you doubled or tripled the dose of the

20   Zoloft, correct?

21   **A**   I did, I did.

22   **Q**   And that you started digging up the yard with your own

23   bare hands for hours and hours?

24   **A**   I did.

25   **Q**   And you testified you did that day on day.  Correct?

1   **A**    That was not true.

2   **Q**    So you were lying to Judge Chen.

3   **A**    That's a very hard word.

4   **Q**    You were lying, if that's not true.

5   **A**    No, ma'am.  I dug maybe for hours on hours.  Probably for

6   a few hours.  But it wasn't day on day.

7   **Q**    Did you testify, sir, that you said, "day on day until my

8   hands would be bloody?"  Isn't that what you testified to,

9   sir?

10  **A**    It may have at the time appeared to me that I was --

11  that's what I was saying.  But the truth is, this was a

12  one-time occasion, when this incident had happened.

13  **Q**    So, in -- on July 19, 2013, you believed and testified

14  that you dug up your yard with your own bare hands, for hours

15  on hours, day on day, until your hands would be bloody.

16       You believed that, in July of this year.

17  **A**    This was one occasion where it may have taken several

18  hours, I agree.  But, it did not happen day on day.

19  **Q**    Sir, but you testified to that, did you not?

20  **A**    Yes.

21  **Q**    And you testified that your wife grabbed you and tied you

22  down.  Isn't that correct?

23       (Witness examines document)

24  **A**    I was probably referring to my hands.

25  **Q**    Did you not testify to that, sir, that your wife grabbed

1   you and tied you down?

2   **A**   I was referring to my hands.

3   **Q**   Sir, did you testify that your wife grabbed you and tied

4   you down?

5            **MR. REEVES:**   Objection.

6            **THE WITNESS:**   I'm explaining this to you.

7            **MR. REEVES:**   I'll object, it's been asked twice now.

8            **THE COURT:**   Well, he hasn't answered the question.

9       So I would like you to answer the question, and then give

10   you a chance to explain.  So, was that your testimony?

11            **THE WITNESS:**   Yes.

12            **THE COURT:**   All right, and you can explain.

13            **THE WITNESS:**   My wife grabbed me and tied me down,

14   meaning my hands.  She tied my hands down, so she can work on

15   my hands.

16   **BY MS. SHIFMAN:**

17   **Q**   She called the ambulance after that.  That's what you

18   testified to.  Correct?

19   **A**   She may have.

20   **Q**   She called the psychiatric unit, correct?

21   **A**   Yes.

22   **Q**   And --

23   **A**   She --

24   **Q**   -- you went to the psychiatric unit.

25   **A**   I don't think so.

1    **Q**    You testified that at the psychiatric unit in Vallejo,

2    "They figured out that I was self-medicating with the Zoloft."

3    **A**    That is true.

4    **Q**    So you went there, sir.

5    **A**    That is true.

6    **Q**    Do you remember going there?

7    **A**    Yes.

8    **Q**    Now you remember.

9    **A**    That, I remember.

10   **Q**    That wasn't the last time that you self-medicated.  You

11   did it again in late November of 2006.  Do you recall that?

12   **A**    No.

13   **Q**    You were feeling depressed in late November, 2006?

14   **A**    I don't recall the incident.

15   **Q**    If you could turn to Exhibit 668, Page 6.

16        (Request complied with by the Witness)

17   **Q**    Are you on Page 6, sir?

18   **A**    Yes, ma'am.

19   **Q**    And the block that says on November 22, 2006, if you would

20   read the next block to yourself.

21        (Witness examines document)

22   **A**    Okay.

23   **Q**    And you told Dr. Shields that you were feeling depressed

24   so you increased your Zoloft dosage, you tripled it to

25   300 milligrams.  Do you see that?

```
 1        (Witness examines document)

 2   Q    Do you see that, sir?

 3   A    So?

 4   Q    So, in -- in the November, late November, 2006, time frame

 5   that you are testifying about here today, when all this

 6   supposedly went on, you were still playing around with your

 7   medication?

 8   A    All of what went on today?

 9   Q    I'm sorry?

10   A    All of what went on?  What --

11   Q    Let me repeat the question.

12   A    I'm confused.

13            THE COURT:  Let's just keep it in the time frame

14   without any editorial -- let's just ask him about the time

15   frame.

16            THE WITNESS:  Yeah.

17            MS. SHIFMAN:  All right.

18   BY MS. SHIFMAN:

19   Q    On November 22, 2006, you were feeling depressed.  Is that

20   correct?

21   A    Yes.

22   Q    So you increased, on your own, your dosage of Zoloft.

23   Correct?

24   A    Yes.

25   Q    You tripled it.  Correct?
```

1   **A**    Yes.

2   **Q**    The same Zoloft that caused all the mania for you

3   previously that you have testified about.  Right?

4   **A**    Yes.

5   **Q**    Dr. Woolery didn't increase your dosage to 300 milligrams.

6   **A**    No.

7   **Q**    You increased your dosage to 300 milligrams.

8   **A**    Yes.

9   **Q**    And, you got caught doing that, because you tried to get

10  an early refill for your Zoloft medication.  Right?

11  **A**    Got caught by who?

12  **Q**    By the medical personnel at Kaiser.  Correct?  They caught

13  you.

14  **A**    Caught me?  Caught me doing what?

15  **Q**    Trying to get an early refill of your Zoloft because you

16  had already gone through your prescription, sir.

17  **A**    It was a polite, "No, we can't -- we cannot renew the --

18  the Zoloft prescription.  Could you please come back in seven

19  days, and we will renew it?"

20       Do you call that caught?

21  **Q**    They were nice about catching you.

22  **A**    Yeah.

23  **Q**    Okay.

24  **A**    But that was not -- that --

25  **Q**    You knew from your previous experiences with playing

```
 1   around with your medication, that increasing your Zoloft

 2   wasn't advisable to your well-being.

 3   A    What's the question?

 4   Q    You knew from your previous experience with increasing the

 5   dosage of Zoloft, that increasing it again was not advisable

 6   for your well-being.

 7   A    Yeah.

 8   Q    You did it anyway.  Right?

 9   A    Are you judging me?

10   Q    I'm just asking you, sir.  You did it anyway.

11   A    What's the question?

12            THE COURT:  Did you do it anyway?

13            THE WITNESS:  Yeah, of course.

14            THE COURT:  Thank you.

15   BY MS. SHIFMAN:

16   Q    And you knew from your earlier experiences of increasing

17   your dosage of Zoloft, that you were increasing your chances

18   of developing hypomania.

19   A    I'm not a doctor.

20   Q    But yet, you increased your own dosages.

21   A    Again, I'm not a doctor.

22   Q    And, all this was going on in the same time period that

23   you are talking with your brother about investment

24   suggestions.  Right?

25   A    Yes.
```

```
 1   Q    The same time period you have been testifying about here

 2   today.

 3   A    Yes.

 4   Q    And yesterday.

 5   A    Yes.

 6   Q    So, I know this is difficult, but a few more I wanted to

 7   go through with you.  A few more episodes of delusions.  All

 8   right?

 9   A    You keep on mentioning delusions.

10   Q    Uh-huh.

11   A    And, I -- I don't see the word "delusions" being used here

12   (Indicating).

13   Q    Between 2004 and 2007, you were experiencing delusions.

14   Right?

15   A    I did not see that word "delusions" being used here.

16   Q    I'm asking you a question now, sir.  Between 2004 and

17   2007, you were experiencing delusions.

18   A    There may have been a couple of episodes.

19           MR. REEVES:  Time frame, Your Honor?  Can we be more

20   specific?

21           THE COURT:  I think that's a fair time frame.

22      So the question is:  Between 2004 and 2007, did you

23   experience delusions?

24           THE WITNESS:  There may have been a couple of

25   episodes, Your Honor.
```

KARA - CROSS / SHIFMAN                                                    246

 1              THE COURT:  Okay.

 2   BY MS. SHIFMAN:

 3   Q    During that time frame, you started to see things and

 4   people that didn't exist.  Isn't that correct?

 5   A    There may have been an episode or two.

 6   Q    Okay.  And, in 2005, you would wake your wife up at least

 7   three times a week, insisting that there were people in your

 8   bedroom.

 9   A    There may have been an episode or two.

10   Q    Please open to Exhibit 666.

11        (Request complied with by the Witness)

12   Q    And, I would ask you, once you are there --

13        (Witness examines document)

14   Q    Paragraph 4, sir.  The fourth sentence in that paragraph

15   that begins with "I would wake..." and read that sentence to

16   yourself.

17        (Witness examines document)

18   Q    Did you get a chance to read that, sir?

19   A    Which paragraph?

20   Q    I'm sorry, Paragraph 4.  The third sentence that starts

21   with "I would wake..."  Do you see that sentence there?

22   A    No.

23   Q    Paragraph 4?

24              THE COURT:  Three lines down.

25              THE WITNESS:  666?

247

KARA - CROSS / SHIFMAN

 1    **BY MS. SHIFMAN:**

 2    **Q**    Yes.  Are you at 666, sir?

 3          (Witness examines documents)

 4    **A**    Yeah.

 5    **Q**    Okay.  Paragraph 4.  It's -- I think the page is in your

 6    right hand.

 7    **A**    Is it in early 2004?

 8             **THE COURT:**  Right.

 9    **BY MS. SHIFMAN:**

10    **Q**    That's right, sir.

11    **A**    Thank you.

12    **Q**    The third line there.

13          (Witness examines document)

14    **Q**    Do you see that?

15    **A**    Yes.

16    **Q**    This document, 666, this is something you prepared, is it

17    not, sir?

18          (Witness examines document)

19    **A**    Yes.

20    **Q**    And you prepared it to give to your lawyers, to let them

21    know what you were experiencing in the years 2004 through

22    2007.

23    **A**    Yes.

24    **Q**    And, is there anything about -- does this look like what

25    you prepared for your lawyers?

```
 1        (Witness examines document)

 2   A    Yes.

 3   Q    And you prepared this for your lawyers in -- was it 2008

 4   or 2009?

 5   A    I can't remember.

 6   Q    But either 2008 or 2009?

 7   A    I don't know.

 8   Q    After the SEC contacted you, you prepared this?

 9        (Witness examines document)

10   A    I don't know.  I really don't know.

11   Q    Is that a fair time frame for when this was prepared, sir?

12   A    I can't tell.

13   Q    But it accurately reflects what you gave to your lawyers

14   and prepared.

15        (Witness examines document)

16   A    Yes.

17             MS. SHIFMAN:  I would move Exhibit 666 into evidence.

18             THE COURT:  Any objection?

19        (Off-the-Record discussion between counsel)

20             MR. REEVES:  No.  There's no objection.

21             THE COURT:  All right.  666 is admitted.

22        (Trial Exhibit 666 received in evidence)

23   BY MS. SHIFMAN:

24   Q    So, sir, in Paragraph 4, you said that you would wake your

25   wife up at night at least three times a week to tell her that
```

 1    there were individuals in your bedroom and in your car in the

 2    garage.  Right?

 3          (Witness examines document)

 4                **THE COURT:**  Is the question whether he said that or

 5    whether he's affirming at this point?

 6                **MS. SHIFMAN:**  Whether he wrote that, gave it --

 7    provided that information to his lawyers.

 8                **THE COURT:**  All right.  So, do you say that in the

 9    statement to your lawyers?

10                **THE WITNESS:**  Uh, yes, but I was referring to 2004.

11    **BY MS. SHIFMAN:**

12    **Q**   All right.  After your father died, right?

13    **A**   Yeah.

14    **Q**   So that was late 2004.

15    **A**   November of 2004.

16    **Q**   Right.

17    **A**   Right.

18    **Q**   And, you also said that you called the Vallejo Police

19    Department and informed the police that the crack in the

20    concrete foundation was caused by people who were trying to

21    get into your house.  Correct?

22    **A**   In 2004.

23    **Q**   And that you hired a professional firm to check for

24    intrusions.

25    **A**   Yes.

1    **Q**    And that they drafted a report of their findings.

2    **A**    Yes.

3    **Q**    And, the report itself didn't indicate the presence of any

4    suspicious holes in your house.

5    **A**    Yes.

6    **Q**    Or electronic devices.

7    **A**    Yes.

8    **Q**    And, your testimony is that was only in 2004 when that

9    happened?

10   **A**    What happened?

11   **Q**    That -- those incidents, sir.  Is that what you are trying

12   to say to us today, that that only happened in 2004?

13   **A**    From this letter, that's what I'm summarizing.  It appears

14   that this particular issue that I'm describing from this

15   letter, it looks like that it happened in 2004.  Yeah.

16   **Q**    But in fact, it happened also in 2005, isn't that correct?

17   **A**    I don't think so.

18   **Q**    If you would go to Exhibit 668.  Page 3.

19        (Request complied with by the Witness)

20   **Q**    And do you see where it says April 9, 2005?  Do you see

21   that time frame on the left-hand side, sir?

22        (Witness examines document)

23   **A**    Yeah.

24   **Q**    Okay.  And if you go all the way over to the right column,

25   the second paragraph.

1           (Witness examines document)

2      **Q**    And if you would read that to yourself.

3           (Request complied with by the Witness)

4      **A**    Yes.

5      **Q**    So you told your lawyers and Dr. Shields that you believed

6      that your neighbor, you suspected that your neighbor was

7      opening and reading your mail in May and June of 2005.

8      **A**    Yeah.

9      **Q**    Right?  And that you saw the mailman drop off the mail,

10     and that your neighbor would come over and take your mail from

11     your house.  Right?

12     **A**    The Charles Schwab envelope.

13     **Q**    Right.

14     **A**    Yeah.

15     **Q**    And that your neighbor would then return, maybe 45 minutes

16     or an hour later, and drop that Charles Schwab envelope back

17     into your mailbox.

18     **A**    Yes.

19     **Q**    And that when you went to retrieve that envelope, that the

20     Charles Schwab envelope had been slit open.  Correct?

21     **A**    Yes.

22     **Q**    And then reglued.  Right?

23     **A**    Yes.

24     **Q**    And that the glue was then wet.

25     **A**    Yes.

```
 1   Q    And, the next time when Charles Schwab mail got dropped
 2   off in another three or four weeks, your neighbor came back
 3   and did the same thing.
 4   A    Yes.
 5   Q    And that the envelope was again slit open.
 6   A    Yes.
 7   Q    Reglued.  Right?
 8   A    Yes.
 9   Q    And wet again.  Right?
10   A    Yes.
11   Q    And you even called Charles Schwab to tell them, "Please
12   don't mail the statements to me any more."
13   A    Yes.
14   Q    Because in 2005, you believed that your neighbor was
15   surveilling your trading activity.
16   A    Yes.
17   Q    And, in 2006, you still believed your house was under
18   surveillance.  Right?
19   A    No, ma'am.  Ma'am, you just mentioned -- you just
20   mentioned the mail.  You know?
21   Q    Yeah.
22   A    We are talking about the mail, right?
23   Q    I'm switching.
24   A    So, how did you go from the mail, into the house?
25   Q    Well, now let's talk about your house being under
```

253

```
 1   surveillance in 2006.  Okay?  We're switching topics.

 2        You thought your house was bugged yet again in 2006.

 3   Correct?

 4   A   I have to see something to refresh my memory.

 5   Q   All right.  Page 5 of Exhibit 668, which you already have

 6   open.

 7   A   Yeah.

 8   Q   Where it says "January 11, 2006."  Do you see that block,

 9   sir?

10       (Witness examines document)

11   Q   The time block?

12   A   Yes.

13   Q   And to the right of that, if you would read that

14   paragraph.  Or, halfway through the paragraph.

15   A   "January 11"?

16   Q   Yes, please.  "2006."

17   A   (Nods head)

18       (Witness examines document)

19   Q   Have you had a chance to read it?

20   A   Not -- not all of it.

21   Q   Okay.

22       (Witness examines document)

23   A   Yes.

24   Q   Okay.  And January 11th, 2006, you thought your house was

25   still bugged, did you not?
```

 1          (Witness examines document)

 2     **A**    Yes.

 3     **Q**    You told that to Dr. Shields?

 4     **A**    I don't have the Shields report, but Miriam, my wife,

 5     apparently is concerned.

 6     **Q**    She was so concerned about your paranoia that she called

 7     your doctor, Dr. Woolery, correct?

 8     **A**    Yes.

 9     **Q**    And that Dr. Woolery wanted you to come back in for an

10     intensive outpatient program.  Right?

11     **A**    Maybe.

12     **Q**    The same type of intensive outpatient program that you had

13     done following your release from the hospital in '99.  Right?

14     **A**    No.  He wanted me to come in for an IOP evaluation.  Not

15     to join the program, but to be evaluated for IOP.

16     **Q**    All right.  And, you weren't willing to come in for that

17     evaluation, were you, sir?

18     **A**    Not at that time.

19     **Q**    And, you were trying to convince your wife in 2006 that

20     there were surveillance and bugging going on in the house,

21     were you not?

22     **A**    Yes.

23     **Q**    She didn't really believe you, did she?

24     **A**    I don't think so.

25     **Q**    And you were so insistent on wanting her to believe you

```
 1    that you said to your wife, and you pulled out a gun, "Do you

 2    want me to kill myself to show you that you should believe

 3    me?"

 4         Do you recall that?

 5    A    I didn't pull out a gun.  I just told her, "What do you

 6    want me to do?"

 7    Q    So on January 26, 2006, on the same page, sir, if you

 8    would go all the way to the right, on that block.  The first

 9    two sentences.

10         (Witness examines document)

11    A    I don't know who wrote this.

12    Q    You met with Dr. Shields, you recall that, numerous times.

13    Right?

14    A    Yes.

15    Q    Hours of interviews with Dr. Shields.

16    A    Yes.

17    Q    And, he asked you to tell him your life history.  Correct?

18    A    Yes.

19    Q    And you were very honest and frank with Dr. Shields.

20    A    Yes.

21    Q    Right?  You wanted him to understand who you were as a

22    person?

23    A    Yes.

24    Q    Your qualities, correct?

25    A    Yes.
```

1   **Q**   As well as some of the problems you had.

2   **A**   Yes.

3   **Q**   And, so, in the course of your interviews with him, you

4   told him about this.

5   **A**   Yes.

6   **Q**   So you told Dr. Shields that you put a gun in your mouth,

7   and said to your wife, "Do you want me to kill yourself to

8   show you that you should believe me?"

9   **A**   That never happened.

10  **Q**   So what you said to Dr. Shields was false?

11  **A**   Maybe through the interpretation, he wrote it down this

12  way.

13  **Q**   You testified earlier that you only believed that your

14  neighbors were surveilling you in 2004.  But in 2006, you

15  hired a company to come search your house, looking for

16  surveillance devices.  Correct?

17  **A**   Yes.

18  **Q**   Because you still believed that there were various cameras

19  or bugs planted by your neighbors.

20  **A**   Yes.

21  **Q**   And that they wanted in on your trading activities.

22  Right?

23  **A**   This is what I believed back then.

24  **Q**   Okay.  And, let me switch to a slightly earlier time

25  frame, in July of 2005.  July of 2005 is when Maher and Susie

```
 1    got married.  Right?

 2    A    Yes.

 3    Q    And, you made that wedding toast, right?

 4    A    Yes.

 5    Q    July of '05?  And, in fact, invited -- got the opportunity

 6    to invite your good friend Emile Jilwan to the wedding.

 7    Right?

 8    A    Yes.

 9    Q    And you testified that Emile -- I believe you testified

10    that Emile is one of your closest friends.

11    A    Yes.

12    Q    He's been a close friend for many, many years.

13    A    Yes.

14    Q    I think maybe even your -- your kids might even know each

15    other, right?

16    A    Yes.

17    Q    And, would it be fair to say that maybe Emile is your

18    closest friend?

19    A    Yes.

20    Q    That's fair to say?  And, if Emile needed anything, you

21    would be there for him.

22    A    Yes.

23    Q    And, likewise, you feel that if you needed something,

24    Emile would be there for you.

25    A    Yes.
```

1   **Q**   So, in July of 2005, you called Emile to come help you.

2   Do you recall that?

3   **A**   Yes.

4   **Q**   And, you called him to come help you because you wanted to

5   determine whether somebody had broken into your home in

6   Vallejo.

7   **A**   Yes.

8   **Q**   And, he came over, and he used a cloth and wiped the door

9   of the cloth -- I'm sorry, wiped the door frame with a cloth.

10  Do you recall that?

11  **A**   Yes.

12  **Q**   That's what you told your lawyers.  Right?

13  **A**   Yes.

14  **Q**   But what really happened is not that.  Is that correct?

15  **A**   Who told you that?

16  **Q**   Let's ask you, sir.  When you asked him to come over to

17  your house in Vallejo, you told him that your house -- you

18  believed your house was bugged.  Right?

19  **A**   Yes.

20  **Q**   And that there was maybe a wire installed underneath the

21  house.

22  **A**   No, no.  Let's go back to Emile.  Let me answer you

23  properly.  I said to Emile that the door looked like it had

24  wet paint on it.

25  **Q**   Uh-huh.  So you're denying that you told Emile that you

 1   believed that there was a bug underneath your house.

 2   **A**   With Emile, the discussion rotated around wet paint on the

 3   door.  Inside the bedroom.

 4   **Q**   So, you are denying that you told him that.  Is that

 5   correct?

 6   **A**   Yes.

 7   **Q**   And would it be true, then, that you deny that he

 8   inspected underneath your house, looking for that wire?

 9   **A**   No.  Emile inspected the entire bedroom.  And he may have

10   seen the area beneath the house.  I'm not denying that.  Emile

11   may have looked underneath the bedroom, too.

12   **Q**   He looked under the bedroom.

13   **A**   Yes.

14   **Q**   Despite the fact that you just said that he was there to

15   look at the wet paint on the door?

16   **A**   He was primarily there to look for paint on the -- on the

17   wet door.  And he also looked beneath the bedroom, for

18   everything.  Not only wires, but for everything.

19   **Q**   And, he found nothing out of the ordinary.

20   **A**   That's not true.

21   **Q**   He told you he didn't believe that the house was bugged.

22   Do you recall that?

23   **A**   That's not true.

24   **Q**   He --

25   **A**   He -- the towel came back with wet paint.

1          (Reporter interruption)

2              **THE WITNESS:**   The towel that Emile had in his hand

3    came back with wet paint.

4    **BY MS. SHIFMAN:**

5    **Q**   Do you remember when he told you that he didn't believe

6    that the house was bugged, that you got upset?

7    **A**   I'm sorry, I didn't follow you.  He -- he told me that the

8    house was not bugged?

9    **Q**   Right.  Do you remember that?

10   **A**   I don't recall that conversation.

11   **Q**   So you don't remember, in response to that, dropping your

12   pants?

13   **A**   My wife was beside me.

14   **Q**   So, that's -- you don't remember that happening in July of

15   '05, dropping your pants in response to Emile saying there are

16   no bugs -- you don't remember that happening?

17   **A**   Absolutely not.

18   **Q**   And I take it, then, that you don't remember going and

19   getting your gun in response to him telling you that there

20   were no bugs in the house.

21   **A**   Absolutely not.

22   **Q**   And you don't remember scaring your best friend Emile in

23   this way.

24   **A**   Absolutely not.

25   **Q**   And you don't remember your wife intervening to calm down

1  the situation, and calm you down.

2  **A**   No.

3  **Q**   After that time frame, and before you sold your house, you

4  testified that you went over to your mother's house to stay.

5  **A**   Yes.

6  **Q**   Okay.  And, you did that because all this activity was

7  going on over at your house, on Sea Lion in Vallejo, correct?

8  **A**   Yes.

9  **Q**   And when you went over to your mother's house, you papered

10  up -- maybe you didn't use paper, but you covered up your

11  windows of the -- the windows of your mother's house so people

12  couldn't see in and see your trading activity.  Do you recall

13  that?

14  **A**   No.

15  **Q**   Let me ask you, sir, if you recall -- let me back up a

16  little bit.  You've got some lawyers representing you in this

17  case, right?

18  **A**   Yes.

19  **Q**   You have probably a pretty decent relationship with your

20  lawyers?

21  **A**   Yes.

22  **Q**   And you believe that they're giving you good advice?

23  **A**   Yes.

24  **Q**   You are doing your best, and have since you first hired

25  them, to give them as much information as possible that you

1  think will help them represent you well.  Correct?

2  **A**    Yes.

3  **Q**    And, in doing so, you try to be as conscientious, to try

4  to give them as many details as possible about who you are as

5  a person.  Right?

6  **A**    Yes.

7  **Q**    And also, about the information that went on with regard

8  to many of the companies that you traded on.

9  **A**    Yes.

10  **Q**    You did it to the best of your recollection, right?

11  **A**    Yes.

12  **Q**    And you did it right at the beginning of your relationship

13  with them.  You started early, doing that.  Correct?

14  **A**    Yes.

15  **Q**    And, you've done that because you wanted them to be as

16  informed as possible, so that they could negotiate the best

17  possible resolution for you.

18  **A**    Yes.

19  **Q**    And defend you against the criminal charges in the SEC

20  case, if that's what you chose to do.

21  **A**    Yes.

22  **Q**    And, in giving them as much information as possible, early

23  on, in 2009, they started, pursuant to your instructions,

24  engaging in a conversation with the government lawyers.

25  Right?

1    **A**    Yes.

2    **Q**    And, part of the reasoning that they engaged in this

3    discussion was to get a sense of what the lawyers for the

4    prosecutors might require if the case was going to resolve.

5    Right?

6    **A**    Yes.

7    **Q**    What -- you wanted to have an understanding of that so you

8    could make some choices about which direction you wanted to go

9    toward concluding the case.  Right?

10   **A**    Yes.

11   **Q**    And you tried to think of everything you could, early in

12   this case, as early as 2009, anything that could be of help to

13   you in this matter.

14   **A**    What's the question?

15   **Q**    Early on, in 2009, you tried to think of absolutely

16   everything you could that would be of any help to your

17   defense.

18   **A**    Who wouldn't?

19   **Q**    Who wouldn't?  Anything that might get you out of this

20   mess.  Right?

21   **A**    I answered that question.

22   **Q**    Is that a "yes"?

23   **A**    Who wouldn't?

24   **Q**    I take it that's a "yes."

25   **A**    Yes.

1   Q   Okay.  You told your lawyers in 2009 that they should get

2   the trading records of your neighbors.  Right?

3   A   I said yes.

4   Q   I'm sorry, you have to speak into the microphone.

5   A   Yes.

6   Q   And, you told your lawyers that if they got those trading

7   records, that those records would help in -- would be a big

8   help to Mr. Reeves.  Did you not?

9   A   Yes.

10  Q   And, you wanted to help Mr. Reeves as much as possible.

11  A   No.

12  Q   You told your lawyers that it would be a big help to

13  Mr. Reeves, but you didn't intend to assist the government in

14  prosecuting.

15  A   I may have mentioned that it would be a good help to

16  Mr. Reeves, because at the time, he was -- he was considering

17  prosecuting me.  And I wanted to -- for him to understand the

18  case against me.

19  Q   Because in 2009, that's when they filed charges against

20  you.

21  A   Correct.

22  Q   And --

23          MS. SHIFMAN:  If I could just have a second,

24  Your Honor?

25          THE COURT:  Uh-huh.

1    **BY MS. SHIFMAN:**

2    **Q**   I want to talk to you for a minute about when you went to

3    go see the FBI in January of -- 20th, 2006.  Do you remember

4    that?

5    **A**   Yes.

6    **Q**   You remember that now?

7    **A**   Yes.

8    **Q**   You remember that now, because you reviewed some

9    investigative reports that told you that?

10   **A**   No.  I remember the occasion.

11   **Q**   You remember the occasion.

12       Well, let talk about that occasion, because in -- on

13   July 19th, 2013, when you testified before Judge Chen, you

14   were asked about going to the FBI.

15       Do you remember that?

16   **A**   Yes.

17   **Q**   And you remember saying you didn't remember going to the

18   FBI?

19   **A**   I don't recall what my answer was.

20   **Q**   Okay.  Let's look at Exhibit 664.

21       (Request complied with by the Witness)

22   **Q**   Page 48, please.  Lines 3 through 7 -- I'm sorry, 3

23   through 9.  If you could read those to yourself, sir.

24       (Witness examines document)

25   **A**   Yes.

 1              MR. REEVES:  Your Honor, I think this may touch on a

 2     ruling.  May we please approach at the sidebar, please?

 3              THE COURT:  Okay.

 4        (Sidebar discussion held on the Record:)

 5              MS. SHIFMAN:  Let's just cut to the chase here.  I

 6     don't intend to get into the substance of what they discussed.

 7     Just the fact that he doesn't remember it.

 8        I understand the Court's ruling.  I have a redacted

 9     document, and I'm able to use the unredacted portions.

10              THE COURT:  Right.

11              MR. REEVES:  I think the point is the Court was still

12     making its ruling when this hearing occurred.  And I think the

13     -- the witness was quite nervous about answering this

14     question.

15              MS. SHIFMAN:  Oh, boy.

16              THE COURT:  Well, if Ms. Shifman confines her

17     examination to what she just said, I don't think that is a

18     problem.

19              MR. REEVES:  And that is what, again?

20              THE COURT:  Well, that he doesn't recall going to the

21     FBI.

22              MS. SHIFMAN:  That is clearly what he said.  You want

23     to try to rehabilitate him with that phone story?  Go ahead.

24              MR. REEVES:  No, I want to make my argument to the

25     Judge.

```
 1              THE COURT:  All right.

 2              MR. REEVES:  Your Honor, I think you were still

 3     ruling on a motion that we had submitted ex parte.  And I

 4     think the witness at that time was quite nervous about

 5     answering this question, in the absence of your ruling.

 6         I'm all for a robust cross-examination.  There is plenty

 7     to work with here.  On this point, I think this witness had

 8     that fear.  I'm bringing it to your attention.

 9              MS. SHIFMAN:  I had the unredacted.

10              THE COURT:  Okay.  At that point you had the redacted

11     version.

12              MS. SHIFMAN:  (Inaudible)

13         (Reporter interruption)

14              THE COURT:  Ms. Shifman said she had the redacted

15     version, and that was known at that point.  The question was

16     whether we could unredact that, and so the contact with the

17     FBI was not a secret at that point.

18              MS. SHIFMAN:  That's correct.  I've always known

19     that.  And frankly, I don't still to this day.  Don't know the

20     substance of the conversation, and I don't care about the

21     substance.

22              THE COURT:  Right.  Well, I think Mr. Reeves' point

23     is that you think this cross-examination is unfair because he

24     may have been sort of reluctant to answer truthfully because

25     of the fear.
```

 1          Frankly, I don't think that is a real stick- --

 2               MR. REEVES:  Sorry to interrupt.  I just want to

 3     point to the Court, I think we were still in the process of

 4     resolving these details.  And that was what was in the

 5     witness's mind.

 6               MS. SHIFMAN:  So he lied then.  Yes.

 7               THE COURT:  Well, we don't have to get into that.

 8     The point is the record was already clear that even the

 9     redacted information showed he had met with the FBI.  And

10     that's all he was asked.

11          So I'm going allow this question, as long as we don't get

12     into the substance of the meeting, and that sort of stuff.

13               MR. REEVES:  Thank you, Your Honor.

14               THE COURT:  All right?

15               MS. SHIFMAN:  Your Honor, do you know what time we

16     are going to break?  I'm just trying to get a sense of when

17     the Court might break for the afternoon break.

18               THE COURT:  Oh, for the afternoon break?

19               MS. SHIFMAN:  Yeah.

20               THE COURT:  I don't know.  It depends on how much

21     more you have.  I was going to maybe go another ten, 15

22     minutes.

23               MS. SHIFMAN:  Okay.  I have more than that, but yeah.

24               THE COURT:  Okay.

25          (Conclusion of sidebar discussion; the following

1    proceedings were held in the presence and hearing of the

2    Jury:)

3    **BY MS. SHIFMAN:**

4    **Q**    Okay, sir.  Exhibit 664, Page 48.  Are you there?

5    **A**    Okay.

6    **Q**    You are there?  Do you recall when you testified on

7    July 19, 2013, before Judge Chen?

8    **A**    Yes.

9    **Q**    You have already said you remember that.  Right?

10   **A**    Yes.

11   **Q**    And on that day you were asked whether in 2006 you went to

12   visit the FBI, correct?

13   **A**    Yes, yes.

14   **Q**    And at that time, you said "I don't know."  Do you

15   remember that?

16   **A**    Yes.

17   **Q**    And you remember being asked a followup question, saying,

18   "You don't know because you don't know what date you went in

19   to see the FBI?"

20        Do you remember that?

21   **A**    Yes.

22   **Q**    And you said "No, I don't know because I don't know."

23   **A**    Yes.

24   **Q**    And then, I asked you, "You don't recall going to see the

25   FBI in 2006."  Right?

KARA - CROSS / SHIFMAN                          270

1    **A**    Yes.

2    **Q**    And you said, "Correct."

3    **A**    Yes.

4    **Q**    So, less than three months ago, you said, under oath, you

5    didn't have any recollection of going to see the FBI in 2006.

6         Right?

7    **A**    Yeah.  That was the polite answer.

8    **Q**    That's what you testified to.  Correct?

9    **A**    Yes.

10   **Q**    Because you had no recollection, going in 2006.

11   **A**    No.  I did have recollection.  But I just did not want to

12   answer that question.

13   **Q**    So you lied under oath.

14           **MR. REEVES:**  I -- I object, Your Honor.

15           **THE WITNESS:**  No.

16           **THE COURT:**  Sustained.

17           **MR. REEVES:**  Thank you, Your Honor.

18   **BY MS. SHIFMAN:**

19   **Q**    Today, in September, 2013, I think we are on the 23rd,

20   today you remember going to the FBI in 2006.

21           **MR. REEVES:**  I object, Your Honor.  I think the

22   witness has been clear about precisely what I brought to the

23   Court's attention.  I object on that basis.

24           **THE COURT:**  Well, I'll allow this question.  You can

25   answer that question.

 1          THE WITNESS:  Yes.

 2   BY MS. SHIFMAN:

 3   Q   And, despite not remembering it or testifying untruthfully

 4   in July of this year, the truth is, getting from Vallejo or

 5   Walnut Creek, even, to see the FBI, takes some effort, does it

 6   not?

 7   A   Ma'am, the FBI was not in Walnut Creek.

 8   Q   That's not what I asked.

 9   A   You're wrong.

10   Q   Yes.  Okay.  Let me ask a clearer question.

11          In February of 2006, you were still living in Vallejo.

12   Correct?

13   A   No.

14   Q   You were in Walnut Creek.

15   A   Yes.

16   Q   Okay.  The FBI's in San Francisco.  Right?

17   A   Yes.

18   Q   Okay.  Getting in from Walnut Creek to San Francisco, that

19   takes some effort.

20   A   Yes.

21   Q   You have got to either get on BART or get in a car.

22   Right?

23   A   Yes.

24   Q   And you have to know exactly where the FBI office would be

25   located.

1    **A**    Yes.

2    **Q**    You would have to park your car, get upstairs, right?

3    **A**    What's the question, ma'am?

4    **Q**    You had to go through an intake process at the FBI.

5    **A**    What's the question, ma'am?

6    **Q**    That's the question.  You had to go through an intake

7    process over at the FBI, did you not?

8    **A**    Yes.

9    **Q**    Okay.  That's what you need to do in order to make a

10   report.  Right?

11   **A**    Yes.

12   **Q**    And, you did that because you wanted to report on

13   suspicions you had.

14   **A**    No.

15   **Q**    You thought it was important enough to drive from Walnut

16   Creek to San Francisco, to report non-suspicions?  You had

17   some suspicions, did you not, sir?

18   **A**    They were not suspicions.  I needed to discuss with them

19   narcotics smuggling and some events overseas.

20   **Q**    Suspicions, sir.  Correct?  Those are suspicions?

21   **A**    Those are events.

22   **Q**    Those are events.

23           **MS. SHIFMAN:**  Your Honor, actually, may we approach

24   at the sidebar, concerning this?

25           **THE COURT:**  All right.

1        (Sidebar discussion held on the Record:)

2        **MS. SHIFMAN:**  So, I have no intent of asking him

3    specifics about what he discussed with them.  The report,

4    itself, said "suspicions," but now that he has opened the

5    door, I believe that the report needs to be unredacted so that

6    I can cross-examine him.  Because, I don't know if that's an

7    accurate statement or not.

8        **MR. REEVES:**  She has the redacted report.  She can

9    use everything that's in it.  Nothing about this testimony

10   would be a basis for overturning the ruling the Court's

11   already made about why it's being redacted.

12       So, and I would say for the Record, the witness -- and you

13   can use this as you wish -- testified that he didn't know

14   about his visit to the FBI in July.  But today, acknowledged

15   the reality that I think I was bringing to the Court's

16   attention before, which is that he didn't want to answer the

17   question.  And so, that is what it is.

18       The point is, he's nervous about this.  And, he should not

19   be cross-examined about this.  There is nothing about the

20   record to date that opens the door in any sense.  She can use

21   the redacted report, if she wishes.  And that will be more

22   than enough.

23       **MS. SHIFMAN:**  A witness doesn't get permission to lie

24   in a proceeding because they decide on their own accord

25   they're not going to answer a question or they don't want to.

```
 1        And I have received zero discovery from the government to

 2   date that Mr. Kara came in here, on July 19, 2013, and refused

 3   to answer the question by submitting a false statement to the

 4   Court.  There's been nothing provided to us.  So this is

 5   something --

 6        THE COURT:  All right, you have already established

 7   that his statement was inaccurate.  You have gotten that

 8   admission.  There's no need to go deeper for purposes of why

 9   we're here, and my ruling stands with respect to the

10   confidentiality of the redacted version.  So your request to

11   see the unredacted version is denied.

12        MR. REEVES:  Thank you, Your Honor.

13        MS. MOEEL:  Your Honor, I'm sorry.  Also, for the

14   Record, does that mean that there is no *Brady* material within

15   that redacted copy?

16        THE COURT:  And that -- you represented that in our

17   last sidebar, correct, Mr. Reeves, there is *Brady* material.

18        MR. REEVES:  There is no *Brady* material.

19        MS. SHIFMAN:  Including now that he's made that

20   statement?

21        MR. REEVES:  The material didn't change from the time

22   it was redacted.  He -- he doesn't want to testify about this.

23   That has now been elicited.

24        THE COURT:  In other words, if you were to reveal the

25   unredacted version of that, but not --
```

```
 1          MS. MOEL:   The inconsistent --

 2          THE COURT:   -- material benefit to the defense at

 3   this point.

 4          MS. MOEL:   Inconsistent with the statement that it

 5   was regarding narcotics smuggling and things overseas.

 6          MR. REEVES:   I'm not going to guess about this.  I

 7   want to looked at the unredacted version.  And I would like to

 8   speak to the Court about this.

 9          THE COURT:   My recollection is that it is consistent.

10   But, during the next break why don't you look at it.  If you

11   -- if there is a -- if there is something inconsistent that

12   might fall under Brady, then we need to revisit this about

13   what -- what we do.  But my recollection is that it was

14   consistent.  But, it's been a while since I looked at it.

15          MS. MOEL:   Okay.

16          MR. REEVES:   As to events overses, you are right,

17   Your Honor.  Now that I'm thinking about it.  But I will

18   definitely look at the unredacted version again, and

19   double-check that.

20          THE COURT:   Okay.

21          MR. REEVES:   Thank you.

22          THE COURT:   Thank you.

23      (Conclusion of sidebar discussion; the following

24   proceedings were held in the presence and hearing of the

25   Jury:)
```

BY MS. SHIFMAN:

Q   When you went to see the FBI in January of 2006, they met

with you after that on February 2nd, 2006, did they not?

A   Yes.

Q   And, they asked you again to drive in from Walnut Creek?

A   Yes.

Q   And, you took all the effort to do that, because you

thought it was important to do so.

A   Yes.

Q   And, while you were there, meeting with the FBI, on

February 2nd, you believed that you were under FBI

surveillance, did you not?

A   Yes.

Q   You believed that they were using parabolic mics and

physical surveillance on you?

A   I don't know about the parabolic mic and all of this

business.

Q   The microphone, sir?

A   I don't know about parabolic mics and all of this fancy

stuff.

Q   That's what you believed, is it not?  You told them that.

A   Parabolic mics?

Q   Yes.

A   Oh.  Where do you see that?

Q   You told them you were under surveillance with mics, did

 1   you not?

 2   **A**   Where -- where do you see parabolic mics?  Can you show

 3   me, please?

 4   **Q**   Exhibit 665, Page 1, sir.

 5   **A**   Okay.

 6       (Witness examines document)

 7   **Q**   The very bottom of the page.  I'm sorry; that last

 8   paragraph at the bottom of the page.

 9       You complained of being under surveillance, parabolic mics

10   and physical surveillance, during the interview.  You told

11   them that, right?

12       (Witness examines document)

13   **A**   I still don't see what you are talking about.  But --

14   **Q**   Sure.  So, in that last paragraph, that says "Details,"

15   the fifth line down that starts (As read):

16           "...kempt but complained of being under FBI

17           surveillance, for example, parabolic mics and

18           physical surveillance during the interview."

19       You told him that?

20   **A**   No.  Those are not my words.

21   **Q**   So the agents got it wrong in their notes of their

22   interview with you.

23   **A**   Negative.  Those are their words.

24   **Q**   They got it wrong about the information you were telling

25   them on February 6, 2006.  Is that what you are saying?

1    **A**    No, what I'm saying, these words are their words.

2    **Q**    Because you told them that you believed they were

3    surveilling you.  Correct?  During the interview.

4    **A**    I said I may have been surveilled.  But I don't think I

5    told them about parabolic mics and all of this other jazz.

6    **Q**    So, the FBI agent got it wrong?

7    **A**    No, he didn't get it wrong, but I'm saying these words,

8    these fancy words were their words, not mine.

9    **Q**    You told them "surveillance," right?

10    **A**    Yes.

11    **Q**    Physical surveillance  (Indicating quotation marks).

12    **A**    No.

13    **Q**    Cameras, microphones.

14    **A**    No.

15    **Q**    You got agitated at that meeting.

16    **A**    Yes.

17    **Q**    You raised your voice at them.

18    **A**    Yes.

19    **Q**    After you voluntarily went there.

20    **A**    Yes.

21    **Q**    But in July of this year, you testified you had no

22    recollection of that.

23            **MR. REEVES:**  I object, again, Your Honor.

24            **THE COURT:**  Sustained.

25            **MS. SHIFMAN:**  Your Honor, this might be a good time

 1    to take a break, because I'm about to change topics.

 2             THE COURT:  All right.  We will go ahead and take our

 3    afternoon break for 15 minutes, and come back at 2:40.

 4             THE CLERK:  All rise for the jury.

 5        (Jury excused)

 6        (The following proceedings were held outside of the

 7    presence of the Jury)

 8             MS. SHIFMAN:  May the witness --

 9             THE COURT:  Yes, you may step down.

10             MS. SHIFMAN:  And I would ask -- I notice the witness

11    is reading an exhibit.

12             THE COURT:  All right.  Well, one way to cure that is

13    to close the exhibit book until it is needed.

14             MS. SHIFMAN:  Yes.

15             THE COURT:  All right?  So, let's get back in maybe

16    like ten minutes, 12 minutes, you've had a chance to look at

17    the unredacted --

18             MR. REEVES:  Sounds good.

19             THE COURT:  All right.

20        (Recess taken from 2:26 to 2:39 p.m.)

21        (The following proceedings were held outside of the

22    presence of the Jury)

23             THE COURT:  Okay.  Let's go on the Record about what

24    we just talked about before the break.

25             MR. REEVES:  Yes, Your Honor.  During the break, I

1    have reviewed the unredacted version of the following

2    document: USA000-7213 through -7218.

3        The redacted portions pertain to matters overseas.  And

4    therefore, I have no further *Brady* or *Giglio* disclosure to

5    make at this time.

6            **MS. SHIFMAN:**  The question would also be:  Did they

7    refer to drug activity?  Is there any reference to that?

8            **THE COURT:**  All right.

9            **MR. REEVES:**  I'm not going to answer that question,

10   Your Honor.  I have a *Brady/Giglio* obligation that I've

11   discharged.  I'm satisfied that the subject pertains to

12   matters overseas.

13           **THE COURT:**  Let me see it.  Do you have it?

14           **MR. REEVES:**  This is the unredacted version I'm

15   handing up.

16       (Document handed up to the Court)

17           **MR. REEVES:**  Would it help to also have the redacted

18   version?

19           **THE COURT:**  I have that.

20       (The Court examines documents)

21           **THE COURT:**  All right.  I'm satisfied that there is

22   not *Brady* material here that is of any materiality.  And

23   therefore, my ruling stands that we are not going to unredact

24   the redacted version.

25           **MR. REEVES:**  Thank Your Honor.

```
1            THE COURT:  I do have a question from a juror.  It's

2     kind of a procedural question:

3            "When questions...when questioned..."

4         I think they mean -- well, I'll read it literally

5     (As read):

6            "When questioned and on an exhibit, they are reading

7            to themselves.  Their testimony is on record yet we

8            do not know what was read.  Are we to have a full

9            picture of what they are agreeing or disagreeing to?"

10            MS. SHIFMAN:  Your Honor, I don't think we actually

11     respond to that question.

12            THE COURT:  I could give the -- the usual -- "This is

13     the Rules of Evidence for what comes in and not, certain

14     documents are here, for purposes -- for limited purposes of

15     refreshing the witness's memory."

16            MR. REEVES:  That is exactly correct.  And there's

17     zero reason not to inform the jury that you're applying the

18     Rules of Evidence precisely as they should be applied, to the

19     refreshing of recollection.  It should not be a mystery to

20     them.

21         So, yes, I would ask the Court to please give exactly that

22     instruction.

23            MS. SHIFMAN:  Well, Your Honor, actually, when a

24     witness refreshes their recollection, and a question is asked,

25     "On February 6th, 2006, you said X and Y and Z," and they say
```

 1   "Yes," it's actually the question and the answer that is

 2   testimony.

 3        **THE COURT:**  And I don't think that is what they're

 4   asking.  They're asking about when something is being read,

 5   the testimony is on the record, but we don't know what was

 6   read.

 7        **MS. SHIFMAN:**  Your Honor, I don't think they're

 8   entitled to any further explanation at all.  Again, that's

 9   interjecting themselves into the proceedings.  They have been

10   given instructions about the Rules of Evidence more than once.

11   Objections by the parties.

12     And, every question they ask doesn't demand that the Court

13   respond.  And I -- I don't think it's proper to respond at

14   this point.

15        **THE COURT:**  Well, if all I'm doing is explaining that

16   there are rules of evidence that govern what comes into

17   evidence and what is not, and sometimes what is read by the

18   jury may serve -- may be done for a number of reasons such as

19   refreshing memory --

20        **MS. SHIFMAN:**  The problem is it makes it sound as

21   though the question and answer -- so, if the answer is "Yes,"

22   on cross-examination you ask a question and the witness says

23   "Yes," after having refreshed their recollection, it sounds as

24   though my question is then improper, and is not actually part

25   of the witness's testimony.  When, in fact, it is.  They're

 1   agreeing to that, "You said on this day, X and Y and Z," and

 2   they say "Yes."

 3           **THE COURT:**  And that testimony is in.  This juror

 4   asks -- says that's on the record.  I don't think there's any

 5   question that that's part of the record.  Everything the

 6   witness agrees to is on the record.

 7      I think what they're saying is that there are times, and

 8   not just this witness, but other witnesses have looked at

 9   various things, but that thing never got into the -- never got

10   into -- into evidence.

11           **MS. SHIFMAN:**  Well, they're asking because we're

12   doing it a lot with Mr. Kara.

13           **THE COURT:**  Yeah.

14           **MS. SHIFMAN:**  And there will be a lot of that with

15   Mr. Kara, obviously.  And I -- I strongly object to any

16   instruction being given to them about any rules that they

17   should follow that are outside of the normal rules that are

18   read to the jury.  Normal instructions.

19           **THE COURT:**  Well, I'll do this.  If you want me to

20   answer this, I would like you to draft exactly the wording you

21   think I should use.  I'll consider that, I'll consider your

22   objection, and make a decision.

23           **MR. REEVES:**  Can I do that right this second,

24   Your Honor?  I'll write it out in hand, if I may.  It's going

25   to be one sentence.

 1          THE COURT:  All right, unless you want to wait until

 2   after the day is over.

 3          MR. REEVES:  I object to the jury being confused.  I

 4   think it's important that they --

 5          THE COURT:  All right, go ahead.  Write your

 6   sentence.

 7          MS. SHIFMAN:  Your Honor, you know, frankly, in

 8   response, on his prior testimony I'll just start admitting it

 9   into evidence.

10          THE COURT:  Well, you can do that.  That's one of the

11   reasons why I bring that to your attention.  Just as you've

12   complained that the government has had some advantage of some

13   of these questions.

14          MS. SHIFMAN:  Well, they have.

15          THE COURT:  And you can take advantage of it, too.  I

16   mean, if you want to move some of these things into evidence,

17   that's -- that's up to you.

18          MS. SHIFMAN:  I mean, it's logistically a nightmare,

19   because it is bits and pieces of one larger exhibit.  So I

20   would have to be moving into evidence, you know, Page 12,

21   Lines 14 through 16.

22          THE COURT:  Well, you know, I mean, that is up to

23   you.

24      (Off-the-Record discussion between counsel)

25          MR. REEVES:  I'm prepared to proceed, Your Honor.

 1          **THE COURT:**  All right.  Do you want to --

 2          **MR. REEVES:**  I'll hand this up.  I'll read for the

 3     record my -- my proposal that is the Court instruct as follows

 4     in response to the question:

 5               "Pursuant to the Federal Rules of Evidence, documents

 6               may be read by a witness to refresh recollection

 7               without offering the documents into evidence."

 8          **MS. SHIFMAN:**  I object.

 9       (Document handed up to the Court)

10          **THE COURT:**  Well, that is a bit specific.  Because

11     this is -- some of these were not -- probably were eligible to

12     be received into evidence.  Some of these were not just

13     refreshing recollection, or -- part of these were prior

14     inconsistent statements taken under oath.

15          **MR. REEVES:**  The chronology that she's using is not

16     the witness's statement.  It's properly used to refresh his

17     recollection.  That's why we have not had an objection, on

18     that basis.

19          And again, what takes us to the core of the juror's

20     question?  Why are the witnesses looking at documents, and

21     reading them to themselves?  It's a legitimate question.  And

22     they should just be told what the simple answer is.  It's --

23     it centers on using a document to refresh recollection.

24     Neither more, nor less.  It shouldn't be a mystery.

25          **MS. SHIFMAN:**  I object, Your Honor.  I think it's

 1   prejudicial.

 2           **THE COURT:**  Why is it prejudicial?

 3       **MS. SHIFMAN:**  It's prejudicial to be commenting on

 4   the state of -- in the middle of cross-examination, the state

 5   of whether something is or isn't admitted into evidence at

 6   this point.  I'm not done with my cross-examination.  And I do

 7   not think it is proper to comment on it.

 8           **THE COURT:**  Okay.  I'm going to read an instruction

 9   after this -- not in the middle of this cross-examination, but

10   after this witness is done.

11           **MR. REEVES:**  Thank you, Your Honor.

12           **THE COURT:**  Okay?  So, let's bring them back.

13       (Off-the-Record discussion between the Court and Clerk)

14           **THE CLERK:**  All rise for the jury.

15       Please be seated.

16       (The following proceedings were held in the presence of

17   the Jury)

18           **THE COURT:**  Okay.  Thank you, ladies and gentlemen.

19   We are going to continue with the cross examination of

20   Mr. Kara at this point.

21           **MS. SHIFMAN:**  Sorry, Your Honor.  We were just

22   talking about one of the exhibits.

23   **BY MS. SHIFMAN:**

24   **Q**   Mr. Kara, I'm going to switch gears here, and ask you some

25   questions that arose at the beginning of this investigation.

1   Okay?

2   **A**   Yeah.

3   **Q**   Okay.  You were contacted early on in this case by the

4   Securities and Exchange Commission, correct?

5   **A**   Yes.

6   **Q**   That was back on April 30th, 2007?

7   **A**   Yes.

8   **Q**   Specifically, a gentleman, a lawyer named Lloyd Farnham of

9   the SEC called you.  Correct?

10  **A**   Yes.

11  **Q**   And, he told you, he advised you, that the interview was

12  part of a fact-finding inquiry.

13  **A**   Yes.

14  **Q**   And, he said that the interview was to determine whether

15  or not there had been violations of statutes and rules that

16  the SEC enforces.  Correct?

17  **A**   Maybe.

18  **Q**   He told you that you weren't required to answer their

19  questions?  Correct?

20  **A**   I don't remember, you know, the whole interview.  Maybe.

21  **Q**   You knew you did not have to answer their questions.  Did

22  you not, sir?

23  **A**   I don't think so.  I think you had to.

24  **Q**   You believed you had to answer the question.

25  **A**   Yeah.

1  **Q**   Do you remember him telling you that if you answered the

2  questions, it had to be truthful?

3  **A**   Yes.

4  **Q**   And that if you did not answer truthfully, that there

5  could be civil and criminal penalties?

6  **A**   Something to that effect.

7  **Q**   You understood what you heard?

8  **A**   (Inaudible)

9      (Reporter interruption)

10         **THE WITNESS:**  I think so.

11         **THE COURT:**  Pull the mic a little closer.

12         **THE WITNESS:**  Forgive me.

13 **BY MS. SHIFMAN:**

14 **Q**   You chose to answer his questions?

15 **A**   I answered his questions.

16 **Q**   You told him that you invested in stocks and securities on

17 a daily basis, right?

18 **A**   Yes.

19 **Q**   That you were very active as a trader?

20 **A**   Yes.

21 **Q**   That you traded two to three times a day?

22 **A**   Yes.

23 **Q**   Every day?

24 **A**   I don't recall the exact interview, ma'am.  This happened,

25 now, approximately seven years ago.

 1   **Q**    Right.  You don't remember an event from seven years ago

 2   so well, do you?

 3   **A**    This particular interview was probably one of the most

 4   nerve-wracking interviews of my life.

 5   **Q**    Great.

 6   **A**    So this particular incident was not in my memory lane.

 7   **Q**    You told them during this interview with them, that you

 8   invested in USPI, United Surgical Partners, based only on your

 9   own research.  Did you not?

10   **A**    I can't remember.

11   **Q**    You answered their questions on April 30th, 2007, that you

12   invested in USPI, based on your own research.  And that was a

13   lie.

14   **A**    Could you repeat the question, please?

15   **Q**    You told them that you invested in USPI, based on your own

16   research.  That was a lie, was it not, sir?

17   **A**    When did I say that, in April?

18   **Q**    On April 30th, 2007.

19   **A**    I don't remember that.

20   **Q**    You told them that you didn't discuss your investment with

21   USPI with anyone.  And that was a lie.

22   **A**    I can't remember that interview clearly.

23        (Off-the-Record discussion between counsel)

24   **BY MS. SHIFMAN:**

25   **Q**    Open up to 656.  Exhibit 656.

```
 1        (Request complied with by the Witness)

 2   Q    Page 2.

 3        (Witness examines document)

 4   Q    Are you on Page 2, sir?

 5   A    Yeah.

 6   Q    Okay.  And you see how it's got four pages there, right?

 7   A    Yes.

 8   Q    Within that one page.  The upper right corner which says

 9   "Page 4," Lines 13 through 15.  Please read that.

10        (Witness examines document)

11   Q    Did you read that, sir?

12        Sir.  There's just two lines.  Did you read that?

13   A    You said 13 through 15.

14   Q    Right.  Two short little lines there.

15             "Have you invested in a company called United

16             Surgical Partners?"

17   A    Yes.

18   Q    You were asked that question, were you not?

19   A    Yes.

20   Q    And in response to that, you told them that you purchased

21   it based on your own research, sir.  Lines 24 through 25, and

22   then continuing at the top of Page 5, 1 through 6.

23        Does that refresh your recollection, sir?

24   A    No.

25   Q    Does not.
```

```
 1   A    No.

 2   Q    You don't remember telling them you bought USPI based on

 3   your own research, sir?

 4   A    No.

 5            MS. SHIFMAN:  Your Honor, I would move to admit

 6   Exhibit 656, Page 2.  And within Page 2, Lines 4, 23 through

 7   25.  And on Page 5, Lines 1 through 6.  We will present a

 8   redacted version.

 9            THE COURT:  All right.  Any objection?

10            MR. REEVES:  Hang on.  I would offer the whole

11   exhibit into evidence, Your Honor.  I mean, I don't know why

12   we need to piece it out.

13            MS. SHIFMAN:  Great.  That's fine.

14            THE COURT:  All right.  Then 656, in its entirety,

15   will be admitted.

16       (Trial Exhibit 656 received in evidence)

17   BY MS. SHIFMAN:

18   Q    You told them that you didn't discuss your investment with

19   USPI with anyone.  And that was a lie.

20            MR. REEVES:  Could we please display it?

21            MS. SHIFMAN:  I -- I don't have it to display.

22            MR. REEVES:  Okay.

23            MS. SHIFMAN:  So there you go.

24            MR. REEVES:  We have a --

25            MS. SHIFMAN:  Thank you.  This is my cross, and I
```

```
 1   don't need it displayed.
 2            THE COURT:  Yeah, she doesn't have to display it.
 3   Right now, she's asking without displaying.
 4       So, you have that prerogative.
 5            MS. SHIFMAN:  But, thank you.  That's very kind.
 6            THE COURT:  Okay.  Go ahead.
 7   BY MS. SHIFMAN:
 8   Q   You asked -- you were asked whether you discuss your
 9   investment with USPI with anyone.  Correct?
10   A   Yes.
11   Q   And you told them no.  And that was a lie.
12   A   Ma'am?  Let's make it really simple.  I think you've asked
13   the question regarding my testimony to the SEC.  And I think
14   I've already testified that I had misrepresented my testimony
15   to the SEC.
16   Q   Great.  We are going to get into it in detail.
17   A   Yeah.
18   Q   Okay?  Through my questions.
19   A   Yeah.
20   Q   All right?  But thank you.
21   A   You're welcome.
22   Q   So, when you told them that you didn't discuss your
23   investment with USPI with anyone, that was a lie, sir.
24   Correct?
25   A   I -- I don't consider it a lie.  I consider it basically a
```

1   misrepresentation.

2   **Q**   A misrepresentation, so that you didn't provide them with

3   a truthful response.

4   **A**   Yes.

5   **Q**   So, it was a lie.

6   **A**   Okay.

7   **Q**   Okay.  You told them that you hadn't heard about the

8   possibility of an acquisition of USPI before you made that

9   investment.  That was a lie, too.

10  **A**   Yes.

11  **Q**   You told them that you learned about USPI's possible

12  acquisition on Yahoo! Financial, and the trade journals

13  *Morning Star*.  That was a lie.

14  **A**   Yes.

15  **Q**   You told them that you don't ever give recommendation for

16  stocks to friends.  That was a lie.

17  **A**   Yes.

18  **Q**   You told them -- if you could close that, sir, that would

19  be great.

20      (Request complied with by the Witness)

21  **Q**   You told them that you hadn't received any stock

22  recommendations from anybody.

23  **A**   Yes.

24  **Q**   That was a lie.

25  **A**   Yes.

1    **Q**   You told them that there weren't any accounts that you had

2    trading authority over that you can trade in that aren't

3    necessarily in your own name.

4    **A**   Yes.

5    **Q**   That was a lie.

6    **A**   Yes.

7    **Q**   You told them that you --

8    **A**   Excuse me, forgive me.  What was the question?

9    **Q**   Sure.  You told them that there weren't any accounts that

10   you had trading authority over, that you traded, that aren't

11   necessarily in your own name.

12   **A**   I see.

13   **Q**   That was a lie.

14   **A**   (Inaudible)  Yes.

15   **Q**   You told them that you hadn't heard anything about the

16   potential for a Biosite acquisition when you made that

17   investment.  That was a lie.

18   **A**   Yes.

19   **Q**   You made up this whole story about how you came to learn

20   of Biosite.  Right?

21   **A**   Yes.

22   **Q**   You told them that you had heard about it on Yahoo!

23   Financial.

24   **A**   Yes.

25   **Q**   On *Morning Star*?

1   **A**    Yes.

2   **Q**    You said that you had heard that it was a company that was

3   a target of acquisition from all these media sources?

4   **A**    Sure.

5   **Q**    The whole thing, all of it, all of it, they were lies.

6   **A**    I testified to that, already.

7   **Q**    You told them that you didn't talk with anyone about it

8   before you invested in Biosite?

9   **A**    Yes.

10  **Q**    That was a lie, too.

11  **A**    I testified that.

12  **Q**    Is that a "yes"?

13  **A**    Yes.

14  **Q**    You told the Securities and Exchange Commission that you

15  didn't know what Maher did for Citigroup.  That was a lie.

16  **A**    They asked me specifically what exactly does he do for

17  Citigroup.

18  **Q**    And you told them that you didn't know what he did for

19  work at Citigroup.  And that was a lie.

20  **A**    Yes.

21  **Q**    Is that a "yes"?

22  **A**    Yes.

23  **Q**    Okay.  You told them that you don't know what industry

24  he's involved in at Citigroup.  That was a lie.

25  **A**    That was a stupid question.

1  **Q**  That was a lie, sir, correct?

2  **A**  What's the question?

3  **Q**  You told them that you didn't know what industry Maher was

4  involved with at Citigroup.  That was a lie.

5  **A**  There's only one industry at Citigroup.  And it's banking.

6  **Q**  That was a lie, sir.  Is that correct?

7  **A**  Okay.

8  **Q**  Is that a "yes"?

9  **A**  Yes.

10  **Q**  You have to keep your voice up, please.

11  **A**  Yes.

12  **Q**  You told the officers of the SEC that you didn't know

13  where Maher was going to work after his employment at

14  Citigroup.

15  **A**  I did not know.

16  **Q**  That was a lie.

17  **A**  That's not a lie.

18  **Q**  That's a lie because you received the offer from Maher's

19  next job at Lehmans in your fax machine.

20  **A**  I've never seen the offer.  Never saw the offer.

21  **Q**  Are you denying that you received that offer in your fax

22  machine at your home, sir?

23  **A**  Yes.

24  **Q**  And when you told them that you never discussed the stock

25  market with Maher, that was a lie, too.

```
 1   A    Yes.

 2   Q    You even lied about how you communicated with Maher.

 3   A    Yes.

 4   Q    You told him you never emailed him.

 5   A    Yes.

 6   Q    That was a lie.

 7   A    Yes.

 8   Q    In fact, you lied to them twice about that.  Right?

 9   A    Yes.

10   Q    And when you told them that you only knew Nasser Mardini

11   by name, that was a lie.

12   A    I think they asked me about Mazen Mardini.

13   Q    Now, sir, when you told them that you only knew Nasser

14   Mardini, --

15   A    Yes.

16   Q    -- that was a lie -- only knew him by name, that was a

17   lie, too.

18   A    No, ma'am.  I think they asked me about Mazen Mardini.

19   Q    If you can open it up to Page 656, Page 6.

20        (Request complied with by the Witness)

21           THE COURT:  Page 6 on the bottom or Page 6 in the

22   transcript.

23           MS. SHIFMAN:  Page 6 on the bottom.  656-006.

24           THE COURT:  All right.

25        (Request complied with by the Witness)
```

1          **THE WITNESS:**  Okay.

2     **BY MS. SHIFMAN:**

3     **Q**   And then in the upper left quadrant that says Page 18,

4     Lines 5 and 6.  They asked if you knew Nasser Mardini.  And

5     you said "Only by name."

6          (Witness examines document)

7     **A**   No, ma'am.  It says "Nazar Mardini."  It doesn't say

8     "Nasser Mardini."  I don't know any Nazar Mardini.

9     **Q**   They spelled Mr. Mardini's name wrong.

10    **A**   Somebody is called "Nazar Mardini."  I have never heard of

11    Nazar Mardini.

12    **Q**   You denied knowing Nasser Mardini --

13    **A**   It doesn't say "Nasser Mardini," ma'am.  It says "Nazar

14    Mardini."

15    **Q**   That wasn't the only time you answered questions at the

16    Securities and Exchange Commission, was it, sir?

17         We're done with that.  You can close the binder.  Thank

18    you.

19         (Request complied with by the Witness)

20    **Q**   That wasn't the only time you answered questions at the

21    SEC, with the SEC.  Correct?

22    **A**   No.

23    **Q**   You answered questions -- can you make sure that the

24    microphone is a little bit in front of you?

25         (Request complied with by the Witness)

1   **Q**   Thank you.  You answered questions with the SEC in August

2   of 2008.  Do you remember that?

3   **A**   I don't remember the date, but I did answer some

4   questions.

5   **Q**   At that point, almost a year and a half had passed since

6   the last time you answered the SEC's questions.  Right?

7   Approximately?

8   **A**   If you say so.

9   **Q**   Okay.  You understood that the SEC had been investigating

10  the case for some time, a year and a half or so, right?

11  **A**   Yes.

12  **Q**   You understood how --

13      (Off-the-Record discussion between counsel)

14  **BY MS. SHIFMAN:**

15  **Q**   You understood how important it was for you to tell the

16  truth in that proceeding?

17  **A**   Yes.

18  **Q**   Proceeding in August of 2008, where you took the oath to

19  tell the truth (Indicating)?

20  **A**   Yes.

21  **Q**   Do you recall taking that oath?

22  **A**   Yes.

23  **Q**   Just like the oath that you took here today?

24  **A**   Yes.

25  **Q**   You brought a lawyer with you to that SEC proceeding,

1    where you took an oath to tell the truth (Indicating).  Right?

2    **A**   Yes.

3    **Q**   You were told that if you answered any questions, you

4    would be doing so voluntarily.  Right?

5    **A**   I don't recall.

6    **Q**   You knew that you didn't have to answer all their

7    questions if you chose not to.

8    **A**   Maybe.

9    **Q**   You told them that you decided to buy securities in United

10   Surgical Partners, USPI, based on an article you saw in *Forbes*

11   magazine about it.  That was a lie.  Right?

12   **A**   I don't recall that conversation.

13   **Q**   Please open up Exhibit 658.  658-13, 013.  658-013.

14   **A**   I can't find 658.

15          **MS. SHIFMAN:**  If I may approach, Your Honor?

16          **THE WITNESS:**  It's on the top.  I found it.

17          **MS. SHIFMAN:**  Okay.

18          **THE WITNESS:**  Don't approach.

19   **BY MS. SHIFMAN:**

20   **Q**   Page 13, sir.

21          (Request complied with by the Witness)

22   **Q**   Page -- lower right quadrant, Page 52.  Lines 3 through 6,

23   only.  Do you see those there?

24          (Witness examines document)

25   **Q**   Have you read Lines 3 through 6, sir?

```
 1        (Witness examines document)

 2   A    Yeah; at the time I took my Fifth Amendment on that issue.

 3            MS. SHIFMAN:  Your Honor --

 4   BY MS. SHIFMAN:

 5   Q    you told them, you were asked --

 6   A    Yeah.

 7   Q    -- why you had purchased USPI, United Surgical Partners.

 8   And you told them that you decided to purchase it based on an

 9   article you saw in Forbes magazine.  Correct?

10   A    I think I was confused about this.  And I think at the

11   advice of counsel, he asked me to take the Fifth Amendment,

12   and I did assert my Fifth-Amendment rights.

13   Q    If I may read from Exhibit 658, the question was

14   (As read):

15            "QUESTION:  What was the basis for your

16            decision to purchase securities in United

17            Surgical Partners?

18            "ANSWER:  I think I saw an article in Forbes

19            magazine about this.  That..."

20            MR. REEVES:  I object.  That's not the complete

21   answer.

22            THE COURT:  That's not the complete answer?

23            MR. REEVES:  The next line.

24            MS. SHIFMAN:  Your Honor --

25
```

1    **BY MS. MOEEL:**

2    **Q**    That statement was a lie, was it not, sir?

3    **A**    That was not --

4              **THE COURT:**  Hold on.  Let me deal here.

5         The objection is overruled.  You may ask your question.

6    **BY MS. SHIFMAN:**

7    **Q**    That statement was a lie.

8    **A**    No.  No.

9    **Q**    You bought USPI based on an article you saw in *Forbes*?

10   **A**    Ms. Shifman, I was dealing with maybe 50-60 companies.  I

11   did see a couple of those companies in *Forbes* magazine.  And I

12   may have confused USPI as being one of them.

13        My attorney reminded me that USPI was not one of them.

14   So, I did take my Fifth-Amendment rights.

15        And if you continue looking at my answer --

16   **Q**    Sir, sir --

17   **A**    Let me finish my answer, please.

18              **MS. SHIFMAN:**  Your Honor --

19              **THE COURT:**  Hold on.

20              **MS. SHIFMAN:**  There's no question on the floor.

21              **THE COURT:**  There's not a further question.  So,

22   your -- the prosecution can bring out anything else on

23   redirect.

24   **BY MS. SHIFMAN:**

25   **Q**    If you would please close the binder, sir.

1      (Request complied with by the Witness)

2  **Q**   You were willing to help your friends -- help counsel your

3  friends to also lie, were you not?

4  **A**   No.

5  **Q**   Let's talk about Joe Azar.  You and Joe Azar, he is your

6  close friend.  Right?

7  **A**   Used to be.

8  **Q**   You have known him for a long time?

9  **A**   Yes.

10  **Q**   Years.  Right?

11  **A**   Yes.

12  **Q**   Your, your kids were friends?

13  **A**   Yes.

14  **Q**   Probably still are friends.  Your children.  Right?

15  **A**   What's the question?

16  **Q**   Mr. Azar's children are friends with your children, are

17  they not?

18  **A**   Yes.

19  **Q**   You and Mr. Azar communicated on a pretty regular basis up

20  through 2007-2008, did you not?

21  **A**   No.

22  **Q**   You didn't communicate on a regular basis with Joe Azar?

23  **A**   Not after 2007.

24  **Q**   Up until 2007, you communicated with him regularly,

25  though.  Did you not?

1  **A**   Yes.

2  **Q**   You had a conversation with Mr. Azar after he was

3  contacted by the SEC.  Right?

4  **A**   I don't remember.

5  **Q**   You told him at the time, you didn't know what the deal

6  was with the SEC investigation.  Do you remember that?

7  **A**   No.

8  **Q**   You told -- I'm going to move a little bit forward.  You

9  told Mr. Azar that you had done your own research on the stock

10 suggestions that you had given him.  Do you recall that?

11 **A**   No.

12 **Q**   You gave him a piece of paper representing your research.

13 Do you recall that, sir?

14 **A**   No.

15 **Q**   Do you remember the Jim Cramer document that you testified

16 to, so -- so -- like it was just yesterday, in response to the

17 government's questions?

18 **A**   Which -- which Jim Cramer document?

19 **Q**   Jim Cramer show.  You testified --

20 **A**   Yes.

21 **Q**   -- about that?

22 **A**   Yes.

23 **Q**   You testified about Yahoo!, downloading materials from --

24 **A**   Yes.

25 **Q**   -- the Yahoo! chatrooms?

1    **A**    Yes.

2    **Q**    Do you remember that, on direct examination?

3    **A**    Yes.

4    **Q**    And, you printed those things up so that if you were asked

5    any questions about your trading, you could point to research

6    out in the community, in the public, as reasons for why you

7    traded.  Do you remember that?

8    **A**    What's the question?

9    **Q**    I'm asking if you remember testifying to that, sir.

10   **A**    Testifying to what?

11   **Q**    That you downloaded things from the Yahoo! website,

12   including Jim Cramer information, and printed them up so that

13   you had something you could point to if you were asked

14   questions about why you had done all this trading.

15   **A**    Yes.

16   **Q**    You recall that?

17   **A**    Yes.

18   **Q**    You testified about that, just earlier today.

19   **A**    Yes.

20   **Q**    Do you remember doing that?

21   **A**    Yes.

22   **Q**    In 2007, you recall doing that.  Right?

23   **A**    I remember.

24   **Q**    You remembered it all the way through to today's date.

25   Correct?

1   A   Yes.

2   Q   And you had a conversation with Mr. Azar about covering up

3   the story about the trading.  You recall that?

4   A   There was no coverup.  I was showing it to him, basically

5   as information that this material was available on the web.

6   Q   You showed him information from the web.  Correct?

7   A   Yes.

8   Q   Yahoo! and Jim Cramer information.  Correct?

9   A   Yes.  Yes.

10   Q   Information that you had printed up so that you had a

11   cover story, I believe was the question asked by the

12   prosecution?

13   A   Yes.

14   Q   You showed that to Mr. Azar, so that if someone asked you,

15   you can tell them that "This is my research."

16   A   This -- this material that we were discussing was printed

17   after the SEC call.  So, to print this material after the SEC

18   call is useless.  It's of no consequence, basically.

19   Q   So if Mr. Azar came in here and testified that you did

20   that, he would be lying, sir?

21   A   No.  He's confused.

22   Q   He's confused.

23   A   Yes.

24   Q   You tried the same coverup story with your brother Maher,

25   did you not?

1    **A**    About what?

2    **Q**    Your research.  Your Yahoo! chatroom research, and Jim

3    Cramer.

4    **A**    No.  I printed it out to show Maher that there was

5    coverage about this company.  And that once the SEC call was

6    made, everything was useless.

7    **Q**    When you saw your brother Maher in June of 2007, when he

8    and Susie brought their newborn daughter to California, you

9    approached him with the exhibit, the Yahoo! exhibit that

10   references Jim Cramer, did you not, sir?

11   **A**    I can't remember.

12   **Q**    You claimed that the rumors of the Biosite acquisition had

13   been all over the Internet when you invested in the company.

14   **A**    I can't remember that.

15   **Q**    You just said that, two sentences ago, sir.  That you had

16   this information so that you could show that it was all over

17   the Internet.  Which is it?

18   **A**    I did not say that.

19   **Q**    You did -- you most certainly did, sir --

20   **A**    No, ma'am, I said --

21   **Q**    -- your answer, and said that you got this information so

22   that you could show that it was all over the Internet.

23   **A**    Ma'am, after April 30, after the SEC call, this

24   information was useless, basically.

25   **Q**    In June of 2007, when he was out here in California with

1   the new baby, you went up to him, and you said, "When can we

2   get together to talk about the stocks?"  Right?

3   **A**   I can't remember.

4   **Q**   You wanted to work a cover story with Maher.

5   **A**   Absolutely not.

6   **Q**   So if he testified to that, he would be lying, too.

7   **A**   No.

8   **Q**   Are you lying, then, sir?

9   **A**   No.

10  **Q**   You showed the same Cramer document to Nasser Mardini, did

11  you not, sir?

12  **A**   The document was on top of my coffee table.  Nasser

13  Mardini picked it up, himself, without asking my permission.

14  **Q**   You told Nasser Mardini that, "There's this public

15  information about a takeover, so that there's no way they can

16  pin us down for this."  It was your own research.

17  **A**   Nasser Mardini believed what he wanted to believe.

18  **Q**   Did you not tell him that, sir?

19  **A**   I don't think so.

20  **Q**   So he, too, would be lying.

21  **A**   No, I did not say that.

22  **Q**   You've testified about a number of companies that you

23  invested in, over the past years.  Many companies.  Right?

24  **A**   Yes.

25  **Q**   From ten years ago in 2003, nine years ago, in 2004.

```
 1   A    It was never any testimony given by me at 2003.  I was not

 2   in the stock market at 2003.  You were confused.

 3   Q    Definitely.  In 2004, you testified about stock companies

 4   that you invested in.  Right?

 5   A    In 2004, yes.

 6   Q    All the way through 2007?

 7   A    Yes.

 8   Q    In fact, you invested in more companies than you had even

 9   testified to today, during that time frame.  Right?

10   A    Some.

11   Q    In fact, your full stock records would show how often you

12   were trading.

13   A    Yes.

14   Q    Options, puts, right?

15   A    Yes.

16   Q    And for years before that, you -- were you not, sir, a

17   stock trader?

18   A    No.

19   Q    No stock trading?

20   A    Only during that period.

21   Q    All right.  When you testified in response to the

22   questions from the prosecutors, you had the aid of nice little

23   file folders that had documents in it.  Correct?

24   A    Yes.

25   Q    And we all got to see documents up on the screen, as well.
```

1   Do you remember that?

2   **A**    Yes.

3   **Q**    And those records were used so that you could look at

4   those records, and supposedly remember what you had done.

5   Correct?

6   **A**    What's the question?  Please?

7   **Q**    That was the question, sir.  Those records were used by

8   you to look at, to see what you had done.

9   **A**    Yes.

10  **Q**    Because you would agree, you had a tremendous amount of

11  trading activity during that time period.

12  **A**    Yes.

13  **Q**    And, without the aid of those documents, you wouldn't be

14  able to remember what you bought or when you bought it, and

15  for how much.

16  **A**    Of course not.

17  **Q**    Now, your conversations with Mr. Salman, those weren't

18  recorded, were they?

19  **A**    Which conversations?

20  **Q**    Your conversations with Sam Salman.  Those weren't

21  recorded, were they, sir?

22  **A**    Between what period and what period?

23  **Q**    Ever.

24  **A**    Of course not.

25  **Q**    So, there's no audio recording or transcript for you to

1    look at so that you can see what really happened.

2    **A**    No.

3    **Q**    But, in preparation for your testimony here, you've done a

4    lot of work.  Right?

5    **A**    What do you mean by "a lot of work"?

6    **Q**    I'll tell you what I mean, sir.  You have reviewed

7    documents and records.  Right?

8    **A**    Yeah.

9    **Q**    You've combed through trading records and phone records,

10   correct?

11   **A**    Yeah.

12   **Q**    You maybe sat with your lawyers and talked about the

13   information in those records and documents?  Right?

14   **A**    Yeah.

15   **Q**    You've reviewed your prior testimony, correct?

16   **A**    Read it once.

17   **Q**    You've reviewed some investigative reports prepared by the

18   FBI, correct?

19   **A**    No.

20   **Q**    You've taken a lot of time to get ready for your

21   testimony.

22   **A**    A few days.

23   **Q**    You've met with the prosecutors (Indicating) on a number

24   of occasions?

25   **A**    A couple of times.

1    Q    Couple of times.  Well, since 2011, sir, would it be fair

2    to say you have met with them six, eight, ten times?

3    A    Since 2011?

4    Q    That's right.

5    A    Yeah.

6    Q    Maybe more.  Right?

7    A    No.  About that.

8    Q    How many times have you met with me?

9    A    Zero.

10   Q    I'm sorry?

11   A    Zero.

12   Q    Zero.  Have you ever met with Bruce Victor, Dr. Bruce

13   Victor?

14   A    Who's he?

15   Q    You declined to be interviewed by Dr. Victor?

16   A    Why should I be interviewed by him?

17   Q    And, after reviewing the discovery -- let me withdraw

18   that.

19        When you met with the prosecutors, particularly more

20   recently, they discussed your testimony in this case, did they

21   not?

22   A    Discussed the testimony?

23   Q    The questions they would ask.

24   A    Um, barely.

25   Q    So, all the questions you got today, those were just a big

1    surprise.  Right?

2    **A**    No questions were asked during the interview process.  It

3    was just basically coverage of material.

4    **Q**    I'm sorry, I didn't hear you, sir.

5    **A**    No questions were asked during the interview process.  It

6    was basically coverage of material.

7    **Q**    Coverage of material.

8    **A**    Yes.

9    **Q**    So there were no -- if you can move the microphone a

10   little closer, I'm sorry.

11       So there were no questions asked, you just sat down and

12   just started talking.  Is that how it went?

13   **A**    No.  It was an organized talk.

14   **Q**    Organized talk.

15   **A**    Yes.

16   **Q**    Questions, answers.  That kind of organization?

17   **A**    Negative.  I didn't say "Questions, answers."  It was an

18   organized talk.

19   **Q**    And in organizing a discussion with someone, they ask you

20   questions, do they not?

21   **A**    No.  You said, Did the questions that you have in this

22   court and the answers were done before you walked into this

23   court with the prosecutor.  I told you, no.

24   **Q**    They never told you what questions they were going to ask.

25   **A**    Negative.  That did not happen.

1    **Q**    They never told you what areas they were going to cover.

2    **A**    The areas, yes.

3    **Q**    They never told you what documents to review.

4    **A**    Not really.  They just basically said, "Review the plea

5    agreement, review your prior testimony, and you should be

6    fine."

7    **Q**    But you also reviewed a number of other documents, you

8    testified.  Correct?

9    **A**    Can you be more specific, please.

10   **Q**    You said you reviewed records, trading records, did you

11   not?

12   **A**    No.

13   **Q**    You did not review your trading records.

14   **A**    No, ma'am.

15   **Q**    So when you testified four or five questions ago that you

16   did review your trading records, that was a lie?

17   **A**    I didn't say I reviewed my trading records.

18   **Q**    And when you testified just maybe four or five minutes

19   ago, not even, you said you also reviewed phone records.

20   Right?

21   **A**    I didn't say I reviewed phone records.

22   **Q**    So that was a lie, too?

23   **A**    Did you hear my response, ma'am?  I said I did not review

24   phone records.

25   **Q**    The prosecutors wanted to make sure that you understood

1    what was expected of you up on that witness stand, right?

2    **A**    What's the question?

3    **Q**    The prosecutors wanted to make sure that you understood

4    what was expected of you up on the witness stand.

5    **A**    No.  He just -- he just basically said, "Please review

6    certain documentation, and as long as the process is

7    respected, that's all I care about.  I don't care about the

8    outcome."  Those were his exact words.

9    **Q**    They wanted to make sure that you understood the case as

10   they were presenting it?

11   **A**    No.  No.

12   **Q**    They told you what areas they were going to cover, did

13   they not?

14   **A**    Not really.

15   **Q**    And you had to evaluate for yourself what you would say up

16   on this witness stand, did you not?  You would have -- you had

17   to make a decision about what would be best for you, to say up

18   on the witness stand.

19   **A**    No, ma'am.  I have basically said nothing but the truth.

20   **Q**    Okay.  Let's talk about what you say is the truth.

21        Let's talk about times where your story has changed.

22   You've already testified that you had your attorneys early on

23   in this case.  Right?

24   **A**    My attorneys?

25   **Q**    Yes.  You had them early on in this case.  Is that right?

316

1    **A**    Yes.

2    **Q**    In fact, they're here today (Indicating).

3    **A**    Yes.

4    **Q**    And they have been with you throughout the whole

5    proceeding, from start to finish.

6    **A**    Yes.

7    **Q**    We talked about and you said that you authorized your

8    attorneys to approach the prosecutors and negotiate on your

9    behalf.  Do you remember that?

10   **A**    Negotiate what?

11   **Q**    A possible resolution for you, on your behalf.  You asked

12   them to do that for you.

13   **A**    Yes, ma'am.

14   **Q**    You instructed them to do that for you.  Right?

15   **A**    Yes.

16   **Q**    And, they met with the -- with the prosecutors, at your

17   request.

18   **A**    Yes.

19   **Q**    They were acting as your agents.

20   **A**    Yes.

21   **Q**    You authorized them to disclose certain information to the

22   prosecutors and the FBI in discussions.  Correct?

23   **A**    Yes.

24   **Q**    You did that because you wanted the best possible

25   resolution for yourself.

Belle Ball, CSR #8785, CRR, RDR
Official Reporter – U.S. District Court
(415) 373-2529

1    **A**    Who wouldn't?

2    **Q**    Who wouldn't?  And your attorneys started meeting with the

3    government as early as December 15th, 2009.  At your request.

4    **A**    I don't know.

5    **Q**    They met with the prosecutors early on, though, sir.

6    Correct?

7    **A**    I don't know the date.

8    **Q**    Early on, shortly after you were charged with the crimes

9    that you were charged with, your lawyers started talking with

10   the government.  Did they not?

11   **A**    Maybe.

12   **Q**    You asked them to talk to the government.  You have

13   already testified to that.

14   **A**    Yes.

15   **Q**    And they started doing that early on in the case.

16   Correct?

17   **A**    Maybe.  I just --

18   **Q**    You don't have --

19   **A**    I just don't know the dates.

20   **Q**    Sir, I asked you if they started talking to the government

21   early on in the case.  Shortly after you were charged in 2009.

22   **A**    Most probably.

23   **Q**    And they went and they told the prosecutors at your

24   request that you had in fact traded on information you got

25   from Maher.  Right?  You authorized that.

KARA - CROSS / SHIFMAN
318

1    **A**    Forgive me?

2    **Q**    You authorized them to tell the prosecutors that you had

3    traded on information you had gotten from your brother, Maher.

4    **A**    Yes.

5    **Q**    That you -- you authorized them to say that you did not

6    recall receiving tips from Maher relating to some of the

7    stocks charged in the indictment.  Do you remember that?

8    **A**    Can you ask the question again, please?

9    **Q**    Sure.  You authorized them in their discussions with the

10   government to let the government know that you didn't remember

11   receiving tips, stock information from Maher, relating to some

12   of the stocks charged in the indictment.

13            **MR. REEVES:**  Objection, as to the foundation.  Can we

14   have the date, Your Honor?

15            **MS. SHIFMAN:**  Shortly after he was charged in 2009.

16            **THE COURT:**  I think that's the time frame we are

17   talking about.

18            **MR. REEVES:**  Thank you, Your Honor.

19            **THE WITNESS:**  Yes.

20   **BY MS. SHIFMAN:**

21   **Q**    And, that Bone Care was an example of one of the charged

22   stocks for which you had no memory of receiving any

23   information from Maher.

24   **A**    That's not true.

25   **Q**    That's what you told your lawyers at the time, correct?

1   **A**   No.

2   **Q**   That's what they told the government at your request, in

3   December of 2009.

4   **A**   I don't recall that.

5   **Q**   Now you don't remember whether or not you remembered?

6   **A**   No.  I don't recall that Bone Care was one of the

7   companies that we told the government was not on the list of

8   companies that we did not have a tip from Maher on.

9   **Q**   You can't recall.

10  **A**   No.  I remember that Bone Care was one of the companies

11  that we told the government about as being a company that we

12  had insider information on.

13  **Q**   So when your lawyers at your request met with the

14  prosecutors and told them that Bone Care was one of the

15  charged stocks for which you had no memory, they had it all

16  wrong?

17  **A**   Or they have been misinformed.

18  **Q**   By you.

19  **A**   Something fell through the cracks.  If you have proof of

20  that, I would like to see it.

21  **Q**   Okay, sir.

22       Actually, I'm not going to ask it.  We will ask it through

23  another witness.  Okay?  Is that all right with you, sir?

24  **A**   Is what all right with me?

25  **Q**   We will move on to another area.

 1        (Off-the-Record discussion between counsel)

 2    **BY MS. SHIFMAN:**

 3    **Q**   Well, I'm changing my mind.  Exhibit 662, sir.  Page 2.

 4    662-002.

 5        (Witness examines document)

 6    **A**   662, Page 2.

 7    **Q**   The second paragraph on Page 2, sir.  That begins

 8    "According Ehrlich..."

 9        Can you read the first three sentences?  Actually, four

10    sentences.

11        (Witness examines document)

12    **Q**   Please let me know when you are done with those four

13    sentences.

14        (Witness examines document)

15    **A**   Okay.

16    **Q**   Okay.  At your request, on December 15th, 2009, your

17    lawyer, Mr. Ehrlich, went in to the government and said that

18    Bone Care was an example of one of the charged stocks for

19    which you have no memory of receiving information from your

20    brother.

21    **A**   That's what this says.

22    **Q**   And he would have learned that information from you, sir.

23    You were his client.  Correct?

24    **A**   Yes.

25    **Q**   You also -- we're done with that, sir.  Thank you.

1       You had your lawyer -- you can turn that over, you can

2   close it.

3       (Request complied with by the Witness)

4   **Q**   Thank you.

5       You also had your lawyers tell the government that you

6   have had given investment suggestions to a number of people on

7   that day.  To Nasser Mardini.  Right?

8   **A**   On which day?

9   **Q**   You had your lawyers go to the government in December of

10  2009, and -- to the prosecutors (Indicating), and tell them on

11  your behalf that you had provided information to Nasser

12  Mardini.

13  **A**   Yes.

14  **Q**   And that you had provided information to Joe Azar.

15  **A**   Yes.

16  **Q**   That you wanted to be the big man to these guys.  And

17  that's why you provided them with information.

18  **A**   I -- I don't think I've used this language, you know.

19  **Q**   Let's go back to Exhibit 662-002.

20  **A**   Uh-huh, uh-huh.

21      (Request complied with by the Witness)

22  **Q**   And that would be the third paragraph on that page, sir,

23  662-002, that begins "According to Ehrlich, Kara has

24  acknowledged that he..." and if you would read only that part,

25  sir.

1    **A**   This is the third paragraph?

2    **Q**   Yes, it ends with "big man."

3    **A**   This is the third page of 662?

4    **Q**   No, it's the second page of 662.  Third paragraph, first

5    sentence only.

6        (Witness examines document)

7    **A**   Okay.

8    **Q**   You wanted the government to know why you would have given

9    information to Joe Azar and Nasser Mardini.  Right?

10        (Witness examines document)

11    **Q**   Okay, sir.  Are you rereading it?

12    **A**   Yeah.

13    **Q**   Okay.

14    **A**   Because I didn't understand it.

15    **Q**   Okay.

16    **A**   Forgive me.

17        (Witness examines document)

18    **A**   Okay.  So what's your question, ma'am?

19    **Q**   You wanted the government to know your reasoning for

20    giving stock tips to Nasser Mardini and Joe Azar.  Right?

21    **A**   This is not what this is -- says.

22    **Q**   Sir, just listen to my question.

23    **A**   Yes.

24    **Q**   You wanted the government to know why you were giving

25    information to -- sir.

 1   **A**    Yes.  This is not what this says, ma'am.

 2          **THE COURT:**  That is not the question.  Listen to the

 3   question.

 4          **THE WITNESS:**  Sorry.

 5   **BY MS. SHIFMAN:**

 6   **Q**    You wanted the government to know why you were giving

 7   stock tips to Nasser Mardini and Joe Azar.  Isn't that

 8   correct?  You wanted them to know that?

 9   **A**    Yeah, but I've already told them.

10   **Q**    Okay.

11   **A**    Yeah.

12   **Q**    On December 15th, 2009, your lawyers told the government

13   that your reason for doing that is because you wanted to be

14   the big man.

15   **A**    Okay.

16   **Q**    Right?

17   **A**    I -- I guess so.  This is the first time I've seen this.

18   **Q**    And that's what they said on your behalf.  Right?

19   **A**    Well, they made a mistake.

20   **Q**    They learned that information from you, the client, did

21   they not?

22   **A**    I don't know.

23   **Q**    During that same interview -- I'm sorry, during that same

24   meeting with the government, your lawyers said that you

25   weren't prepared to talk about any details about Sam

1    (Indicating).  Do you remember that, sir?

2    **A**    No.

3    **Q**    You don't recall your lawyer saying you didn't want to

4    talk about details about Sam?

5    **A**    No.

6    **Q**    Let's look at 662, Page 2, again.

7         Are you on 662, Page 2?

8    **A**    I'm getting there.

9    **Q**    Okay.  Just let me know when you are there.

10   **A**    Okay.

11   **Q**    Third paragraph, the very last sentence of that paragraph

12   that begins, "Ehrlich indicated..."

13        **MS. SHIFMAN:**  And my apologies to Mr. Ehrlich for

14   quoting you so many times.

15        (Witness examines document)

16        **THE WITNESS:**  Okay.  What's the question?

17   **BY MS. SHIFMAN:**

18   **Q**    At your request, your lawyers told the government that you

19   weren't prepared to talk about the details about Sam.

20        **MR. REEVES:**  I object.  I think that misstates and

21   misreads the sentence you -- as to the pronoun "he."

22        **MS. SHIFMAN:**  I don't understand the objection.

23        **THE COURT:**  I'm not sure.

24        **MS. SHIFMAN:**  Sorry.

25        **THE WITNESS:**  Yeah.

```
 1              MR. REEVES:  I think that "he" pertains to Mister --

 2              THE WITNESS:  Ehrlich.

 3              MR. REEVES:  -- was not prepared.

 4              THE WITNESS:  Not me.

 5              MR. REEVES:  Not you, Michael Kara.

 6              THE COURT:  All right.  So why don't you ask the

 7    question, and clarify that.

 8              THE WITNESS:  Uh-huh.

 9    BY MS. SHIFMAN:

10    Q    On December 15th, 2009, you hadn't fully discussed the

11    details about Sam.  Correct?

12    A    Ehrlich --

13              THE COURT:  Hold on.  With whom?  Let's clarify --

14    are you talking about with his attorney or --

15    BY MS. SHIFMAN:

16    Q    Your attorneys.  We will start with your attorneys.

17    A    No.

18    Q    And as a result, when they went in to talk to the

19    government about trying to resolve the case, they weren't

20    armed with any of the information from you about Sam and any

21    possible involvement.  Right?

22    A    That's true.

23    Q    Even though you knew they were going in there to try to

24    negotiate possible resolutions for you, at your request.

25              MR. REEVES:  Your Honor, I object.  The report is
```

 1    indicating that the attorney, not the client, was not

 2    prepared.

 3              **THE COURT:**  Well, all right.  She's already elicited

 4    from him that he did not discuss, or his discussions were

 5    limited.  So if you can follow up on that question.

 6              **MS. SHIFMAN:**  Sure.

 7    **BY MS. SHIFMAN:**

 8    **Q**   You knew that when your -- we're done with that.  Thank

 9    you.  You can close it.

10       (Request complied with by the Witness)

11    **Q**    You knew that when your lawyers were going to talk with

12    the government, that the government would be interested in

13    hearing the truth.  Right?

14    **A**   Which truth?

15    **Q**   (Nods head)

16    **A**   The truth about what?

17    **Q**   Well, Mr. Kara, that they would want to know the truth

18    about what had happened with regard to passing stock

19    information.

20    **A**   About Sam, you mean?

21    **Q**   The whole truth about what had happened about passing

22    stock information, in their investigation and case.  Right?

23    You knew they wanted that.

24    **A**   True, but the story was so large that we haven't gotten to

25    Bassam yet.

1    **Q**    You knew that they were interested in the entire truth,

2    correct?

3    **A**    Yes.

4    **Q**    And that was important to their investigation?

5    **A**    Yes.

6    **Q**    I'm going to switch topics.  Okay?  And, talk to you again

7    a little bit about the time frame when your dad was sick.

8    Okay?

9         You got that in your mind, sir?

10   **A**    Yeah.

11   **Q**    Okay.  Your dad was quite ill in the 2004 time frame.  As

12   you have testified to.

13   **A**    Yes.

14   **Q**    And, during that time, would it be fair to say that you

15   undertook any effort you could to help find a potential cure

16   for the disease that your father suffered from?

17   **A**    Yes.

18   **Q**    That you devoted your energies to researching drugs in the

19   United States, right?  That might be available?

20   **A**    Yes.

21   **Q**    Drugs in the United States that might become available?

22   **A**    Yes.

23   **Q**    Drugs even outside of the country, that might be a

24   potential cure or even lengthen his life, for your dad.

25   **A**    Yes.

1    **Q**    And you spent a considerable amount of energy and time

2    researching those drugs.

3    **A**    Yes.

4    **Q**    And researching the companies that produced these drugs.

5    **A**    Yes.

6    **Q**    Researching what the FDA, when they might actually approve

7    a variety of these drugs.  Right?

8    **A**    Yes.

9    **Q**    And you were calling Maher on a regular basis to update

10   him about the findings that you came across with regard to the

11   variety of drugs.  Right?

12   **A**    Yes.  Yes.

13   **Q**    Because, your expertise -- withdrawn.

14        It's fair to say that you had more of an expertise in

15   pharmacology than Maher.

16   **A**    A little bit.

17   **Q**    And that he, Maher, relied upon you and your research in

18   this regard.  Right?

19   **A**    A little bit.

20   **Q**    I'm sorry, is that a "yes"?

21   **A**    A little bit.

22   **Q**    And you were -- you would spend maybe each night, two to

23   three hours, researching these possible treatments.

24   **A**    Yes.

25   **Q**    It's fair to say that you were obsessed with trying to

```
 1  locate something that might help.

 2  A    I was trying to find something that would help.

 3  Q    Sure.  And, it became your focus.

 4  A    Yes.

 5  Q    You wanted to ensure that with Maher, and with your dad,

 6  that you were the expert on these drugs.  Did you not, sir?

 7  A    Okay.

 8  Q    Is that a "yes"?

 9  A    How can you answer a question like that?

10  Q    Sir, you wanted to be an expert on these drugs, did you

11  not?

12  A    Okay, yes.

13  Q    And, while your dad was quite ill, in addition to trying

14  to research a drug cure for him, you also spent a considerable

15  amount of time at his side.  Right?

16  A    Yes.

17  Q    You helped care for him, right?

18  A    Yes.

19  Q    And, you just sat and talked with him as well.

20  A    Yes.

21  Q    And, he taught you how to trade on options while you sat

22  with him in 2004.

23  A    Yes.

24  Q    You spent a lot of time learning from him about options.

25  Right?
```

KARA - CROSS / SHIFMAN

1   **A**   I did.

2   **Q**   He schooled you on it, everything he knew, right?

3   **A**   Everything he knew.

4   **Q**   Because before 2004, you hadn't traded on it.

5   **A**   That's true.

6   **Q**   And when you met on one of our first meetings with the

7   government, March 15, 2011, you told them that options trading

8   was like Russian to you.

9   **A**   Yes.

10  **Q**   Incomprehensible.

11  **A**   Yes.

12  **Q**   Correct?

13  **A**   Yes.

14  **Q**   You had a lot to learn.

15  **A**   Yes.

16  **Q**   And, you told them, as well, did you not, sir, on

17  March 15th, 2011, that you had traded in stock since 1986?

18  **A**   That was a mistake.

19  **Q**   That was a mistake?  Because you hadn't traded on stocks?

20  **A**   I was in school in 1986, and there's no possibility that I

21  had traded in stocks in '86.

22  **Q**   You told them that you traded on stocks before you traded

23  on options, did you not, sir?

24  **A**   I may have traded on stock, but I don't remember anything

25  in '86.

1   **Q**   So, when you testified just -- I don't know, 30 minutes

2   ago that you never traded before 2004 on stocks, that was a

3   lie.

4   **A**   No.  This one, 1986, is a complete error.

5   **Q**   Uh-huh.

6   **A**   That's what I'm testifying on.

7   **Q**   Uh-huh.  So, before 2004, you actually traded on stocks.

8   Right?

9   **A**   No.  No.  What I'm trying to tell you is that I traded in

10  1986 in stocks is a complete error.

11  **Q**   Sir, my question to you, you told the prosecutors when you

12  -- you personally went in the first time, on March 15th, 2011,

13  that you traded on stocks before you traded on options.

14  Correct?

15  **A**   No.  I'm saying I don't know if I said that.  I don't know

16  any of that.

17  **Q**   Okay.  Exhibit 670, sir.

18      (Witness examines document)

19  **Q**   Page 2, 670-002.

20      (Witness examines document)

21  **A**   Okay.

22          **MS. SHIFMAN:**  Actually, question withdrawn,

23  Your Honor.  I'm going to move on.

24          **THE WITNESS:**  Where's 1986?

25          **MS. SHIFMAN:**  I'm going to move on, sir.

1          **THE COURT:**  All right.

2   **BY MS. SHIFMAN:**

3   **Q**   If you can close the binder, please.

4        (Request complied with by the Witness)

5          **MS. SHIFMAN:**  Is the Court taking an after noon

6   break?  Because I'm about to switch areas.

7          **THE COURT:**  No, we've already had our break.

8          **MS. SHIFMAN:**  Okay.  All right.  That's right, we

9   did.  Sorry.

10  **BY MS. SHIFMAN:**

11  **Q**   Now, you and your brother talked about a company called

12  APPX, right?

13  **A**   Yes.

14  **Q**   And, you talked about it because there was a drug that

15  APPX had that might have worked well for your dad.

16  **A**   Yes.

17  **Q**   And, you researched up on the drug, and its possibilities

18  for your father.  Right?

19  **A**   Yes.

20  **Q**   And, when you met with the government on March 15, 2011,

21  you wanted to tell them what you knew, everything you knew

22  about APPX.  Right?

23  **A**   If you say so.

24  **Q**   Well, sir, when you were talking about the companies that

25  you traded on, you wanted them -- to tell them as much

1   information as you knew.  Did you not?

2   **A**   Yeah.

3   **Q**   Okay.  And you wanted them to find your information

4   helpful.  True?

5   **A**   Yeah.

6   **Q**   And you wanted them to find your information truthful.

7   Did you not?

8   **A**   Everybody does.

9   **Q**   And, when you told them that "Janine's dress" was related

10  to APPX, was that truthful, sir?

11  **A**   Yes.

12  **Q**   And, Janine, she's your daughter.  Correct?

13  **A**   Yes.

14  **Q**   And Janine's dress in 2004, in that time frame on those

15  emails, that, in fact, was also a time when Janine was going

16  to be a bridesmaid at Maher and Susie's wedding.  Right?

17  **A**   Yes.

18  **Q**   And, in fact, Janine's dress was a topic of discussion as

19  to what she would wear and what the bridesmaids would wear.

20  Correct?

21  **A**   Yes.

22  **Q**   And so, when you sent the "Janine's dress" e-mail to

23  Maher, you came up with that coded language (Indicating

24  quotation marks) for APPX, using "Janine's dress."

25  **A**   Yes.

1    Q    And you came up with that on your own, because you wanted

2    to hide it from Citigroup.  Right?

3    A    Yes.  Yes.

4    Q    And in fact, you testified on direct that one of the

5    emails about Janine's dress was actually not about APPX.

6    Right?

7    A    No.

8    Q    One of the emails was about Janine's dress, and her going

9    off to school.  Do you recall that?

10   A    No.

11   Q    I don't have it readily available, I will give it back to

12   you -- get back to you on that specific e-mail.  But sir,

13   Janine's dress, Maher didn't always respond timely to your

14   inquiries on Janine's dress.  Correct?

15   A    I don't remember if he did or did not.

16   Q    You had a series of emails with Maher about "I really need

17   to know, time is short," do you recall that?

18   A    Yes.

19   Q    Maher wasn't giving you the information that you wanted.

20   A    Yes.

21   Q    Within the time frame that you desired.

22   A    (Inaudible)

23   Q    You have to answer, for the Record.

24   A    Yes, ma'am.

25   Q    Okay.  And, when he asked -- when you were asking about

 1    Janine's dress, initially Maher had no idea that you were

 2    referring to APPX.

 3    **A**    (Inaudible)

 4         (Reporter interruption)

 5              **THE WITNESS:**  Janine's dress was already done.

 6              **MS. SHIFMAN:**  I'm sorry; I didn't get that response.

 7    I didn't hear it.

 8              **THE WITNESS:**  Janine's dress was already done in

 9    Chicago.

10    **BY MS. SHIFMAN:**

11    **Q**    When you -- let's back up, here.

12              **MS. SHIFMAN:**  Actually, if we could just repeat the

13    question from the court reporter?

14              **THE COURT:**  All right.  You may read the question.

15              **MS. SHIFMAN:**  And we're having a little trouble

16    hearing you, sir, so --

17              **THE WITNESS:**  Sure.

18              **MS. SHIFMAN:**  I apologize.

19         (Previous testimony read back by the Reporter)

20    **BY MS. SHIFMAN:**

21    **Q**    So when you sent the emails initially to Maher about

22    Janine's dress, he didn't know that you were referring to

23    APPX, because you had come up with that phrase, "Janine's

24    dress," as your code.

25    **A**    Yeah.

1   **Q**   And in fact, on APPX, Maher never wanted you to trade.

2   **A**   Maher did not want me to trade?

3   **Q**   Correct.

4   **A**   Uh, I don't know the answer to that question.

5   **Q**   In fact, on all the drugs and the information and the

6   companies that might produce them in 2004, Maher didn't want

7   you to trade.

8   **A**   No, I can count few that he would probably want me to

9   trade.

10  **Q**   When he asked you if you were trading, you swore on your

11  daughter's life, on Janine's life, that you weren't trading.

12  Isn't that correct?

13  **A**   No.

14  **Q**   So, you're denying that you said that to your brother?

15  **A**   Yes.

16  **Q**   So if he testified to that, he would be the liar?

17  **A**   He's confused.

18  **Q**   You've testified about some very detailed conversations

19  you supposedly remember having with Sam Salman (Indicating).

20  **A**   Yes.

21  **Q**   Do you remember that?  In some of your testimony, you

22  remember exactly what days of the week you supposedly called

23  Sam Salman, in 2007 or 2005.  Do you remember that?

24  **A**   Yes.

25  **Q**   You remember those days specifically.

1   **A**   Very much so.

2   **Q**   Very much so.  For example, you -- you testified about

3   what you told Sam about Biosite.

4   **A**   You know, ma'am, yes.  And I have an answer for that.

5   These -- these deals were big deals.  And, the -- we're not

6   talking about ten or 20 or 30 deals.  We're talking about four

7   or five deals, in totality.  And so -- and they were exciting

8   deals that produced few million dollars.

9   **Q**   For you, sir.

10  **A**   No, for everybody.  For -- for everybody.

11  **Q**   Let me ask you a question, sir.

12       You have been in here, in this courtroom, now over the

13  course of two days.  And you have testified to -- I don't know

14  exactly the number of companies, I would have to go through my

15  notes, but well over 20 companies.

16       Isn't that correct?

17  **A**   Yeah, but I'm referring to four, five companies that

18  really count.  Bone Care --

19  **Q**   Excuse me --

20  **A**   Permit me, let me finish.  Please.

21           **MS. SHIFMAN:**  Excuse me.  Your Honor, if I may --

22           **THE COURT:**  She asks the questions.

23           **THE WITNESS:**  Okay.

24           **THE COURT:**  You may explain later.

25           **MR. REEVES:**  Your Honor, I object.  He was answering

 1    her question.

 2              **THE COURT:**  Well, I'm going to let her ask the next

 3    question.

 4    **BY MS. SHIFMAN:**

 5    **Q**   Those companies matters because those are the companies

 6    that the government's charged Sam with?  Just -- that's right.

 7    That's why they matter.  Correct?

 8    **A**   I don't know what he's been charged with.

 9    **Q**   You were shaking your head, nodding yes.  Right?

10    **A**   No.  I'm saying I don't know what he's been charged with,

11    which companies.  I really don't.

12    **Q**   Uh-huh.

13    **A**   But I'm saying --

14    **Q**   Sir --

15    **A**   -- that --

16    **Q**   You've testified to more than 20 companies here today.

17    Correct?

18    **A**   Maybe.

19    **Q**   You've interviewed with the government, now, eight, ten,

20    maybe 12 times.  Right?

21    **A**   No.

22    **Q**   Ten times, sir.  Many times, you have interviewed with the

23    prosecutors.  Have you not?

24    **A**   Yeah.

25    **Q**   They've asked you about many companies.  Correct?

```
 1   A    Yeah.

 2   Q    Well more than four or five companies.

 3   A    Yes.

 4   Q    But now, on four or five companies, you remember the

 5   specific details, including the days of --

 6   A    For the reason --

 7   Q    Excuse me.  The question is, you remember those details.

 8   Correct?

 9   A    Yes.

10   Q    Great.  You claim that you told Sam that Biosite was going

11   to be acquired over the weekend.

12   A    Yes.

13   Q    Right?

14   A    Yes.

15   Q    You claimed that you said, "Buy Biosite."  Right?

16   A    Yes.

17   Q    And you spelled it.

18   A    No.  I did not spell it.  I said "Bassam, Sammy, Tommy,

19   Ear."

20   Q    "Bassam, Sammy, Tommy" --

21   A    "Ear."

22   Q    E-A-R?

23   A    Correct.

24   Q    "Ear."  So, when you testified on direct that when you

25   told Sam to buy Biosite, and you spelled it, that was a lie.
```

1    **A**   I didn't spell it.  I gave him the acronym, "Bassam,

2    Sammy, Tommy, Ear."  I spelled, ma'am, if you let me finish,

3    Bone Care.  I spelled Bone Care.

4    **Q**   Uh-huh.

5    **A**   B-O-N C-A-R-E.  There's a difference between the two.

6    **Q**   Now, talking about that Boy, Sammy -- whatever you said.

7    Let's see.  This time you said it was "Bassam, Sammy, Tommy,

8    Ear."

9        On March 11th -- let me make sure the date's right.  March

10   15th, 2011, the first time you went in, sat down with the

11   prosecutors and told them what had happened, you told them

12   that Maher, when he told you about Biosite, he said, "Boy,

13   Sammy, Tommy, Echo."  That he didn't say "Biosite."  Right?

14   **A**   No.

15   **Q**   No, you never said that?

16   **A**   I -- no.

17   **Q**   Exhibit 670, Page 8.

18       The bottom paragraph there.  The -- the three sentences up

19   from the very bottom, that starts with "After a long silence,

20   Maher replied."

21   **A**   That was what Maher told me would be the acronyms for

22   Biosite.

23   **Q**   He told you --

24   **A**   Yes.

25   **Q**   "Boy, Sammy, Tommy, Echo."  Right?

 1   **A**   That's what Maher said.

 2   **Q**   That's what he said.  So, when he testified here in court

 3   that he told you that it was Biosite, the word, he would have

 4   been lying about how he conveyed the information to you?

 5   **A**   Not lying, but he conveyed the information to me as what

 6   -- you know, "Boy, Sammy, Tommy, Echo."

 7   **Q**   So, actually, he was confused again?

 8   **A**   Yes.

 9   **Q**   Yes.  Okay.  You testified that -- one moment

10        (Off-the-Record discussion between counsel)

11   **BY MS. SHIFMAN:**

12   **Q**   What's Sam Salman's telephone number?

13   **A**   I have to see it.  To recognize it.

14   **Q**   Because you don't know.

15   **A**   What?

16   **Q**   Because you don't know.  Right?

17   **A**   I have to see it, to recognize it.  I don't know it by

18   heart.

19   **Q**   What's Joe Azar's phone number?

20   **A**   Again, I have to see it to know it.

21   **Q**   How about Nasser Mardini?

22   **A**   Same.

23   **Q**   How about Emile Jilwan's number?

24   **A**   I don't know it.

25   **Q**   Your best friend?

1    **A**   It's been seven years since I last dialed any of those

2    people.  So, the human mind cannot retain any of those phone

3    numbers.

4    **Q**   It's been seven years since you traded on any of the

5    things that you have testified about here today.

6    **A**   Yes, but I tried to explain that situation, but you never

7    permitted me.

8    **Q**   I just want to make sure, you testified that when you had

9    stock information, that you called Sam Salman first.  Right?

10   **A**   I did.

11   **Q**   You've -- I want to talk to you about when Sam came back

12   to your house.  You -- I think you testified that he came back

13   to your house -- at least here in this courtroom, this time,

14   you testified that he came back to your house after the

15   memorial service for your dad.  Right?

16   **A**   Yeah.

17   **Q**   Okay.  And, he -- he came there, I think you said, to help

18   you get the house ready for the 150 guests that were going to

19   be coming from the service.

20   **A**   Yes.

21   **Q**   And in the course of that, he supposedly came upon your

22   bedroom desk that was littered with option and stock

23   information.  Right?

24   **A**   Yes.

25   **Q**   And, that was in December -- December of '04.  Yes?

1    **A**    Could be December or early January.

2    **Q**    Well, it was the 40-day service for your dad.  Right?

3    **A**    Yeah.

4    **Q**    So it would have been 40 days past his death?

5    **A**    I don't know, because of the holidays we did it in

6    December or waited until January.  I don't know the date.

7    **Q**    Okay.  But in that early time frame, you testified that

8    supposedly you told Sam that this information was coming from

9    Maher.  Right?

10   **A**    Yes.

11   **Q**    Now, you've told the government in your interviews that,

12   in fact, Sam came to your dad's funeral?

13   **A**    No.  The funeral, they didn't make it.  They may have made

14   the rosary.

15   **Q**    I didn't hear the end of that, I'm sorry.

16   **A**    The funeral was sudden because it happened, you know, now

17   we had to bury him.

18   **Q**    Sure.

19   **A**    They may have come to the rosary, which is a few days

20   later.

21   **Q**    A few days later.

22   **A**    Yeah.

23   **Q**    Okay.  So Sam came, you believe Sam came to the rosary.

24   **A**    I think so.

25   **Q**    Okay.  And he would have come to the rosary with his wife,

```
 1   Roula?  Do you recall?

 2   A    I don't remember.

 3   Q    But you remember Sam there.

 4   A    I think so.

 5   Q    Is that a "yes"?

 6   A    "I think so" means yes.

 7   Q    Okay.  Thank you.

 8   A    Yeah.

 9   Q    You had previously told the government that he had come

10   back to the house after your dad's funeral, to help prepare

11   the house for the guests that would arrive after the funeral.

12   A    Negative.  I said not -- not the funeral -- after the

13   memorial day.

14   Q    And, was that the same time that you supposedly gave Sam

15   that -- your hit list of stocks?

16   A    Negative.  I gave him the hit list of stuff as a wedding

17   gift for Susie and Maher.

18   Q    Okay.  So, when you told the government on March 15th,

19   2011, that you gave Sam a list of stocks in December of '04,

20   that -- that wasn't true.

21   A    No, that is very true.  I gave him a list of stuff,

22   comprised of maybe five or six companies.  But I did not give

23   him the entire list of all the stocks that I was working on.

24   Q    So, that hit list that you gave him as a wedding gift,

25   supposedly, that would have contained the 20 or 30 stocks that
```

1   you say he mirrored your trading on.  Right?

2   **A**   Yeah.

3   **Q**   Right?

4   **A**   Yeah.

5   **Q**   So you knew supposedly in July of '05, at the time of the

6   wedding, exactly what was going to happen on Biosite and USPI,

7   in the future, for example?

8   **A**   No.  No.  It was an up-to-date, timed hit list of

9   basically whatever companies that I was working on.  Biosite

10  and USPI only came -- and Bone Care and whatever, came to us

11  as we went.

12  **Q**   As you went.

13  **A**   Yeah.

14  **Q**   And so this list, it was constantly being updated.

15  **A**   It's a fluid list that was being updated every Friday.

16  **Q**   You never gave that list, your hit list, to the SEC, did

17  you?

18  **A**   Whatever they asked for, they got.

19  **Q**   You never gave that list to the SEC, did you, sir?

20  **A**   Whatever they asked for, they got.

21  **Q**   So, a hit list containing all the stocks and companies and

22  options that you traded on, if they didn't specifically ask

23  for a hit list, you hid that from them?

24  **A**   I didn't hide it from them.  In fact, you know what?  They

25  do have a list from us.

1    **Q**    Uh-huh.

2    **A**    Of all the companies that we traded on.

3    **Q**    Right.  They assembled a list, looking at the brokerage

4    records.  Correct?

5    **A**    Yes.

6    **Q**    Right.  And, you never gave your hit list (Indicating

7    quotation marks) to these prosecutors (Indicating), did you?

8    **A**    Oh, they have the list.

9    **Q**    Your list that you wrote in your writing, sir.  You never

10   gave it to them.

11   **A**    They have a very similar list.  Yeah.

12   **Q**    They have a list that they assembled by going through the

13   brokerage records.  You have already testified to that.

14   **A**    Yeah.

15   **Q**    Now, in July of '05, when you went, supposedly went to see

16   Sam's business at the warehouse, you said you guys went out

17   into the car as you were getting ready to leave, and the two

18   of you had a conversation at that time.  Right?

19   **A**    Yes.

20   **Q**    And, you said on direct in response to the prosecutor's

21   questions that when you expressed, supposedly, your dismay

22   over seeing documents somewhere, records somewhere, that you

23   said "Where do you think it's coming from?  It's coming from

24   Maher."  Right?  That's what you testified to.

25   **A**    Yes.

1    **Q**    And you said that Sam looked shocked.  Right?  Completely

2    shocked.

3    **A**    Stunned.

4    **Q**    Stunned.  But yet, you just testified that you told him in

5    December of '04 or January of '05 that it supposedly came from

6    Maher.

7    **A**    I don't think he was stunned because I just revealed to

8    him that it was Maher.  I think it was more because I think

9    he's never seen me raise my voice.

10   **Q**    I see.  You ferociously raised your voice?

11   **A**    Yeah.

12   **Q**    Yeah.  Well, in fact, when you told the prosecutors about

13   this supposed incident in the car --

14   **A**    Yeah.

15   **Q**    -- the first time you went in there, on March 15th, 2011,

16   you said that Sam went in the car, and removed his battery

17   from the cell phone (Indicating), and put it up on the

18   dashboard (Indicating).

19   **A**    That happened.

20   **Q**    That happened.

21   **A**    Absolutely.

22   **Q**    And you didn't testify to that?

23   **A**    Nobody asked me.

24   **Q**    So you left out some of the information that happened

25   during the conversation, supposedly, when you testified

1    earlier.

2    **A**    Nobody asked me about the minutiae.

3    **Q**    You said that during the wedding weekend in July of '05,

4    that, you know, you talked to Sam about a company called

5    Celgene.  Right?

6    **A**    Yes.

7    **Q**    That was based on your own research, right?

8    **A**    Yes.

9    **Q**    That you didn't tell Sam whether it was based on your

10   research or it came from Maher, you just told him Celgene

11   looked good.

12   **A**    Excuse me.  Yes.

13   **Q**    And, that Sam left the wedding activities from the

14   weekend.

15   **A**    He did leave for a couple of hours.

16   **Q**    For a couple of hours.  And in fact, sir, the couple of

17   hours that you are talking about is when you left the wedding

18   and disappeared for a couple of hours.  Right?

19   **A**    No.

20   **Q**    You didn't leave the wedding, sir?

21   **A**    No.  I was there.

22   **Q**    You were there.

23   **A**    Yes.

24   **Q**    You went somewhere and changed your clothes, did you not,

25   sir, at the wedding?

```
 1    A    That was at night.  At night.

 2    Q    Uh-huh.  And so, you left the wedding for a couple of

 3   hours.

 4    A    At night.

 5    Q    Is that a "yes"?

 6    A    To change my clothes.

 7    Q    Is that a "yes," sir?

 8    A    Ma'am, I left for 20 minutes to change my clothes because

 9   I was dripping with sweat.

10    Q    So your testimony is that you didn't leave the wedding for

11   two to three hours?

12    A    Yes.  I did not leave the wedding for two to three hours.

13    Q    Now let's go back to Biosite for a minute.  You were --

14   you reached out to Maher in March of '07 to get information.

15   Any kind of information you could get about some company being

16   acquired.  Right?

17    A    I don't understand the question.

18    Q    You called and reached out to Maher to get information

19   from him.  Correct?

20    A    Yes.

21    Q    First you called his office, he wasn't there.  Right?

22    A    Yes.

23    Q    Then you spoke on his cell phone?

24    A    Yes.

25    Q    Trying to reach him.  Right?
```

1    **A**    Yes.

2    **Q**    And that, you were desperate for information about a

3    company.

4    **A**    I wouldn't call it desperate.  I -- I needed to talk to

5    Maher.

6    **Q**    You needed information.

7    **A**    I needed to talk to Maher.

8    **Q**    You needed information about a company.  Information that

9    he might have.  Isn't that correct?

10   **A**    Yes.

11   **Q**    Because it's fair to say, sir, that at that time, you

12   weren't working too much.

13   **A**    I was ill.

14   **Q**    You were ill.  You hadn't really worked too much since

15   your father grew gravely ill in 2004.

16   **A**    Ma'am, Applied Remedial Services, my company, generates

17   approximately 6-, $700,000 a year.  During that period.

18   **Q**    Between 2004 and 2007?

19   **A**    Yeah.  Minimum.  That was enough income for us to live on.

20   And to answer you, I had enough income to live on.

21   **Q**    So, when you testified that you only had 20- or $30,000

22   left in the brokerage account, your brokerage account, you

23   could have put more money in from your own funds.  Right?

24   **A**    No.

25   **Q**    No.

1   **A**    Jonathan was going to go to school.  And, there was some

2   significant sum of money that needed to be parked in his

3   account.  And, that happened.  And, he was going to go to

4   Baylor.

5   **Q**    I'm sorry, he was going to go --

6   **A**    To Baylor.

7   **Q**    Baylor, uh-huh.

8   **A**    And, a significant sum of money there.

9   **Q**    Uh-huh.

10  **A**    And it was only 35 or maximum, $35,000 left in the

11  account.

12  **Q**    Uh-huh.

13  **A**    Total.

14  **Q**    Because a school like Baylor would cost maybe like $50,000

15  a year.

16  **A**    Correct.

17  **Q**    Expensive.

18  **A**    Yes.

19  **Q**    But for a guy who's hauling in 6- or 700,000 a year,

20  50,000 is a drop in the bucket.

21  **A**    Yeah.  But then, this is a company.  You can't just borrow

22  from a company like that.  The company needs reserves,

23  et cetera.

24  **Q**    Sir, the -- when your dad was alive, you worked hand in

25  hand with your dad at your company, right?

1    **A**    Yes.

2    **Q**    And, your wife, Miriam, also helped at your company.

3    Right?

4    **A**    Yes.

5    **Q**    So when your dad got sick, that really took a lot of wind

6    out of the sails of the company, if you will.  Right?

7    **A**    Yes.

8    **Q**    And you weren't paying attention to the company, because

9    you were focused on your dad, and your dad's well-being.

10   Right?

11   **A**    Correct.

12   **Q**    So it's fair to say that there was no one at the helm from

13   the time your dad got sick until he passed away.  Right?

14   **A**    Very true.

15   **Q**    At the end, after your dad passed away, in late '04 and in

16   '05, you were consumed with grief.  Understandably so.  Right?

17   **A**    Yes.

18   **Q**    Very depressed, right?

19   **A**    Yes.

20   **Q**    Having a number of psychological problems, mental health

21   issues.  Right?

22   **A**    Yes.

23   **Q**    Your focus wasn't really on your work, as well.

24   **A**    True.

25   **Q**    And, your focus, your obsession was really on researching

```
 1   and trading on a number of different companies and options,

 2   right?

 3   A   Yes.

 4   Q   And so in 2007 when you reached out to Maher, you weren't

 5   really running a thriving business at that time.

 6   A   True.

 7   Q   True.  So, you -- when you spoke to him, you begged him

 8   for information.  Right?

 9   A   Brothers don't beg each other.

10   Q   Fair.  I'll give you that.  You worked really hard for him

11   to give you that information.  Right?

12   A   I -- I asked him twice.

13   Q   You asked him twice.  He hesitated, did he not?

14   A   Yes.

15   Q   He didn't really want to do it, it didn't seem.  Right?

16   A   Yes.

17   Q   But you pushed some of his buttons?

18   A   Yes.

19   Q   Told him you really needed it.

20   A   Yes.

21   Q   And the second it came out of his mouth, he instantly

22   called you back and said "Don't trade on it."  Right?

23   A   Yes.

24   Q   He begged you not to trade on it.

25   A   Yes.
```

1    **Q**    That was a time when brothers beg.

2    **A**    Yes.

3    **Q**    He didn't want you to do anything with that information.

4    **A**    No.

5    **Q**    And he asked you, "Don't do it."  Right?

6    **A**    Yes.

7    **Q**    And you lied to him, and said, "Don't worry about it."

8    Right?

9    **A**    Yes.

10   **Q**    And you traded on that, even though he didn't want you to.

11   **A**    Yes.

12          **MS. SHIFMAN:**  If I can have just a second,

13   Your Honor.

14          **THE COURT:**  Sure.

15   **BY MS. SHIFMAN:**

16   **Q**    You traded with your best friend, Emile Jilwan, in

17   addition to doing your own trading, right?

18   **A**    Correct.

19   **Q**    And, in essence, you and Emile were, I guess you would

20   call it trading partners.  Right?

21   **A**    Yes.

22   **Q**    And, you did it partially to help him out, right?  Because

23   he was your friend?

24   **A**    No.  We were actual trading partners.

25   **Q**    Sure.  But the reason that you gave him this information

1   was to help him out because he was your friend.

2   **A**   No, no.  We were trading partners.

3   **Q**   Let me try to reword that.

4        You could have traded on all this information on your own.

5   Correct?

6   **A**   Yes.

7   **Q**   You didn't really need to get into a trading partnership

8   with Emile Jilwan in order to trade.

9   **A**   Yes.

10  **Q**   Right?

11  **A**   Yeah, but we each contributed $50,000 to an account.

12  **Q**   Right.

13  **A**   We had a formalized trading partnership with each other.

14  So, we were actual trading partners.

15  **Q**   I understand, sir.

16  **A**   I had access to Emile's accounts, I had the secret code,

17  and I could trade on his accounts.  And I did.

18  **Q**   Right.  And the reason that you did that is because you

19  wanted Emile to get a benefit out of your trading.

20  **A**   Yes.

21  **Q**   You wanted him to make some money.

22  **A**   Yes.

23  **Q**   He's your close friend and you wanted to help him.  Right?

24  **A**   Yes.

25  **Q**   And, when Emile asked you "Where are you getting this

 1  information," you didn't tell him you were getting it from

 2  Maher, did you?

 3  **A**   Emile never, ever asked me, "Where are you getting this

 4  information from?"

 5  **Q**   You hid the fact that you were getting information from

 6  Maher, to -- excuse me.  Let me rephrase that.  You hid that

 7  you were getting this information from Maher.  You hid it from

 8  Emile.  Right?

 9  **A**   I didn't hide anything from Emile.  Uh --

10  **Q**   You didn't tell him that Maher was giving you this

11  information.

12  **A**   Yeah, but Emile never asked.  So how could I hide

13  something from somebody that never asks?

14  **Q**   And just like with Emile, with your Uncle Zahi Haddad, you

15  helped him by giving him stock information.  Right?

16  **A**   Yes.

17  **Q**   And, you did that because you love your Uncle Zahi, right?

18  **A**   Yes.

19  **Q**   You wanted to help him out?

20  **A**   Yes.

21  **Q**   Any kind of benefit you could give, you felt good doing

22  that.  Right?

23  **A**   Yes.

24  **Q**   He was your closest uncle.  Correct?

25  **A**   Yes.

1    **Q**    He is.  Is, in the present tense.  Excuse me.  Right?

2    **A**    Yes.

3    **Q**    And, with your Uncle Zahi, when you passed along stock

4    information to him, you didn't tell him where the information

5    was coming from.

6    **A**    Never.

7    **Q**    You hid it from him.  Correct?

8    **A**    Didn't hide anything from him.  Just never told him.

9    **Q**    And when you never told him, he didn't have the luxury of

10   knowing whether or not he should trade on it.  Right?

11   **A**    What's the question?

12   **Q**    When you didn't tell him that the information was coming

13   from Maher, he didn't have the ability, the luxury, of making

14   a choice about whether or not he should trade on the

15   information.

16   **A**    I don't understand the question.

17   **Q**    Let me ask it a different way.

18       When you passed along information to Zahi, to your Uncle

19   Zahi, and you didn't tell him it was coming from Maher, he

20   wouldn't have known that he shouldn't trade on that

21   information.  Isn't that correct?

22   **A**    Um, maybe, maybe not.  I don't know.

23   **Q**    Well, he wouldn't have known that information was coming

24   from Maher.

25   **A**    True.

1  **Q**   He wouldn't have known whether or not the information

2  revealed something secret.  Right?

3  **A**   Maybe.

4  **Q**   He wouldn't have necessarily known whether or not the

5  information came with some special duties of confidentiality,

6  would he?

7  **A**   True.

8  **Q**   Because he didn't know where the information was coming

9  from.

10  **A**   (Inaudible)

11      (Reporter interruption)

12      **THE WITNESS:**  Yes.

13  **BY MS. SHIFMAN:**

14  **Q**   So when you didn't tell Emile, and when you -- your best

15  friend, and when you didn't tell Uncle Zahi, your closest

16  uncle, you were hiding something very important from them,

17  weren't you?

18  **A**   I guess you could look at it that way.

19  **Q**   You deceived them.

20  **A**   You could say that.

21  **Q**   So, I want to ask you about when Sam supposedly offered

22  you money.  You said that he offered you rolls and rolls of

23  money.  A lot of money.  Right?

24  **A**   I wouldn't know about rolls and rolls of money.  It was a

25  stack of money.

1   **Q**   A stock of money.  Thirty, $40,000 in cash is a lot of

2   money.  Right?

3   **A**   It wasn't a lot of money.  It was about this much money

4   (Indicating).

5   **Q**   About this much money (Indicating).

6   **A**   Yes.

7   **Q**   Right.  He offered you this much money (Indicating) or

8   this much money (Indicating), 30 or $40,000, in a car.  He

9   offered that to you.

10   **A**   Yes.

11   **Q**   In a public parking lot.  Right?

12   **A**   Yes.

13   **Q**   During the day.

14   **A**   Yes.

15   **Q**   Parked outside of the Burlington Coat Factory.

16   **A**   Yes.

17   **Q**   A fact you never told the government before, that you were

18   there to buy a coat for you.

19   **A**   I didn't tell the government before?

20   **Q**   Right.

21   **A**   Who told you that?

22   **Q**   It was a huge amount of money.  Right?  Thirty or 40,000

23   is a lot in cash.  It's a lot, even in a check.  Right?

24   **A**   I told them -- I told them a long time ago.

25   **Q**   Thirty or $40,000 is a lot of money, sir?  Right?

1   **A**   Everything is relative.  You know?

2   **Q**   You don't think that is a large amount of cash, sir?

3   **A**   To whom?  No.  To whom?

4   **Q**   Right there in public, he is offering you that money, and

5   you said, "No, no, no, no, no," is that how it went?

6   **A**   No.  I told you, he insisted.  He insisted, and I end up

7   taking a chunk of the rubber bands, you know, with some money

8   in it.

9   **Q**   So you took -- out of this little chunk (Indicating), you

10  took a littler chunk?

11  **A**   Yes.

12  **Q**   If I can use that word, "littler"?  This smaller chunk?

13      This supposed money that he gave you, did you put that in

14  the bank?

15  **A**   No.

16  **Q**   Did you pay taxes on it?

17  **A**   It was a smaller amount.  I put it in a drawer, and I used

18  it for groceries.

19  **Q**   Uh-huh.  You used $10,000 cash for groceries?

20  **A**   And -- yeah.

21  **Q**   Did you make a notation of it anywhere, a record of it?

22  **A**   I told the government about this, about three or four

23  years ago.

24  **Q**   Uh-huh.  I asked you, sir, did you make a record of this

25  supposed money that he gave you?

1   A    No.

2   Q    Did you keep the receipts for how you spent the money?

3   A    He didn't give me any receipts.

4   Q    No, for how you spent the money, sir.  Did you keep any of

5   the receipts?

6   A    No.

7   Q    So, this is just based on your word?

8   A    Yeah.

9   Q    Now, you're here as a government witness.  Let's talk

10  about how that came to be.

11       You were charged in the indictment, your indictment, with

12  37 separate criminal offenses.  Do you remember that?

13  A    Yes.

14  Q    And, 34 of those charges were for criminal insider

15  trading, or securities fraud.  Right?

16       You have to answer for the Record, sir.

17  A    Yes.

18  Q    And each one of those charges carries a lot of time.  Does

19  it not?

20  A    Yes.

21  Q    Twenty years for each violation of the criminal insider

22  trading laws.

23  A    Yes.

24  Q    So, 680 years, just on those 34 charges.  That's what you

25  are facing.

1  **A**   Yes.

2  **Q**   Two additional charges were for conspiracy.  Right?

3  **A**   Yes.

4  **Q**   Conspiracy to commit securities fraud, right?

5  **A**   Yes.

6  **Q**   Two counts of those.  Criminal insider trading.  Right?

7  **A**   Yes.

8  **Q**   Each of those can get up to five years -- I'm sorry, one

9  count of that, that can get you up to five years.  Right?

10  **A**   Yes.

11  **Q**   You were also charged with conspiracy to commit

12  obstruction.  Were you not?

13  **A**   (Nods head)

14  **Q**   Yes?

15  **A**   Maybe, yeah.

16  **Q**   Is that a "yes"?

17  **A**   Okay.

18  **Q**   Were you charged, sir, with conspiracy to commit

19  obstruction?

20  **A**   I guess so.

21  **Q**   Is that a "yes"?

22  **A**   I don't have the plea agreement in front of me, so I can't

23  tell you --

24  **Q**   I'm not asking you about the plea agreement.  I'm asking

25  you about your indictment.  What you are charged with.  You

```
 1    were charged with agreeing with someone else to lie.  Do you
 2    recall that?
 3    A    I thought the charges were obstruction, and -- excuse me.
 4    Forgive me.  No.  The charges were conspiracy, and insider
 5    trading.
 6    Q    And obstruction, sir, for lying at the SEC.
 7    A    I didn't see that.
 8    Q    You don't remember that.
 9    A    No.
10    Q    You have no recollection of being charged with it.
11    A    No.
12    Q    So, when you testified earlier that -- when you pled
13    guilty, how can you remember that, sir?  You don't remember
14    that.
15    A    Don't remember what?
16    Q    What charges did you plead guilty to, sir?
17    A    I thought I pled guilty to conspiracy, and to insider
18    trading.
19    Q    Sir, you were charged, were you not -- in Count 37, might
20    be 38, let me pull it up -- with conspiracy.  An agreement to
21    commit obstruction.  In other words, an agreement with --
22    Count 37.
23              MS. SHIFMAN:  If I may approach with Exhibit 682,
24    Your Honor.
25              THE COURT:  All right.
```

Belle Ball, CSR #8785, CRR, RDR
Official Reporter – U.S. District Court
(415) 373-2529

```
 1    BY MS. SHIFMAN:

 2    Q    And sir, that's your indictment in this -- against you?

 3    The charges, right?

 4         (Witness examines document)

 5    A    Yes.

 6    Q    Okay.  And if you would look on Page 18, there.  I turned

 7    it to the side.  Count 37.

 8    A    Yes.

 9    Q    Count 37 charges you with obstruction of justice.

10    Correct?

11    A    Yes.

12    Q    So you were charged with lying.  Were you not?

13         (Witness examines document)

14    A    I don't know if the plea agreement is one thing and this

15    other document (Indicating) is another.

16    Q    I'm asking you, sir, what the charges were.  You were

17    charged with obstruction of justice.  Lying to the SEC.

18    A    Uh-huh.

19    Q    Were you not, sir?  Read Count 37.

20         (Witness examines document)

21    Q    Refresh your recollection.

22    A    Count 37.

23         (Witness examines document)

24    A    Yes.

25    Q    Okay.  So you agree that that was one of the charges you
```

```
 1   were facing.

 2   A    Yes.

 3   Q    Okay.

 4            MS. SHIFMAN:  If I may approach, Your Honor?

 5            THE COURT:  All right.  4:30.

 6            MS. SHIFMAN:  Yes.

 7            THE COURT:  At this point.  So, are you close to

 8   concluding, or should we adjourn?

 9            MS. SHIFMAN:  I'm probably a half an hour.

10            THE COURT:  All right, then we're going to go ahead

11   and adjourn for the day.  And resume tomorrow morning at 8:30.

12       And so, just a reminder again:  Please do not discuss this

13   case, conduct any research, or form any opinions.  And we will

14   see you tomorrow morning at 8:30.

15            THE CLERK:  All rise for the jury.

16       (Jury excused)

17       (Conclusion of Michael Kara's September 23, 2013

18   testimony)

19

20

21

22

23

24

25
```

**PLAINTIFF'S WITNESSES**                                  **PAGE**    **VOL.**


**KARA, MICHAEL FAYEZ**
(Recalled)                                                  104         2
Direct Examination by Mr. Reeves                            104         2
Cross Examination by Ms. Shifman                            207         2


                        **E X H I B I T S**


**TRIAL EXHIBITS**                                         **EVID**    **VOL.**

139                                                         127         2
329                                                         163         2
138                                                         172         2
374                                                         182         2
96                                                          193         2
28                                                          195         2
666                                                         248         2
656                                                         291         2

**<u>CERTIFICATE OF REPORTER</u>**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball

Tuesday, September 24, 2013

Belle Ball, CSR 8785, CRR, RDR