1                                                    **Pages 1 – 58**
                        UNITED STATES DISTRICT COURT
2                     NORTHERN DISTRICT OF CALIFORNIA
              BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE
3    UNITED STATES OF AMERICA,            )
                                          )
4                 Plaintiff,              )
                                          )
5      vs.                                )  NO. CR 11–0625 EMC
                                          )
6    BASSAM YACOUB SALMAN,                )
                                          ) San Francisco, California
7                 Defendant.              ) Wednesday
                                          ) September 25, 2013
8    _____ ) 12:27 p.m.

9                        EXCERPT OF PROCEEDINGS
                  TESTIMONY OF BRUCE SCOTT VICTOR, M.D.
10

11   APPEARANCES:
     For Plaintiff:          MELINDA L. HAAG
12                           United States Attorney
                             450 Golden Gate Ave.
13                           San Francisco, California  94102
                       BY:  ADAM A. REEVES
14                           KATHERINE BURKE DOWLING
                             Assistant United States Attorneys
15
     For Defendant:          SHIFMAN GROUP
16                           601 California Street
                             Suite 1800
17                           San Francisco, California  94108
                       BY:  GAIL R. SHIFMAN, ESQ.
18                           and
                             MOEEL LAW OFFICE
19                           214 Duboce Avenue
                             San Francisco, California  94108
20                       BY:  SHAFFY MOEEL, ESQ.

21

     Reported by  BELLE BALL, CSR 8785, CRR, RDR
22               Official Reporter, U.S. District Court

23

24

25

```
1   WEDNESDAY, SEPTEMBER 25, 2013                    12:27 P.M.

2                      EXCERPT OF PROCEEDINGS

3            THE COURT:  Ms. Shifman?

4            MS. SHIFMAN:  Thank you, Your Honor.

5       The defense calls Dr. Bruce Victor.

6            THE COURT:  All right, thank you.

7     BRUCE SCOTT VICTOR, M.D., DEFENDANTS' WITNESS, SWORN

8            THE CLERK:  Please state your full name, and spell

9    your last name, for the Record.

10           THE WITNESS:  Certainly.  My full name is Bruce Scott

11   Victor, V-I-C-T-O-R.

12           THE COURT:  Thank you, Dr. Victor.

13      You may proceed.

14           MS. MOEEL:  Thank you, Your Honor.

15      And as an initial matter, Your Honor, the Plaintiffs

16   stipulate that Dr. Victor is qualified as an expert witness

17   under Rule 702.

18           THE COURT:  All right.  And, if you'd bring the

19   microphone toward you a little bit.

20      (Request complied with by the Witness)

21           THE COURT:  Thank you.

22           MS. MOEEL:  So at this time I would like to tender

23   Dr. Victor as an expert witness.

24           THE COURT:  All right.

25           MR. REEVES:  For the record, I don't object.  I don't
```

1    stipulate, but I don't object.

2            **THE COURT:**  All right.  Then I find that he's

3    qualified to give the opinions that I believe he is about to

4    give to you, so you may proceed.

5            **MS. MOEEL:**  Thank you.

6                    **DIRECT EXAMINATION**

7    **BY MS. MOEEL:**

8    **Q**   Good afternoon, Dr. Victor.

9    **A**   Good afternoon.

10   **Q**   Sir, what do you do?

11   **A**   I'm a psychiatrist.

12   **Q**   And could you please briefly describe for the jury your

13   education?

14   **A**   Certainly.  I received a BA in psychology from Stanford

15   University in 1975.  I then did my premedical training at

16   Harvard, in Bryn Mawr College, between 1975 and 1976.

17       I then attended the University of Michigan Medical School

18   from 1976 to 1980, where I got my MD degree.  And I then did

19   my post-graduate work, my residency in psychiatry at the

20   University of California in San Francisco, between 1980 and

21   1984.

22   **Q**   Thank you.  Where do you work right now?

23   **A**   Right now I work in San Francisco, in my private office.

24   **Q**   And what is it that you do there?

25   **A**   What I mainly do is, I see patients.

VICTOR - DIRECT EXAMINATION / MOELE

1  **Q**   And what is the focus of the work that you do with your

2  patients?

3  **A**   Most of the patients that I see suffer from serious mood

4  or anxiety disorders.

5  **Q**   Thank you.  Have you ever taught in your field,

6  Dr. Victor?

7  **A**   Yes, I have.

8  **Q**   And where was that?

9  **A**   From 1984 to 1986, I was an assistant clinical professor

10  in the Department of Psychiatry at the University of

11  California, at San Francisco, teaching the first-year

12  residents at San Francisco General Hospital.  And from 1986

13  until about 1999, I taught also at the California Pacific

14  Medical Center psychiatric residency.

15      In 1995, I returned to teach at the University of

16  California at San Francisco, where I taught psychiatric

17  residents and was co-director of the course on mood disorders

18  from 1995 to 2003.  And at that time I was an associate

19  clinical professor.

20      I took a two-year break from teaching, from 2003 to 2005,

21  went back to teaching the advanced residents at the University

22  of California at San Francisco, Department of Psychiatry, and

23  did that until 2007.  At that time I was a full clinical

24  professor of psychiatry.

25  **Q**   You mentioned that you, right now, work primarily with

VICTOR - DIRECT EXAMINATION / MOELE

1   patients who suffer from mood disorders, and that you have

2   previous experience teaching in the field of mood disorders.

3   **A**   Yes.  But during the time that I was teaching, I was

4   mostly seeing patients with mood and anxiety disorders through

5   that time.  So the teaching was in addition to the actual

6   seeing of patients.

7   **Q**   Okay.  What are some examples of mood disorders?

8   **A**   Some examples of mood disorders would be major depressive

9   episodes; also bipolar disorder, which has both depressive and

10   manic features.  And those are pretty much the basics, with a

11   lot of variations that can happen in either of those basic

12   disorders, mood disorders.

13   **Q**   Okay.  And so to sum up, how long have you been treating

14   patients with mood disorders?

15   **A**   Pretty much since my first year of residency, so that --

16   um, the psychiatric part of my internship began in January of

17   1981, so that was when I first started treating people with

18   serious mood disorders.

19   **Q**   As a clinician, how did you diagnose bipolar mood

20   disorder?

21   **A**   I diagnose bipolar disorder by the criteria that are

22   described in what is called "The Diagnostic and Statistical

23   Manual."  And there -- well, most recently the fifth edition

24   has just come out, and the fourth edition had been around for

25   about, ballpark, 17, 18 years, prior to that.

 1      And that's pretty much the diagnostic bible, as it were,

 2   which sets forth very specific criteria for these diagnoses,

 3   so that everybody can be talking about the same entity when

 4   they are discussing somebody with a certain psychiatric

 5   disorder.

 6   **Q**   Thank you.  And we will get to those symptoms and talk

 7   about that a little bit further on.

 8      Now, were you hired by Mr. Salman in this case to provide

 9   expert testimony regarding Mr. Mounir Kara?

10   **A**   I was.

11   **Q**   And have you evaluated Mr. Kara, yourself?

12   **A**   I have not.

13   **Q**   Did you make a request to evaluate Mr. Kara?

14   **A**   I did make such a request.

15   **Q**   And to your knowledge, was that request denied?

16   **A**   To my knowledge, that request was denied.

17   **Q**   Are you familiar with an individual named Dr. Shields?

18   **A**   I am.

19   **Q**   And to your knowledge, did Dr. Shields have an opportunity

20   to evaluate Mr. Kara?

21   **A**   He did.

22   **Q**   For this case.

23   **A**   Yes.

24   **Q**   And do you know whether, after preparing his evaluation of

25   Mr. Kara, Dr. Shields was retained by the government?

1    **A**    That --

2              **MS. DOWLING:**  Objection.

3              **THE COURT:**  Sustained.  It's not --

4         (Off-the-Record discussion between counsel)

5    **BY MS. MOEEL:**

6    **Q**    Do you know whether Mr. Kara was retained by Mounir Kara's

7    lawyers?

8    **A**    Might I get that question again?  I'm sorry.

9    **Q**    Do you know whether Dr. Shields was retained by Mounir

10   Kara's lawyers?

11   **A**    My understanding is that that was the case.

12   **Q**    Let's talk about what you did to prepare for your

13   testimony in this case.

14        Did you review any records in preparation for your

15   testimony?

16   **A**    I did.

17   **Q**    And what did you review?

18   **A**    I reviewed about 1,500 pages of medical records of

19   Mr. Kara, between the years, roughly, 1988-89 to 2008.  I have

20   reviewed another sixty pages of medical records -- well,

21   actually more than that, um, that describe his medical care

22   between 2009 and, actually, up until July of 2013.

23        Um, I examined Dr. Shields's report.  I also saw the notes

24   that he took during his several interviews with Mr. Kara.  And

25   I also examined other documents, one related to an encounter

 1   with Mr. Kara and the FBI.  I also examined the testimony of

 2   Mr. Kara that took place on July 19th of this year.  I also

 3   examined some of the attorney notes having to do with this

 4   case.

 5       And those are -- there may be some more, but those are the

 6   ones that come immediately to mind.

 7   **Q**   Thank you.  Do those medical records that you reviewed

 8   contain information about the medications that Mr. Kara has

 9   been prescribed over a period of, I would say, since the early

10   1990s?

11   **A**   They do.

12   **Q**   And do the medical records also describe specific

13   instances in which Mr. Kara was symptomatic of any psychiatric

14   illnesses?

15   **A**   They do.

16   **Q**   Did you review the evaluation report prepared by

17   Dr. Shields in this case?

18   **A**   I did.

19   **Q**   Thank you very much.

20       So, Dr. Victor, based on your education, your experience,

21   and what you have learned about this case, were you able to

22   form an opinion to a reasonable degree of certainty regarding

23   Mr. Kara's psychiatric diagnosis?

24   **A**   I was.

25   **Q**   And what is that opinion?

1    A    My opinion is that Mr. Kara suffers from what is called

2    bipolar disorder, and to -- and that the type of bipolar

3    disorder that he suffers from is what is referred to as a

4    Bipolar I disorder, to be distinguished from a Bipolar II

5    disorder, or the other sort of bipolar disorder which is

6    called "cyclothymia."

7    Q    Okay.  We will get to Bipolar I in a moment.

8         Is your opinion consistent with the opinion that

9    Dr. Shields formed after having an opportunity to evaluate

10   Mr. Kara?

11   A    It is.

12   Q    I would like to ask you some questions about that

13   diagnosis.

14        What is Bipolar I disorder?

15   A    Bipolar I disorder is a disorder of regulation of mood,

16   whereby one's mood either becomes inappropriately high or

17   inappropriately low for a sustained period of time, and that,

18   with the lack of regulation of the mood for a sustained period

19   of time, there are associated symptoms that go along with this

20   disorder of mood.

21        And it is called a disorder particularly when the lack of

22   regulation of mood as well as the associated symptoms are

23   sufficiently severe as to interfere with one's usual

24   functioning.

25   Q    To interfere with one's -- I'm sorry?

1    A    I'm sorry.  Usual functioning.

2    Q    Thank you.  And I'll get to the symptoms in a moment.

3         What are the key components of Bipolar I disorder?

4    A    Um, component -- the key components are a period -- is the

5    presence of manic episodes in addition to depressive episodes.

6    That is the key component.

7    Q    What is a manic episode?  How is that defined?

8    A    Okay.  A manic episode is a -- is a period of very high or

9    very irritable mood, lasting at least a week, wherein some of

10   the following symptoms take place:  Pressure of speech, where

11   the speech becomes very rapid and difficult to understand;

12   impulsive acts having to do with what's called an

13   over-involvement in pleasurable activities, and that can be

14   impulsive and poorly thought-out sexual encounters or, for

15   that matter, business decisions; an intense distractibility,

16   so, difficulty focusing on something; as well as a subjective

17   experience of one's thoughts going so quickly that it's

18   difficult to keep up with them, called "racing thoughts."

19        And also during these times it is possible to have a very

20   inflated sense of one's own self-esteem.  One can believe that

21   one has magical powers, or is omnipotent or all-knowing.  And,

22   obviously, this -- this also interdigitates with some of the

23   other symptoms such as, you know, making foolish decisions or

24   doing impulsive, ill-considered acts.

25   Q    And what are -- what is a depressive episode?

1  **A**   And a depressive episode has to do with a period of at

2  least two weeks where one's mood is characterized either by a

3  subjective sense of depression, blue, melancholy, or not

4  necessarily a sense of subjective depression, but an inability

5  to experience pleasure, because some people have less of a

6  language about their mood stints.

7        And then it's a question of whether, say, five out of

8  perhaps nine symptoms are present, such as a tremendous amount

9  of either agitation or slowing, sleep difficulties, appetite

10  difficulties, ruminations of guilt, decreased self-esteem,

11  suicidal thoughts, or even suicidal intent, guilty

12  ruminations; and that even though everybody has these sorts of

13  things at various times, the key point here is that they are

14  sustained for at least -- every day, at least for a two-week

15  period, in that one's usual functioning is interfered with.

16  **Q**   Now, of these manic and depressive episodes, would someone

17  suffering from Bipolar I disorder have both manic and

18  depressive episodes with equal regularity?

19  **A**   Not necessarily.  For some people who have bipolar

20  disorder, their -- the recurrence of abnormal mood states,

21  because this is an ongoing and recurring disorder, can be

22  characterized by a predominance of manic episodes and, for

23  some, a predominance of depressive episodes.

24        Just to be fully accurate, there is also something called

25  a mixed episode, where there's -- where somebody might satisfy

1   the criteria for having a certain number of manic symptoms,

2   coupled with a certain number of depressive symptoms.  So, you

3   know, just to make it completer here.

4   **Q**   Thank you.  You mentioned that Bipolar I is a recurrent

5   illness.  What does that mean?

6   **A**   It means that left to its own devices, in the vast

7   majority of cases, and particularly if left untreated, it's an

8   illness that often begins in the late teens, usually begins in

9   the late teens to early to mid-twenties, that will recur over

10  the course of one's life.  Not like, say, chicken pox, where

11  you have one episode and that's it.

12  **Q**   And the fact that -- were you finished?  I'm sorry.

13  **A**   Oh, yes.

14  **Q**   Is the fact that it is recurrent, does that affect a

15  doctor's, say, ability to treat for Bipolar I?

16  **A**   Yes, it is a factor.  Because what -- what usually happens

17  is, first of all, each recurrence heightens the likelihood of

18  the next episode.

19       So, for example, if one only has one episode, depending on

20  what you read, you have a fifty, sixty percent chance of

21  having a second.  If you have a second, you have about an

22  eighty percent chance of having a third.  If you have a third,

23  you got easily upwards of a ninety percent chance of having a

24  fourth.  And then, and then the percentages go up even beyond

25  the third and fourth.

1        And it also makes a difference because, in general, the

2    episodes get more severe, and they get harder to treat.  So,

3    the fourth episode would be in -- in general, harder to treat,

4    as a rule of thumb, than, say, the second episode.

5    **Q**    Is bipolar disorder the result of a series of underlying

6    chemical or physiological malfunctions?

7    **A**    Yes.

8    **Q**    And, and how is that?

9    **A**    Well, there are many factors that -- that have been

10   studied in bipolar disorder, things having to do with

11   biochemical imbalances.  And, also, neurophysiologic or brain

12   wave-type factors enter in as well, so that many people have

13   likened it to a seizure disorder where, in essence, less and

14   less stimulation is required to provoke more of a brain, and

15   then behavioral, reaction.

16   **Q**    So, since it is a physiological illness, it has to do with

17   brain chemistry balance, is there a cure?

18   **A**    There's no real cure, but there are certainly a variety of

19   medications that can quell the symptoms and, when fortunate,

20   quell the symptoms for a long time.

21   **Q**    Now, is the experience of delusional thought also a

22   feature of Bipolar I disorder?

23   **A**    Yes.  And that's pretty much the cardinal distinction

24   between a Bipolar I disorder and a Bipolar II.  So if you look

25   at the criteria, say, for Bipolar II disorder, which has what

VICTOR - DIRECT EXAMINATION / MOLEL

1  are called hypomanic, or manic-like but not as severe as

2  manic, one cannot call it hypomanic any more, if it's -- if

3  there's the presence of delusions.

4  **Q**   And what are delusions?

5  **A**   Delusions are fixed false beliefs that are not amenable

6  to, say, rational persuasion or even data presentation to the

7  contrary.

8  **Q**   Might delusional thought in Bipolar I occur in both manic

9  and depressive episodes?

10  **A**   Yes.

11  **Q**   And, turning your attention to this case, in addition to

12  his bipolar disorder, Mounir Kara's bipolar disorder

13  diagnosis, was there also an evaluation done by Dr. Shields,

14  of his underlying personality traits?

15  **A**   Yes.

16  **Q**   And, where do you see that evaluation done?

17  **A**   Um, the actual evaluation, I believe, is on Page 7 of his

18  report, although the -- or what he called the presence of --

19  **Q**   Or -- yeah.  You can sort of hold onto that (Indicating)

20  for now, but --

21  **A**   Okay.

22  **Q**   -- I guess the question was, was that in Dr. Shields'

23  report?

24  **A**   It was.

25  **Q**   And what were the significant findings to you of that

1    personality testing?

2    **A**    The personality testing indicated that left to his own

3    devices, underneath the bipolar disorder, that there was a

4    tremendous degree of passivity, both alienation from others

5    and general traits of passivity and acquiescence, and that he

6    would have great difficulty asserting his own needs in the

7    favor of requests from others.

8    **Q**    When you say "acquiescence," acquiescence to what?

9    **A**    In this instance, relenting to the requests of others that

10   he do something.  And he would then, according to Dr. Shields'

11   report, make efforts to be amenable to whatever that request

12   was.

13   **Q**    And did Dr. Shields undertake certain types of tests to

14   draw that conclusion, based -- of his personality -- of

15   Mr. Kara's personality traits?

16   **A**    He certainly undertook to evaluate that through objective

17   personality testing, but he also made a special point to note

18   of his eagerness to please others, and, and to acquiesce

19   during actual -- the behavioral description of the several

20   interviews that Dr. Shields had with Mr. Kara.

21   **Q**    Now, based on your review of Mr. Kara's psychiatric

22   records, and Dr. Shield's report, was Mr. Kara experiencing

23   delusional thought from 2003 until at least 2006?

24        **MR. REEVES:**  Objection.  Foundation, as to time

25   period, Your Honor.

 1          THE COURT:  Well, I think she just said 2003 to 2006.

 2          MR. REEVES:  A long span of time, Your Honor.

 3          THE COURT:  Well, I'm going to allow that span of

 4    time.

 5        So, go ahead.

 6          THE WITNESS:  There was -- both Dr. Shields' report

 7    and the medical records indicate that there were a number of

 8    periods of delusional thoughts and different types of

 9    delusions that existed during that time period.

10    BY MS. MOEEL:

11    Q   I would like to ask you some questions about the

12    medications prescribed to treat Bipolar I disorder and,

13    specifically, the medications that Mr. Kara was taking, and

14    what that indicates to you about the severity of his illness.

15    A   Yes.

16    Q   What record did you review to determine Mr. Kara's

17    prescriptions from approximately the mid-1990s until 2013?

18    A   As part of the 1,500 pages of medical records that I was

19    given that had to do with the years 1988 to 2008, there was a

20    long series of pharmacy logs, medica- -- and a log of what

21    medication had been prescribed to Dr. Kara (sic), how many

22    pills, what directions, and basically -- and a sort of

23    complete listing of those throughout that time period.

24    Q   Now, do you remember, off of the top of your head, what he

25    was taking during this period, or would you need perhaps some

1    assistance, an aid, an exhibit to look at, to -- to remind

2    yourself of what he was taking?

3        I would like to go through that time period with you.

4    **A**    I would be happy to, but given the length of the time

5    period and the number of documents, I will need -- I will need

6    my notes.

7            **MS. MOEEL:**  And, Your Honor, I would like to ask

8    Dr. Victor to take a look at defense exhibit, marked for

9    identification purposes only, 696, for the next few questions.

10       And, Your Honor, if I may actually hand it up to you?

11           **THE COURT:**  Okay.  The government has a copy?

12           **MS. MOEEL:**  Yes, Your Honor.

13           **THE COURT:**  Thank you.

14       (Reporter interruption)

15   **BY MS. MOEEL:**

16   **Q**    Now, Dr. Victor, what medications was Mr. Kara taking in

17   the early 1990s, from approximately 1993 to 1995?

18           **MR. REEVES:**  I object, Your Honor.  If the witness is

19   going to testify about Exhibit 696, I would appreciate a

20   foundation as to what this is.

21           **THE COURT:**  Yes.

22           **MS. MOEEL:**  Sure.

23   **BY MS. MOEEL:**

24   **Q**    Dr. Victor, did you create Exhibit 6- -- what I've marked

25   as Exhibit 696?

 1   **A**    I created a couple, so I apologize, I'm not sure which one

 2   is 696.

 3           **MS. MOEEL:**  I'm sorry.

 4       Your Honor, if I may approach?

 5           **THE COURT:**  Yes.

 6       (Witness examines document)

 7           **THE WITNESS:**  I did create that.

 8   **BY MS. MOEEL:**

 9   **Q**    Okay.  And did you create 696 by looking at the medical

10   records, part of the medical records that you reviewed in this

11   case?

12   **A**    I did.

13   **Q**    And, were some of the medical records that you used to

14   look at -- or to create the chart of 696, the pharmacy records

15   of Mr. Kara, from Kaiser Hospital?

16   **A**    That is correct.

17   **Q**    All right.  And do those pharmacy records indicate

18   Mr. Kara's use of his medications to treat bipolarity from

19   approximately the early 2000s until, I believe, 2008?

20   **A**    Yes, they do.

21   **Q**    All right.  And what were the other things that you looked

22   at to create the chart marked as Defendant's Exhibit 696?

23   **A**    Um, this -- with regard to 696, I really only used the

24   actual pharmacy records that were provided in the medical

25   records.

1  **Q**    Thank you.  And are you familiar with the type of

2  medication that Mr. Kara was taking in the early 1990s?

3  **A**    I am.

4  **Q**    And how are you familiar with the medication he was taking

5  then?

6  **A**    Um, I'm familiar with that because, number one, I've

7  prescribed it.  I prescribe these medications as part of my

8  practice, and have since the early eighties, number one.

9      Number two, I've taught about them for 20, 25 years, as

10  well, and I've reviewed others' use of it.

11  **Q**    Great.  That's how you are familiar with the actual

12  medications?

13      How are you familiar with what Mr. Kara was taking in the

14  early 1990s; how do you know what he was prescribed at that

15  time?

16  **A**    I have the pharmacy records as part of the medical records

17  here.

18  **Q**    Okay.  So I would like to ask you some questions about

19  what Mr. Kara was prescribed in the early 1990s, specifically

20  from about 1993 to 1995.

21  **A**    All right.  From 1993 to 1995, he was prescribed a series

22  of antidepressants, such as amitryptyline, which is Elavil, in

23  1993.

24      In 1994, he was prescribed Paxil, which is also an

25  antidepressant; 1995, he was also prescribed Trazodone and

1   Effexor, which are also antidepressants.

2   **Q**   What does the fact of these medications having been

3   prescribed to him tell you about Mr. Kara's mental state in

4   this period of time?

5   **A**   At that time, it does tell me that at least somebody with

6   a medical degree thought that he was depressed enough to need

7   antidepressant medication.

8   **Q**   And, was the next available record for your review his

9   prescriptions for about 1999?

10  **A**   That is correct.

11  **Q**   And, was that also the same year that the records indicate

12  Mr. Kara was hospitalized?

13  **A**   That is also correct.

14  **Q**   What medication was he prescribed around the time of this

15  hospitalization?

16  **A**   Um, in 1999, he was prescribed, in addition to Paxil, he

17  actually was prescribed some Valium.  He was prescribed

18  Zyprexa, which is an antipsychotic medication that is used for

19  bipolar disorder.

20      He was prescribed -- he was also prescribed Depakote,

21  which is an anti-convulsant medication that psychiatrists have

22  used for stabilization of manic episodes for the past 20 years

23  or so.

24      So he was on, it looks like, a combination of Zyprexa and

25  Depakote, although at one point that may have included Paxil.

VICTOR - DIRECT EXAMINATION / MOBEL

1  **Q**   Let me ask you, are you aware of whether, in 1999,

2  Mr. Kara was diagnosed with having Bipolar I disorder?

3  **A**   He was.

4  **Q**   And does that mean, then, that he was -- I guess speaking

5  generally, when one is diagnosed with bipolar disorder, does

6  that mean that that is when it starts?

7  **A**   That does not mean that that's when it starts.  That means

8  when it was diagnosed.  Because sometimes people get diagnosed

9  considerably after the time it started.

10 **Q**   The fact that he was taking the medications that you

11 described in the early 1990s, does that tell you anything

12 about whether that was an early indication that there was

13 something wrong with his mental health, or something that

14 needed further treatment?

15 **A**   Almost by definition it was something that, according to

16 medical evaluation, certainly did need further treatment, and

17 that might -- that even though the symptoms were predominantly

18 though not exclusively depressive, that might have been some

19 of the early indications of bipolar disorder at that time.

20 **Q**   So moving forward to the year 2000, what medications is

21 Mr. Kara prescribed in this period of time?

22 **A**   In the year 2000, he was prescribed Depakote, which was

23 the mood stabilizer; Seroquel, which is an antipsychotic that

24 is sometimes used in the treatment of bipolar disorder;

25 Zyprexa, an anti-psychotic that is used in the treatment of

1    bipolar disorder; Topamax, another anti-convulsant that is

2    used for both mood stabilization and symptom reduction; and

3    Lithium, which has been used for bipolar disorder -- well, the

4    first trials were 1955, and it was authorized for use for that

5    reason in this country in 1975.

6            **MR. REEVES:**  Your Honor, I'm sorry for the

7    interruption.  I don't know that I have a complete exhibit.

8    Because if he's testifying from 696, that's not on what I

9    have.  Can I just confer for a moment?

10           **THE COURT:**  Yes.

11      (Off-the-Record discussion between counsel)

12           **MR. REEVES:**  Thank you, Your Honor.

13   **BY MS. MOEEL:**

14   **Q**   With respect to your answer just a moment ago about what

15   Mr. Kara was prescribed in the year 2000, are you testifying

16   based on your memory, or are you testifying based on

17   Exhibit 696?

18   **A**   No, I'm testifying -- I created 696, but there was another

19   one that I created that I forwarded, having to do with a more

20   chronological approach, that I hoped -- I made five copies.

21           **MS. MOEEL:**  Your Honor, may I approach, please?

22           **THE COURT:**  Yes.

23      (Off-the-Record discussion)

24           **MS. MOEEL:**  Sorry, didn't realize the witness was

25   looking at a different exhibit.

1    **THE COURT:**  Okay.

2        (Off-the-Record discussion between counsel)

3    **THE COURT:**  Let me clarify for the Record, does that

4    also include his testimony based on the 1993-95-99 time frame

5    as well?  Because that wasn't in 696.

6    **MS. MOEEL:**  Right.

7    **BY MS. MOEEL:**

8    **Q**  And --

9    **A**  That's correct.

10   **MS. MOEEL:**  Yes.  And, Your Honor, what I've just

11   handed to the Court is Exhibit 697, Defendant's Exhibit 697,

12   which is identified for the Record, and government counsel

13   also has a copy.

14   **THE COURT:**  All right.

15   **BY MS. MOEEL:**

16   **Q**  Going back to the medications that Mr. Kara was taking in

17   2000, what does the fact that he was on Depakote and Zyprexa

18   tell you about what Mr. Kara may have been experiencing at

19   this time?

20   **A**  Well, reasoning backwards just from this, it was clear

21   that whoever prescribed them thought he needed at least four

22   medications to stabilize his symptoms.  And that's in contrast

23   with other patients who have bipolar disorder where really

24   only one medication is necessary.

25   **Q**  What about moving forward to 2001, what medication does

1    the record indicate he was being prescribed?

2    **A**    He was prescribed all of those medications.  And, but in

3    addition, he was also -- well, there's a note that he was both

4    self-medicating with Prozac, but also that it was prescribed

5    for him, actually.  And that's, that's also in the medical

6    records.

7         Also, in 2001, let's see, he was continued yet on both

8    Lithium and Depakote, and was continued on all the other

9    medications.

10        (Witness examines document)

11   **Q**    I'm going to ask you a few questions about this in a

12   moment, but does the progression of the medications that

13   Mr. Kara was prescribed tell you something about the severity

14   of his illness over time?

15   **A**    It does tell me that -- that his illness had certainly

16   progressed in severity -- or this would be a piece of

17   evidence, as it were, a strong log on that fire, that his

18   illness had progressed.  Because prior to the year 1999, he

19   had not needed two antipsychotic medications in tandem with

20   two mood-stabilizing medications that were not antipsychotics.

21   **Q**    Now, a few questions, once we get more to the current day,

22   I'm going to ask you that question again, with some further

23   opinion on your part.

24        I guess the question now is:  Does the progression of his

25   medication also tell you, potentially, something about what

1    his neurocognitive functioning may have been with the

2    progression of his illness?

3    **A**    I don't -- I don't think it says much about the specific

4    aspects of his neurocognitive functioning at that time, but I

5    would add that any of those medications can severely affect

6    neurocognitive functions.

7    **Q**    With that, let's move forward to about 2003.

8         Were there additional medications that Mr. Kara was

9    prescribed in 2003, apparently for the first time?

10   **A**    Actually, I misspoke about one aspect of 2002.  At that

11   point, a medication called carbamazepine, or Tegretol, was

12   also started, and continued through 2003, which is yet another

13   yet another anti-convulsant mood-stabilizing medication.

14        And during that time he had also self-medicated with

15   Effexor, which is another anti-depressant, during that time,

16   analogous to the self-medication described in the year 2001,

17   with Prozac.

18   **Q**    By the time we get to 2004, is Mr. Kara taking, one,

19   Topamax?

20   **A**    Yes, he is.

21   **Q**    Seroquel?

22   **A**    Yes.

23   **Q**    Zoloft?

24   **A**    Yes.

25   **Q**    And, Tegretol?

 1   **A**    Yes.

 2   **Q**    Given that he was already on some of these type of

 3   medications, what, what indication does it present to you that

 4   these additional medications were added around this time?

 5   **A**    It means that his evaluating psychiatrist or clinicians

 6   felt that, in order to keep Mr. Kara on a more even keel, to

 7   the point where symptoms would not intrude, that all of these

 8   medications were not -- were necessary, and that one or two or

 9   three just weren't going to do it.

10        (Reporter interruption)

11             **THE WITNESS:**  Were not going to do it.

12   **BY MS. MOEEL:**

13   **Q**    Can you tell us a little bit about Tegretol?

14   **A**    Yes.  Tegretol is an anticonvulsant medication -- it's

15   been used by neurologists also for seizures -- like Depakote

16   and like Topamax.  And it is a potentially toxic medication

17   because it is known to have depressing effects on the bone

18   marrow.  And, and so then, I can't speak to the specific minds

19   of the doctors who prescribe it, but because that side effect

20   of Tegretol is fairly well known, one usually only drags that

21   one out when the risk of symptomatic exacerbation of bipolar

22   disorder is worth taking the chance of Tegretol's effect on

23   the bone marrow.

24   **Q**    I would like to ask you some specific questions about

25   Mr. Kara's prescription in 2005, and his refilling of that

1    prescription.

2        Do the pharmacy records indicate, for January of 2005,

3    that Mr. Kara was prescribed Seroquel?

4    **A**    They certainly do.

5    **Q**    And do you have the first date in 2005 that Mr. Kara was

6    prescribed Seroquel?

7    **A**    Yes.  January 19th of 2005.

8    **Q**    And how many tablets of Seroquel did he get?

9    **A**    300.

10   **Q**    And, how many tablets was he supposed to take a day?

11   **A**    Five tablets.

12   **Q**    All right.  So, is that a 60-day supply?

13   **A**    It is.

14   **Q**    All right.  Then, was he prescribed Seroquel again,

15   shortly after January 19th?

16   **A**    Yes.  He was prescribed Seroquel on January 26th, one week

17   later.

18   **Q**    And one week later, how many additional pills was he able

19   to get?

20   **A**    800.

21   **Q**    And -- doing some really basic math here, is that a

22   160-day supply?

23   **A**    I will defer to your basic math, Counsel.

24   **Q**    Okay.  It's whatever 800 is divided by 5.

25   **A**    Yes, 160.  Okay, just --

 1   **Q**   Okay.  Then, is that unusual to have received such a large

 2   amount of supply within one week, in your opinion?

 3   **A**   Extremely unusual.

 4   **Q**   Then in March of that same year, 2005, does Mr. Kara get

 5   even more Seroquel?

 6   **A**   Yes.

 7   **Q**   And when is the first record, in March, of his

 8   prescription for Seroquel?

 9   **A**   March 11, 2005.

10   **Q**   And how many tablets did he get on that day?

11   **A**   He gets another 500 tablets on that day.

12   **Q**   Is that a 100-day supply?

13   **A**   It is.

14   **Q**   And three days later, on March 14th, is he prescribed

15   Seroquel again?

16   **A**   Yes.

17   **Q**   And, how many tablets does he get on that day?

18   **A**   He gets another 300 tablets on that day.

19   **Q**   Okay.  Now, is that unusual, to you?

20   **A**   Yes.

21   **Q**   And for the same reason?

22   **A**   Absolutely --

23   **Q**   Well, why is that unusual to you?

24   **A**   Because usually one does not supply 160 days of a

25   medication when a 160-day supply was -- was granted only 6

1   weeks prior, or 40-something days, give or take.

2   **Q**   Now, was he prescribed more Seroquel in June of 2005?

3   **A**   He was.

4   **Q**   Was that even though he should have had at least far more

5   supply days left for his Seroquel, based on his March and

6   January prescriptions?

7   **A**   Yes.

8   **Q**   Was he prescribed even more in August?

9   **A**   He was prescribed 500 tablets again in June, and -- of

10  2005 -- and another 500 on August 21st, and another 400 on

11  August 24th.

12  **Q**   All right.  Now, moving forward to the year 2006, what

13  medications was Mr. Kara prescribed only -- or earlier that

14  year, in 2006, starting with January?

15  **A**   Okay.  He was still on Seroquel.

16      (Witness examines document)

17  **A**   He was on Topamax; and he was on Zoloft; and I believe he

18  was on carbamazepine, as well, or Tegretol.

19  **Q**   Was he on Tegretol, was he prescribed Tegretol in January

20  of 2006?

21  **A**   Yes, he was.

22  **Q**   At what dosage?

23  **A**   In January, this would have been on January 23rd, he was

24  prescribed 4 tablets daily, and was given a 180-day supply.

25  **Q**   Now, is there anything of the dosage of Tegretol that

1    indicates anything of significance to you?

2    **A**    Yes.    180 tablets, at a dose of four per day, at that

3    point he would have only had enough for 45 days, and yet he

4    doesn't refill his prescription for Tegretol until May 16th.

5    And, and, so that -- that's 120 days.

6    **Q**    If one is on a medication like Tegretol for a sustained

7    period of time or for some time, and then has a period in

8    which they stop taking it, are there any potential side

9    effects that could negatively impact their treatment?

10   **A**    Well, there certainly are.    First of all, there can be

11   withdrawal symptoms from those medications.    So, for example,

12   in my experience, withdrawal from anti-convulsant medications,

13   they are pretty much designed to make the brain considerably

14   less irritable.    One can then have a kind of rebound or reflex

15   irritability of the brain that can then -- that then can lead

16   to the recurrence of symptoms.

17   **Q**    And the recurrence of symptoms, such as what?

18   **A**    Such as any manic symptoms, such as difficulty controlling

19   one's emotions, temper; ability to regulate one's mood;

20   ability to refrain from impulsive, poorly-considered actions;

21   ability to be able to keep up with one's own thoughts; and

22   associated symptoms of mania.

23   **Q**    And might it also trigger delusional thought experiences?

24   **A**    It certainly could.

25   **Q**    In February of 2006, is Mr. Kara described Abilify?

1   **A**   He is.

2   **Q**   Is there also an indication in this record that, during

3   this period of time, Mr. Kara is taking opiates?

4   **A**   There is that indication, yes.

5   **Q**   And is there anything significant to you about the fact

6   that he was also taking opiates along with his medications for

7   bipolar?

8   **A**   Well, it is significant.  Even though they were prescribed

9   medications, opiates can also interfere with the ability to

10  regulate one's mood.  And opiates can also interfere with

11  one's ability to process cognitively.

12  **Q**   Okay.  Now, in March of 2006, if you could focus your

13  attention to March of 2006, was Mr. Kara prescribed Topamax in

14  this period?

15  **A**   Yes, he was.

16  **Q**   On March 27th, was he prescribed 250 tablets?

17  **A**   Yes, he was.

18  **Q**   And on March 30th, 500 tablets?

19  **A**   Yes, he was.

20  **Q**   And March 31st, the next day, another 500 tablets?

21  **A**   Yes.

22  **Q**   And is the prescription of these -- of this medication

23  with this regularity significant to you in any way?

24  **A**   Well, it's significant insofar as he now has 1,250 Topamax

25  tablets that were prescribed over a four-day period, where the

1    instructions with regard to Topamax at that time were to take

2    them five a day.  So, doing the math on that, he gets a

3    250-day supply, somehow, in a four-day period.

4    **Q**    What are some of the side effects of Topamax, Dr. Victor?

5    **A**    Side effects of Topamax can be sedation, feeling slowed,

6    lethargic, but also some subjective sense of confusion, and

7    particularly difficulty with one's memory.

8    **Q**    Let's talk about Mr. Kara's prescription for Zoloft in

9    2006.  In July of 2006, was he prescribed Zoloft?

10    **A**    Yes.

11    **Q**    And, what was that prescription?

12    **A**    On July 29th, he was given 200 tablets.

13    **Q**    On August 28, 2006, was he given another medication; was

14    he prescribed another medication that acts like Zoloft?

15        (Witness examines document)

16    **A**    Actually, it's just the generic form of Zoloft.  So, he

17    was prescribed sertraline, which is just generic Zoloft.  So

18    on July 29th, he's prescribed 200 tablets of Zoloft, which,

19    given that he was instructed to take it two per day, would

20    have been a 100-day supply.

21        And then, ballpark, thirty days later, he gets another

22    100-day supply.  And then, at the risk of anticipating your

23    next question, he gets another 100-day supply, ten days later.

24    **Q**    All right.  So, in a period of 42 days, does he get a

25    300-day supply from July 29th until September 8th?

```
 1  A   Yes.  He gets 600 tablets of Zoloft, or sertraline generic
 2  equivalent; over the course of a little bit over a month, he
 3  gets a 300-day supply.
 4  Q   Okay.  Now, I'm going to skip forward, luckily for
 5  everyone, to July of 2013.
 6      Are you familiar, based on your review of the records in
 7  this case that you described at the beginning of your direct
 8  testimony, what Mr. Kara was taking in July of this year?
 9  A   Yes.  But I will need to get one more sheet of notes out,
10  just because there's a number of medications.
11          MS. MOEEL:  Okay.  If I may approach, Your Honor?
12          THE COURT:  Yes.
13          THE WITNESS:  There we go.  Actually, I don't need to
14  get notes, I can take it right from the -- from his testimony.
15      (Off-the-Record discussion between Counsel and Witness)
16          MS. MOEEL:  Your Honor, if I may?
17          THE COURT:  Yeah.
18          MS. MOEEL:  Okay.  And Dr. Victor is looking at
19  Defendant's Exhibit, marked for identification, 664.
20  BY MS. MOEEL:
21  Q   And that, Dr. Victor, is the prior testimony of Mr. Kara?
22  A   From July 19th of this year, yes.
23  Q   Okay.  And based on your review of that, what medications
24  was Mr. Kara taking at the time?
25  A   He was taking Tegretol at 400 milligrams; Topamax at 1,000
```

1    milligrams -- this is what Mr. Kara said he was taking, by the

2    way -- Geodon, which is an anti-psychotic medication that is

3    sometimes used in the treatment of bipolar disorder, at 400

4    milligrams; Abilify, which is also an antipsychotic medication

5    used to treat schizophrenia and sometimes to use, bipolar

6    disorder, 20 milligrams.

7    **Q**    In your experience, what does the number of medications

8    and this combination of medications tell you about what the

9    severity of Mr. Kara's illness could have been in this period

10   of time?

11   **A**    One would not prescribe this many potentially quite toxic

12   drugs, and these relatively high dosages, if Mr. Kara were not

13   adjudged, um, to be potentially quite at risk for recurrence

14   of more debilitating manic symptoms.

15   **Q**    Let's take, for example, his prescription for Topamax,

16   which you said was 200 milligrams, five times a day; is that

17   right?

18   **A**    That's correct.

19   **Q**    What is the maximum that you have prescribed, for a

20   patient, of Topamax?

21   **A**    The maximum I have ever prescribed was 400 milligrams, and

22   that was just on one occasion.  When I use that medication, it

23   usually winds up being between 50 and 150 milligrams.

24   **Q**    And so this dosage, 1,000 milligrams of Topamax a day, is

25   about two and a half times more than the max you have ever

 1    prescribed.

 2    **A**    The max that I have ever prescribed, and I've seen studies

 3    where the limit tends to be about 375.

 4    **Q**    Okay.  Do you have an opinion about how these medications

 5    could have affected Mr. Kara's neurocognitive functioning?

 6    **A**    Yes.  Because these medications are all associated with

 7    adverse effects on neurocognitive functioning, but

 8    particularly the Topamax, and I would add that the effects of

 9    these medications on neurocognitive functioning are -- are

10    dose-related, so the higher the dose, the more likely the

11    effect on cognitive functioning.

12    **Q**    Let me back up here for a second.

13          What is neurocognitive functioning?

14    **A**    Neurocognitive functioning has to do with an evaluation

15    less of how somebody feels than how they think, and whether

16    they know where they are, whether they can remember things,

17    whether they can pay attention, whether they can organize

18    themselves appropriately for certain tasks, whether they can

19    perform certain cognitive tasks -- or, I'm sorry, you know,

20    certain tasks that require certain kinds of thinking, be it

21    kind of verbal, logical kind of thinking, or nonverbal, more

22    egoistic kind of thing.

23    **Q**    Now, was there anything in Dr. Shields' report that

24    indicated to you that he undertook an evaluation of Mr. Kara's

25    neurocognitive functions?

1   **A**   Yes, there was.

2   **Q**   What was that?

3   **A**   Dr. Shields administered the Wechsler Adult Intelligence

4   Scale, to Mr. Kara, as well as the Wechsler Memory Scale, as

5   well as the Reynolds intelligence assessment scale -- I think

6   that is what it's called, the gentleman's name is Reynolds --

7   and he administered all three of those tests.

8   **Q**   And are these standard tests in the field to determine

9   neurocognitive functioning based on objective standards?

10   **A**   Yes.

11   **Q**   What were the results of Dr. Shields' testing?

12   **A**   The results of Dr. Shields' testing -- which, as I

13   understand it, were completed in 2010 -- were that

14   according -- that his overall cognitive functioning, as

15   measured by the Wechsler scale, was in about the 16th

16   percentile.  I think the Reynolds index was something closer

17   to the 12th.

18   And, if I may, I'm going to have to look up the Wechsler

19   Memory Scale results.

20   **Q**   And are you looking at Dr. Shields' report to refresh your

21   recollection?

22   **A**   I am.

23   **Q**   And that is identified as Defendant's Exhibit 659.

24   (Witness examines document)

25   **A**   And the Wechsler Memory Scale, he came in at about the

1    14th percentile, and that there was a particular decline in

2    his perceptual organizational ability, which was listed to be

3    at the fifth percentile.

4    Q    And do those objective tests, and Dr. Shields' conclusion

5    about what the -- the results mean, do they indicate on a

6    spectrum how -- whether there had been a cognitive decline in

7    Mr. Kara's ability for -- to recall or to -- his short-term

8    memory, I suppose?

9    A    That was certainly Dr. Shields's conclusions, and one that

10   I concur with, and for a lot of the same reasons, that, you

11   know, Mr. Kara has a degree in toxicology, had -- had done

12   well academically, and was able to run his own business, um,

13   but that somebody who is able to do all that at one point was

14   not functioning at these fairly low percentiles from a

15   cognitive standpoint; which, therefore, indicated that during

16   the course of the years, his cognitive functioning had

17   declined.

18   Q    And, is this conclusion that his cognitive functioning had

19   declined over some period of time, at least as seen in 2011,

20   is that consistent with your understanding of how some of

21   these medications we have talked about might affect his

22   neurocognitive functions?

23   A    It is both consistent with how the medications might

24   affect the neurocognitive functioning, as well as the fact

25   that there is some studies that say that one can see deficits

VICTOR - CROSS - REEVES

```
 1    in verbal memory, in particular, with -- with somebody

 2    being -- having bipolar disorder, irrespective of whether they

 3    are manic or depressed.

 4              MS. MOEL:   Thank you.

 5         Your Honor, one moment, please?

 6              THE COURT:   Yes.

 7         (Off-the-Record discussion between counsel)

 8              MS. MOEL:   Thank you, Your Honor.  I have no more

 9    questions.

10              THE COURT:   All right, thank you.

11         Cross-examination?

12         (Off-the-Record discussion between counsel)

13              MS. MOEL:   Your Honor, may I approach?  I'm sorry.

14              THE COURT:   Yes.

15         (Off-the-Record discussion)
```

**CROSS EXAMINATION**

```
17    BY MR. REEVES:

18    Q    Good afternoon, Dr. Victor.

19    A    Good afternoon.

20    Q    My name is Adam Reeves.  I'm an Assistant U.S. Attorney.

21    We haven't met before, have we?

22    A    We have not.

23    Q    How are you today?

24    A    Good, thanks.  How are you?

25    Q    Good.  Do doctors always agree?
```

VICTOR - CROSS / REEVES

1   **A**   No, they don't.

2   **Q**   Okay.  Have you disagreed with a diagnosis of other

3   doctors in the course of your practice as a -- as a treating

4   psychiatrist?

5   **A**   I certainly have.

6   **Q**   On many occasions?  Is that fair to say?

7   **A**   Um, over the course of 30 years, I would -- I think that's

8   fair to say.

9   **Q**   Do you think doctors disagree as often as lawyers

10  disagree?

11  **A**   Uh, I don't think I would be a competent expert witness on

12  lawyers' disagreement.

13  **Q**   Okay, fine.

14           **THE COURT:**  That's a fair answer.

15           **MR. REEVES:**  That is a fair answer, and I'll accept

16  it.

17  **BY MR. REEVES:**

18  **Q**   I would like to ask some questions about the

19  prescriptions.

20  **A**   Yes, sir.

21  **Q**   You, in the course of your testimony, have remarked on the

22  extent to which Mr. Kara is receiving a lot of prescribed

23  medications for his bipolar disorder.  Correct?

24  **A**   Yes.

25  **Q**   And, those were all prescriptions prescribed by his

VICTOR - CROSS / REEVES

1    treating physicians, were they not?

2    **A**    That's correct.

3    **Q**    All right.  And, you're not familiar with the actual

4    specifics of the circumstances associated with the decisions

5    of Mr. Kara's treating physicians to prescribe the amounts

6    that they prescribed at the time that they prescribed it, are

7    you?

8    **A**    Not the amounts prescribed, say, for example, the 500 or

9    300 at a time.

10   **Q**    But that was the focus of a lot of your testimony, so

11   that's the thrust of my question.

12       You don't -- in other words, you don't know what the other

13   doctors thought might justify those amounts of those

14   prescriptions at the times that they did.

15   **A**    That's correct.  I don't.

16   **Q**    And do you leave open the possibility that that could be a

17   principled disagreement between you and other treating

18   physicians for Mr. Kara at that particular time?  As to the

19   amount of the dosage.

20   **A**    I -- I'm sorry, I don't think I understand the question,

21   in terms of that I -- is it that I would disagree with the

22   amounts prescribed?

23       Is that -- I'm sorry, I didn't quite get the question.

24   **Q**    That's fine.  I'll ask it again.

25   **A**    Thanks.

1  **Q**   The other treating physicians that Mr. Kara had at that

2  time --

3  **A**   Yes.

4  **Q**   Okay.  Do you leave open the possibility in your mind that

5  they could have had medically well-justified reasons for

6  prescribing the amounts that they did at the time that they

7  did, that are at this point not well known to you?

8  **A**   I can't think of any reason why 500 tablets of a

9  potentially toxic medication would ever be prescribed to

10  somebody with a history of suicide attempts, inconsistent

11  compliance, and impulsive behavior.

12  **Q**   Okay.  Are you being paid for your testimony today?

13  **A**   I'm not -- what -- not being paid for my testimony.  I'm

14  being paid for my time.

15  **Q**   Are you paid to help the Defendant, Bassam Salman, in this

16  case?

17  **A**   I'm not paid to help the Defendant above and beyond my

18  best review of -- of the material, and I would tell the same

19  thing to whatever side hired me.

20  **Q**   Well, you're not here for free, are you?

21  **A**   I'm being paid for my time.

22  **Q**   Okay, so that's my question.  My question --

23  **A**   That is different from testimony.

24  **Q**   My question is how much you are being paid.

25  **A**   I am being -- I'm being paid at $400 an hour.

VICTOR - CROSS - REEVES

1   **Q**   Okay.  And, do you have a retainer in this matter?

2   **A**   I had a five-hour retainer given to me in June of 2013, of

3   $2,000.

4   **Q**   And do you have a total retainer of approximately $10,000

5   that you're drawing down on in this matter?

6   **A**   Uh, not exactly.  That's not the total retainer, because

7   the 10,000 was not paid up front.

8   **Q**   You are authorized to bill up to $10,000, are you not?

9   **A**   I'm authorized to bill up to $10,000, after August 1st of

10  this year.

11  **Q**   Okay.  Well, we're after August 1st of this year.

12  **A**   Yes.

13  **Q**   So, what does that mean?

14  **A**   Okay.  What that means is that apparently there was a

15  shortage of funds for the defense, and beyond August 1st, I

16  agreed to cap my fees at $10,000 for any and all services

17  after August 1st.

18  **Q**   And so, who is the person that's ultimately paying your

19  fee today?

20  **A**   Um, I'm not sure, because my arrangement is with

21  Ms. Shifman, and she's the writer of the checks.

22  **Q**   Okay.  Let's talk about the Shields report, if we could,

23  please.

24  **A**   Yes.

25  **Q**   Do you have a copy up there?

VICTOR - CROSS / REEVES

1   **A**   I do.

2   **Q**   Did you carefully review the Shields report?

3   **A**   I did.

4   **Q**   And you understand, do you not, that this was a report

5   that was ordered by the Court relating to the competency of

6   Mr. Michael Kara?

7   **A**   I do.

8   **Q**   And you understand further that the Court directed

9   Dr. Shields to conduct his evaluation in order to inform the

10   Court about whether Mr. Kara was competent to enter a plea of

11   guilty.

12   **A**   That's my understanding, yes.

13   **Q**   All right.  And, in fact, on the first page of the report,

14   there's a clear definition of the standard that Dr. Shields

15   was instructed to follow in order to perform this function for

16   the Court.

17         Do you understand that?

18   **A**   I do.

19   **Q**   And that standard is that the question that Dr. Shields

20   was asked to answer is whether the Defendant may presently be

21   suffering from a mental disease or defect rendering him

22   mentally incompetent to the extent that he's unable to

23   understand the nature and consequences of the proceedings

24   against him, or to assist in -- properly in his defense.

25         Is that your understanding of the standard that

VICTOR – CROSS / REEVES

1  Dr. Shields was seeking to answer for the Court in his

2  evaluation?

3          MS. MOEL:  Your Honor, I'm going to object, as it

4  calls for legal speculation, and also outside the scope of

5  direct testimony.

6          THE COURT:  Overruled.  You can ask the question.

7  Goes to his understanding.

8          THE WITNESS:  That is my understanding, yes.

9  BY MR. REEVES:

10  Q   All right.  And, Dr. Shields performed that function in

11  the court, by carrying out his evaluations of Michael Kara

12  over repeated visits, is that correct?

13  A   That's correct.

14  Q   And he spent a lot of time, is that fair to say, in the

15  course of his evaluation of Mr. Kara during the course of year

16  2010, right?

17  A   That's correct.

18  Q   And Dr. Shields reached certain conclusions, some of which

19  you agree with, do you not?

20  A   That's correct.

21  Q   All right.  Directing your attention to the -- toward the

22  end of the report, on Page 22 of 23, for example, Dr. Shields

23  came to the conclusion to the following question:

24          "Is Mr. Kara presently capable of understanding the

25          nature of the proceedings against him?"

1          "ANSWER:  It is the evaluator's opinion that

2          Mr. Kara does demonstrate understanding of

3          the nature of the proceedings against him."

4     Right?

5   **A**   That's correct.

6   **Q**   All right.  And part of the evaluation that Dr. Shields

7   undertook involved a consideration of Mr. Kara's

8   post-traumatic stress disorder symptoms.  Correct?

9   **A**   That is correct.

10  **Q**   All right.  And that contributed -- withdrawn.

11       The post-traumatic stress disorder contributed to some of

12  the mental health symptoms that Michael Kara experienced in

13  the course of his lifetime.

14  **A**   I believe that that's the conclusion that Dr. Shields came

15  up with, but I really couldn't speak to that.

16  **Q**   Okay.  Thank you.  Dr. Shields further concluded that, in

17  response to the following question from the Court to him, "Is

18  Mr. Kara presently capable of understanding the consequences

19  of the proceedings against him," on Page 23 of 23, his answer

20  is:

21          "It is the evaluator's opinion that Mr. Kara does

22          demonstrate understanding of the consequences of the

23          proceedings against him."

24       Is that correct?

25  **A**   That's correct.

VICTOR - CROSS / REEVES

1    Q    All right.  And, the fourth question from the Court to

2    Dr. Shields was (As read):

3              "Is Mr. Kara able to assist his attorneys -- attorney

4              -- properly in conducting his defense?"

5              "ANSWER:  It is this evaluator's opinion that

6              Mr. Kara does demonstrate an ability to

7              assist his attorney properly in regard to the

8              proceedings against him."

9         Was that his conclusion?

10   A    That was, indeed.

11   Q    Excuse me?

12   A    That was, indeed.  Yes, sir.

13   Q    Okay.  Good.  And, as part of that paragraph, the part

14   that I want to draw your attention to, Dr. Shields also came

15   to the following conclusion.  Quote:

16              "Based on the more than two dozen hours spent with

17              Mr. Kara over the course of the present evaluation,

18              it was apparent to this evaluator that Mr. Kara's

19              psychiatric status is presently well..."

20        I'm sorry.

21              "...is presently in a well-controlled state of

22              remission, and that his mental faculties are such

23              that he is able to converse appropriately and

24              rationally about his case."

25        Was that Dr. Shields' conclusion?

VICTOR - CROSS - REEVES

1    **A**    That was Dr. Shields' conclusion.

2    **Q**    Now, you understand that, thereafter, Michael Kara did

3    enter a plea of guilty before this Court.  Do you have that

4    understanding?

5    **A**    I do.

6    **Q**    Okay.  Now, I want to talk about the time when you were

7    first retained to work on behalf of the Defendant, Bassam

8    Salman.

9        You are aware, are you not, that counsel for Bassam Salman

10   moved to compel another examination of Michael Kara in or

11   around 2013, prior to this proceeding.  Is that correct?

12          **MS. MOEEL:**  Objection, Your Honor.  This is beyond

13   the scope.

14          **THE COURT:**  Overruled.

15          **THE WITNESS:**  Yes.

16   **BY MR. REEVES:**

17   **Q**    You know that they were seeking to order another

18   evaluation.  Correct?

19   **A**    I am aware of that.

20   **Q**    And as a matter of fact, you were providing advice to

21   counsel for the Defendant about the possible need for an

22   additional examination.  Correct?

23   **A**    That is correct.

24   **Q**    And I would like to show you, if I could -- bear with me

25   one second.

1       Okay.  You were asked by Counsel for the Defendant to

2  prepare, I think, three different declarations over the course

3  of the summer, relating to their request for an examination of

4  Mr. Kara.  Right?

5  **A**   That is correct.

6  **Q**   And, among other conclusions, your conclusion was that

7  another examination would be helpful in examining his status?

8       Is that correct?

9  **A**   I'm sorry, could you ask that question one more time?

10 Sorry.

11 **Q**   The question is, did -- at bottom, was it your

12 recommendation that there be another examination of Mr. Kara?

13 **A**   Yes.

14 **Q**   Okay.  And, did any such examination occur?

15 **A**   It did not.

16 **Q**   Do you know if the Court ever ordered any such examination

17 of Michael Kara?

18 **A**   My understanding was that the Court did not order that

19 examination.

20 **Q**   And thereafter, do you have an understanding whether

21 Michael Kara testified in this course of this trial?

22 **A**   My understanding is that Michael Kara did testify on

23 July 19th, and that he testified earlier this week.

24 **Q**   Okay.  For approximately three days?

25 **A**   I don't know how long.

VICTOR - CROSS / REEVES

1   **Q**   You don't know how long.  Okay.

2       Now, I heard you express, as part of your opinion, that

3   you agree that Michael Kara suffers from Bipolar I disorder.

4   Is that your medical opinion?

5   **A**   That is my medical opinion.

6   **Q**   In that way, do you concur with the testimony of Michael

7   Kara, himself, that he has Bipolar I disorder?

8   **A**   As far as that goes, yes.

9   **Q**   Okay.  Now, you were also asked some questions about the

10  neurocognitive memory tests, if I'm using my terms properly,

11  that Dr. Shields performed on Mr. Kara?

12      Do you recall that?

13  **A**   I do.

14  **Q**   And I think it was your conclusion that the -- those tests

15  reflect a decline in Mr. Kara's short-term memory?

16  **A**   Not quite.

17  **Q**   Okay.

18      (Witness examines document)

19  **A**   Um --

20  **Q**   I'll ask another question.

21  **A**   Okay, please.  Thanks.

22  **Q**   I'm going to show you what has been marked as Government

23  Exhibit 452, if I may, please.

24      All right.

25          **MR. REEVES:**  May I approach, please?

1          **THE COURT:**  All right.

2          **THE WITNESS:**  Thank you.

3      (Witness examines document)

4  **BY MR. REEVES:**

5  **Q**   I'm showing you what has been marked as Government 452,

6  for identification.

7      Were you aware that the Defendant in this case submitted

8  to the Court and to the government a proffer and summary of

9  your testimony in this matter, approximately two days ago, on

10  or about September 23rd, 2015?

11      Did you know that, Dr. Victor?

12  **A**   Um, I know that something was submitted about my

13  testimony.  I didn't know the specifics beyond that.

14  **Q**   Were you asked to contribute to the summarizing of your

15  testimony?

16  **A**   I think we had talked on the phone, but I did not write

17  it.

18  **Q**   Okay.  But you talked on the phone about it.

19  **A**   I think so.

20  **Q**   All right, good.  I would like to show you the third page

21  -- fifth page of the document, and ask if you formulated the

22  opinion in the last paragraph on the fifth page, that is as

23  follows.

24      Beginning in the middle of the last paragraph, on the

25  right-hand side, begins (As read):

1          "Dr. Victor will testify that Dr. Shields' objective

2          test results of Mounir Kara show that there is

3          evidence to suggest that Mounir Kara's cognitive

4          functioning, particularly with respect to his ability

5          to maintain short-term memory, was in a state of

6          neurocognitive decline at the time of Dr. Shields'

7          testing, as compared to his level of accomplishments

8          and education."

9      Do you see that?

10  **A**   I do.

11  **Q**   Your opinion, was it not, is that the testing of

12  Dr. Shields is that there was a decline in Mr. Kara's ability

13  to maintain short-term memory.

14      Is that correct?  Yes or no.

15  **A**   No.  It -- no.

16  **Q**   One last topic, I think.  In your testimony, Dr. Victor --

17  I'm done with that one.  I have a feeling you will have a

18  chance to answer your question in a minute.

19  **A**   Okay.

20  **Q**   All right.  So you can put that away.

21  **A**   Very well.

22      (Request complied with by the Witness)

23  **Q**   Thank you.  There was a part of your testimony in which

24  you talked about Page 7 of Dr. Shields' report.

25  **A**   Yes.

1    **Q**    And, you -- you said that Dr. Shields had found

2    indications of passivity by Michael Kara, for example.

3    **A**    I'm sorry, do you mean specifically with what I talked

4    about on Page 7 of his report?  Or --

5    **Q**    Well, I -- my notes indicate that it was in reference to

6    Page 7 of the report, which I'm happy to get out if you would

7    like to look.

8    **A**    No, no, I have it right here.

9    **Q**    Okay.

10   **A**    And I think that because -- only because I remember that

11   the passivity part was delineated specifically on what would

12   have been Page 13 of his report.  But his eagerness to please

13   others and to acquiesce to them, I believe was on Page 7.

14   **Q**    Okay.  Sounds like you know the report pretty well.  Is

15   that fair?

16   **A**    I think so.  I would like to believe so.

17   **Q**    Okay.  Good.  All right, good.

18        That there were indications that Michael Kara was passive,

19   that he was acquiescent, that he had difficulty asserting his

20   own needs in the face of others?  Do you recall that

21   testimony?

22   **A**    I recall that that testimony occurred in the context of

23   what objective testing data showed.  So the majority of that

24   would be on Page 13.

25   **Q**    And would those types of characteristics be symptomatic of

 1   a person with the type of mental illness that Michael Kara

 2   has?

 3   **A**   It would not, in and of itself, be symptomatic of somebody

 4   with a bipolar disorder.  People with very differing kinds of

 5   underlying personalities can develop bipolar disorder, just

 6   like people who develop diabetes can also have very different

 7   personalities.

 8   **Q**   And, you know, where do you come out with Dr. Shields'

 9   assessment of these characteristics involving Michael Kara?

10   Do you have any reason to dispute them?

11   **A**   I certainly do not.

12   **Q**   Okay.  So, are we moving from not disputing to maybe

13   agreeing that a person with his type of mental illness,

14   Bipolar I disorder, can exhibit these types (Indicating) of

15   characteristics?

16   **A**   I disagree, both that -- I disagree that that's what

17   Dr. Shields said about those characteristics.

18        So, for example, on Page 3 of the report, he talks about

19   notable underlying personality pathology, which, as I read it,

20   was a separate consideration, and not from the bipolar

21   disorder.  And not part and parcel of it.

22   **Q**   A separate -- I'm sorry, consideration?

23   **A**   I'm sorry.  A separate consideration.

24   **Q**   What do you mean by that?

25   **A**   By that, I mean that even if, for example, Mr. Kara's

1    bipolar disorder were adequately treated, yea, these 20 years,

2    that his underlying personality might yet be passive,

3    acquiescent, submissive to authority, and willingness to do

4    what somebody in authority wants him to do.  Because the

5    concept of personality has to do with underlying traits that

6    would be present, irrespective of the state, be it a depressed

7    state, a manic state, or a normal state.

8    Q    But do the Bipolar I -- does the fact -- withdrawn.

9         Does the fact that Michael Kara has the Bipolar I disorder

10   tend to accentuate those personality traits in any way?  When

11   he is manic, or when he is depressive, for example?

12   A    I would say that that kind of disorder can accentuate

13   preexisting traits.  But it doesn't necessarily accentuate

14   traits of passivity, deference to authority, willingness to do

15   what somebody else wants.  That that is not part and parcel of

16   a bipolar disorder.

17   Q    So, one last time through this.

18        I don't understand, then, if you would please explain, how

19   Dr. Shields's findings about Mr. Kara's personality traits

20   fits into the diagnosis, if it does, for a Bipolar I disorder.

21        Could you please enlighten me?

22   A    My reading of Dr. Shields' report is that it doesn't fit

23   into the diagnosis of Bipolar I disorder, so that -- on

24   Page 3, I believe, of his report.

25        (Witness examines document)

```
 1              MS. SHIFMAN:  Just for the record, is that 659-007?

 2              THE WITNESS:  It is.

 3              MS. SHIFMAN:  Okay.

 4              THE WITNESS:  Here we go, if I may refer you to the

 5    middle of the third bullet-pointed paragraph, where it says:

 6                   "Personality assessment also finds notable

 7                   pathology."

 8    BY MR. REEVES:

 9    Q    I'm on Page 3 of 23 --

10    A    Yes.

11    Q    Of Shields, the third full bullet point.  Go ahead.

12    A    Right.  So it would be one, two, three, four --

13    Q    "Personality assessment."

14    A    There we go, thanks.

15                   "Personality assessment also finds notable

16                   pathology."

17         Now, the phrasing of that question -- I'm sorry, the

18    phrasing of that sentence makes no reference to the

19    personality pathology as tied in to bipolar disorder.

20         And in general, reference to "personality pathology" in

21    psychiatry and psychology is a reference to something that

22    exists in parallel.

23         Now, I think it's reasonable to assume there can be back

24    and forth between a state disorder and a trait disorder, but

25    they are still considered separately.
```

VICTOR - CROSS / REEVES

1     And it is not true that the traits of the passivity, of

2    the acquiescence to authority, et cetera, can be considered

3    part and parcel of a bipolar disorder.  And in fact, those

4    traits will not be found in any diagnostic scheme of bipolar

5    disorder.

6    **Q**   My question is a different one.  My question is whether

7    the preexisting personality traits that you have discussed

8    Mr. Kara having can be accentuated in any way as a result of

9    his having bipolar disorder -- a desire to please, a -- a

10   passivity, a difficulty confronting others with his --

11   asserting his own needs in the face of others -- whether

12   there's anything about his illness that would make him more

13   susceptible, in a sense, to those preexisting personality

14   traits.

15   **A**   Okay, I may have misunderstood that, then.  In which case,

16   I would say, rather than being part and parcel of a bipolar

17   disorder, certainly the depressive phase can, in theory, but

18   does not always exacerbate those kinds of feelings, because

19   one considers oneself more helpless, in that state.

20       But it is not consistent, necessarily, with the traits

21   that would be exacerbated by being in the manic phase.  In

22   fact, quite the reverse.  And, so, some people like their

23   manic phases, because they experience themself as more

24   powerful, less in need of deferring to others, when in a manic

25   state.

VICTOR - CROSS / REEVES

1    **Q**    Thank you.  Just a couple more questions.  I want to focus

2    on the depressive stage.

3        If we assume, hypothetically, Mr. Kara was in a depressive

4    stage, a very depressed stage, would the fact that he had

5    bipolar symptoms have made him more vulnerable, more

6    susceptible, to people insisting on him doing certain things,

7    and in that sense, put him in a position where they could take

8    advantage of his passivity, his acquiescence, his difficulty

9    in asserting his own needs in the face of others, when he is

10   very depressed and suffering from bipolar?

11       That would happen, would it not?

12   **A**    I would say there would be a chance of that happening.

13   But it is not axiomatic, necessarily, that it would.

14           **MR. REEVES:**  Thank you.  Nothing further.

15           **THE COURT:**  Any further redirect?

16           **MS. MOEL:**  No more questions, Your Honor.  Thank

17   you.

18           **THE COURT:**  Thank you, Dr. Victor.  You may step

19   down.  Thank you.

20       (Witness excused)

21

22

23

24

25

1

2                         **I N D E X**

3

4

  **VICTOR, M.D., BRUCE SCOTT**
5 (SWORN)                                        2      1
  Direct Examination by Ms. Moeel              3      1
6 Cross Examination by Mr. Reeves             38      1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball

Thursday, September 26, 2013

Belle Ball, CSR 8785, CRR, RDR